YM

FILED
JANUARY 7, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

08 C 139

JUDGE GOTTSCHALL
MAGISTRATE JUDGE KEYS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation,** | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) ) | |
| **CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company,** | ) ) ) ) ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, MacNeil Automotive Products Limited, by its undersigned attorneys, for its Complaint against Defendant Cannon Automotive Limited f/k/a Cannon Rubber Limited, Automotive Division, alleges as follows:

### PARTIES

1. Plaintiff MacNeil Automotive Products Limited ("MacNeil") is a corporation organized under the laws of the State of Illinois with a principal place of business located at 2435 Wisconsin Street, Downers Grove, Illinois 60515-4018. MacNeil is a manufacturer and supplier of automotive accessories including, among other things, floor liners and mats.

2. Upon information and belief, Defendant Cannon Automotive Limited ("Cannon") is a corporation organized under the laws of England and Wales with a principal place of business located at 881 High Road, Tottenham, London N17 8EY, England. Cannon is a manufacturer and supplier of rubber floor mats for automotive vehicles.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 (a)(2) as this is an action between a citizen of a State and a citizen or subject of a foreign state wherein the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. This Court has personal jurisdiction over Cannon due to Cannon's systematic and continuous business connections and contacts with Illinois.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 (a)(2) in that a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## FACTUAL BACKGROUND

5. Cannon has been engaged in the business of manufacturing floor mats for automobiles for about 60 years. MacNeil was founded as a supplier of floor mats for automobiles by David F. MacNeil in 1989. MacNeil and Cannon began doing business together soon thereafter. Since 1989, and until very recently, MacNeil has engaged Cannon as a supplier of rubber floor mats which MacNeil has then resold to end users, including automobile manufacturers, in the United States.

### I.   Cannon's Defective Hyundai Floor Mats

6. In or about May, 2004, Hyundai Motors America, Inc., ("HMA") the American division of Korean auto manufacturer Hyundai Motors Corporation ("Hyundai"), awarded MacNeil a contract to supply Hyundai with composite floor mats which consisted of a molded rubber base with a carpet insert thermally bonded into a cavity in the rubber mat. The mats were to go in all Hyundai Tucson vehicles delivered to U.S. ports and to be sold in the United States.

7.      Because MacNeil had experienced problems with an earlier composite floor mat manufactured by Cannon for Land Rover, MacNeil's Vice President, Allan Thom, traveled to England in May of 2004 to meet with Cannon representatives to address concerns over potential problems with the Hyundai program.  Specifically, Messrs. Thom and MacNeil were concerned about potential adhesion problems between the carpet and the rubber mat.  Cannon's representatives assured Mr. Thom that Cannon could manufacture a quality mat with carpet that properly adhered to the mat, that Cannon's mats would meet MacNeil's and Hyundai's expectations of quality, and that Cannon's mats would be suitable for their purposes.  Bob Peacock, Cannon's Operation Manager, even remarked during the 2004 meeting that Cannon had "learned a lot from the Land Rover days" referring to the earlier composite floor mat program.

8.      Production of the tooling for the Hyundai composite floor mats began in about early June 2004 at Cannon.  Additionally, MacNeil shipped approximately 52 compression mold sets over to Cannon, valued at about $2,800,000 currently, for the production of its WeatherTech™ brand of floor mats.  These tools sets were designed and built in-house by MacNeil at its facilities in Downers Grove.  A compression mold set for the rubber floor mats can be described as similar to a waffle iron that closes on the rubber and creates the shape/design of a floor mat.

9.      MacNeil received the first shipment of Hyundai Tucson mats from Cannon in about late August 2004.  Upon inspection of the first crate of mats, MacNeil found that over 87% of the mats showed major flaws in carpet adhesion and cracked corners in the rubber.  In response, MacNeil overnighted samples of the defective mats to Cannon and e-mailed pictures of the mats as well, demanding that Cannon remedy the situation.

