IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, ) ) ) | |
| Plaintiff, ) | No.  08 C 139 |
| ) | |
| v. ) | |
| ) | Hon. Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a ) CANNON RUBBER LIMITED, ) AUTOMOTIVE DIVISION, ) a United Kingdom Company, ) | Magistrate Arlander Keys |
| ) | |
| Defendant. ) | **JURY TRIAL DEMANDED** |

**MACNEIL'S MOTION TO ENJOIN DEFENDANT FROM
PURSUING A COLLATERAL PROCEEDING IN A FOREIGN JURISDICTION**

Plaintiff MacNeil Automotive Products Limited ("MacNeil"), by and through its attorneys, submits its Motion to Enjoin Defendant from Pursuing a Collateral Proceeding in a Foreign Jurisdiction.[1]  For the reasons stated below, MacNeil respectfully moves this Court to preserve its jurisdiction and enjoin Defendant Cannon Automotive Limited f/k/a Cannon Rubber Limited, Automotive Division ("Cannon") from proceeding with its collateral, duplicative and vexatious action, which it filed against MacNeil on November 30, 3007 in London, England. MacNeil filed its lawsuit against Cannon in this Court on January 7, 2007.

**INTRODUCTION**

Unfortunately, a handshake and a person's word is no longer worth what it used to be.  This case arises from serious quality control issues regarding Cannon's defective floor mats for automobiles which it supplied to MacNeil, and the severe damages MacNeil has

---

[1] To provide Cannon with adequate time to respond to this Motion and retain American counsel, MacNeil has noticed this Motion for two weeks from the date of its filing.  This also is why MacNeil has not styled this Motion as an "Emergency Motion."

suffered as a consequence. No express, written contract covers the parties' dealings in this case. Instead, the parties have engaged in a course of dealing since 1989, and various emails, letters and other documents evince the parties' agreements and understanding with regard to the instant dispute. Succinctly put, the parties agreed and understood that any disputes regarding these defective products would be resolved in this forum, the parties understood that American law would govern any such disputes and, as all third-party witnesses and most, if not all, of the relevant evidence is located in the United States, this forum clearly is the proper forum in which to proceed.

Up until Cannon filed suit in England,[2] MacNeil was attempting to work out an amicable solution to the situation – despite the fact that MacNeil is the party that has suffered severe harm here. Without so much as informing MacNeil of its intentions, Cannon "raced to the courthouse" and filed its suit in England, in direction violation of the parties' agreement and understanding that any dispute would be resolved in this forum. In its filings, Cannon seeks to apply English law in an English court to the parties' dispute and thus deprive MacNeil of its rights and remedies, which are significant and numerous, in this forum. See Ex. 1. Cannon's litigation tactics and forum shopping here are exactly the type of activities that have been condemned and enjoined by courts of this Circuit that have addressed the issue of an anti-suit injunction. MacNeil respectfully moves this Court to preserve its jurisdiction over this matter, and prevent Cannon from engaging MacNeil in duplicative, vexatious and oppressive foreign litigation, by enjoining Cannon from pursuing its English action.

---

[2] MacNeil was just served with these papers on December 20, 2007, and has not yet responded to this lawsuit. MacNeil intends to file papers in the English court objecting to its jurisdiction later this week.

## **FACTUAL BACKGROUND**

Cannon is a large corporation that has been engaged in the business of manufacturing floor mats for automobiles for about 60 years and has its principal place of business in London, England. MacNeil Automotive Products was founded as a supplier of floor mats for automobiles by David F. MacNeil in 1989. After seeing Cannon's heavy rubber mat product, one thing led to another, and MacNeil became Cannon's American distributor of its mats. Since that time, David has made MacNeil Automotive a world-class American manufacturer and supplier of floor mats and automobile accessories, with 63 employees and 2 locations in Downers Grove, Illinois.

