**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation,** ) ) ) | |
| **Plaintiff,** ) ) | **No.  08 C 139** |
| **v.** ) ) | **Hon. Joan B. Gottschall** |
| **CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company,** ) ) ) ) ) | **Magistrate Arlander Keys** |
| **Defendant.** ) | **JURY TRIAL DEMANDED** |

**Exhibit Index**

Exhibit 1.................................................................Declaration of Kent Phillips

Exhibit 2.................................................................7/8/06 email from Bob Peacock

Exhibit 3.................................................................Hyundai-MacNeil Agreement

Exhibit 4.................................................................7/4/06 email from David MacNeil

Exhibit 5.................................................................7/10/07 email from David MacNeil

Exhibit 6.................................................................9/25/07 email from David MacNeil

Exhibit 7.................................................................4/26/07 email from Allan Thom

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MACNEIL AUTOMOTIVE PRODUCTS** | ) | |
| **LIMITED, an Illinois Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CANNON AUTOMOTIVE LIMITED, f/k/a** | ) | |
| **CANNON RUBBER LIMITED,** | ) | |
| **AUTOMOTIVE DIVISION,** | ) | |
| **a United Kingdom Company,** | ) | |
| | ) | |
| **Defendant.** | ) | **JURY TRIAL DEMANDED** |

<u>**DECLARATION OF KENT NAPIER PHILLIPS**</u>

I, Kent Napier Phillips, make this Declaration in support of MacNeil's Motion to Enjoin Defendant From Pursuing a Collateral Proceeding in a Foreign Jurisdiction.

1.      I am a partner in the firm of Winston & Strawn LLP, resident in the London office.  My firm acts as solicitors to the Plaintiff ("MacNeil") in England.  I am a Solicitor of the Supreme Court of England & Wales, and for the last 8 years have specialized in the field of international commercial litigation and arbitration.  I am authorized to make this Declaration on behalf of MacNeil.  I make this Declaration of my own personal knowledge and based upon information and belief, and would and could competently testify to the matters set forth below if called upon to do so.

2.      Mr Timothy Schaum of Daspin & Aumont, LLP, MacNeil's Illinois attorney, has supplied me with a copy of the Claim Form issued on 6 December 2007 in the High Court of Justice (Queens Bench Division) in London, England (Claim No. HQ07X04142), and served with the Particulars of Claim on MacNeil on 20 December 2007.  I have also been

supplied with a copy of the Application Notice dated 30 November 2007 (in which the Defendant, "Cannon" applied for permission to serve the Claim Form and Particulars of Claim on MacNeil who is located outside the jurisdiction of the English court), together with the witness statement of Richard Gary Marshall (Cannon's English solicitor) which was filed in support. I have reviewed these documents and a final draft of the Complaint, to be filed on behalf of MacNeil in this proceeding.

3.      I understand from my review of these documents that Cannon's claim in the English proceedings (totaling approximately £297,544.87 plus interest) relates to payment for its supply to MacNeil in Illinois of floor mats for automobiles. Cannon maintains that English law applies to the dispute. I understand that MacNeil's claim relates to losses arising out of defects in the floor mats supplied by Cannon, including losses of profits on additional business from existing customers in the US. I understand from Mr Schaum that MacNeil intends to recover its losses – exceeding $4 million - through the Courts in Illinois which would apply American law.

4.      I have not undertaken any comparative analysis of the legislation referred to in the Complaint as against English law equivalents, nor of the respective jurisdictions' laws of damages. However, the allegations made on behalf of MacNeil in Illinois would differ from those which would need to be brought if the matter were to proceed under English law. In particular:

4.1     the Complaint places reliance on the Illinois Consumer Fraud and Business Practices Act - relating to a prohibition on unfair and/or deceptive acts or practices in the normal course of trade or commerce – but I am not aware of any equivalent legislation applicable in England.

4.2     the Complaint places reliance on a covenant of good faith and fair dealing under the contracts implied by law.  Again, I am not aware of any equivalent applicable at English law.

4.3     the Complaint is framed in terms of breach of certain warranties with reference to the Uniform Commercial Code; although these concepts have broad equivalents at English law these may not be co-extensive.

4.4     the scope of damages available under English law were these allegations proven (as well as those available for the breaches of contract alleged) may not be co-extensive with those available to MacNeil in Illinois.  Perhaps more significantly, MacNeil may be exposed to claims from customers for damages under American law which may not necessarily be recoverable from Cannon at English law.

5.     I note that the Complaint demands a jury trial.  Were MacNeil required to bring the matter before the Courts of England, it would lose any right it may have to jury trial, since the only material provision for a jury trial in civil matters in England exists in fraud, libel and slander actions, and even then is subject to the Court's discretion.

6.     I have also been asked to comment on the method of service of foreign documents required by English law.  Section 1139 of the Companies Act 2006 ("Service of Documents on Company") allows service of a document by post, or by "*leaving it at the company's registered office*".  The Companies Register shows Cannon's registered office as 881 High Road, London N17 8EY.  At English law service of foreign process may (but need not) follow the Hague Convention process, and may be effected by process server.  In this case a solicitor of Winston & Strawn will personally serve Cannon by delivery of the Complaint and Motion to its registered office at this address, with a copy delivered to Cannon's English

solicitors, Manches LLP of Aldwych House, 81 Aldwych London WC2B 4RP (reference Mr RG Marshall).

**FURTHER AFFIANT SAYETH NOT**

Dated: January _8_, 2008

_Kent Phillips_ signature

Kent Phillips

Subscribed and sworn to
before me this _8th_
of January, 2008

_Taylor Yves Harrington_ signature

~~Solicitor/Commissioner for Oaths~~
Notary Public

```
┌─────────────────────────────────────┐
│            OFFICIAL SEAL             │
│     TAYLOR YVES HARRINGTON           │
│  NOTARY PUBLIC, STATE OF ILLINOIS    │
│  MY COMMISSION EXPIRES 2-13-2011     │
└─────────────────────────────────────┘
```

LN:21334.2

# EXHIBIT 2

**From:** Bob Peacock [mailto:Bob.Peacock@cannonauto.co.uk]
**Sent:** Thursday, June 08, 2006 1:39 AM
**To:** Dick Bidgood; Ruby King; Thelma Brett; Redif Husein; Steve Parish; Tony Lucciola; Andy Huggett; Trudy Smith; Alan Jackson - Junior; Alan Jackson; Dee Jackson
**Cc:** Al Thom; David F. MacNeil; Del Hollingsworth
**Subject:** FW: BMW Grey mat issue!
**Importance:** High

Can all of you please read all the emails below plus the attached photographs.

This is another example where we have let down our major customer but much more serious give him major problems with his customer !!! This is totally unacceptable and is down totally to a lack of control in our process....from mixing...to moulding...to packing !!!!!

I have personally given everybody at MacNeil Automotive assurance that this will not happen again . But why should they believe this !!!!! Later on they will get further problems from Cannon....they have lost trust in our creditability and who can blame them.

Ruby everyday somebody needs to check MacNeil products to ensure we are giving him the correct colours....the correct labels....the correct quality in all aspects....if we cannot get this right then we need to get people who can.

Dick/Ruby ...please ensure we have systems that prevent serious quality problems from ever reaching this customer or any others.

