IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS<br>LIMITED, an Illinois Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CANNON AUTOMOTIVE LIMITED, f/k/a<br>CANNON RUBBER LIMITED,<br>AUTOMOTIVE DIVISION,<br>a United Kingdom Company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 08 C 139<br><br>Honorable Joan B. Gottschall<br><br>Magistrate Judge Arlander Keys |

**MEMORANDUM IN SUPPORT OF CANNON'S**
**MOTION TO DISMISS OR STAY PROCEEDINGS**

**INTRODUCTION**

MacNeil Automotive Products, Limited ("MacNeil") is engaging in improper forum shopping. Cannon Automotive Limited ("Cannon") is a United Kingdom company located in the UK and incorporated under UK law. On November 30, 2007, Cannon commenced an action against MacNeil in the UK for MacNeil's failure to pay Cannon for more than $600,000US worth of automobile floor mats that Cannon delivered in the UK to MacNeil. It is notable that MacNeil does not dispute that it owes Cannon, and has not paid Cannon, for that product. Instead, MacNeil claims that the Court should relieve it of its obligation to pay to Cannon the undisputed amount owed because other automobile floor mats that Cannon delivered to MacNeil in the UK allegedly were defective. But rather than pursue in the UK its purported defenses to Cannon's first-filed action, MacNeil brings those alleged defenses before this Court in the guise of a complaint. MacNeil's maneuvering is transparent. It seeks to deprive Cannon of its right to proceed in its chosen forum.

Fortunately for Cannon, where a "foreign action is pending rather than decided, comity counsels that priority generally goes to the suit filed first." *Basic v. Fitzroy Eng'g, Ltd.*, 949 F. Supp. 1333, 1340 (N.D. Ill. 1996) (citation and internal quotation marks omitted). For several reasons, there is no reason to deviate from that principal here, including:

*First*, Cannon and MacNeil fully performed their supply relationship in the UK. MacNeil solicited Cannon in the UK to enter into a supply relationship; the parties entered into the supply relationship in the UK; Cannon manufactured automobile floor mats for MacNeil in the UK; Cannon delivered those mats in the UK to MacNeil; and MacNeil paid Cannon in the UK. In light of the complete UK-centered relationship, it is not surprising that Cannon fully expected that any litigation between the parties would be resolved in theUK.

*Second*, because the supply relationship took place in, and was fully performed in, the UK, both U.S. and UK choice of law principals direct application of UK law to the parties' respective claims and defenses.

*Third*, even if Illinois law had applied to the parties' supply relationship, the UK Court would apply Illinois law. But, in reality, it should make little difference to MacNeil which law the UK Court applies. The UK has causes of action similar to those McNeil asserts.

*Fourth*, the UK provides, by far, the most convenient forum. Cannon likely will have to call several of its design and manufacturing engineers and employees – all of whom reside in the UK – to provide testimony on Cannon's tooling and manufacturing processes, testing protocols and results, packaging and delivery of the mats to MacNeil in the UK, among other topics. And, the physical evidence that pertains to those protocols, processes and results is located in the UK In stark contrast, there is little evidence in the U.S. save for MacNeil employees. ***MacNeil admits that it destroyed the most important evidence -- the mats it claims were defective.***

*Fifth*, Cannon's first-filed UK action and MacNeil's second-filed U.S. action are parallel proceedings. The parties' respective claims arise out of their supply relationship. And, in Court II of its complaint MacNeil admits that its claims against Cannon in the U.S. action serve as its defenses to Cannon's first-filed UK action.

*Sixth*, in light of the parallel nature of the proceedings, promotion of efficient litigation, preservation of party and judicial resources and, importantly, international comity each compel a ruling in Cannon's favor.

*Seventh*, as shown in Cannon's opposition to MacNeil's Motion to Enjoin, filed concurrent herewith, there is no basis for enjoining Cannon from proceeding with its first-filed UK action. No agreement, written or oral, directs Cannon to pursue its claim against MacNeil in this forum.

Cannon did not race to the courthouse door to defeat this Court's jurisdiction, as MacNeil would have this Court believe. Cannon initiated its UK action six weeks after it warned MacNeil to pay up or face legal redress. The same cannot be said for MacNeil. Although MacNeil's purported claims against Cannon ripened over the course of years, MacNeil remained silent. But when faced with the reality of having to defend in the UK its conduct, MacNeil rushed to commence this second-filed, parallel action in effort to stymie Cannon's appropriate choice of forum. For these reasons, as well as the UK-centered supply relationship in the first place, MacNeil should not be permitted to now complain about litigating in the UK.