10. On or about August 31, 2004, MacNeil requested that Cannon send its production manager and quality control inspectors to MacNeil to inspect the mats firsthand and to repair, if possible, the defective items. MacNeil needed to have the defects repaired, rather than to have the mats replaced, because it was due to ship the mats to HMA immediately. Cannon refused to send any representatives to the United States to address the quality issues. Thus, MacNeil had to implement a costly, time-consuming 100% Quality Check program and individually inspect each floor mat from Cannon and repair all the defective floor mats. MacNeil could not afford to wait for replacement Cannon mats as HMA needed these floor mats immediately.

11. On September 9, 2004, Cannon's Managing Director, Adrian Conway, sent David MacNeil an e-mail in which he apologized for the defective mats, and stated that MacNeil could return the mats to Cannon at Cannon's expense. Mr. Conway also stated that Cannon was modifying its tooling so that the carpet would fit better into the rubber mat, and, hopefully, adhere fully to the mat. On September 23, 2004, Cannon's Operations Manager, Bob Peacock, sent MacNeil an e-mail in which he indicated that the adhesion problem was the result of a tooling fault that needed repair and/or modification.

12. Despite Cannon's assurances that it would address the problem, production delays continued and Cannon continued to miss delivery deadlines.

13. In or about early February, 2005, MacNeil received another delivery of mats from Cannon that exhibited major defects. Specifically, sixty-one percent of the mats had tears around the retention grommet or defects related to carpet adhesion and/or other issues. MacNeil informed Cannon of the defects on February 10, 2005. In response, Cannon's Managing Director, Adrien Conway, sent an e-mail to his staff, with copies to certain MacNeil representatives, in which he stated that "if this defect rate is correct, I want this programme

stopped today…I do not want the late shift making any more of these mats if there is a problem with the tools of this magnitude. I am really not happy about the manner in which this whole programme has been run from start to finish both internally and with DM's team. I want a full autopsy on this project so that we can all learn from it."

14. After an inspection of its tooling, Cannon assured MacNeil that there would be no further problems with its production, and also suggested that MacNeil's inspection process had "provoked" the problem by bending the mats at the corner and other such "provocations" when quality checking the product. In part, MacNeil representatives responded that MacNeil's and HMA's quality checks were reasonable because consumers would wash and clean their floor mats, and MacNeil's and HMA's quality checks tested for those conditions.

15. In about mid-May 2005, Cannon's head of design, James Ashley, and members of the Cannon's design team, along with Bob Peocock, visited MacNeil's operations in Downers Grove, Illinois. During the meeting the MacNeil and Cannon representatives discussed HMA rejects and delivery delays. Cannon promised that it would rectify the problems by developing a third set of tools and increasing the thickness of the rubber pad to retain more heat during adhesion of the carpet to the mat.

16. In June of 2005, MacNeil had a meeting with HMA representatives to discuss MacNeil's proposal to supply all of Hyundai's vehicles (and certain subsidiaries) with all-weather rubber mats. This business was worth millions of dollars to MacNeil. However, HMA representatives instead surprised MacNeil and indicated their displeasure regarding the quality of the Cannon floor mats. Indeed, MacNeil was not able to secure the all-weather floor mat business for the rest of Hyundai's vehicles because HMA was very displeased with the defective Cannon floor mats. MacNeil also received a strongly worded e-mail from HMA regarding the

carpet adhesion issue and the defective Cannon floor mats. MacNeil forwarded the e-mail to Cannon.

17. On June 20, 2005, Cannon responded and sent MacNeil an "Assurance of Quality Control for Process" (FMEA) identifying the entire Cannon manufacturing process specifications for the HMA mats. Upon a review of the report, MacNeil was able to identify several potential problems with the Cannon process. MacNeil communicated its findings to Cannon. Cannon took no remedial measures in response to the problems identified by MacNeil.

18. Between June 2005 and September 2005 Cannon continued to ship product that MacNeil inspected and found to be defective. Once again, MacNeil attempted to repair these defective Cannon floor mats to the best of its ability. On September 28, 2005, HMA sent MacNeil a report detailing various adhesion and other defects with the Cannon manufactured mats. The report included photographs of mats which showed carpet delamination around the corners and other areas of the mat, as well as the same tears that MacNeil had earlier identified, but which Cannon had claimed did not exist.