The instant dispute relates to defective floor mats that Cannon supplied to MacNeil for MacNeil's American Hyundai and BMW accounts. Around May of 2004, MacNeil was awarded the floor mat contract for Hyundai's Tucson vehicle. This mat was a composite floor mat, which consisted of a molded rubber base with a carpet insert thermally bonded into a cavity in the rubber mat. From the first day there were serious problems. Indeed, upon inspecting the first crate of floor mats from Cannon, MacNeil found that the mats had a defect rate over 87%. These defects primarily consisted of the failure of the carpet section to adhere to the rubber base and cracks found in the rubber and grommet area.[3] MacNeil could not return these mats as it had a tight supply deadline for Hyundai, and thus did all it could to repair the defective Cannon mats. These reoccurring defects eventually became such an issue that Hyundai refused to accept the Cannon mats and MacNeil was forced to destroy entire shipments and replace these mats for Hyundai – all at MacNeil's time and expense.

---

[3] The "grommet" area is where a hole is created in the floor mat so that the mat can attach to an anchor on the vehicle to ensure that the floor mat stays in place and does not slide around the floor of the vehicle.

Cannon also had serious quality problems with the mats it supplied to MacNeil for distribution to MacNeil's American BMW account – MacNeil was awarded this account in 2001. The primary defect from Cannon related to the BMW account involved floor mats that were the wrong color and sets of floor mats where the back floor mats did not match the color of the front floor mats. The following statements by Bob Peacock – a Cannon executive – in a June 8, 2006 email to his staff fairly sums up the quality control problems that MacNeil was forced to deal with over the years:

> This is another example where we have let down our major customer but much more serious give him major problems with his customer !!! This is totally unacceptable and is down totally to a lack of control in our process....from mixing...to moulding...to packing !!!!!
>
> I have personally given everybody at MacNeil Automotive assurance that this will not happen again . But why should they believe this !!!!! Later on they will get further problems from Cannon....they have lost trust in our creditability and who can blame them.
>
> Ruby everyday somebody needs to check MacNeil products to ensure we are giving him the correct colours....the correct labels....the correct quality in all aspects....if we cannot get this right then we need to get people who can.
>
> Dick/Ruby ...please ensure we have systems that prevent serious quality problems from ever reaching this customer or any others.

See Ex. 2. Needless to say, the quality control issues from Cannon were serious and many for MacNeil's Hyundai and BMW accounts, and for MacNeil's own WeatherTech™ brand as well.

When these Cannon defects first surfaced, MacNeil made it clear to Cannon how important quality was because – among other concerns – the floor mats were warranty items, which MacNeil was obligated to repair or replace for five years. For example, MacNeil informed Cannon that, pursuant to its contract with Hyundai, MacNeil and potentially Cannon

were subject to a lawsuit under California law in a California court because of the five year warranty that was provided for Cannon's floor mats. See Ex. 3 at ¶ XVII, which is a true and correct copy of the contract and warranty agreement between Hyundai Motor America and MacNeil.

Indeed, MacNeil informed Cannon of this fact in July of 2006: "Hyundai may sue MacNeil and also sue Cannon [because of Cannon's defective mats]." See Ex. 4, 7/4/06 email between Cannon and MacNeil representatives. Because the eventual end-users and customers of these defective Cannon floor mats are all located in the United States, the parties clearly contemplated having to litigate any issues arising out these defects in an American court. For example, MacNeil's founder emailed the head of Cannon in July of 2007 regarding the defect issues and stated: "I can assure you that Hyundai is deadly serious about this issue and I have been told in person that they have no qualms about instituting legal action and joining all parties (meaning Cannon and MacNeil) in a suit." See Ex. 5, 7/10/07 email from David F. MacNeil to Edward Atkin of Cannon.