Bob


-----Original Message-----
**From:** Al Thom [mailto:arthom@macneil.com]
**Sent:** 08 June 2006 00:30
**To:** Bob Peacock
**Cc:** Dick Bidgood; David Macneil; Del Hollingsworth
**Subject:** BMW Grey mat issue!
**Importance:** High

Bob,

Our worst fears have been realized, as BMW dealers are beginning to complain of the color change to the grey mats!  We officially have a collossal mess on our hands...please see the attached photos and read below:

Another quote from BMW: a dealer in Birmingham Al. that claimes to have "several" sets that are off color and it is having an impact on his sales.
The most recent complaint came from Park Ave in NJ.  They have mats from E39 with

2003 and 2004 production dates and they are saying they have E90 mats with more current production with a similar issue. We all know the distance between front an back often makes this point moot, however, they are saying the color variation from 1 to the other is causing customer complaints.

There is a pretty good chance that BMW will require one (or more) of our people to visit every one of they're 6 warehouses in the US to "isolate" all the inferior mats so we can collect them (at our expense), and replace them by airfreight.

This is going to be ugly!

P.S. we never got a good explanation as to why-or-how the change took place in the first place!


Allan Thom


_____

**From:** SSA12866@aol.com [mailto:SSA12866@aol.com]
**Sent:** Wednesday, June 07, 2006 3:12 PM
**To:** David F. MacNeil
**Cc:** Al Thom; Del Hollingsworth
**Subject:** Fwd: FW: Stock Check.

Guy's

Here is another photo of the color issue. Mt. Olive is looking at all the gray mats they have and they are telling me that there are numerous sets off color.

Paul

-----------------------------------------------------------------------

This email and any files transmitted with it are confidential and

intended solely for the use of the individual or entity to whom they

are addressed. If you have received this email in error please notify

the system manager.


This footnote also confirms that this email message has been swept by MIMEsweeper for the presence of computer viruses.

www.cannonauto.co.uk

# EXHIBIT 3

## PARTS FOR RESALE
## PURCHASE AGREEMENT

This Parts for Resale Purchase Agreement (the "Agreement"), dated as of June 1, 2004, by Hyundai Motor America (hereinafter referred to as "HMA"), and MacNeil Automotive Products Limited (hereinafter referred to as "Seller") contains additional terms and conditions for the purchase by HMA of certain products manufactured and/or supplied by Seller, and is hereby made a part of the standard HMA Blanket Purchase Order ("P.O."). These additional terms and conditions supersede the terms and conditions of the Blanket P.O. only to the extent that they are inconsistent therewith. In all other respects, the provisions of both this Agreement and the Blanket P.O. remain in full force and effect. The additional terms and conditions are as follows:

I.        **TERM**

A.        This Agreement shall become effective following execution by two (2) authorized employees of HMA of Director level or higher and receipt by HMA of written acceptance by Seller. This Agreement shall continue in effect for a period of three (3) years from the date listed in the first paragraph on page 1 above, unless earlier terminated as permitted herein, at which time it shall automatically expire without further notice. At the option of HMA, and subject to the terms of HMA's Purchasing Policy, this Agreement may be extended for subsequent one (1) year periods. All extensions shall be documented in writing.

B.        Either party shall have the right to terminate this Agreement and any orders pending hereunder, at any time without cause, following thirty (30) days prior written notice to the other.

II.       **PRODUCT DESCRIPTION AND ENGINEERING REQUIREMENTS**

A.        Seller shall design, manufacture and/or supply HMA with Floor Mats and other automotive accessories (hereinafter referred to as "Product(s)") for application on Hyundai vehicles, that meet all requirements submitted in writing to Seller by HMA or otherwise approved by HMA in writing.

B.        Prior to the execution of this Agreement, Seller must submit to HMA its specifications, test reports and any other information specifying the functions, roles and responsibilities necessary to assure the quality of the Product, and HMA hereby agrees to keep, in strict confidence, all such information submitted by Seller.

C.        Seller warrants that Seller and each Product manufactured or supplied by Seller shall comply with all applicable federal, state and local laws, rules, orders, regulations and standards (including, but not limited to, provisions of information and materials required hereunder by the federal Occupational Safety and Health Act ("OSHA") Hazard Communication Standard and state "Right to Know" laws, and compliance with safety, noise and emission standards) in effect on the date of each particular Product shipment from Seller to the destination specified by HMA. The foregoing warranties shall remain in effect during the entire period of use of each Product.

IN THE CASE OF HAZARDOUS MATERIALS, SELLER IS TO PROVIDE HMA WITH A MATERIAL SAFETY DATA SHEET ("MSDS") FROM THE ORIGINAL MANUFACTURER OR SUPPLIER WITH EACH SHIPMENT OF PRODUCT(S). ANY SHIPMENT OF HAZARDOUS MATERIALS WITH A MISSING OR INCORRECT MSDS SHALL BE SUBJECT TO THE REJECT PROCEDURE DESCRIBED IN ARTICLE IX BELOW.

- 1 -

D.     Seller shall mark Products to identify them as those supplied to HMA pursuant to this Agreement. This identifying mark shall be of a type and in a place approved in advance in writing by HMA. Products with missing or incorrect marks shall be subject to the reject procedure described in Section IX below.

E.     Seller shall affix an HMA-approved identifying label to each intermediate carton, which is within the master carton, indicating HMA part number, description and quantity. Cartons or master cartons with missing or incorrect labels shall be subject to the HMA Debit System described on Exhibit 1 which is attached hereto and incorporated herein by this reference.

F.     No changes may be made by Seller or Seller's subcontractor(s) to Products after final acceptance by HMA of submitted specifications without express prior written permission from HMA.

G.     At all times and at no additional cost, HMA shall have title to any and all drawings, specifications, reports, records, documents and other materials (and to all copies of each of the foregoing) prepared by HMA, Seller, or their employees, representatives, subcontractors or agents pursuant to or for this Agreement. Seller shall use these drawings, specifications, and other technical information only in connection with this Agreement and shall not disclose any one or more of the foregoing to any person or entity without obtaining HMA's prior written consent. All Product subcontractors shall provide for assignment to HMA of any HMA-approved documents or materials prepared by them, and in the event Seller fails to secure such assignment, Seller shall indemnify HMA for all damages suffered thereby. Following expiration or termination of this Agreement or, upon HMA's earliest request, Seller shall promptly return to HMA all drawings, specifications, reports, records, documents and other materials referenced above (and all copies of each of the foregoing). The drawings, specifications, reports, records, documents and other materials (including the terms of this Agreement) prepared by HMA or Seller, their employees, representatives, subcontractors and agents in the performance of this Agreement, are confidential and proprietary, and shall not be released publicly without the prior written approval of HMA.

**III.     PACKAGING**

A.     Seller shall package products in an HMA approved shipping carton with a legible packing slip which identifies the HMA Purchase Order Number, part number(s), description(s), and quantities enclosed. Seller shall include in every carton printed installation instructions, as approved in advance in writing by HMA. Prices for such packaging will be included in the pricing on the Blanket Purchase Order. Products with packing slip discrepancies shall be subject to the HMA Vendor Debit System described in Exhibit 1 hereto.

B.     Seller shall package products individually in a minimum 175 lb. test-shipping carton with either an FOL (Fold over Lap) or RSC (Regularly Slotted Carton) style closure. Cartons smaller than .5 cu. ft. will be further multi-packaged into a 200 lb. test RSC carton capable of being developed into a palletized load. Any changes must be approved in advance by HMA.

C.     Seller shall affix labels to the end flap of each carton. HMA shall approve camera-ready artwork setting forth the format of the label. Seller shall "date-code" Products as specified by HMA. Products with missing or incorrect date-codes, and cartons with missing or incorrect labels, shall be subject to the HMA Vendor Debit System described in Exhibit 1 hereto.

D.    Seller hereby warrants that all Products and packaging will bear all markings and labels required by applicable federal, state and local laws, rules and regulations, as such requirements may be amended from time to time.

E.    Neither the Seller's name nor its logo shall appear on the carton or Products, unless approved in advance in writing by HMA.