## BACKGROUND

### Cannon Has Manufactured Automobile Car Mats For Decades Without Systemic Defects

Cannon has designed and manufactured in the UK for over 60 years automotive floor mats for leading automobile manufacturers in Europe. Mats that Cannon manufactures for some European automobile manufacturers are similar in design and manufacturing process to mats that MacNeil now alleges were flawed when it purchased them from Cannon. During the past approximately 15 years, Cannon has not received complaints from any of those automobile manufacturers of a systemic flaw or defect in a Cannon mat. (Peacock Decl. ¶ 2-4, 7-8.)[1]

Cannon's headquarters, design and manufacturing facilities, principal place of business and workforce are located in London, England. (*Id.* ¶ 5.) Cannon is incorporated under the laws of the UK. (*Id.*) Cannon has no facility or an employee located in the United States. (*Id.*)

### Cannon/MacNeil Supply Relationship Was Made In, And Fully Performed In, The UK

David MacNeil solicited Cannon in the UK to enter into a supply relationship. (*Id.* ¶ 9.) MacNeil desired to purchase mats from Cannon in the UK and to resell those mats in the U.S. (*Id.* ¶ 10.) Negotiations concerning the Cannon/MacNeil relationship took place in the UK. (*Id.* ¶ 11.) Eventually, the parties agreed in the UK to enter into a supply relationship pursuant to which MacNeil would purchase mats from Cannon in the UK for resale in the U.S. (*Id.* ¶ 9-16.)

The parties did not enter into a master written contract or otherwise subject the supply relationship to a set of written standard terms and conditions. (*Id.* ¶ 13.) Rather, sales by Cannon to MacNeil were conducted and made in the following manner:

---

[1] Robert Peacock is the Cannon Operations Manager. The background section of this memorandum is based on the Peacock Declaration and publicly available court papers filed in the UK Mr. Peacock's Declaration is attached hereto as Exhibit 1 and incorporated herein by reference.

a. MacNeil sent purchase orders to Cannon in the UK;

b. Cannon accepted orders by sending to MacNeil from the UK an acknowledgment reflecting the price for the mats and the anticipated delivery dates;

c. Cannon manufactured the mats at its facilities located in the UK;

d. MacNeil took delivery of the mats at Cannon's facilities in the UK;

e. MacNeil was responsible for shipping the mats from the UK to the U.S.;

f. Cannon sent to MacNeil an invoice for payment;

g. MacNeil was to pay Cannon within 90 days of receipt of the invoice; and

h. MacNeil wired payment to Cannon in the UK.

(*Id.* ¶ 14.)   In light of MacNeil's solicitation of Cannon in the UK and the subsequent UK-centered supply arrangement, Cannon understood from the beginning of the relationship that any disputes between the parties requiring court intervention would be resolved in the UK, under UK law. (*Id.* ¶ 49.)  Cannon would not conduct business otherwise, as it did business in over sixty different markets. (*Id.*)  MacNeil never stated or suggested anything to the contrary. (*Id.* ¶48-49.)

### The Evidence With Respect To The BMW And Hyundai Mats Is In The UK

MacNeil alleges that some of the mats that Cannon delivered in 2004 - 2006 to MacNeil for the BMW and Hyundai programs were defective.  (*Id.* ¶ 17-18; Cmplt. ¶ 6-37.)  The evidence needed to test MacNeil's allegations regarding the performance of those Cannon-produced mats is in the UK, which includes Cannon mat designs, Cannon tooling, Cannon manufacturing processes and lines, Cannon testing protocols and Cannon test results.  (*Id.* ¶ 18-21.)  In addition to this tangible evidence in the UK, several Cannon witnesses who are likely to give testimony in this matter reside exclusively in the UK.  (*Id.* ¶ 21-22.)

In stark contrast, there is likely to be little evidence in the U.S. save for McNeil employees.  Indeed, MacNeil admits that it destroyed the very mats about which it complains, eliminating in the U.S. the physical evidence most important to MacNeil's claims.  (*Id.* ¶ 40-41.)