19. On several occasions in October 2005, HMA contacted MacNeil regarding the defective Cannon mats and explained that these defects were unacceptable to HMA and that HMA was displeased with MacNeil as a result of all the defects found in Cannon's floor mats.

20. In November 2005, Cannon's operation's Manager, Bob Peacock, again visited MacNeil's facility in Downers Grove, Illinois to personally inspect some of the defective mats which Cannon had manufactured. Mr. Peacock told MacNeil's representatives that MacNeil's inspection process was "too stringent" and was "provoking the carpet separation."

21. On February 23, 2006, MacNeil representatives met with representatives of HMA, including Stephen Lee, a Hyundai representative from Korea, at HMA's offices in

California. During the meeting, the Hyundai representatives expressed their displeasure and concern with the delivery and quality issues involving the defective Cannon composite floor mats. At one point during the meeting, Mr. Lee even pounded his fist on the table and exclaimed in Korean that MacNeil was "finished as a supplier."

22.     In April, 2006, MacNeil sent Cannon numerous HMA warranty claims regarding the carpet adhesion issue. On April 7, 2006, Hyundai instructed HMA to stop installing the Cannon manufactured mats in HMA vehicles because of quality issues. On April 11, 2006, HMA notified MacNeil that HMA had awarded its new mat program to another vendor. HMA informed MacNeil that it had lost the award as a result of the quality problems with Cannon's defective composite mats. This represented the second time that MacNeil lost HMA's significant additional mat business due to Cannon's defective floor mats.

23.     On May 10, 2006, Cannon representatives Bob Peacock and James Ashley again visited MacNeil to discuss additional quality concerns regarding carpet adhesion and color consistency.

24.     In early July 2006, HMA demanded a solution to the adhesion problem or a return and replacement of the defective mats. Despite MacNeil's best efforts to quality check and repair these Cannon floor mats, HMA informed MacNeil that it had inspected the most recent shipment of mats manufactured by Cannon and that there was an 80% to 100% defect rate. MacNeil had no choice but to offer to repair the mats at its expense. It was HMA, not MacNeil, that found the defect rate of Cannon's shipment to be around 80-100%.

25.     Thereafter, MacNeil attempted to find a means to rebind the carpet of the defective Cannon mats to the rubber. Despite its efforts, MacNeil was unable to come up with a satisfactory repair alternative for HMA. As a result, MacNeil was forced to offer HMA a one-

for-one replacement of the defective mats. After months of investigation into possible repair alternatives, MacNeil notified HMA that the only possible alternative was to destroy and replace all of the defective product. Likewise, MacNeil informed Cannon that these mats were a total loss and that MacNeil expected Cannon to credit MacNeil for this loss.

26. Throughout the entire period covering Cannon's manufacture of defective mats, MacNeil repeatedly informed Cannon that MacNeil was subject to warranty liability – under California law and jurisdiction pursuant to MacNeil's contract with HMA – for five years for these mats, and that HMA already had submitted multiple warranty claims to MacNeil based on Cannon's defective floor mats.

27. Between August 2006 and January 2007, MacNeil management, concerned about the future relationship with Cannon and Cannon's dependability as a supplier due to the constant quality concerns, was compelled to research an alternate strategy to secure their future as a supplier of automotive floor mats. To this end, MacNeil developed a two-pronged effort of investigating Injection Molding of car mats in the United States or finding an alternative supplier. As the search for an alternative supplier turned up fruitless, MacNeil was forced to make the decision to invest in an American manufacturing solution to obtain greater quality control. As a result, MacNeil was forced to continue to use Cannon as a supplier during this time until it was able to procure its own supply of mats from its own floor mat manufacturing facility.