Not only did the parties anticipate potential litigation in the United States, but they agreed that disputes regarding the Cannon defects would be resolved in this forum. In the same July 10th email, Mr. MacNeil stated to Cannon's principal officer: "Come yourself or send Bob Peacock if he has the authority to reach a resolution while in Chicago or send a Mediator that has the same decision making authority. I do want a FAIR resolution." Id. Cannon assented to this request and Bob Peacock visited MacNeil at its Downers Grove facility on October 9, 2007. Likewise, any time the parties met to discuss the Cannon defects and what to do about them, Cannon representatives came to Chicago. To be sure, Cannon representatives visited MacNeil's facilities in Chicago to discuss the defective product issues in May 2005,

November 2005, May 2006, and finally to resolve the disputes in October 2007. Not once did MacNeil representatives ever visit Cannon in England to discuss Cannon's defective products and MacNeil has absolutely no presence in England.

## **LEGAL STANDARD**

Since at least 1961, the Seventh Circuit has recognized that federal district courts have the authority to enjoin parties from pursuing collateral lawsuits pending in foreign countries. See Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542, 544-45 (7th Cir. 1961); see also Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir. 1981) ("a federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country.") Indeed, the Seventh Circuit employs a "lax standard" regarding whether a party pursuing a foreign lawsuit should be enjoined, expressly rejecting the "strict standard" employed by other Circuits. Allendale Mut. Ins. Co. v. Bull Data Sys. Inc., 10 F.3d 425, 431 (7th Cir. 1993).

As its name implies, the "lax standard" employed by this Circuit takes a more liberal stance in favor of enjoining parties from pursuing collateral foreign proceedings as compared with the "strict standard" of other Circuits. In the Seventh Circuit, "[i]njunctions against foreign litigation are allowed upon a finding that letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say 'vexatious and oppressive.'" Varrin v. Queen's University, No. 01-C-9297, 2002 U.S. Dist. LEXIS 16580, at *4 (N.D. Ill. Aug. 29, 2002) (citing Allendale). "[T]he court must consider domestic judicial interests, including the prevention of vexatious or oppressive litigation and the need to protect the court's jurisdiction, and concerns of international comity." United States Commodity Futures Trading Comm. v.

Lake Shore Asset Mgm't Ltd., No. 07-C-3598, 2007 U.S. Dist. LEXIS 74615, at *64 (N.D. Ill. Oct. 4, 2007). In this Circuit it is clear that:

> [C]ourts following the liberal approach look for the presence of several interrelated factors, including (1) "inequitable hardship" resulting from the foreign suit; (2) the foreign suit's ability to frustrate and delay the speedy and efficient determination of the cause; and (3) the extent to which the foreign suit is duplicitous of the litigation in the United States.

Id. at *64-65 (citation omitted). These concerns weigh in favor of an injunction here.

## ARGUMENT

In an attempt to sidestep this Court's jurisdiction and the parties' agreement and understanding that their disputes would be resolved in this forum, Cannon – without providing any notice to MacNeil that it intended to do so – raced to an English court and filed its suit on November 30, 2007. In doing so, it has attempted to drag MacNeil into vexatious, oppressive and duplicative litigation that may – if this Court does not act to preserve its jurisdiction – deprive MacNeil of substantial rights and remedies that MacNeil has available in this Court. Cannon's litigation "tactics" should be proscribed and Cannon should be enjoined from pursuing its English action as this Court is the proper, and agreed upon, forum in which to try this action.

**I.   The parties agreed and understood that any dispute related to Cannon's defective floor mats would be resolved in Chicago.**

It is clear from the correspondence between Cannon and MacNeil that it was agreed and understood that any dispute arising as a result of Cannon's defective floor mats would be resolved in this forum. Here, this is perhaps the most important, if not dispositive, factor in considering whether to enjoin a party from pursuing a collateral proceeding. As an illustration of the parties' agreements and understanding that disputes were to be resolved in this forum, in a July 10, 2007, email between the heads of both MacNeil and Cannon (discussing the

possibility of an *American lawsuit* involving the parties and Hyundai), David F. MacNeil stated: "Come yourself or send Bob Peacock if *he has the authority to reach a resolution <u>while in Chicago</u>* or send a Mediator *that has the same decision making authority*. I do want a FAIR resolution." <u>See</u> Ex. 5 (emphasis added). Cannon agreed to this request and Bob Peacock visited MacNeil at its Downers Grove facility on October 9, 2007. Again, right before Mr. Peacock visited to Chicago, MacNeil and Cannon engaged in further correspondence which makes clear that the dispute was to be resolved in this forum: "As you have noticed, I have stopped placing orders and I have stopped sending money until all of our outstanding issues are resolved. Those issues will be resolved at our meeting in Chicago." <u>See</u> Ex. 6, 9/25/07 email from David MacNeil to Bob Peacock.