F.    Seller shall place Products on pallets and band for shipment in a manner and in quantities approved by HMA.

G.    Seller shall make shipments only on pallets of which the dimensions have been approved by HMA. Each pallet will be 42" x 48" and have four-way entry. Each pallet will contain shipping cartons not to exceed a maximum height of 42" including the pallet, or as otherwise specified by HMA. Seller shall obtain approval from HMA prior to making any changes in the dimensions of pallets used by Seller to ship Products under this Agreement.

## IV.    NON-EXCLUSIVE LICENSE

A.    Notwithstanding anything to the contrary, Seller shall have no right, title or interest in any HMA, Hyundai Motor Finance Company ("HMFC"), or Hyundai Motor Company ("HMC") name, trade name, or trademark pursuant to this Agreement. Seller's sole privilege under this Agreement is a non-exclusive, limited license to sell products to HMA, some of which bear in whole or in part trademarks owned or licensed by HMA, HMFC, or HMC. Upon the termination or expiration of this Agreement, Seller's limited privilege to sell products using such trademarks shall immediately cease. Any trademark used by Seller in the course of this Agreement must be reviewed and approved in advance, in writing, by HMA.

B.    HMA agrees to indemnify and save Seller harmless from any claims of trademark infringement arising from the limited license of Section IV (A) when such trademark is produced with the written authorization of HMA in accordance with Section IV (A) above, provided that (i) Seller promptly notifies HMA in writing of the claim; (ii) HMA shall have the sole control of the settlement or defense of any action to which this indemnity relates; and (iii) Seller cooperates with HMA in every reasonable way to facilitate such defense.

## V.    INSPECTION BY HMA

A.    Seller will permit HMA's representatives to visit Seller's factories or facilities used to produce the Products manufactured and/or supplied hereunder, and inspection visits may be made during normal business hours upon notice to Seller in advance, for the purpose of determining whether said Products are being manufactured in accordance with the terms and provisions of this Agreement. Notwithstanding the foregoing, HMA has no obligation to make any inspection visits. Further, inspection visits shall not supplant Seller's warranties or other obligations hereunder.

B.    At HMA's request, Seller shall deliver to HMA a reasonable number of Products for a determination of the compliance of said Products with this Agreement. Such Products shall be delivered per price quotes provided and approved by Hyundai personnel. Delivery of such Products shall not supplant Seller's warranties or other obligations hereunder; Seller retains at all times the obligation to ensure product compliance within the warranty period. Seller further agrees to ship Products ordered hereunder within thirty (30) days of the date manufacture of such Products.

C.    Seller shall keep such records and data concerning the manufacture and sale of Products hereunder as shall be necessary to perform the services required by this Agreement and enable HMA to evaluate the performance of such services. Such records shall be available for review and audit by HMA's representatives at all reasonable times during the term of this Agreement and any amendment hereof, and for two (2) years thereafter upon request with reasonable notice, provided that for fixed price Products, Seller shall not be obligated to make any financial information available to HMA (except as otherwise noted in this Section or in Section VII (D). For cost-plus or pass-through charges to HMA under this Agreement or any amendment hereof, however, such records shall include but not be limited to, time records and all expense documentation. Copies of said records, including without limitation proof of payment of taxes due pursuant to Section XXVI of this Agreement, shall be provided to HMA upon request, at cost.

## VI.    PURCHASING PROCEDURES

A.    Seller shall supply Products of the type and in the manner specified in Sections II and III above pursuant to the terms and conditions of HMA's Blanket P.O. and this Agreement. The Blanket P.O. may contain estimated requirements for a period of time so specified, but shall not be construed as HMA's authorization to Seller to purchase raw materials, produce Products, or ship them to HMA.

B.    Seller will acknowledge an order by completion of the acknowledgment copy of the Purchase Order and execution of the Purchase Agreement. The return of these documents to HMA constitutes Seller's acceptance of the Purchase Order. Failure by Seller to execute and return such documents to HMA within fifteen (15) business days of receipt thereof, will permit HMA to cancel the Purchase Order with five (5) days prior written notice to Seller, and HMA shall have no liability to Seller for such cancellation or costs arising therefrom.

C.    Authorization for production and shipment of Products shall be made on individual release orders from HMA's National Parts Supply Department which shall incorporate all the terms and conditions of the Blanket P.O.

D.    All Products are to be shipped on or before the date specified in the HMA release, and always within thirty (30) days of the HMA release order date.

E.    As required to accommodate Seller lead-times, HMA will also provide forecasts of thirty (30) days. However, HMA shall not be obligated to purchase any Products forecasted beyond sixty (60) days from the date of an HMA release order.

| Forecast (days): | 30_____ | 60 |
| Variance (+ or -): | Firm | 10% |

F.    Inventory

Unless otherwise directed by HMA, Seller shall maintain an inventory, and have available for shipment at all times a quantity of each Product equivalent to the most recent thirty (30) day order or forecast for each Product.

- 4 -

Additionally, Seller understands that HMA's warranty on new cars requires access to service parts for five (5) or more years. Therefore, Seller agrees to use its best efforts to maintain production capability on all Products sold to HMA hereunder for a period of six (6) years from the date of shipment to HMA. In the event Seller cannot maintain such production capability, Seller agrees to provide HMA with no less than ninety (90) days written notice of proposed discontinuance of a Product. This notice will permit HMA to buy sufficient replacement Products prior to disposal of Seller's tooling.

## VII.    PRICING AND PAYMENT

A.    Product prices shall be F.O.B., Downers Grove, IL. and shall be inclusive of all charges to HMA, including, but not limited to, the cost to maintain HMA's tooling in production ready condition, and all setup, inventory and subcontractor's costs.

B.    Payment terms shall be thirty (30) days from the date of HMA's receipt of invoice.

C.    Seller's prices shall remain firm for a period of twelve (12) months from the effective date of this Agreement, and shall be automatically renewed unless a price change request is submitted by Seller with not less than sixty (60) days prior written notice. Seller may not request a price increase more than once during any twelve (12) month period, unless HMA requests a structural change be made to the Product.

D.    Proposals for price changes submitted by Seller shall be accompanied by sufficient documentation (including, but not limited to, proof of Seller's increased costs) to enable HMA to reasonably evaluate and approve the changes. Seller may not disclose prices under this Agreement to any third party without HMA's specific written authorization.

E.    Invoices

For each shipment of Products, Seller shall submit an invoice to HMA including the following information:

- HMA Purchase Order number
- HMA Part number
- HMA Customer number
- Unit price
- Quantity shipped
- Warranty % discount amount as a separate line item, if applicable
- Destination of shipment

F.    In the event of an uncured default by Seller, HMA may withhold from any moneys payable to Seller sufficient funds to compensate HMA for any losses, costs, liabilities or damages suffered by HMA due to such default of Seller under this Agreement.

## VIII.   DELIVERY

A.   Delivery shall be made within thirty (30) days of receipt by Seller of release order or as otherwise agreed. Drop-shipments to HMA dealers will be made within twenty-four (24) hours from Seller. All Product shipments must be accompanied by a legible packing slip (as noted in Section III (A) above) and invoice (as noted in Section VII (E) above).

B.   Seller shall be responsible for any and all freight costs of late shipments, including the use of premium freight at HMA's option. Seller shall ship late shipments freight prepaid unless otherwise instructed by HMA. Late shipments are defined as Products not shipped within thirty (30) days of Seller's receipt of an HMA release order or as otherwise agreed.

## IX.   REJECTS

A.   Rejects are herein defined to mean failed Products and/or Products which do not conform to specifications set forth in Sections II and III (including packaging specifications but other than Products with packing slip and labeling discrepancies addressed in Exhibit 1 hereto), which rejects are discovered by HMA or subsequent purchasers.