### MacNeil Overstates Its Claims And Distorts Their Accuracy

Cannon disputes the accuracy of MacNeil's allegations as to product defects.  (*See, e.g.*, *id.* ¶ 24-28.)  Of course, the merits of MacNeil's allegations are for determination at a later date once forum issues have been resolved.[2]  For purposes of this Motion (as well as for purposes of

---

[2] Cannon's Motion to Dismiss or, in the alternative, Stay is procedural in nature.  As the Court noted in its Order of January 24, 2008, Cannon has reserved the right to file within 10 days of the Court's ruling on

Cannon's opposition to the Motion to Enjoin), it is important to note Cannon's position that MacNeil's allegations are inaccurate. *See, e.g.*, *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 432 (7th Cir. 1993) (in deciding the forum in which the parties are to proceed, the court considers that a country "has an interest in protecting its citizens, including its corporate citizens, from trumped-up multi-million dollars claims."). In short, MacNeil's complaints during the course of the Hyundai program are significantly inconsistent with the mass defects MacNeil now claims. For example:

- in the first three months of the Hyundai program in 2004, Cannon produced approximately 14,020 sets of mats of which MacNeil rejected only 510 sets (3.4% of the total) because of issues with the startup, temporary carpet used and requested on November 26, 2004 reimbursement from Cannon of £21,618.05 (or $11,399US at the time) comprising the rejected sets of mats and labor costs MacNeil claimed it incurred to repair other mat sets;

- by August 2005, the approximate end of the first year of the Hyundai program, Cannon had delivered to MacNeil about 78,000 sets of mats, but apart from the initial complaints in November 2004 the only other complaints of which Cannon had been made aware were 23 warranty claims that Hyundai received, which MacNeil acknowledged was a relatively small number; and

- the Hyundai mat warranty claims totaled for 2004-2007 only $23,241.89US, less than 1% of the more than $2,300,000US worth of product delivered.

(*Id.* ¶ 28-31.) Instead, it is Cannon's position that MacNeil and Hyundai alleged systemic mat defects, and MacNeil attempted to hold Cannon responsible therefore, only after Hyundai decided to switch from carpeted floor mats to all rubber floor mats and Hyundai required MacNeil to take back thousands of carpeted mats for which Hyundai no longer had use.[3] (*Id.* ¶ 37-39, 42.)

---

this Motion and on MacNeil's Motion to Enjoin a motion to dismiss MacNeil's complaint or other responsive paper should the Court's rulings create the need.

[3] MacNeil omits to mention that it acknowledged that Hyundai used about 80,000 out of the 98,035 mat sets that Cannon sold to MacNeil for the Hyundai program. (*Id.* ¶ 41.) Of the 18,189 mat sets Hyundai and MacNeil had in stock when Hyundai switched to rubber mats, at least 7,124 of those sets comprised mats that Hyundai had agreed to take when it decided in August 2005 to change the mat carpet color. (*Id.* ¶ 40.) Cannon has not reimbursed MacNeil for any of the mats at issue, including the mats comprising the 2004 credit request or the purported warranty claims. (*Id.* ¶ 42.) In contrast, Cannon has replaced for MacNeil the few BMW mat set claims that MacNeil brought to Cannon's attention. (*Id.* ¶ 24-27.) It is Cannon's position that no dispute remains with respect to BMW mats. (*Id.*)

**MacNeil Does Not Dispute That It Has Failed To Pay Cannon For Mats**

Between January and August 2007, Cannon delivered to MacNeil in the UK mats totaling nearly £1,000,000.00. (*Id.* ¶ 43.)    MacNeil has refused to pay Cannon for a portion of those mats worth approximately £384,020.60 and $53,795.80US.[4] (*Id.* ¶ 43-45.)

On August 16, 2007, Cannon requested that MacNeil pay to Cannon immediately all amounts owed. (*Id.*)   MacNeil refused and, in September 2007, stopped placing orders with Cannon. (*Id.*) Prior to September 2007, MacNeil made no mention of the alleged defective mats that Cannon delivered to MacNeil in 2004-2006.   Nor did MacNeil contend that Cannon delivered defective mats in 2007.   Instead, MacNeil refused to pay Cannon unless Cannon agreed to pay MacNeil for allegedly defective mats previously delivered. (*Id.* ¶ 43-46.)

On October 9, 2007, Robert Peacock, Cannon's Operations Manager, met with MacNeil at MacNeil's place of business in an effort to secure from MacNeil the amounts owed. (*Id.* ¶ 46.) David MacNeil admitted during that meeting that his company owed to Cannon the full amount claimed, but he offered only approximately $182,286.28US, the full amount MacNeil owed Cannon less the amounts MacNeil claimed Cannon owed to MacNeil for defective Hyundai and BMW mats. (*Id.*)   Robert Peacock told David MacNeil at the October 9 meeting that his terms for resolution of the dispute were not acceptable and that Cannon would pursue payment of the full amount due. (*Id.* ¶ 47.)