28. From the summer of 2006 to the summer 0f 2007, David F. MacNeil repeatedly tried to address this issue with Edward Atkin, the head of Cannon. Despite Mr. MacNeil's repeated requests to resolve the parties' disputes amicably, the parties were never able to reach a final agreement regarding the repeated quality issues experienced from Cannon. Although even Mr. Atkin admitted that Cannon had had quality concerns regarding its floor mats and its past

dealings with MacNeil, he still did not want to credit MacNeil for the defective product that Cannon had sold MacNeil.

29.     Finally, after months of negotiation and MacNeil's persistence, in August 2007 HMA agreed to MacNeil's proposal to solve the defective floor mat problem and MacNeil was prepared to produce and ship over 17,000 sets of mats to HMA for replacement. MacNeil and Hyundai have since agreed to a one year deal in which MacNeil will work off the returned goods balance by supplying HMA with substitute product.

30.     Finally, in October of 2007, Cannon assented to MacNeil's request that the parties resolve their disputes in Chicago and Bob Peacock of Cannon visited MacNeil's facilities in Downers Grove to address the parties' ongoing disputes. It was at this meeting that MacNeil demanded the return of its compression mold tool sets, currently in Cannon's possession.

## II.     Cannon's Defective BMW Floor Mats

31.     In addition to HMA, MacNeil has also supplied BMW with rubber floor mats manufactured by Cannon since 2001. In the beginning of the relationship with Cannon and BMW, MacNeil found several quality control problems; once even finding bird feces *within the mat itself*. In response to these problems, Bob Peacock conceded: "Al.....please let me apologise to yourself, David and the staff at MacNeil for these unacceptable and totally inexcusable problems you have had with recent deliveries." Mr. Peacock then admonished his staff, "Alan J....I do not think I should have my reputation tarnished by these disgraceful problems…"

32.     More serious problems developed as the relationship progressed. On September 28, 2005, MacNeil received odd colored grey floor mats from Cannon, which were passed-off by Cannon as a "fluke" when MacNeil raised the issue with Cannon.

33.     Several months later, on March 22, 2006, MacNeil contacted Cannon again about Cannon's mats that did not have matching colors for the back and front floor mats for both BMW and WeatherTech™ branded product for the vehicles. MacNeil stated that the problem was significant and requested a credit for the defective mats in the amount of $145,332.12.

34.     Cannon recognized that its defective mats – non-matching colors for a set of floor mats – were a serious problem in March of 2006. Bob Peacock frankly stated: "Presently, you will have "two" grey colours. My only suggestion is that we try to "match up" where possible. Al… if we are in the crap so to speak I will do everything possible at this end to make things right as quickly and as painless as possible."

35.     The following statements by Bob Peacock in a June 8, 2006 to his staff email sum up the quality control problems at Cannon that MacNeil was forced to deal with over the years:

> This is another example where we have let down our major customer but much more serious give him major problems with his customer !!! This is totally unacceptable and is down totally to a lack of control in our process....from mixing...to moulding...to packing !!!!!
>
> I have personally given everybody at MacNeil Automotive assurance that this will not happen again . But why should they believe this !!!!! Later on they will get further problems from Cannon....they have lost trust in our creditability and who can blame them.
>
> Ruby everyday somebody needs to check MacNeil products to ensure we are giving him the correct colours....the correct labels....the correct quality in all aspects....if we cannot get this right then we need to get people who can.

36.     The problems regarding defective Cannon mats with the wrong colors again resurfaced in October and November of 2006 when BMW notified MacNeil that it had *again* received a shipment of defective floor mats. MacNeil again raised the issue with Cannon and a Cannon engineer was designated to investigate all of these quality control problems.

37. As even Cannon recognized, the constant defects and quality problems from Cannon caused severe harm to MacNeil's reputation and its business relations with BMW.

## COUNT I – BREACH OF CONTRACT

38. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 37 as if fully set forth herein.