The Ninth Circuit, which follows the same lax standard regarding antisuit injunctions that the Seventh Circuit has adopted, encountered a situation like the instant case and stated:

> That [the foreign suit was] filed first, however, *makes no difference as to the propriety of an anti-suit injunction*. In a situation like this one, where private parties have previously agreed to litigate their disputes in a certain forum, one party's filing first in a different forum would not implicate comity at all. No public international issue is raised in this case… The case before us deals with enforcing a contract [between private parties] and giving effect to substantive rights. This in no way breaches norms of comity.

<u>E. & J. Gallo Winery v. Andina Licores S.A.</u>, 446 F.3d 984, 994 (9th Cir. 2006) (enjoining foreign action – where the American suit was filed six weeks after Gallo was apprised of the foreign lawsuit – because the parties had agreed that the dispute would be resolved in an American forum) (emphasis added). Here, it is true that there is no express forum selection clause, but that is merely a function of the fact that no express, written contract governs **any** of the parties' dealings and agreements. Further, as discussed in Section II, *supra*, it is clear that

-8-

the parties anticipated litigating disputes regarding Cannon's defective products in the United States under American law and that American law governs end-users' claims regarding the same.

In sum, every time the issue of defective Cannon products was discussed, Cannon representatives came to this forum to resolve the issue. When the matter was finally coming to a head, and a resolution was demanded, the meeting on these issues was conducted in Chicago and the correspondence is clear that the dispute was to be resolved in this forum. Through its race to the courthouse, Cannon should not be allowed to circumvent the parties' agreement that disputes would be settled in this forum by proceeding with its English lawsuit. This Court should enjoin Cannon from proceeding with its collateral lawsuit.

**II.     The parties understood that American law and American courts, not English law and English courts, would govern disputes related to Cannon's defective products.**

It is clear that both Cannon and MacNeil recognized that issues regarding Cannon's defective floor mats would be subject to American law and American courts. The defective Cannon mats were supplied to American companies for use by American consumers. MacNeil made it clear to Cannon that both MacNeil and Cannon were subject to warranty claims and commercial suit by Hyundai in American courts. Examples of this understanding can be found in the parties' correspondence: "Hyundai may sue MacNeil and also sue Cannon [because of Cannon's defective mats]," and "I can assure you that Hyundai is deadly serious about this issue and I have been told in person that they have no qualms about instituting legal action and joining all parties (meaning Cannon and MacNeil) in a suit." See Exs. 4 and 5.

Further, MacNeil, on numerous occasions, forwarded to Cannon the warranty claims it received from Hyundai due to Cannon's defective mats. See Ex. 7. The contract between Hyundai and MacNeil expressly states that any dispute (including disputes regarding the

defective Cannon mats) between the two parties was to be resolved in American courts under American law:

> This Agreement shall be construed and interpreted both as to validity and to performance of the parties in accordance with the laws of the State of California.  Legal actions concerning any dispute, claim or matter arising out of or in relation to this Agreement shall be instituted in Orange County Superior Court, State of California, or any other appropriate court in such county, and both parties consent and agree to submit to the jurisdiction of such court in the event of such action.

See Ex. 3 at ¶ XVII.  It is clear that the parties contemplated facing litigation in the United States over a potential dispute regarding Cannon's defective floor mats.