B.   HMA shall notify Seller in writing of rejects at any time until the warranty period referenced in Appendix A (which Appendix is attached hereto and incorporated herein by this reference) expires. Additionally, HMA shall provide Seller with an opportunity to examine rejected Products upon Seller's request. Any rejected products or packaging returned to Seller for analysis shall be shipped to Seller freight collect. Seller must dispute HMA's determination within sixty (60) days of receipt of notice of rejected Products or packaging in a writing clearly identifying all objections. HMA's remedies in the event of rejects shall include, but not be limited to, the reject procedure set forth below.

C.   <u>Reject Procedure</u>

1.   Seller shall replace each reject or rejected packaging with a non-defective and conforming part or packaging within five (5) business days at its own CIF expense, or

2.   Seller shall reimburse HMA for the current Seller's selling price of each reject plus freight or, in the event of defective packaging, for the cost of repackaging, including labor; and

3.   Seller shall make an emergency shipment, within seventy-two (72) hours (including by air freight) at Seller's own expense. HMA will make a good faith effort to use such freight only to the extent HMA has immediate need for the Products.

4.   Rejects and rejected packaging shall be returned to Seller by HMA freight collect. If requested in writing, Seller may choose the means of disposition or request that rejects and related packaging not be returned.

5.   For shipments received by HMA which contain less than the number of invoiced items or which contain mis-packed items, Seller shall provide all missing units within ten (10) days, or fully compensate HMA within sixty (60) days, after notification from HMA of the receipt of such short or mis-packed shipments.

6.    Reject replacement parts installed on vehicles will be charged back to Seller at Hyundai dealer cost plus 40% parts handling allowance (mark up), plus labor, plus other related repair expenses, which charge back amount is subject to change with at least (30) days prior written notice to Seller.

7.    In the event any Product has a reject rate of over four percent (4%), Seller shall, in addition to the foregoing, renegotiate the warranty reject percentage with HMA.

## X.    WARRANTY

A.    Seller shall warrant all products supplied to HMA as specified in Appendix A hereto, and shall acknowledge said warranty by signing Appendix A in the place so indicated and returning a signed copy of said Appendix A to HMA with the Purchase Order acknowledgment copy and Purchase Agreement.

B.    Seller understands that in certain instances Product complaints are brought to HMA's attention within the relevant warranty period that are not due to defects in materials or workmanship under normal use. In order to maintain the goodwill of consumers of its Products, Seller agrees to reasonably review such complaints and work with HMA to address the consumer's concerns.

C.    Seller understands that in certain instances Product complaints are brought to HMA's attention after the relevant warranty period has expired. In order to maintain the goodwill of consumers of its Products, Seller agrees to reasonably review such post-warranty complaints and work with HMA to address the consumer's concerns.

## XI.    RECALL

In the event of a government-ordered or voluntary recall or Product change resulting from an alleged defect or failure in the design, manufacture, workmanship or materials of Products, Seller shall indemnify and hold harmless HMA, its employees, agents and Hyundai dealers from and against any and all losses, costs and expenses, including administrative costs and expenses associated with, but not limited to, legal costs and attorneys fees, costs of procuring names and addresses of consumers, mailing/freight and storage costs, and administrative costs and expenses associated with remedying the defect or failure and/or conducting a recall campaign.

## XII.    INDEMNITY

Seller shall defend, indemnify and hold harmless HMA, its employees, agents and Hyundai dealers from and against any and all liability, losses, claims, actions, suits, proceedings, damages, costs and expenses, including, but not limited to, legal costs and attorneys' fees, for injury to or death of person(s), for damages to property, and for errors and omissions committed by Seller, its employees, representatives, agents and subcontractors, based on or arising out of any allegation that any Product manufactured or supplied by the Seller pursuant to this Agreement is defective or that such Product is not in compliance with applicable federal, state or local laws, rules or regulations. HMA agrees to give Seller prompt written notice of any such claims, action, suit or proceeding and Seller shall thereafter assume and diligently conduct the defense thereof.

## XIII.    INSURANCE

Seller represents, and HMA relies upon the representation that, Seller currently maintains commercial general liability and property damage insurance, including contractual and product liability/completed operations insurance, with minimum combined single limits of Five

- 7 -

Million Dollars ($5,000,000) per occurrence for each claim which may arise in connection with Products manufactured or supplied by Seller to HMA or Hyundai dealers. The insurance policy or policies shall contain a severability of interest clause providing that the coverage shall be primary for losses arising out of Seller's performance hereunder and neither HMA nor its insurers shall be required to contribute to any such loss.

NOTE:    Seller shall furnish HMA a certificate of insurance from its insurance carrier(s) evidencing such insurance, naming HMA as additional insured, and providing that HMA shall receive ninety (90) days prior written notice by the insurance carrier(s) of any change, non-renewal, cancellation or reduction in coverage. Insurance certificate(s) shall be delivered to and approved by HMA prior to the commencement of the services hereunder. The procuring of such insurance, or the delivery of policies or certificates evidencing the same, shall not be construed as a limitation of Seller's obligation to indemnify HMA, its employees, agents and Hyundai dealers.

## XIV.    PATENT

Except as otherwise noted in Section IV (B) above, Seller shall defend at its sole expense any suit or proceeding brought against HMA, its employees, agents and/or Hyundai dealers, based upon any claim that any Product which is the subject of this Agreement infringes any United States or foreign patent, trademark, copyright or trade secret.  Seller shall indemnify and hold harmless HMA, its employees, agents and Hyundai dealers from and against any and all losses, costs and expenses, including, but not limited to, legal costs, attorney's fees, and administrative costs and expenses, incurred in connection with any such claim(s).

## XV.    ROYALTIES

If Seller obtains new customers due in any part to the recommendation or referral by HMA, Seller agrees to share with HMA a negotiable percent of all moneys received from said customers, excluding taxes and shipping charges (herein "Royalties"). Seller shall provide HMA with monthly invoices itemizing all Royalties earned. HMA shall have the option to receive its Royalties either by check or in credits applicable to purchases from Seller. HMA shall have access, during Seller's normal business hours, to all records relevant to Royalties due under this Section, including the right to inspect, copy, audit and make records and transcripts from such records, for the purpose of verification by HMA of Royalties due from Seller.

## XVI.    HMA PROPERTY

Unless otherwise specified in separate written agreements between HMA and Seller, all tools, equipment, dies, jigs, specifications and other material of every description furnished to Seller by HMA in the performance of this Agreement, shall be inspected by Seller for condition, compliance with specifications, descriptions and count, but shall remain the sole property of HMA, shall be plainly marked and/or otherwise clearly identified by Seller as "Property of Hyundai Motor America," shall be stored on Seller's premises, shall be stored and used in compliance with any instructions of HMA so as to prevent disclosure inconsistent herewith, shall not be used except for the production of goods for HMA, shall be subject to HMA's inspection at any time during business hours, immediate possession on demand and, in any event, shall be returned to HMA simultaneously with termination or expiration of this Agreement.

HMA property identified above shall be insured at Seller's cost in amounts equal to its full replacement value with loss payable to HMA, and shall be subject to HMA's immediate possession and total control. Excepting only reasonable wear and use, such property in the

- 8 -

possession of Seller shall be kept at Seller's risk and Seller shall be responsible for all maintenance thereof.

## XVII.    GOVERNING LAW

This Agreement shall be construed and interpreted both as to validity and to performance of the parties in accordance with the laws of the State of California. Legal actions concerning any dispute, claim or matter arising out of or in relation to this Agreement shall be instituted in Orange County Superior Court, State of California, or any other appropriate court in such county, and both parties covenant and agree to submit to the jurisdiction of such court in the event of such action.