**The Parties Did Not Agree To Resolve Their Disputes In The U.S. Court System**

By letter dated October 16, 2007, Cannon again demanded that MacNeil pay the full amount outstanding. (*Id.* ¶ 50.) Cannon warned that unless MacNeil cured its breach within 7 days, Cannon would take legal action. (*Id.*) Cannon did not indicate in the October 16 letter, at the October 9 meeting or at any other time its agreement to pursue in the U.S. its breach of contract claim. (*Id.* ¶ 46-50.) Nor did MacNeil indicate at the October 9 meeting or at any other time before this litigation is purported position that the parties should resolve their disputes in the U.S. court system. (*Id.*) Indeed, the minutes that Robert Peacock prepared regarding the October 9 meeting – which MacNeil accepted as a correct record – are telling. (*Id.* ¶ 48.)   Those minutes reflect no mention or suggestion that the parties litigate in the U.S. even though Mr. Peacock

---

[4] Cannon permitted MacNeil to pay Cannon, in the UK, in U.S. dollars for Cannon-branded mats that Cannon sold to MacNeil.  Cannon required MacNeil to pay Cannon, in the UK, in British pounds sterling for WeatherTech™, BMW and Hyundai mats. (*Id.* ¶ 14.)

informed MacNeil at the October 9 meeting (as reflected in the minutes) that Cannon would pursue full payment. (*Id.*)

**Cannon Did Not Race To The UK Courthouse To Commence Its Action**

But Cannon did not race after the October 9 meeting to the UK court, as MacNeil contends.  It waited until November 30, 2007, more than seven weeks after the parties met on October 9, to initiate its action against MacNeil in the UK's High Court of Justice, Queen's Bench Division.  (A copy of Cannon's November 30 Claims of Particulars is attached hereto as Exhibit 2.)[5]  And, Cannon did not effect service on MacNeil until December 20, 2007, more than 10 weeks after the October 9 meeting, while MacNeil continued to sit on purported claims all of which had ripened more than a year (some two or three years) before.

**The UK Court Has Not Abdicated To This Court Selection Of The Proper Forum**

On January 21, 2008, MacNeil secured in the UK action, without notice to Cannon, an extension of time in which to respond to Cannon's UK complaint.  MacNeil impliedly represented to the UK Court that it had filed in the U.S. action a motion to enjoin, that it would soon be resolved and that it might obviate the need for further applications in the UK action.  Based on MacNeil's *ex parte* representations, the UK Court granted an extension until seven days after this Court ruled on the motion to enjoin.  (*See* January 21, 2008 Order, attached hereto as Exhibit 3.)

During the hearing on January 24, 2008, before this Court, counsel for MacNeil represented that the UK Court had entered an Order giving MacNeil seven days after the date on which this Court rules on the motion to enjoin to file its response to Cannon's UK action.  Since then, U.S. counsel for Cannon has learned that was not entirely accurate.  The January 21 Order was entered subject to Cannon's right to move to set it aside.  (*See id.*)

On January 29, 2008, Cannon moved to set aside the January 21 UK Order and indicated that it intended to seek an anti-suit injunction against MacNeil from proceeding with its U.S. action.  (*See* Cannon's Application to Set Aside January 21 Order, (without exhibits), attached hereto as Exhibit 4.)    On February 18, 2008, Cannon filed in the UK Court its anti-suit injunction.  (*See* Third Witness Statement of Richard Gary Marshall, (without exhibits), attached hereto as Exhibit 5.)  On February 19, 2008, Cannon's U.S. counsel were informed by Manches

---

[5] The court may take judicial notice of the proceedings in, and papers filed in, the UK Court. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F. Supp. 2d 864, 867 (N.D. Ill. 2007).

LLP, solicitors for Cannon in the UK proceeding, that on February 19 the UK court had adjourned Cannon's application to set aside the January 21 Order to be heard at the same time as Cannon's Application for an interim anti-suit injunction on February 28. U.S. counsel for Cannon have been further advised that because the Parties in the UK proceeding may need to file further evidence, the hearing on the anti-injunction petition will not occur until the first available hearing date after March 6 that Cannon can secure.

In other words, the UK Court has not abdicated to this Court determination of the forum in which the parties should proceed. That makes sense. After all, Cannon, a UK citizen, filed its action first in the UK asserting breach of a supply relationship that was solicited, and fully performed, in the UK.