39. During the Spring of 2004, MacNeil and Cannon entered into an oral agreement whereby Cannon agreed to, on a timely basis, supply MacNeil with non-defective composite floor mats for HMA's Tucson vehicle. These floor mats consisted of rubber with a section of carpet located within, and adhered to, the mat. In addition, starting in 2001, MacNeil and Cannon entered into an oral agreement whereby Cannon agreed to, on a timely basis, supply MacNeil with non-defective, all-rubber floor mats for BMW vehicles. The parties' agreements are valid, legally enforceable contracts between the parties upon proper consideration, whereby the parties were mutually obligated to one another and there was a mutuality of agreement, and the parties were competent to enter such contracts. These contracts are evidenced in part by Cannon's acceptance of MacNeil's purchase orders and shipment of Cannon floor mats to MacNeil.

40. MacNeil performed its obligations under the parties' agreements and contracts.

41. Cannon breached the contracts by: a) delivering defective automobile floor mats to MacNeil for HMA's Tucson vehicle; b) delivering defective automobile floor mats for MacNeil's customer BMW and WeatherTech™ branded product; and c) failing to timely deliver automobile floor mats to MacNeil for HMA's Tucson vehicle and the BMW vehicles.

42. Cannon further breached the parties' covenant of good faith and fair dealing under the contracts implied by law by engaging in the breaches of the parties' agreements described above.

43. As a direct and proximate consequence of Cannon's breaches of the parties' agreements, MacNeil has suffered damages in the form of lost profits, lost business opportunities, damage to its reputation, replacement of goods, and other such actual and consequential damages, in an amount not yet determined but which are not less than $4 million.

WHEREFORE, MacNeil respectfully requests that a judgment be entered in its favor and against Cannon in an amount to be determined at trial, but which is not less than $4 million, together with its costs, interest and attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT II – DECLARATORY JUDGMENT

44. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 43 as if fully set forth herein.

45. This count is for declaratory judgment pursuant to 28 U.S.C. § 2201.

46. This count is for the purpose of determining a question of actual controversy between the parties and terminating an uncertainty and controversy giving rise to this proceeding, as set forth below.

47. A serious dispute exists between the parties, which will have immediate and significant consequences if this Court does not determine the rights of the parties.

48. Specifically, a dispute exists regarding whether MacNeil is obligated to pay Cannon for certain outstanding invoices relating to Cannon's supply to MacNeil of floor mats for Hyundai's Tucson vehicle, MacNeil's customer BMW, and its own WeatherTech™ branded

product. Indeed, Cannon has filed an action in the United Kingdom against MacNeil seeking to be reimbursed for certain alleged outstanding invoices, which eventually will total £384,020.60 pounds sterling and $53,795.00. True and correct excerpts of this lawsuit are attached hereto as Exhibit 1.

49.     MacNeil disputes this claim, contending that it does not owe Cannon any monies for the alleged invoices as MacNeil was entitled to a full credit to offset the amount of said invoices because of Cannon's supply of defective floor mats and the damages Cannon has caused MacNeil. As such, a real dispute exists, resulting in MacNeil's refusal to make payments to Cannon for the supply of these floor mats as the same were seriously defective and in fact caused MacNeil severe harm.

50.     MacNeil seeks a judicial determination of the rights, duties and obligations of the parties and a declaration that MacNeil does not owe Cannon any monies for the defective floor mats, which are the subject of Cannon's action in the United Kingdom against MacNeil.

51.     It is necessary, proper and appropriate that this Court declare the rights and obligations of the parties with respect to the instant dispute and render a declaratory judgment setting forth those rights and obligations.

WHEREFORE, MacNeil respectfully requests that the Court enter an Order declaring that MacNeil does not owe any outstanding monies to Cannon and that Cannon is responsible for defects, and warranty claims regarding said defects, related to its floor mats manufactured for the Hyundai Tucson vehicle, BMW vehicles and its own WeatherTech™ branded product.

**COUNT III – PROMISSORY ESTOPPEL**

52. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 51 as if fully set forth herein.

53. Cannon made actual, unambiguous, and definite promises, whether express or implied, that, among other things, Cannon would supply MacNeil with non-defective floor mats for HMA's Tucson vehicle, for MacNeil's customer BMW and for its own WeatherTech™ branded product, and would do so in a timely fashion.