In addition, and perhaps most importantly, as the defective Cannon products all have been distributed in the United States, MacNeil remains potentially liable under American law in American courts for any consumer claims that may arise as a result of defects found in Cannon's floor mats, whether for BMW, Hyundai or WeatherTech™ customers.  The above correspondence only refers to potential commercial disputes between Hyundai or BMW and the parties.  Allowing Cannon to proceed with its collateral foreign proceeding could result in confusing and inconsistent results regarding the defective nature of Cannon products, as applicable to potential consumer claims.  In other words, subsequent to any potential decision in the English court, MacNeil could be the subject of a consumer suit in an American court regarding Cannon's defective floor mats.

It would be extremely vexatious and oppressive, and unnecessarily duplicative, for MacNeil to have to litigate issues regarding Cannon's defective floor mats in two jurisdictions under two sets of laws.  This is true especially when one considers that Cannon knowingly distributed its defective products to American consumers.  See Lake Shore Asset, 2007 U.S. Dist. LEXIS 74615, at *68-69 ("[a party] cannot take advantage of U.S. laws and

exchanges and then shield itself from any liability for its actions simply by … filing its own case in a foreign jurisdiction."). It makes much better sense to have one forum address all of the issues that potentially could arise from the distribution of Cannon's defective mats. An American forum is the only forum where that is a possibility, as American consumers cannot be forced to litigate in an English court.

> **III. Cannon's filing of a lawsuit in an English court is nothing more than an improper tactic meant to involve MacNeil in vexatious, oppressive and duplicative litigation in a foreign country under unfamiliar laws and deprive MacNeil of substantial remedies and rights that would be available under this Court's jurisdiction.**

Without so much as attempting to seriously resolve the dispute with MacNeil, Cannon filed its foreign action. It did so to attempt to drag MacNeil into vexatious and oppressive foreign litigation – MacNeil has no presence in the United Kingdom – to deal with defective products that were all supplied, and used or are in use, in the United States. Moreover, litigating this case in the United Kingdom potentially would deprive MacNeil of substantial remedies and rights it would have available in this Court. Litigating this action in this forum, on the other hand, would not deprive Cannon of any remedies that would be available to it in an English court.[4]

> **A. This Court should preserve its jurisdiction and safeguard the substantial remedies and rights available to MacNeil under American law by enjoining Cannon from pursuing its foreign action.**

A court's preservation of its own jurisdiction is customarily one of the main reasons to enjoin a party from pursuing collateral foreign proceedings. Indeed, anti-suit "[i]njunctions are most often necessary to protect the jurisdiction of the enjoining court…" Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 927 (D.C. Cir. 1984).

---

[4] Indeed, given the prevailing exchange rate, Cannon likely will find it much more economical to hire American counsel and litigate this case in the United States.

"When the availability of an action in the domestic courts is necessary to a full and fair adjudication of the plaintiff's claims, a court should preserve that forum." Id. at 929. MacNeil cannot achieve a full and fair adjudication of its claims in an English court and would be stripped of substantial remedies and rights in such an action. As can be seen in the attached affidavit of Kent Phillips, a solicitor and an expert in English law, MacNeil likely would not be entitled to pursue substantial remedies or causes of action – such as a claim under the Illinois Consumer Fraud Act – in the pending English lawsuit. See Ex. 1.

Similarly, a review of Mr. Phillips' affidavit reveals that MacNeil would be deprived of its right to a jury in the English court. "[T]he right of jury trial is fundamental, [and] courts [must] indulge every reasonable presumption against waiver." Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937). Indeed, this principle is cemented in the Federal Rules of Civil Procedure: "The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." Fed. R. Civ. P. 38(a). MacNeil has not waived, nor forfeited, its right to have a jury determine disputed issues of fact in this case. This is a fundamental right that must be preserved and, due to potential preclusion issues, this right only can be guaranteed if Cannon is enjoined from proceeding with its foreign action and the case is tried in this forum. Further, Cannon's foreign action is clearly an attempt to "shake-down" MacNeil for payment, as MacNeil is the real aggrieved party in this case and if anyone is owed payment, it is MacNeil. As the Seventh Circuit so eloquently stated when affirming the grant of an anti-suit injunction in Allendale, "[the foreign defendant] is American, and the United States has an interest in protecting its citizens, including its corporate citizens, from trumped-up multi-million dollar claims." Allendale, 10

F.3d at 432. The Court should preserve its jurisdiction and Cannon should be enjoined from pursuing its collateral, foreign action.