## XVIII.    OTHER SUPPLIERS

HMA reserves the right to authorize other persons, firms or corporations to design, manufacture, and/or supply to HMA products similar to those of Seller for application on Hyundai vehicles.

## XIX.    DEFAULT AND TERMINATION PROCEDURES

A.    Except as otherwise provided herein, if HMA cancels or otherwise breaches a binding obligation to purchase Products, and if Products are made especially for HMA and cannot be sold to other purchasers or otherwise used by Seller in its business, Seller shall promptly advise HMA of the quantities of HMA authorized work and material purchased pursuant to a valid release order prior to HMA default, and the most favorable disposition that Seller can make thereof. Seller shall comply with HMA's instructions regarding disposition of such work and material. All claims by Seller based on such default must be asserted, in writing and in full, within thirty (30) days from the date of default. HMA will make no payments for such finished work, work in process, or raw material procured or fabricated by Seller unnecessarily in advance or in excess of HMA's delivery requirements pursuant to valid release orders. The payment provided under this Section XIX shall constitute HMA's sole liability in the event this Agreement is breached as provided herein.

B.    To the extent this Agreement covers items normally carried in inventory by Seller (as distinguished from items specially made to HMA's specifications), HMA shall have no liability to purchase such items following termination of this Agreement. During the thirty (30) days notification period prior to termination, HMA shall be liable for the purchase of such items only if such items are included in a valid release order.

C.    Within ten (10) business days following the termination of this Agreement, Seller shall, at its sole expense, return and deliver to HMA all documents containing technical information, drawings, or specifications referenced in Section II (G) of this Agreement, together with any reproduced copies thereof and, if applicable, all of HMA's tooling and materials referenced in Section XVI of this Agreement.

## XX.    USE OF NAME

Both parties acknowledge that neither shall acquire any right, title or interest in the name(s), trade name(s) or trademark(s) of the other pursuant to this Agreement. Neither party shall use the name(s), trade name(s) or trademark(s) of the other after expiration or termination of this Agreement. The parties understand that the limited authorization, if any, to use such names, trade names, and trademarks may be terminated at any time by the other party, and shall terminate

immediately upon the giving of written notice by the party licensing or owning such name, trade name or trademark.

## XXI. INDEPENDENT CONTRACTOR

Neither HMA nor any of its employees or agents shall have any control over the manner, mode or means by which Seller, its agents, employees, representatives or subcontractors, perform the services required herein. Seller shall perform all services required herein as an independent contractor of HMA and shall remain at all times as to HMA a wholly independent contractor with only such obligations as are consistent with that role. Seller shall not at any time or in any manner represent that it or any of its agents, employees, representatives or subcontractors are agents or employees of HMA.

## XXII. WAIVER

No delay or omission in the exercise of any right or remedy of a non-defaulting party on any default shall impair such right or remedy or be construed as a waiver. HMA's consent to or approval of any act by Seller requiring HMA's consent or approval shall not be deemed to waive or render unnecessary HMA's consent to or approval of any subsequent act of Seller. Any waiver by either party of any default must be in writing and shall not be a waiver of any other default concerning the same or any other provision of this Agreement.

## XXIII. RIGHTS AND REMEDIES ARE CUMULATIVE

Except with respect to rights and remedies expressly declared to be exclusive in this Agreement, the rights and remedies of the parties to this Agreement are cumulative, and the exercise by either party of one or more of such rights or remedies shall not preclude the exercise by it, at the same or different times, of any other rights or remedies for the same default or any other default by the other party.

## XXIV. LEGAL ACTION

In addition to any other rights or remedies, either party may take legal action, in law or in equity, to cure, correct or remedy any default, to recover damages for any default, to compel specific performance of this Agreement, to obtain injunctive relief, or to obtain any other remedy consistent with the purposes of this Agreement.

## XXV. SEVERABILITY

If any term or provision of this Agreement, or the application thereof to any person or circumstance, shall be declared invalid, void, or unenforceable by a valid judgment or decree of a court of competent jurisdiction, such term or provision will be deemed deleted from this Agreement, and the remaining terms and provisions, and any application thereof, will continue in full force and effect without being impaired or invalidated in any way and shall be interpreted to carry out the intent of the parties hereunder.

## XXVI. TAXES

Seller shall pay all local, state, federal, or other applicable fees, assessments and taxes, including without limitation, sales taxes, use taxes, excise taxes, and customs assessments, levied or based upon the sale of Products to HMA hereunder, and Seller shall maintain accurate records of same for reporting purposes.

**XXVII.    FORCE MAJEURE**

Performance by either party pursuant to this Agreement shall be extended because of any delays due to unforeseeable causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God, wars, fires, earthquakes, floods, riots, strikes, freight embargoes and acts of any governmental agency provided the delaying party shall within three (3) business days of the commencement of the delay notify the other party in writing of the causes of the delay. The time for performance of the subject at issue shall be extended for the period of the enforced delay.

**XXVIII.    NOTICE**

A.    Unless otherwise specifically provided herein, any notice required to be given by either party to the other under or in connection with this Agreement shall be in writing and delivered personally, or by nationally recognized overnight delivery service, or by certified mail, return receipt requested and will be effective from the date of receipt. Alternatively, either party may fax notices, provided that no fax notice shall be deemed communicated until telephone confirmation of receipt by the individual addressee is received.

Notices to the Seller will be directed to:

Representative:    Allan Thom
Seller's Firm:    MacNeil Automotive Products Limited
Seller's Address: 2435 Wisconsin Street
                  Downers Grove, IL 60515
Telephone:        630-769-1500
Fax:              630-769-0300

Notices to HMA will be directed to:

Ted Boudalis
Parts Development Manager
Parts Marketing
Hyundai Motor America
10550 Talbert Avenue
Fountain Valley, CA 92708
Telephone: (714) 965-3870
Fax:          (714) 965-3835

B.    Either party may change its address by notifying the other party of the change of address in writing.

/
/
/
/
/
/
/
/
/
/

- 11 -

**XXIX.    CAPTIONS**

The various captions used in this Agreement are for reference purposes only and are not to be construed in any way as part of this Agreement. In any case where the caption and the related text conflict, the text will govern.

**XXX.    EXHIBITS**

All exhibits and appendices hereto are incorporated by reference and are made a part hereof as if they were fully set forth herein.

**XXXI.    ASSIGNMENT**

The experience, knowledge, capability and reputation of Seller, its officers and employees, were a substantial inducement for HMA to enter into this Agreement. Therefore, Seller shall not contract with any other entity to perform in whole or in part the services required hereunder without express prior written consent of HMA. If Seller is permitted to subcontract any part of this Agreement, Seller shall be as fully responsible to HMA for the acts and omissions of its subcontractors as it is for the acts and omissions of persons directly employed by Seller. In addition, neither this Agreement nor the rights or obligations of either party hereunder may be sold, assigned, delegated, or otherwise transferred, voluntarily or by operation of law, without the prior written consent of the other party.

**XXXII.    INTEGRATED AGREEMENT**

Except as otherwise specifically provided for herein, this Agreement constitutes the entire Agreement of the parties, contains all covenants, warranties, or representatives made by the parties to each other, and supersedes any and all previous agreements, whether oral or in writing, between the parties and relating to the subject matter covered herein.

**XXXIII.    AMENDMENT**

No amendment of any portion of this Agreement will be valid or binding upon the parties hereto unless the same is approved in writing by an authorized representative of each of the parties.