## ARGUMENT

As indicated, where a "foreign action is pending rather than decided, comity counsels that priority generally goes to the suit filed first." *Basic*, 949 F. Supp. at 1340 (citation and internal quotation marks omitted); *see also Martin v. Graybar Elec. Co.*, 266 F.2d 202, 204 (7th Cir. 1959) (We believe it to be important that there be a single determination of a controversy between the same litigants and, therefore, a party who first brings [an] issue into a court of competent jurisdiction should be free from the vexation of concurrent litigation over the same subject matter ...."). The Court thus may dismiss or stay MacNeil's U.S. action and "await the outcome of [the] parallel [first-filed UK] proceedings as a matter of wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation." *Finova Capital Corp. v. Ryan Helicopter U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999; *Finova Capital Corp. v. Ryan Helicopter U.S.A., Inc.*, No. 98 C 0761, 1998 WL 698900, at *2 (N.D. Ill. Oct. 2, 1998) ("The pragmatic considerations of judicial efficiency" have led to an expanding doctrine of abstention).

In addition to consideration for the first-filed action, the Court analyzes the two-step *Colorado River* doctrine to determine if MacNeil's U.S. action should be dismissed or stayed. First, the Court must determine whether the two proceedings are parallel. *Finova*, 180 F.3d at 898. Second, the Court weighs nine considerations: (1) whether the foreign or federal court has assumed jurisdiction over the property; (2) the geographical inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law; (6) the adequacy of foreign

court action to protect the federal plaintiff's rights; (7) the relative progress of the foreign and federal proceedings; (8) the presence or absence of concurrent jurisdiction; and (9) the vexatious or contrived nature of the federal claim. *Id.* (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236 (1976)). Here, each consideration favors dismissal or, in the alternative, a stay of the U.S. action pending resolution of the UK action.

### A.    The UK And U.S. Actions Are Parallel.

Actions are considered parallel where there is a "substantial likelihood that the [foreign] litigation will dispose of all claims presented in the federal case." *Lumen Constr. Inc. v. Brant Constr. Co.,* 780 F.2d 691, 695 (7th Cit. 1985). But, actions need not be identical in order to qualify as parallel; formal symmetry between the two actions is not required. *Lowery v. Schnorf,* No. 97 C 6688 1998 WL 341835 at *6 (N.D.Ill. June 18, 1998).

Here, there can be no dispute that the UK and U.S. actions are parallel. The parties are identical. And, the parties' respective claims and defenses arise out of the same core operative facts – each party's respective performance under the supply relationship. That is why MacNeil admits its Motion to Enjoin at page 13: "the same parties and both sets of litigation will involve many of the same facts and issues." MacNeil may not avoid that admission now. In Count II of its complaint, MacNeil seeks a declaration that it may offset the undisputed amount it owes Cannon against the damages Cannon allegedly caused MacNeil. In other words, each cause of action that MacNeil asserts against Cannon serves as MacNeil's defense to Cannon's UK claim. Thus, resolution of Cannon's cause of action will necessarily include resolution of MacNeil's causes of action.[6]

---

[6] Similarly, MacNeil may not avoid the parallel nature of the proceedings by pointing to its various claims beyond breach of contract. Each action mirrors its breach claim, and resolution of one claim would be dispositive of the others. *See, e.g. Clark v. Lacy,* 376 F.3d 682, 686-87 (7th Cir. 2004)("Just as the parallel nature of the actions cannot be destroyed by simply tacking on a few more defendants, neither can it be dispelled by repackaging the same issue under different causes of action."); *Bell v. Bd. Of Trustees of the Harvey Firefighters' Pension Fund*, Case No. 05 C 6742, 2006 WL 1517772 at *2 (N.D. Ill. April 5, 2006)(granting stay despite the fact that claims in the two actions were different because the actions "are both based on the same underlying conduct."); *Proctor & Gamble Co. v. Alberto-Culver Co.*, Case No. 99 C 1158, 1999 WL 319224, at *5 (N.D. Ill. Apr. 29, 1999) ("merely raising an alternative theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the stated suit."); *see also Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp.2d 248, 253-54 (D. Mass. 1999) ("The fact that a claim sounds in tort rather than in contract does not mean that the factual issues are so dissimilar that a stay may not be granted.")

**B.    On Balance, The Factors Weigh Substantially In Favor Of Cannon.**

The Court applies the *Colorado River* factors "pragmatically and flexibly, recognizing that no single factor is determinative." *Spizzirri v. Mortgage Electronic Registration Systems, Inc.,* No. 03 C 2000 2003 WL 21640468 at *3 (N.D.Ill. July 11, 2003) (granting motion to stay federal proceedings pending resolution of parallel state proceedings.)  On balance, the factors strongly weigh in favor of abstention.