54. Cannon expected MacNeil to rely on its promises and inducements, including but not limited to those described above, and said reliance was foreseeable by Cannon.

55. MacNeil justifiably relied on Cannon's representations and promises, and, among other things, dedicated its purchase orders to Cannon and placed its business reputation, standing and goodwill on the line, to and for the benefit of Cannon in reliance on Cannon's promises and representations that, among other things, Cannon would supply MacNeil with non-defective floor mats for HMA's Tucson vehicle, BMW vehicles, and for its own WeatherTech™ branded product, and would do so in a timely fashion.

56. MacNeil justifiably relied, to its detriment, on the promises and inducements of Cannon, including but not limited to those described above.

57. The promises and representations of Cannon must be enforced in order to avoid injustice and inequity.

WHEREFORE, MacNeil respectfully requests that judgment be entered in its favor and against Cannon in an amount to be determined at trial, but which are not less than $4 million, together with costs, interest, attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT IV – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT – 815 ILCS 505 *et seq.*

58. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 57 as if fully set forth herein.

59. In violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Cannon has engaged in at least the following unfair and/or deceptive acts or practices:

    a) Cannon has made false statements and misrepresentations with respect to the quality of Cannon's floor mats that MacNeil supplied to Hyundai, BMW, and WeatherTech™ branded product and Cannon has concealed, suppressed or omitted the material fact that the floor mats it manufactured were defective. These false statements, misrepresentations, and concealments are detailed herein.

    b) Other false statements and misrepresentations, concealments, suppressions or omissions according to proof.

60. Cannon intended for MacNeil to rely on its unfair and deceptive acts and practices and thus use, and continue to use, Cannon as a floor mat manufacturer.

61. Cannon's unfair and deceptive acts and practices occurred in the normal course of trade or commerce.

62. Through its unfair and deceptive acts and practices, Cannon has harmed MacNeil, a consumer of its manufacturing services, as well as the end-user consumer of Cannon's products, such as automobile manufacturers or individual automobile owners.

63. As a direct and proximate result of Cannon's unfair and deceptive acts and practices, the business of MacNeil was severely damaged and MacNeil has incurred damages in an amount to be determined at trial, but which are not less than $4 million.

WHEREFORE, MacNeil respectfully requests that a judgment be entered in its favor and against Cannon in an amount to be determined at trial, but which is not less than $4

million, together with its costs, interest and attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT V – BREACH OF EXPRESS WARRANTY

64. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 63 as if fully set forth herein.

65. When Cannon sold and delivered the defective automobile floor mats for the HMA Tucson project to MacNeil, Cannon breached its express warranty to MacNeil that Cannon floor mats would conform to the quality of floor mats required for the HMA Tucson project, would be delivered in a timely fashion, and that the carpet would properly adhere to the rubber floor mat. For example, the carpet in said floor mats did not properly adhere to the rubber and the rubber of the floor mats was cracked and ripped in said floor mats, among other defects. Moreover, Cannon represented and made warranties to MacNeil that its BMW mats would be free from defects, timely delivered, and that Cannon would remedy any such existing defects. These warranties and representations formed the basis of the bargain between MacNeil and Cannon, MacNeil justifiably relied on these representations, and MacNeil would not have dealt with Cannon but for these warranties. Through Cannon's failure to provide goods conforming to these requirements, Cannon breached its express warranties made to MacNeil in violation of Section 2-313 of the Illinois Uniform Commercial Code (810 ILCS 5/2-313).

66. On account of Cannon's above-described breach of express warrant and Cannon's breaches of implied warranties as set forth in Counts VI and VII hereof, MacNeil is entitled under Sections 2-714 and 2-715 of the Illinois Uniform Commercial Code (810 ILCS 5/2-714-15) to recover its actual damages resulting in the ordinary course of events from Cannon's

delivering goods not in conformity with such warranties, as well as MacNeil's incidental and consequential damages flowing from such breaches.