> **B.  Cannon's foreign lawsuit is nothing more than an attempt to drag MacNeil into duplicative, vexatious and oppressive litigation and Cannon should be enjoined from doing so.**

All of the third-party witnesses are located in the United States. Most, if not all, of the relevant evidence in this case is located in the United States. The actual defective products are located in the United States. The individuals/end-users of Cannon's defective floor mats are all located in the United States. MacNeil is located in the United States and has no presence in the United Kingdom. The parties are identical in the pending foreign litigation and in this case, and the issues raised here encompass all of the claims that are present in the foreign action.

Considering these facts, and "applying the usual and *by no means stringent rules for limiting duplicative litigation*" to enjoin foreign litigation, Cannon should be enjoined from pursuing its foreign action. See Phillips Med. Sys. Int'l v. Bruetman, 8 F.3d 600, 605 (7th Cir. 1993). Cannon's foreign action is merely one for account stated, which is clearly recognized as a cause of action in this forum. On the other hand, MacNeil is pursuing multiple counts against Cannon, such as for breach of contract, consumer fraud, and breach of warranties, and seeks remedies that likely would not be available to it in an English court. Moreover, these are the same parties and both sets of litigation will involve many of the same facts and issues. As the evidence and all third-party witnesses are in the United States, requiring MacNeil to defend a similar collateral lawsuit in England would be "an absurd duplication of effort," Allendale, 10 F.3d at 431, and "would result in unwarranted inconvenience, expense, and vexation." Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 627 (5th Cir. 1996).

To be sure, the Seventh Circuit has recognized that an anti-suit injunction is appropriate when its denial "would cause irreparable harm to the movant by making [movant] proceed in two courts at once and the grant of it would cause no irreparable harm to the nonmovant." Allendale, 10 F.3d at 433. Similarly, the Fifth Circuit, which employs the same lax standard as the Seventh Circuit has stated:

> [A] district court does not abuse its discretion by issuing an antisuit injunction when it has determined that allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the cause.

Kaepa, 76 F.3d at 627. MacNeil would suffer irreparable harm here as it would be forced to proceed simultaneously with the English action. Under these circumstances, the parties will be forced to operate under drastically different rules of procedure. Among other things, different laws will govern ongoing discovery and pretrial proceedings in a race to judgment. This bedlam, and the possibility of inconsistent results, weigh heavily in favor enjoining Cannon from pursuing its collateral proceeding.

## **CONCLUSION**

For the foregoing reasons, MacNeil respectfully requests that the Court enter an Order enjoining Cannon from pursuing its English lawsuit.

          Respectfully submitted,

          **MACNEIL AUTOMOTIVE PRODUCTS LIMITED**

Dated: January 8, 2008       By:    /s/ Robert S. Grabemann
                                   One of Its Attorneys

Robert S. Grabemann
Timothy M. Schaum
DASPIN & AUMENT, LLP
227 West Monroe Street
Suite 3500
Chicago, Illinois 60606
(312) 258-1600

## CERTIFICATE OF SERVICE

       The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing NOTICE AND MACNEIL'S MOTION TO ENJOIN DEFENDANT FROM PURSUING A COLLATERAL PROCEEDING IN A FOREIGN JURISDICTION, along with a copy of the Complaint, to be personally served by a Solicitor, in accordance with the English rules on service of process for these types of papers, on or about the 10th day of January, 2008 on:

| | |
|---|---|
| Cannon Automotive Limited, | Richard Marshall |
| f/k/a Cannon Rubber Limited, Automotive Division | Manches LLP of |
| Brook House | Aldwych House |
| 881 High Road | 81 Aldwych |
| Tottenham | London |
| London | WC2B 4RP |
| N17 8EY | England |
| England | |

                                                   /s/   Robert S. Grabemann
                                                          Robert S. Grabemann