/
/
/
/
/
/
/
/
/
/
/
/
/
/

**XXXIV.    SIGNATURE**

The persons executing this Agreement on behalf of the parties hereto warrant that they are duly authorized to execute this Agreement on behalf of said parties.

By their signatures hereto, the parties agree to abide by the terms and conditions of the Contract.

**HYUNDAI MOTOR AMERICA ("HMA")**

By:    Frank Ferrara
Its:    Executive Vice President,
        Parts and Service

By:    Keith Duckworth
Its:    Executive Vice President,
        Administrative Services

**MACNEIL AUTOMOTIVE PRODUCTS LTD ("SELLER")**

By:  David MacNeil
Its:  President

## HMA VENDOR DEBIT SYSTEM FOR
## LABELING AND PACKING SLIP DISCREPANCIES

### EXHIBIT 1

Sections II and III of the foregoing Purchase Agreement outline HMA's packaging requirements for Products manufactured and/or supplied by Seller. In the event that any shipment from Seller fails to meet specifications due to missing, incorrect or incomplete labeling and/or packing slips, HMA will document the discrepancies and debit Seller's account payable by Twenty-five Dollars ($25.00) per occurrence. Each of the following errors shall constitute an occurrence subject to issuance of a debit memo:

| ERROR CODE | ERROR TYPE |
|---|---|
| A | Missing/incorrect HMA Customer Order Number |
| B | Missing/incorrect HMA Part Number |
| C | Missing/incomplete Packing Slip |
| D | Missing/incorrect labels on cartons or master cartons |
| E | Missing/incorrect date-codes on Products |
| F | Incorrect quantities vs. Packing Slip |

Debit memos will be issued quarterly by HMA. Seller shall receive a copy of each debit memo referencing Seller's packing slip number.

- 14 -

**APPENDIX A-1**
**WARRANTY AGREEMENT**

I.          This Warranty Agreement is made by MacNeil Automotive Products Limited (hereinafter referred to as "Seller") as of the 1st day of June, 2004, for the benefit of Hyundai Motor America ("HMA"), all Hyundai dealers, and purchasers of Products supplied by Seller to HMA pursuant to the Purchase Order and/or Purchase Agreement (herein "Contract") which incorporates this Warranty Agreement by reference.

II.          Seller warrants that all Products supplied pursuant to the Contract shall be free from defects in materials or workmanship under normal use, service and maintenance for that period identified in Section III below within which HMA and Hyundai dealers in the fifty (50) United States and Washington, DC warranty each new Hyundai part or accessory.

III.     HMA's warranty is as follows:

   A.     New Vehicle Limited Warranty:

          The part or accessory, if installed on a new vehicle at the time of or any time prior to or .after the vehicle's date of delivery or the date vehicle is first put into service, whichever is earlier, shall be warranted for up to 60,000 miles or 60 months, from the vehicle's date of delivery or the date vehicle is first put into service, whichever occurs first or the remainder of the New Vehicle Limited Warranty.

   B.     Replacement Parts Limited Warranty:

          The part or accessory, if installed after the expiration of the 60 month, 60,000 mile New Vehicle Limited Warranty period, shall be warranted for 12,000 miles or 12 months from the date of installation, whichever occurs first. A part or accessory purchased over-the-counter shall be warranted for 12 months from the date of purchase.

   C.     Accessory Limited Warranty:

          An accessory installed on a new vehicle at the time of, or prior to the vehicle's date of delivery to the original retail purchaser, or the date the vehicle is first put into service, whichever is earlier, is covered under the New Vehicle Limited Warranty and is limited to 60 months from the date of original retail delivery or date of first use, or 60,000 miles, whichever occurs first.

IV.          A.     SELLER AGREES THAT EACH WARRANTY CLAIM SHALL BE PROCESSED ACCORDING TO THE PAPERLESS WARRANTY PROCESSING PROCEDURES OF HMA, AND UPON SUBMISSION OF AN ELECTRONICALLY PRINTED CLAIM SUMMARY.    SELLER SHALL REIMBURSE HMA WITHIN THIRTY (30) DAYS AFTER RECEIPT OF A CLAIM IN THE FOLLOWING AMOUNTS:

- THE CURRENT HYUNDAI DEALER COST OF THE PRODUCT(S), INCLUDING ANY HMA SUPPLIED PART THAT IS DAMAGED DUE TO THE FAILED SELLER'S PRODUCT, PLUS A MARK-UP TO COVER DEALER HANDLING COSTS AS IDENTIFIED BELOW. THIS MARK-UP IS SUBJECT TO CHANGE WITH AT LEAST THIRTY (30) DAYS PRIOR WRITTEN NOTICE TO SELLER. 40% MARK-UP

- ANY LABOR COST RESULTING FROM THE WARRANTY REPAIR BY AN AUTHORIZED HYUNDAI DEALER IN ACCORDANCE WITH HMA'S LABOR TIME STANDARDS MANUAL AT A LABOR RATE IN ACCORDANCE WITH HMA'S LABOR RATE APPROVAL PROCESS. LABOR TIME STANDARDS TESTING TO ARRIVE AT TIME ALLOWANCES WILL BE PERFORMED BY HMA, BUT SELLER MAY ASSIST IN THE PROCESS.

- ANY SUBLET COST RESULTING FROM THE WARRANTY REPAIR FOR WHICH AN AUTHORIZED HYUNDAI DEALER IS REIMBURSED.

- ANY TOWING EXPENSES RELATIVE TO THE WARRANTY REPAIR FOR WHICH AN AUTHORIZED HYUNDAI DEALER COULD BE REIMBURSED.

- ANY AND ALL FREIGHT COSTS ASSOCIATED WITH THE RETURN OF FAILED PRODUCTS. THIS COST MAY BE SEPARATELY ~~INVOICED OR CHARGED AS~~ AN ADDITIONAL FACE DISCOUNT AGAINST EACH PRODUCT PURCHASED.

B.    Upon request, HMA will provide Seller with a statement of warranty activity for review.

C.    When requested, HMA will use its best efforts to obtain a representative sampling of failed Products and return the same to Seller, freight collect. These Products will be tested by Seller and the results released to HMA.

V.    It is understood that new, and/or changing state, and/or federal laws, as well as consumer and/or aftermarket considerations, may require changes in warranties. HMA may, in its sole discretion, make such changes which may be required by law, regulation, rule or guide. HMA agrees to give Seller as much notice as it can of any such changes.

VI.    If HMA desires to voluntarily make other changes in its standard warranties, and if the effect of said other changes is to increase Seller's financial obligations or costs, HMA and Seller will negotiate in good faith and attempt to arrive at such voluntary changes which are mutually acceptable.

The provisions of this Warranty Agreement shall survive the termination or expiration of the Contract.

By their signatures hereto, the parties agree to abide by the warranty provisions herein and in the Contract.

**HYUNDAI MOTOR AMERICA**
**("HMA")**

By:   Frank Ferrara
Its:   Executive Vice President
       Parts and Service


By:   Keith Duckworth
Its:   Executive Vice President
       Administrative Services

**MACNEIL AUTO PRODS LTD**
**("Seller")**

By:  David MacNeil
Its:  President

# EXHIBIT 4

## Bob Peacock

| | |
|---|---|
| **From:** | David F. MacNeil [dfmacneil@macneil.com] |
| **Sent:** | 04 July 2006 16:00 |
| **To:** | Bob Peacock |
| **Cc:** | Al Thom |
| **Subject:** | RE: Carpet adhesion inspection |

Bob, what your other customers complain about or don't complain about is irrelevant! Even remotely blaming Hyundai for the problem because of the way they store the mats is ridiculous! Please don't insult our intelligence with lame excuses! That again confirms to me that Cannon does not take building quality floormats seriously or that this was a real problem! It's so easy to blame someone else for YOUR problems! That won't work in this situation. Did the carpet that literally fell out of the mats in my conference room during your last visit, fall out due to Hyundai's improper storage or was it poor Cannon quality? Well Bob, those mats were fresh from Cannon's factory and had obviously never been in Hyundai's possession. My theory is that the ship the container was on sailed through some rough seas and the "wave action" shook the carpet loose! Right!