**1.    The UK Court Has The Only Jurisdiction Over The Only Property At Issue.**

The only property at issue is "tooling" that MacNeil contends that Cannon has converted. (Cmplt. at ¶¶ 76-79 (Ct. VIII).)  Cannon contests MacNeil's contention.  Regardless, that tooling is located in the UK and, therefore, the UK Court is the only court with jurisdiction over it.

**2.    Litigation In This Court Would Be More Inconvenient Than In The UK.**

As set forth in the background above, the UK provides a far more convenient forum in which to resolve the parties' dispute.  MacNeil has destroyed the only physical evidence located in the U.S. important to its claim – the very mats it claims defective.  Apart from the non-existent mats, evidence regarding the performance of the Cannon-manufactured mats is in the UK  (*See* Exhibit 1 at ¶ 18-21.)  Moreover, several Cannon witnesses who are likely to give testimony in this matter reside in the UK, including Robert Peacock, Richard Bigood, Michael Wren, John Mall and Edward Atkin.  (*Id.* ¶ 22.)    Cannon will be substantially inconvenienced, and likely suffer business losses and interruptions, if these and other Cannon employees are required to travel to the U.S., at the same time for trial.[7]  (*Id.* ¶ 23.)

Having to proceed in the UK may present MacNeil some inconvenience.  But any such burden was foreseeable when MacNeil decided to solicit Cannon in the UK and form and complete the supply relationship in the UK.   MacNeil cannot avoid this reality by suggesting that it might call end-users as witnesses.  The possibility that MacNeil would attempt to call an end-user at trial hardly tips the balance of convenience in favor of MacNeil. *See, e.g., Household*

---

[7] Robert Peacock is the Cannon Operations Manager.  All Cannon departments report to him, including, production, engineering, quality/technical, design/toolroom, personnel, accounts, planning, sales and security.  In addition, Peacock is responsible for Cannon's domestic and export sales of OEM and Cannon-branded products.  Richard Bigood is Mr. Peacock's deputy and he also deals with all technical aspects of the business.  Given their importance to Cannon's continued operations, Mr. Bigood and Mr. Peacock generally are not off site at the same time.  Michael Wren is Cannon's credit controller.  John Mall is project manager at Cannon.  He is the Cam/Cad co-ordinator and provides MIS and internet support.  Edward Atkin is the owner of Cannon and is also responsible for its overall operations.  (*Id.* ¶ 22.)

*Financial Services, Inc., v. Northern Trade Mortgage Corp.*, Case No. 99 C 2840, 1999 WL 782072 at \*5 (N.D.Ill. Sept. 27, 1999) ("court must consider not only the number of witnesses located in each forum but also the nature and importance of their testimony").

### 3.      Dismissal Or Stay Is Needed To Avoid Piecemeal Litigation.

Because MacNeil's claims serve both offensive and defensive roles, the parties will duplicate efforts and likely waste party and judicial resources if both Courts exercise jurisdiction. And, dual proceedings may result inconsistent judgments.  In the interest of avoiding such circumstances, the Court should dismiss or, alternatively, stay MacNeil's action.  *See Ingersoll Mill Mach. Co. v. Granger*, 833 F.2d 680, 685-86 (7th Cir. 1987); *The Proctor & Gamble Co. v. Alberto-Culver Co.*, Case No. 99 C 1158, 1999 WL 319224, at \*6 (N.D. Ill. Apr. 29, 1999).

### 4.      The UK Court Obtained Jurisdiction First.

The UK Court obtained jurisdiction over the parties first.  Try as it might, MacNeil cannot fairly characterize Cannon's first-filed UK action as the product of a race to the courthouse door.  On October 9, 2007, Cannon informed MacNeil that it would seek to recoup the full amount MacNeil owes.  On October 16, Cannon warned MacNeil, in writing, that it would seek legal redress unless MacNeil cured its breach by October 23.  Although that deadline passed, Cannon waited more than five additional weeks before it initiated its action.  Had MacNeil truly been concerned about selecting Illinois in which to assert its claims, it had ample time between October 9 and November 30 in which to so do.  MacNeil cannot complain that it had insufficient time.  To do so require that MacNeil ignore that its purported claims ripened as early as 2004 and no later than the end of 2006.  Here, its actions are worth a thousand words. MacNeil initiated litigation with doubtful claims *only after* it received Cannon's UK complaint in a transparent effort to attempt to deprive Cannon of its properly selected forum.  This factor too weighs heavily in Cannon's favor.