67. As a direct and proximate result of the defective floor mats sold by Cannon, the business of MacNeil was severely damaged and MacNeil has incurred damages in an amount to be determined at trial, but which are not less than $4 million.

WHEREFORE, MacNeil respectfully requests that a judgment be entered in its favor and against Cannon in an amount to be determined at trial, but which is not less than $4 million, together with its costs, interest and attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT VI – BREACH OF IMPLIED WARRANTY OF MERCHANABILITY

68. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 67 as if fully set forth herein.

69. Through its sale to MacNeil of defective floor mats for the HMA Tucson project, to MacNeil's customer BMW, and WeatherTech™ branded product, Cannon breached its implied warranty of merchantability to MacNeil.

70. By selling MacNeil goods that were not fit for the ordinary purposes for which such goods are used, such ordinary purposes being floor mats for automobiles that are defect free, do not crack or rip or lose adhesion between the carpet and the rubber, and/or are the products specified by MacNeil or the end-user customer, Cannon has violated the rights of MacNeil under Section 2-314 of the Illinois Uniform Commercial Code (810 ILCS 5/2-314).

71. As a direct and proximate result of the defective floor mats sold by Cannon, the business of MacNeil was severely damaged and MacNeil has incurred damages in an amount to be determined at trial, but which are not less than $4 million.

WHEREFORE, MacNeil respectfully requests that a judgment be entered in its favor and against Cannon in an amount to be determined at trial, but which is not less than $4 million, together with its costs, interest and attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

### COUNT VII – BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE

72. MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 71 as if fully set forth herein.

73. By selling MacNeil floor mats that Cannon knew at the time of shipment did not meet MacNeil's, BMW's or HMA's particular purpose for which the goods were required when MacNeil was relying on Cannon's skill to furnish such suitable goods, Cannon has breached its implied warranty of fitness for particular purpose in violation of MacNeil's rights under Section 2-315 of the Illinois Uniform Commercial Code (810 ILCS 5/2-315).  MacNeil reasonably and justifiably relied on Cannon's warranties and representations that its products would be defect free, that the carpet would properly adhere to the rubber floor mat for the Tucson vehicle, and the colors of the mats would be matching for the BMW vehicles and would be correct, consistent and true to the defined standard.

74. As a direct and proximate result of the defective floor mats sold by Cannon, the business of MacNeil was severely damaged and MacNeil has incurred damages in an amount to be determined at trial, but which are not less than $4 million.

WHEREFORE, MacNeil respectfully requests that a judgment be entered in its favor and against Cannon in an amount to be determined at trial, but which is not less than $4 million, together with its costs, interest and attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT VIII – CONVERSION

75.  MacNeil reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1 through 74 as if fully set forth herein.

76.  Cannon has wrongfully assumed control of approximately 52 of MacNeil's compression mold tools valued at approximately $2,800,000.00.

77.  MacNeil has a right to said property and the right to have it returned to MacNeil's possession.

78.  MacNeil has the right to immediate possession of its compression molds.

79.  MacNeil has demanded that Cannon return its compression molds to MacNeil's possession and Cannon has refused to do so.

WHEREFORE, as to this Count, MacNeil respectfully requests this Court enter an Order instructing Cannon to return MacNeil's tooling to MacNeil's possession as soon as it is feasible, or, in the alternative, that Cannon remit $2,800,000.00 to MacNeil to compensate MacNeil for its compression molds wrongfully held by Cannon, together with MacNeil's costs, interest and attorney fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## JURY TRIAL DEMAND

MacNeil hereby demands a trial by jury on all issues so triable.

                                      Respectfully submitted,

                                      MACNEIL AUTOMOTIVE PRODUCTS LIMITED

Dated: January 7, 2008        By:     /s/ Robert S. Grabemann
                                             One of Its Attorneys

Robert S. Grabemann
Timothy M. Schaum
DASPIN & AUMENT, LLP
227 West Monroe
Suite 3500
Chicago, Illinois 60606
(312)258-1600

-20-