Obviously some of the inferior mats Cannon built got past our inspection people (I will deal with that internally), Our people were probably unprepared to deal with such horrific quality! however the quality responsibility rests 100% with Cannon and I expect that Cannon will financially stand behind the product and all of the expenses associated with dealing with this issue.

My guess is that Hyundai may sue MacNeil and also sue Cannon. THIS is what we are trying to prevent.

Since you don't have a plan,
here's mine:
If Hyundai allows us, Cannon will sent over 3 or 4 top people to personally inspect and repair, by a mutually agreeable method at Hyundai's locations, all 11,500 sets that Hyundai has in stock. My guess is that this will take about a month.

Who is coming and when? By the way, I don't and Hyundai doesn't care about vacations or holidays! This problem needs to go away NOW!
DMN

---

**From:** Bob Peacock [mailto:Bob.Peacock@cannonauto.co.uk]
**Sent:** Tuesday, July 04, 2006 9:32 AM
**To:** David F. MacNeil
**Subject:** RE: Carpet adhesion inspection

David....I started my email by saying I understood the frustration and annoyance. $500,000 is a huge sum and certainly not something I could authorise.



With regard to the problem I can only assure you that no other customer as made the complaint...perhaps it is the way Hyundai store mats since as you say both Jason and Dan were doing a 100% inspection it appears problems were still occurring.

We did not ignore the complaint and I do not know what to suggest.

Bob

    -----Original Message-----
    **From:** David F. MacNeil [mailto:dfmacneil@macneil.com]

08/11/2007

**Sent:** 04 July 2006 15:24
**To:** Bob Peacock; Al Thom
**Subject:** RE: Carpet adhesion inspection

Bob, We think Hyundai fully intends to return $500,000 worth of mats. If they return $500,000 in mats, we intend to return to Cannon $500,000 in mats. This issue is fully the responsibility of Cannon. The quality of the Hyundai floor mats coming out of your factory was inferior, unacceptable and as Winston Churchill said "We are now entering the consequences phase". We have notified Cannon multiple times over the past few years of the inconsistency of the carpet adhesion. The problem was for the most part ignored by Cannon and the "blame" from Cannon's point of view was the "overly critical" inspection process done by Jason Houcek at MacNeil Automotive. In my opinion, Jason did a good and proper job. We are stuck in the middle of a situation that we find very uncomfortable, unfair and unacceptable. We are not the manufacturer of the floormats, Cannon is, but we are stuck trying to formulate a plan that Hyundai will accept to QC the mats AGAIN and to repair (re-glue) any defective product. Thanks to this Cannon caused situation, we will NEVER do business again with Hyundai.

Bob, what is YOUR solution to this crisis?

DMN

---

**From:** Bob Peacock [mailto:Bob.Peacock@cannonauto.co.uk]
**Sent:** Tuesday, July 04, 2006 8:46 AM
**To:** Al Thom
**Cc:** David F. MacNeil
**Subject:** RE: Carpet adhesion inspection

Al....Happy independence Day too !

Whilst I understand your frustration and annoyance at this problem I am not sure why you made the comment " All I can say is that if we are going down,we are not going down alone".

Who is this intended towards ? If for any reason you are dissatisfied of my handling of this or any other areas of the MacNeil account I would prefer that you take this up with David who can then take the issues up with Edward. If I have mistaken your comments then I apologise but "veiled" threats do not make for good relationships.

Bob

    -----Original Message-----
    **From:** Al Thom [mailto:arthom@macneil.com]
    **Sent:** 04 July 2006 12:54
    **To:** Bob Peacock
    **Cc:** David Macneil; Dick Bidgood
    **Subject:** Fw: Carpet adhesion inspection

    Bob,

    Happy Independence Day.

    You wanted to know how my meeting with Hyundai went. The email below pretty much sums it up.

08/11/2007

All I can say is that if we are going down, we are not going down alone!

The really sad thimg is that we lost the opportunity for the rubber mat program as a result of our inability to mat carpet stick to rubber. A huge opportunity thrown out the window!


Allan Thom

----- Original Message -----
From: Kurth, George [HMA] <gkurth@hmausa.com>
To: Conner6800@aol.com <Conner6800@aol.com>; Al Thom
Cc: Kubowski, Jim [HMA] <jkubowski@hmausa.com>; Taylor, Dana [HMA]
<DTaylor@hmausa.com>; Knipe, Michael [HMA] <mknipe@hmausa.com>; Bistline, Phil
[HMA] <pbistline@hmausa.com>
Sent: Mon Jul 03 12:28:56 2006
Subject: Carpet adhesion inspection

T <<MacNeil Carpet underside of carpet.jpg>> o:      Roger Conner

        Allan T <<MacNeil Carpet carpet peeling b.jpg>> hom


This email has two purposes: <<MacNeil Carpet carpet peeling.jpg>> First, to send you some photos of mats <<MacNeil Carpet Production date.jpg>> returned by a Hyundai dealer in Tucson that illustrate a much more serious adhesion problem than originally viewed last week in my office, and second, to advise you of      our plan to inspect mats.


The attached photos show a mat returned to us by a Tucson, AZ dealer that ordered three sets of mats and found that all three had carpet peeling back from the corners. The mat in the photo shows no adhesion at all in about half of the carpet area.


These mats came from the Ontario, CA PDC. All beige and gray mats that I inspected at that PDC (5 sets) exhibited the same problem with a lack of bonding in the corners between the carpet and rubber. You saw the problem in your visit here last week.


Today I stopped by the PDC and pulled out two beige sets and one gray set and had them sent to you for you to determine how best to repair them, if that's possible at all. These would be the samples that you would repair and send back to us for testing. If you need more samples, we can send them. All three samples demonstrated a lack of adhesion in the corners. You do not have to replace the grommets for the samples – it's the carpet adhesion we're worried about.


08/11/2007



We're concerned that heat is affecting the mats. The mats are stored in a warm environment and of course will get very hot in Tucson. It is important that any repair of the mats take this into consideration.

This week, starting Wednesday, we are coordinating a sample inspection of mats at all of our ports. The quantity to be inspected and the inspection procedure developed by our Service Engineering group will be available on Wednesday and I will share that with you at that time. Based on the results of that inspection, we will make a determination as to whether the mats are suitable for continued installation or must be shut off pending either repair or scrapping. If we have to scrap the mats, the exposure is close to $500,000.00 since there are around 11,500 mats either at our PDC's or at the ports.

If you wish to inspect our mat inventory at the Aurora, IL PDC we can arrange for you to do that, but we would want a Hyundai Field Technical Engineer present during that inspection. If you give me an indication of your availability next week and the following week, I will coordinate a day for you to visit the PDC and do a sample inspection of mats with the participation of our FTE.

Sincerely,

George S. Kurth

Director, Supply Chain and Logistics

Hyundai Motor America

714-965-3597

gkurth@hmausa.com

---

[..........., ... [HMA]
.... Monday, July 03, 2006 9:42 AM
To: Kurth, George [HMA]
Cc: Boudalis, Ted [HMA]
Subject: MacNeil Carpet photos

09/11/2007 .....