### 5.      The UK Is The Source Of Governing Law.

No agreement, written or oral, specifies the parties' choice of law.  Therefore, this Court must apply the Illinois "most significant contacts" test to determine whether UK or U.S. law applies.  *See CSX Transp., Inc. v. Chicago and North Western Transp. Co.*, 62 F.3d 185, 188 (7th Cir. 1995).  The Court considers five factors:  the place of contracting; negotiation; performance; location of the subject matter of the contract; and the domicile, residence, place of incorporation, and business of the parties.  *Wildey v. Springs*, 47 F.3d 1475, 1481-83 (7th Cir. 1995); *Palmer v.*

*Beverly Enters.,* 823 F.2d 1105, 1109-10 (7th Cir. 1987). In light of the UK-centered nature of the supply relationship, including MacNeil's solicitation of Cannon in the UK and Cannon's delivery of product to MacNeil in the UK, it is clear that the UK has the most significant contacts.[8] *See* Restatement (Second) of Conflicts § 188(3) (1971) (if the place of contract negotiation and performance are the same, that state's law usually will apply). As the UK Court is well-suited for hearing disputes governed by UK law, this factor also weighs heavily in Cannon's favor.

### 6.     UK Court can Protect MacNeil's Interests.

The UK Court is uniquely well-suited to protect MacNeil's rights. As indicated, under Illinois choice of law principles, UK law governs MacNeil's claims. The same is true under UK choice of law principles which, like Illinois, applies the law of the country having the closest connection to the contractual relationship. *See* UK The Contracts (Applicable Law) Act 1990, which gives the Rome Convention force of law; *see also* Rome Convention Article 4(1).[9] But even if this Court or the UK Court could somehow find that Illinois law applied, the UK Court would apply Illinois law (just as this Court might be called upon in appropriate circumstances to apply UK law).

But MacNeil has no reason to quibble. English law provides it with ample protection. *See Goldhammer*, 59 F. Supp.2d at 254-55 ("because the United States and England share the same common law heritage, deference to British proceedings is consistent with notions of international comity."). For example, there is substantial legislation in the UK designed to

---

[8] MacNeil, of course, has based its complaint on U.S. law. But in light of its solicitation of Cannon in the UK and its UK-centered relationship with Cannon, it should come as no surprise to MacNeil that it erred. MacNeil should have expected that it would be required to defend its conduct in the UK under UK law. *See, e.g, Midwest Grain Prods. Of Illinois v. Productization, Inc.*, 228 F.3d 784, 787-88 (7th Cir. 2000) (in choice of law analysis, the place of performance governs; Oklahoma law applied were the contract was for the manufacture of goods and the manufacturing took place in Oklahoma); *Crown Prods, Inc. v. Wilkinson Mfring. Co.*, Case No. 89 C 5374, 1989 WL 165068, at *3 (N.D. Ill. Dec. 22, 1989) (Illinois law applied to parties' dispute where defendant initially approached plaintiff in Illinois and the manufacture of the product took place in Illinois even though the events underlying defendant's counterclaim for improper design and installation took place in Nebraska). Indeed, "notions of international comity are at an apex when parties inject themselves into the economy of another nation for profit, particularly one as close as Great Britain, and then try to extricate themselves from its jurisdiction." *Goldhammer v. Dunkin Donuts, Inc.*, 59 F. Supp. 2d 248, 255-56 (D. Mass. 1999).

[9] UK solicitors for Cannon, Manches LLP, have confirmed for Cannon's U.S. the accuracy of the representations in this memorandum with respect to UK law. (*See* Richard Marshall Declaration, attached hereto as Exhibit 6.)

protect consumers. *See Phillips Electronics, N.V., v. New Hapshore Ins. Co.*, 728 N.E.2d 656, 669 (1st Dist. 2000) (even if UK court were unable to hear Illinois Consumer Fraud Act claim, a U.S. litigant would not be deprived of any remedy or treated unfairly because "English courts are capable of adjudicating [] other common law fraud causes of action."). English law also provides remedies for breach of contract and express and implied warranties.[10] Moreover, English law allows a buyer to set-off its damages for defective goods against the price for those goods and also for defective goods against the price of those goods where the parties operate a running account. MacNeil's purported concern that it will not be able to pursue Cannon in the UK should end users sue MacNeil in the U.S. is misplaced for at least two reasons. First, under English law, the intermediate buyer may be able to pass on damages it has had to pay to its buyer up the chain to its seller subject to issues of causation and foreseeability. Second, Cannon is aware of no such warranty litigation even though many of the alleged defective mats are several years old.

There is, of course, one substantial difference between the U.S. and UK court systems. Under English law, the norm is that the Court would award the prevailing party the legal costs of its action as additional relief. This is a difference it would seem MacNeil would embrace if it truly put stock in its claims.