# EXHIBIT 5

Re: Tooling Expediting  Case 1:08-cv-00139  Document 6-2  Filed 01/08/2008  Page 35 of 40

**From:** Al Thom
**Sent:** Monday, December 31, 2007 12:17 PM
**To:** Al Thom
**Subject:** FW: Open Mat Account Balance

Allan Thom

---

**From:** David F. MacNeil
**Sent:** Tuesday, July 10, 2007 12:59 PM
**To:** Edward Atkin
**Subject:** FW: Open Mat Account Balance

Dear Edward, It was really great to see you and the family this past week.  I'm glad everyone made it out of Telluride "alive".  I may take you up on your kind offer to allow the children to visit England for a few weeks, I know Devon loved it there.  It was also good to see Ross growing up to be a fine young man and Lara seems to be doing well also.  Brenda has been in Telluride since Saturday evening and the kids have barely spent any time with her as they don't really want to, which is quite unfortunate, however she has brought the childrens feelings about her upon herself.

Regarding business,
There are two issues that I see as critical to future sales and growth between MacNeil and Cannon.
1) The exchange rate is killing us and I believe true partners will find a way to have both company's share in the currency fluctuations.  The Climair has an arrangement with us whereby if the Dollar-Euro relationship is 1 to 1 then we pay 1 for 1.  If the Euro costs $1.10, then we pay $1.05.  If the Euro costs $1.30, then we pay $1.15.  We both equally share in the fluctuation. On the same note, if the Euro costs $.90, then we pay $.95.

2) The Hyundai issue is quite alive and it need a resolution.  Just last night I received the email below.  I have sent you two emails inviting you to visit MacNeil Automotive in person to sort through this issue.  I have not received a response from you regarding either invitation.  I can assure you that this is NOT a stock cleanse and you have known me too long to think that I would try to pull a "fast one".  These mats were truly defective, in-fact, they were complete shit! We tried in vain to repair the mats using heat guns and the results were a disaster. I have retained plenty of examples to show you in person.  It is critical that my trading partners stand behind the quality of the products they supply us with and this has not been the case with Cannon regarding these Hyundai mats.  Bob Peacock has not have the authority to deal with this issue himself and you have frankly taken the "ignore it and it will go away approach"! Yes I'm frustrated!  One other myth is that the mats were stored in hot conditions in a Hyundai Tucson warehouse.  Nothing could be further from the truth.  Hyundai does not have a Tucson warehouse nor a warehouse anywhere in the state of Arizona.  Their Southwest warehouse is in Ontario California.  Regardless, it will ALWAYS be hotter in a customers car parked in the sun than in any warehouse and the hot melt adhesive should have been specified to have a melt point well above any possible automotive interior temperature.

The simple solution that I am looking for is that Cannon accept a credit memo from MacNeil for the cost of the mats, duties, freight, cost of scrapping them, etc, which I am happy to send to Mike Wren immediately.
or
Cannon send an authorized representative to MacNeil to see the mats in person and the concrete trail of correspondence between MacNeil and Cannon and MacNeil and Hyundai.  Come yourself or send Bob Peacock if he has the authority to reach a resolution while in Chicago or send a Mediator that has the same decision making authority.  I do want a FAIR resolution!

I can assure you that Hyundai is deadly serious about this issue and I have been told in person that they have no qualms about instituting legal action and joining all parties (meaning Cannon and MacNeil) in a suit.

"Its not the fact that there was a problem, it's how the problem is handled by the responsible party"

Thanks,
David
PS, I hope Vegas was a great time and that California is also enjoyable.  Safe Travels!

---

**From:** Kurth, George [HMA] [mailto:gkurth@hmausa.com]
**Sent:** Monday, July 09, 2007 7:47 PM
**To:** Al Thom
**Cc:** David F. MacNeil; Conner6800@aol.com; Ferrara, Frank [HMA]
**Subject:** Open Mat Account Balance

Allan, we have reached the point with the open account balance on the returned mats that I have to bring this to your attention and to try to come up with a solution.

As you recall, we reached an agreement in January of this year in which MacNeil agreed to supply HMA with Tucson all-weather mats at no charge up to the total number of combo mats that were returned to MacNeil for inspection and possible rework.  MacNeil ultimately decided to scrap all the mats rather than rework them, opting to supply HMA with replacement all-weather mats.  That was OK with us.

We purchased a lot of mats at that time to support the new all weather program.  Unfortunately, sales have not been as strong as we all expected.  We did blanket the dealers with racks and launch materials and we will be relaunching the program this fall, but it's unlikely that we'll see the kinds of volumes that are needed to come out even on mats returned versus mats supplied.

Currently, we have 2,500 Tucson front mats on-hand and 2700 Tucson rear mats on-hand.  This is roughly a two year supply at current sales rates.  With the relaunch this fall we should see these sales pick up and I feel confident that we can work this inventory down, but clearly we aren't going to sell thousands of additional mats beyond what we have already on hand.

Using round numbers, we billed MacNeil $725,000 for the mats that were returned.  We received $150,000 worth of all weather mats back.  That leaves $575,000 on the books as still open and our Finance department has asked us for a resolution.

If we can come up with a solution I am sure that our Finance department will work with us, but we have auditors coming soon and this open item on our balance sheet has to be addressed before that time.

Let's discuss what we can do.

Thank you.

George S. Kurth
Director, Supply Chain and Logistics
Hyundai Motor America
714-965-3597
gkurth@hmausa.com

---

# EXHIBIT 6

regard to your account management and have continued to accept and ship as normal.

I am disappointed that this is the stance you have taken before any direct discussions have taken place but nevertheless will be at Walnut Grove on 9th Oct at 10.00 hrs for the meeting.

Regards

Bob



Bob Peacock.
Operations Manager.
Cannon Automotive.
881 High Road.
Tottenham.
London.
N17 8EY.

Tel. 00 44 (0)2082756070
email. Bob.Peacock@cannonauto.co.uk

Visit : www.cannoncarmats.co.uk

-----Original Message-----
**From:** David F. MacNeil [mailto:dfmacneil@macneil.com]
**Sent:** 25 September 2007 14:29
**To:** Bob Peacock
**Cc:** Al Thom; Les Veatch
**Subject:** Re: Payment URGENT


Bob, you are not confused, you are accurate. I would like to resume making payments as necessary, but only after our meeting. That's why I want to move the meeting up to the 3rd of October. Back in August I again asked Mr. Atkin by email for a meeting in Chicago and I wasn't even worthy of a reply answer of any kind. (Being ignored really bothers me.)
This wasn't the first time my request for a meeting and a resolution to our outstanding issues was ignored completely by him.
As you have noticed, I have stopped placing orders and I have stopped sending money until all of our outstanding issues are resolved. Those issues will be resolved at our meeting in Chicago. I would prefer to meet sooner rather than later. I know you have a ticket for the 8th, but I strongly suggest that you purchase another ticket for the 2nd of October.
Regards,
David MacNeil
-------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Bob Peacock <Bob.Peacock@cannonauto.co.uk>
To: David F. MacNeil
Cc: Al Thom; Les Veatch
Sent: Tue Sep 25 08:04:29 2007
Subject: RE: Payment            URGENT


42

# EXHIBIT 7

**From:** Al Thom
**Sent:** Friday, April 14, 2006 4:53 PM
**To:** Bob Peacock
**Subject:** Hyundai Warranty claims

Happy Easter!

Attached is a copy of the invoice, as well as the check we paid to Hyundai for the warranty claims of the past six months.  I would assume that we can expect some participation from you, as the claims were for carpet coming unglued!

Lets talk!

Allan R. Thom
Vice President
MacNeil Automotive Products Ltd.
voice:    630.769.1500
fax:       630.241.7928
email:     arthom@macneil.com