### 7.   The Relative Progress Of The Proceedings Favors The UK.

Cannon filed its UK action first by more than a month. This factor tips in favor of Cannon more than slightly. As indicated, MacNeil's claims for defective products arose during the course of 2004-2006, yet it took no action. Even when Cannon stated on October 9, 2007 that it intended to collect from MacNeil the full amount due and on October 16 warned MacNeil that it would seek legal action, MacNeil sat on its rights. Had MacNeil truly been concerned with an Illinois forum, it had ample time – years – to select it. MacNeil should not be permitted to complain now about proceeding in the U.K. when it is clear that one purpose of MacNeil's complaint is to deprive Cannon of its properly chosen forum. *See, e.g., Beck v. Dobrowski*, Case No. 06 C 6411, 2007 WL 3407132 at *8 (N.D.Ill. Nov. 14, 2007) (dismissing claim under *Colorado River* doctrine and noting "[t]he Court is also not unmindful of the fact that Plaintiff

---

[10] Moreover, given the common law nature of the parties' claims, this case does not involve application of legal rights or principles unique to the U.S. Federal Courts such that this consideration would weigh in favor of a dismissal or stay. *Finova*, 180 F.3d at 900.

here did little to prosecute this action until after the Maryland court issued an initial unfavorable ruling.").

**8.     Dismissal Or Stay Is Necessary To Avoid The Inefficiency Of And The Potential For Inconsistent Results From Concurrent Jurisdiction.**

It would appear that both the UK and U.S. Courts can obtain jurisdiction over the parties. But there is no reason to exercise concurrent jurisdiction here. As indicated, the waste of party and judicial resources and the potential for inconsistent results strongly weighs in favor of dismissal or stay of the U.S. action. *See, e.g., Evergreen Marine Corp. v. Welgrow Intern. Inc.*, 954 F.Supp. 101, 103 (S.D.N.Y. 1997) (staying federal action in favor of Belgian litigation because "maintaining two concurrent and simultaneous proceedings [] consumes a great amount of judicial, administrative, and party resources only for speculative gain.") So does the deference Courts give to international comity where the foreign action is first-filed. *Basic*, 949 F. Supp. at 1340 (citation and internal quotation marks omitted).

**9.     The Vexatious And Contrived Nature Of MacNeil's Claim Favors Cannon.**

In the end, it is apparent that MacNeil initiated this litigation, and brought a variety of claims premised on the same fundamental facts, for the purpose of attempting to defeat Cannon's first-filed choice of forum.  As set forth in the background, MacNeil's claims do not appear to follow the facts.  Nor does bringing these claim appear to comport with MacNeil's conduct – the purposeful destruction of the very mats about which it now complains.   These circumstances strongly favor dismissal or a stay in favor of Cannon's first-filed UK action.

## CONCLUSION

International comity prevails here.  MacNeil solicited Cannon in the UK and the parties performed their supply relationship, including the delivery of mats, in the UK.   Those circumstances alone require a ruling in Cannon's favor.   But the avoidance of piecemeal litigation, the preservation of resources, the UK Court's jurisdiction over MacNeil's alleged tooling, the fact English law governs the parties' claims, and the fact that MacNeil has adequate remedies under English law all leave no room for doubt that there is no reason to deviate from the rule that where a "foreign action is pending rather than decided, comity counsels that priority generally goes to the suit filed first." *Basic*, 949 F. Supp. at 1340.  For all the reasons set forth above, and for the reasons set forth in Cannon's opposition to MacNeil's motion to enjoin,

Cannon respectfully requests that the Court dismiss the complaint or, in the alternative, stay this action pending resolution of the first-filed UK action.

Respectfully submitted,

CANNON AUTOMOTIVE LIMITED.

By:___/s/ John T. Shapiro_____
        One of Its Attorneys

William N. Howard
John T. Shapiro
T.J. Sheahan
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000

Dated:  February 20, 2008

## CERTIFICATE OF SERVICE

The undersigned, being one of the attorneys of record in the above cause, certifies that he this day caused a copy of **Memorandum in Support of Cannon's Motion to Dismiss or Stay Proceedings** to be served upon the attorneys listed below via the Northern District of Illinois, Eastern Division, ECF filing system, and as otherwise noted, on this 20th day of February, 2008.

TO:     Robert S. Grabemann
        Timothy M. Schaum
        Daspin & Aument
        227 West Monroe Street
        Suite 3500
        Chicago, IL 60601
        (312) 258-1600
        Fax: (312) 258-1955
        rgrabemann@daspinaument.com


                              /s/ John T. Shapiro

1485161v1/26168-0001