**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) ) | Honorable Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Magistrate Judge Arlander Keys |
| Defendant. | ) | |

## DECLARATION OF ROBERT PEACOCK

### CANNON IS A LONGSTANDING U.K. COMPANY

1.      I am, and have been, the Operations Manager for Cannon Automotive Limited ("Cannon") since its incorporation in June 2005. I have personal knowledge of the statements made in this Declaration based upon my working knowledge, review of business records and communications with Cannon personnel and can competently testify to the facts contained herein.

2.      Prior to Cannon's incorporation, Cannon Rubber Limited carried on the same business now operated by Cannon. I served as Operations Manager of Cannon Rubber for 11 years before its business was transferred to Cannon. Practically, there was no change in operations when the business was so transferred. When I refer to Cannon in my Declaration, I also include Cannon Rubber.

3.     Cannon designs, manufactures and supplies automotive floor mats and automobile boot protectors and boot mats.  Cannon has designed, manufactured and supplied automotive floor mats for over 60 years.

4.     Cannon manufactures automobile floor mats for leading automobile manufacturers in Europe, including Toyota, Nissan, Peugeot and Land Rover.  In addition, consumers are able to purchase directly from Cannon, through its website, Cannon-branded mats for various automobile vehicles. And of course Cannon supplies retail and wholesale outlets with its Cannon-branded products.  For the last 50 years, Cannon has been Europe's largest supplier of these mats.

5.     Cannon's headquarters, design and manufacturing facilities, principal place of business and workforce always have been located in London, England.  Cannon is incorporated under the laws of England and Wales.  Cannon has no other place of business or other facility. And, Cannon Automotive never has had a facility or an employee located in the United States.

6.     In my declaration, I refer to England or the United Kingdom as the "U.K."  And, I refer to the United States as the "U.S."

## CANNON HAS HAD NO SYSTEMIC PROBLEMS WITH MATS IT HAS MANUFACTURED FOR ANY OTHER CUSTOMER

7.     As I stated above, Cannon manufactures floor mats for numerous leading automobile manufacturers throughout Europe.  In a typical year, Cannon produces approximately 8 to 10 million floor mats for those manufacturers, collectively.  In my years as Operations Manager, Cannon has not received any complaint from any of those automobile manufacturers of a systemic flaw or defect in a Cannon mat.

8.     MacNeil Automotive Products Limited ("MAPL") is the first party to complain of a systemic flaw or defect in mats Cannon has manufactured.  Mats that Cannon has

manufactured, and continues to manufacture, for some European automobile manufacturers without complaint are similar in design and manufacturing process to the mats that MAPL now alleges in its January 2008 U.S. Complaint were flawed.

**THE ENTIRETY OF THE CANNON/MAPL SUPPLY RELATIONSHIP TOOK PLACE IN THE U.K. – SOLICITATION; MANUFACTURING; DELIVERY; AND PAYMENT**

9.      In late 1988 – early 1989, David MacNeil, the owner of MAPL, solicited Cannon in the U.K. to enter into a supply relationship for automobile floor mats.  At the time, David MacNeil had yet to form MAPL.

10.      David MacNeil told Cannon that he was impressed with the quality of Cannon's automobile floor mats.  He desired to purchase mats from Cannon and to resell those mats in the United States and act as Cannon's sole U.S. distributor.

11.      Negotiation of the Cannon/MacNeil Automotive supply relationship took place in the U.K., initially by telephone and post and then by David MacNeil visiting the U.K.

12.      Eventually, Cannon and David MacNeil agreed to enter into a supply relationship and MacNeil incorporated MAPL in February 1989.

13.      The parties did not enter into a master written contract or otherwise subject the supply relationship to a set of written standard terms and conditions.

14.      Rather, sales by Cannon to MAPL were conducted and made in the following manner:

   a.      MAPL sent purchase orders to Cannon;

   b.      Cannon accepted orders by sending to MAPL an acknowledgment reflecting the price for the mats and the anticipated delivery dates;

   c.      Cannon manufactured the mats at its facilities located in the U.K.;

   d.      MAPL took delivery of the mats at Cannon's facilities in the U.K.

e.  MAPL was responsible for shipping the mats from the U.K. to the U.S.;

f.  Cannon sent to MAPL, after MAPL picked up the mats at Cannon's U.K. facility, an invoice for payment;

g.  Cannon allowed MAPL 90 days from receipt of the invoice in which to pay the invoice; and

h.  MAPL paid Cannon in the U.K. in U.K. currency, the pound sterling, by wiring payment to Cannon's bank account located in the U.K.

For a two-year period, mid 2004 to mid 2006, and as an accommodation to MAPL because of the weak position of the U.S. dollar compared to the pound sterling, Cannon allowed MAPL to pay Cannon in the U.K. in U.S. dollars at a fixed rate of $1.60 to the pound sterling. This was on average a 15% benefit to MAPL.

**THE MATS CANNON SOLD TO MAPL**

15.  From 1989 to mid-2004, Cannon made floor mats for MAPL to be sold under the Cannon/WeatherTech brand name. These were all designed in the U.K. and all the tooling was made at Cannon's plant in the U.K.

16.  In 2003, BMW USA awarded to MAPL a contract for the provision to BMW of rubber car mats for BMW cars sold in the U.S. In July 2004, Hyundai USA awarded to MAPL a contract for the provision of car mats for Hyundai's Tuscon model vehicle sold in the U.S. In turn, MAPL ordered from Cannon the mats for the BMW and Hyundai programs. In its U.S. Complaint, MAPL alleges defects with certain mats that Cannon produced for the Hyundai and BMW programs.

17.  Until the parties terminated their relationship in the fall of 2007, Cannon made for MAPL Cannon-branded products, "WeatherTech" floor mats and the mats for the BMW and Hyundai programs.

**THE ENGINEERS WHO DESIGNED AND MANUFACTURED THE MATS FOR MAPL ARE LOCATED IN THE U.K.**

18.    From May 2005, MacNeil started to manufacture tooling for the Cannon/WeatherTech program in the US and shipped these tools to Cannon. By the end of 2007, the following tools had been made by Cannon for MacNeil:

Cannon/WeatherTech tooling:

104 sets made by Cannon

36 sets made by MacNeil

BMW tooling:

60 sets made by Cannon

4 sets made by MacNeil

Hyundai tooling:

6 sets made by Cannon

0 sets made by MacNeil

19.    MAPL designed the Hyundai mats and sent the specifications and drawings to Cannon in the U.K. Cannon engineers, in turn, created the tooling from those designs and drawings to manufacture the mats. Cannon engineers also created the assembly lines necessary for production of those mats, created the testing protocols, and tested mats before mass production. No physical specifications were provided by either Hyundai or MacNeil.

20.    With respect to the BMW program, MAPL forwarded to Cannon in the U.K. the specifications. Cannon engineers, in turn, created mat designs from those specifications. Other Cannon engineers created the tooling and assembly lines necessary for production of those mats, created the testing protocols, and tested mats before mass production. No MAPL employees

participated in Cannon's design, manufacture and testing of the BMW mats before mass production.

21.    The Cannon engineers and other employees who might be needed to provide testimony as to the quality of the Hyundai and BMW mats when MAPL picked up the mats at Cannon's U.K. facility, as well as to the designs, specifications, testing protocols test results, manufacturing processes, packaging and delivery of product to MAPL in the U.K., among other things, all are located in the U.K. In addition, the physical evidence pertaining to those various processes is located in the U.K.

22.    Cannon anticipates that it will have to call in this litigation several witnesses, all of whom live in the U.K., including myself, Richard Bigood, Michael Wren, John Maul and Edward Atkin. As I stated above, I am the Cannon Operations Manager. All Cannon departments report to me, including, production, engineering, quality/technical, design/toolroom, personnel, accounts, planning, sales and security. In addition, I am responsible for Cannon's domestic and export sales of OEM and Cannon-branded products. Richard Bigood is my deputy and he also deals with all technical aspects of the business. Mr. Bigood and I generally are not off site at the same time. Michael Wren is Cannon's only credit controller. John Maul is project manager at Cannon. He is the Cam/Cad co-ordinator and provides MIS and internet support. Edward Atkin is the owner of Cannon and is also responsible for its overall operations.

23.    It would pose a substantial inconvenience, and likely an interruption and loss, to Cannon's business operations if these Cannon personnel are required to travel to the U.S. at the same time to participate in a trial of this matter. The anticipated Cannon witnesses include key personnel who typically are not away at the same time from Cannon's U.K. facilities.

**NO DISPUTE EXISTS AS TO THE BMW MATS**

24.    From 2003 to 2007, Cannon supplied to MAPL approximately 500,000 sets of BMW mats.  MAPL paid to Cannon a total of £4 million for those mats.

25.    MAPL claimed that that 1100 pairs of BMW mats did not satisfy standards and requested credit of $11,652US for the expense in the credit.

26.    Cannon replaced those mats.  But is appears that MAPL still seeks reimbursement for the credit alleged.

27.    MAPL has submitted no warranty or other claim with respect to any other mats that Cannon produced for MAPL's BMW program.

**CANNON CONTESTS THE ACCURACY OF MAPL'S HYUNDAI CLAIM**

28.    Based on the facts, Cannon finds unbelievable MAPL's complaints with respect to the quality of the mats that Cannon produced for the Hyundai program.  Although MAPL now claims millions of dollars in damages, throughout the course of the Hyundai program, MAPL made Cannon aware in October 2007 of only $23,241.89US in alleged warranty claims from 2005 through 2007.  Instead, the facts suggest that Hyundai may have required MAPL to take back thousands of mats that MAPL had purchased from Cannon when Hyundai no longer had use for those mats.  And, now, MAPL improperly seeks to pass on to Cannon the cost MAPL incurred for mats Hyundai decided not to use.  And, in the process, MAPL seeks to use its fictitious claims, or at the very least hugely exaggerated claims, as a reason to deprive Cannon of its right to pursue in the U.K. Court its first-filed claim against MAPL for undisputed amounts owed.  It should be noted that MAPL started to manufacture mats itself for Hyundai in 2006 in breach of our distribution agreement and without informing us.  We were still under the impression that we were the sole Hyundai U.S. rubber mat supplier.

A.    **MAPL Only Sought A Small Credit Over The First Year Of The Program**

29.    As stated above, Hyundai USA awarded its mat program to MAPL in July 2004. Because of MAPL's immediate demands, Cannon had to produce mats quickly even though it did not have time to source carpeting for the mats that matched exactly Hyundai's specifications. MAPL was aware of, and requested, the production of these initial mats even though Cannon did not have time to source carpeting for the mats that matched exactly Hyundai's specifications.

30.    On November 26, 2004, MAPL requested a credit of £21,618.05 to reimburse it for (i) alleged defective products that it had rejected from the initial, hurried productions runs that Cannon delivered to MAPL for the Hyundai program, and (ii) alleged time MAPL spent repairing other Hyundai mat sets.  Specifically, MAPL claimed that it had rejected 275 out of 8,900 sets of grey mats and 235 out of 6,020 sets of beige mats, or 3.4% of the mat sets delivered, at £23.50 per set, for a total of £11,985.00.  MAPL also claimed that it had spent 523 hours, at a cost of £17.00 per hour, repairing other mat sets. Cannon did not pay the credit and MAPL did not pursue payment from Cannon.

31.    As of August 2005, Cannon had delivered to MAPL in the UK about 78,000 sets of mats for the Hyundai program.  Over the course of the first year of the program, the only other complaints that MAPL lodged with respect to mats that Cannon made for MAPL for the Hyundai program was to note in an October 4, 2005 email that Hyundai had received 23 warranty claims. In the same email, MAPL admitted that the alleged failure rate reported was quite small when compared to the total number of mats sold, that the alleged failures pertained to mats produced early in the program and that numerous improvements to the mat product had been made since production of mats early in the program.  At the time, MAPL did not seek reimbursement from Cannon for the warranty claims.

**B.    HYUNDAI CHANGES ITS SPECIFICATIONS MID-PROGRAM, REQUIRING HYUNDAI TO PURCHASE MAT SETS ALREADY PRODUCED THAT HYUNDAI DID NOT WANT**

32.    In June 2005, Hyundai had told MAPL that there would be no changes to the mat specifications.  At MAPL's direction, Cannon continued to produce mats for the Hyundai program based on the then current specifications.

33.    But in August 2005, MAPL notified Cannon that Hyundai had decided to change the carpet color for the 2006 Tuscon models.  In the same email notifying Cannon of this change, MAPL indicated that Hyundai had accepted full responsibility for the situation it had created and that Hyundai would purchase any stocks of mats held by Cannon or MAPL manufactured pursuant to the old specifications.  At the time, Cannon had in stock 7,124 sets of mats (3,450 grey and 3,674 beige) that Cannon already had produced pursuant to MAPL's orders.  Cannon delivered those mats to MAPL in the U.K. and MAPL paid Cannon for the mats.

**C.    HYUNDAI MADE FURTHER CHANGES TO ITS MAT PROGRAM THAT RESULTED IN HYUNDAI HAVE A STOCK OF MATS FOR WHICH IT HAD NO NEED**

34.    In November 2005, Hyundai finally decided on the new carpet color specifications for its Tuscon model mat program.  MAPL ordered from Cannon on a rush basis under the new specifications 2,600 sets of mats.  Later in November 2005, or in early December 2005, Hyundai changed the ferrule specifications for its Tuscon model mat program.  (Ferrules are used to attach the mat to pegs on the floor of the vehicle.)  As a result of this change, Hyundai would have been unable to use any unused stock of mats manufactured up to that time, including the 2,600 of mats that Cannon rushed to produce under the new carpet color specifications.

35.    From November 18, 2005 until May 22, 2006, Cannon manufactured and delivered to MAPL in the U.K. 20,025 sets of mats pursuant to Hyundai's new carpet color and

ferrule specifications.  Of those 20,025 sets of mats, 8,025 bore product number 00281-T6P00-Z9 and 12,000 bore product number 00281-T6P00-U7.

36.    On July 4, 2006, approximately six weeks after Cannon had delivered to MAPL the last of the mats for the Hyundai program that MAPL had ordered up to that time, MAPL sent to Cannon an email it had received from Hyundai in which Hyundai alleged that the carpet did not properly adhere to the rubber bottom of some of the mats.  Hyundai indicated that it had approximately 11,500 sets of mats in stock worth about $500,000US that it intended to inspect.  In the same email, Hyundai indicated that it had used only 8,525 sets of the new mats out of the 20,025 that Cannon had delivered to MAPL.  In a separate Hyundai email that MAPL forwarded to Cannon, Hyundai indicated that it also had 7,124 sets of mats in stock that were manufactured pursuant to old specifications that Hyundai had agreed to take when it changed the carpet color specifications.

### D.    MAPL OFFERS TO REPLACE THE MATS IN ORDER TO SECURE HYUNDAI'S RUBBER FLOOR MAT BUSINESS

37.    At approximately the same time, Hyundai decided in late July or early August 2006 that it would no longer use for its Tuscon model vehicles a rubber-based carpet mat.  Instead, Hyundai decided to change its mat program completely and use all rubber mats.

38.    In an effort to secure Hyundai's rubber mat business, MAPL offered to replace the carpet mats with all rubber mats.  On or about August 3, less than one month after Hyundai had first complained about the rubber-based carpet mats, Hyundai awarded to MAPL its rubber floor mat business for the Tuscon and Sante Fe models.

39.    MAPL placed with Cannon the orders for Hyundai's rubber mat floor program.  MAPL submitted the first order to Cannon in October 2006.

### E.   MAPL Destroys The Evidence Of The Allegedly Defective Mats

40.     On November 16, 2006, MAPL informed Cannon that MAPL had credited Hyundai for 18,189 sets of mats.  That amount included the 7,124 old mats that Hyundai had agreed to take when it decided in August 2005 to change the carpet color of the mats.  Curiously, MAPL also indicated on November 16 that it had destroyed the very mats about which it was complaining.

41.     In an email dated November 23, 2006, MAPL asked Cannon for credit corresponding to the destroyed mats together with freight and duties.  In the same email, MAPL acknowledge that 80,000 out of 98,035 sets of the Cannon-manufactured Hyundai mats had been sold without problem.

### F.   Cannon Rejects MAPL's Request For A Credit

42.     On December 1, 2006, Edward Atkin, the owner of Cannon, rejected MAPL's request for a credit for the destroyed mats.  Edward Atkin noted that it was clear to him that MAPL sought to pass on to Cannon the cost to MAPL for Hyundai's decision to convert the Hyundai mat program to all rubber floor mats.  As a result of Hyundai's decision to switch to rubber mats before it used up its stock of carpeted mats, Hyundai found themselves with a substantial stock of the carpeted mats for which they had no additional use.

### MAPL Fails To Pay Cannon For Rubber Mats

43.     Cannon continued to manufacture for MAPL rubber mats.  Between about February 26, 2007 and August 28, 2007, Cannon manufactured and delivered in the U.K. to MAPL, pursuant to MAPL's orders, rubber mats totaling approximately £1.0 million.  During this time, MAPL did not mention payment from Cannon for the allegedly defective mats that MAPL destroyed.

44.    MAPL defaulted on its payment to Cannon for some of the rubber mats that Cannon produced in 2007.  On August 16, 2007, Cannon requested that MAPL pay to Cannon immediately all amounts owed – at that time approximately £379,301.20 and $45,954.64.  In September 2007, MAPL stopped placing orders with, and refused to pay, Cannon pending resolution of the parties' outstanding issues.  Cannon does not contend that the rubber mats that Cannon produced in 2007 were defective or otherwise flawed.

45.    At this time, the total amount owed to Cannon is approximately £384,020.60 and $53,795.80.

**THE PARTIES' ATTEMPTS TO RESOLVE THEIR DISPUTES ARE NOT SUCCESSFUL**

46.    I agreed to meet with MAPL at its Chicago area offices on October 9, 2007 in an effort to resolve the parties' disputes and to secure for Cannon payment of the amounts MAPL indisputably owes to Cannon.  During the meeting, David MacNeil admitted that MAPL owed to Cannon £384,020.60 ($719,723.88US) and $53,795.80US.  But MacNeil claimed that MAPL was entitled to offset that amount by $642,199.36 and $11,652.28 for allegedly defective Hyundai and BMW program floor mats, respectively.  MacNeil admitted that MAPL nevertheless owed to Cannon $182,386.28US even with the alleged offset.

47.    Unfortunately, the parties could not resolve their differences at the October 9 meeting.  At the conclusion of the October 9 meeting, I informed David MacNeil that his terms for resolution of the dispute were not acceptable and that Cannon would pursue full payment of the hundreds of thousands of dollars that MacNeil owed Cannon.  MacNeil then ended the distribution agreement without notice, leaving Cannon with unsold MacNeil stock and packaging materials.

## CANNON ALWAYS UNDERSTOOD THAT DISPUTES BETWEEN THE PARTIES WOULD BE RESOLVED IN THE U.K. UNDER U.K. LAW

48.    MAPL contends in its U.S. Court papers that the parties agreed during the October 9 meeting that they would use the U.S. court system to resolve their disputes.  Neither I, nor any other representative of Cannon, ever made such an agreement on October 9 or at any other time during the Cannon/MAPL relationship.  I agreed to come to MAPL's Chicago area headquarters only for purposes of trying to secure the amounts MAPL owes to Cannon and to attempt to resolve the parties' differences.  We never discussed litigation in Illinois or anywhere in the U.S. if the parties were unable to resolve their differences.   The minutes that I prepared for the October 9 contain no suggestion that the parties mentioned or contemplated litigation in the U.S.  Via email dated October 15, 2007, David MacNeil informed me that the minutes accurately captured our October 9 meeting.

49.    Had MAPL raised the issue, I would have rejected such a notion.  Cannon has always been of the position that U.K. law governs the parties' supply relationship and that the parties would have resolve disputes in the U.K. court system.  After all, the supply relationship was performed completely in the U.K. and MAPL was a startup when David MacNeil solicited Cannon in 1989 to do business.   Cannon never would have agreed to application of U.S. law to the Cannon/MAPL relationship or to a venue in the U.S. should litigation between the parties ever ensue.  We do business in over 60 markets and we cannot be expected to work under so many legal jurisdictions.

## CANNON SUED MAPL FIRST IN THE U.K.

50.    Cannon did not race to the courthouse door as MAPL contends in its U.S. Court papers.  Rather, by letter dated October 16, 2007 addressed to MAPL, Cannon again demanded payment from MAPL of outstanding amounts.  Cannon warned that unless MAPL made payment

within 7 days, Cannon would take appropriate legal action.  (A true and correct copy of the October 16 letter is attached hereto as Exhibit A.)  But MAPL still refused to pay amounts to Cannon that it does not dispute it owed.

51.    On November 30, 2007, approximately six weeks after the October 16 letter, Cannon instituted in the U.K.'s High Court of Justice, Queen's Bench Division, litigation to recover from MAPL the amounts owed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  February 20, 2008

_____
Robert Peacock

# EXHIBIT A

### CANNON AUTOMOTIVE LTD,
### 881 HIGH ROAD,
### TOTTENHAM,
### LONDON, N17 8EY,    ENGLAND
TEL: 0208 275 6024                        FAX: 0208 275 6011

October 16, 2007

MacNeil Automotive Products Ltd.,
2435 Wisconsin Street,
Downers Grove,
Illinois 60515,
U.S.A..

For the attention of Les Veatch

Dear Sirs,

#### Re: May, June & July Accounts (Statements Attached)

We note that despite previous reminders the May account £23476.80 & $6480.00, June account £97327.80 & $17525.00, and July accounts £78284.60 & $4710.00 are still outstanding for payment.

We must inform you that unless payment is received within the next 7 days, we will have to insist on future transactions being made on a payment in advance basis and that we will be taking the appropriate legal advice.

Yours Faithfully.

CANNON RUBBER LTD

M. R. WREN

Credit Controller

**EXHIBIT 2**



# Claim Form

| In the | High Court Of Justice |
|---|---|
| | Queen's Bench Division Division |

| | *for court use only* |
|---|---|
| Claim No. | HQ07x04142 |
| Issue Date | 0 3 DEC 2007 |

CLAIMANTS COPY

Claimant:

Cannon Automotive Limited
Brook House
881 High Road
Tottenham
London
N17 8EY

SEAL

Defendant:

MacNeil Automotive Products Limited (A company incorporated in Illinois, USA)
2435 Wisconson Street
Downers Grove
Illinois 60515
USA

Brief details of claim:

The Claimant is entitled to and claims the sum of £297,544.87, being the balance of monies due and payable by the Defendant to the Claimant for goods supplied by the Claimant to the Defendant at the Defendant's request, together with interest thereon pursuant to section 35A of the Supreme Court Act 1981 at the rate of 8% per annum from 18 August 2007 until the date of issue of the Claim Form herein, amounting to £3,377.54 and thereafter interest at the daily rate of £65.21 until judgment or sooner payment.

Value:

The Claimant expects to recover more than £15,000.

*ASSIGNED TO MASTER* Fenwick6

| Defendant's name and address | MacNeil Automotive Products Lt 2435 Wisconsin Street Downers Grove Illinois 60515 USA | | £ |
|---|---|---|---|
| | | Amount claimed | 300,922.41 |
| | | Court fee | 1,530.00 |
| | | Solicitor's costs | 110.00 |
| | | Total amount | 302,562.41 |

The court office at Strand, London, WC2A 2LL

is open between 10 am and 4 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

N1 Claim form (CPR Part 7) (04.02)                             Laserform International 3/02

| Claim No. | |
|---|---|

Does. or will. your claim include any issues under the Human Rights Act 1998?   ☐ Yes   ☒ No

Particulars of Claim (attached) XXXXXXXXX
See attached.

Statement of Truth
XXXXXXXXX (The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name  Richard Marshall
Name of claimant's solicitor's firm.    Manches LLP

signed _____  position or office held  Partner
XXXXXXXX XXXXXXXXXXX (Claimant's solicitor)     (if signing on behalf of firm or company)
*delete as appropriate

Manches LLP                              Claimant's or claimant's solicitor's address to
Aldwych House                           which documents or payments should be sent if
81 Aldwych                              different from overleaf including (if appropriate)
London                                 details of DX, fax or e-mail.
WC2B 4RP

DX 76   Chancery Lane
020 7430 1133

**IN THE HIGH COURT OF JUSTICE**                        CLAIM NO:
**QUEENS BENCH DIVISION**

**B E T W E E N**


**CANNON AUTOMOTIVE LIMITED**
                                                        <u>Claimant</u>


- and -


**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**
                                                        <u>Defendant</u>

---

**PARTICULARS OF CLAIM**

---

**The Parties**

1.    At all material times:

    (a)    the Claimant is and was a company carrying on business as, inter alia, manufacturers and suppliers of rubber mats for motor vehicles;

    (b)    the Defendant is a company incorporated under the laws of Illinois in the United States of America;

    (c)    the Defendant has carried on business as suppliers of, inter alia, rubber mats for motor vehicles in the United States.


**The Agreements**

2.    By a series of agreements made between the Claimant and the Defendant between about 26 February 2007 and 28 August 2007, the Claimant agreed

to manufacture and supply to the Defendant rubber mats to be incorporated into the boots of motor vehicles for the sum total of £278,729.00 and US$38,883.00, respectively.

3.    The said agreements are contained in:

    (a)    purchase orders which were e-mailed by the Defendant to the Claimant, particulars of which are set out in the schedule at Annexure 1;

    (b)    acknowledgement pro forma invoice forms which were e-mailed by the Claimant to the Defendant, particulars of which are set out in the schedule at Annexure 1.

4.    It was an express, alternatively, an implied term of the said agreements (such term being implied by the course of dealings between the parties) that the Defendant should pay for the rubber mats within 90 days of the date of the Claimant's invoice for the same.

**Breach**

5.    The rubber mats which were the subject of the said agreements were duly manufactured and delivered by the Claimant to the Defendant.

6.    By a series of invoices, the Claimant invoiced the Defendant for the said rubber mats in sums totalling £278,729.00 and US$38,883.00, respectively. Copies of sterling and dollar statement of accounts setting out the said invoices are attached hereto at Annexure 2.

2

7.    In breach of the terms of the said agreements, the Defendant has failed and/or refused to pay to the Claimant the said sums of £278,729.00 and US$38,883.00 or any part thereof.

8.    The sum of US$38,883.00 equates to the sum £18,815.87, using the Financial Times US$:£ exchange rate of 2.06650:1 as at today's date.

9.    The Claimant is, therefore, entitled to and claims the sum total of £297,544.87, together with interest thereon pursuant to Section 35A of the Supreme Court Act 1981 at the rate of 8% per annum from 17 August 2007 to the date of issue of the Claim Form herein amounting to £3,377.54 and thereafter further interest at the daily rate of £65.21 until judgment or sooner payment. A schedule setting out the calculation of interest is attached hereto at Annexure 3.

AND the Claimant claims:

(1) the sum of £297,544.87;

(2) interest pursuant to Section 35A of the Supreme Court Act 1981 at the rate of 8% per annum from 18 August 2007 to the date of issue of the Claim Form herein amounting to £3,377.54 and thereafter further interest at the daily rate of £65.21 until judgment or sooner payment.

Dated this 30th day of November 2007

The Claimant believes that the facts stated in these Particulars of Claim are true.

3

CANNON AUTOMOTIVE Ltd -v- MACNEIL AUTOMOTIVE
PRODUCTS Ltd

I am duly authorised by the Claimant to sign this statement.

.........................................

**Richard Marshall**

**PARTNER**

Manches LLP of

Aldwych House

81 Aldwych

London WC2B 4RP

Tel +44 (0)207 404 4433

Fax +44 (0)207 430 1133

DX 76 Chancery Lane

Ref: RGM/LTA/250199

4

<u>IN THE INTENDED ACTION</u>
IN THE HIGH COURT OF JUSTICE

CLAIM NO:

B E T W E E N

CANNON AUTOMOTIVE LIMITED

<u>Claimant</u>

- and -

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

<u>Defendant</u>

---

PARTICULARS OF CLAIM

---

MANCHES LLP
ALDWYCH HOUSE
81 ALDWYCH
LONDON
WC2B 4RP

TEL: 020 7404 4433
FAX: 020 7430 1133
REF: RGM/LTA/250199

5

**EXHIBIT 3**



**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**                                    **CLAIM NO: HQ07X04142**

**In the matter of an intended action**

**BETWEEN**

**CANNON AUTOMOTIVE LIMITED**
                                                              <u>**Intended Claimant**</u>

**and**

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**
                                                              <u>**Intended Defendant**</u>

---

**ORDER**

---

**UPON** the application of the Defendant made by Application Notice dated 21st January 2008

**AND UPON READING** the Witness Statement of Kent Napier Phillips dated 21st January 2008, together with its exhibits

**IT IS ORDERED THAT:**

1.    That pursuant to CPR 3.1(2)(a) the 14 day time period under CPR 11(4)(a) for the
      Defendant to file an application for orders declaring that the Court has no jurisdiction
      (and further orders under CPR 11) be extended until seven days after such time as the
      United States District Court for the Northern District of Illinois (Eastern Division) has
      determined the Defendant's Motion filed on 8 January 2008 to enjoin the Claimant from
      pursuing these proceedings.

LN:21472.1

2.      Costs reserved to the hearing of the application, or to the next convenient hearing.

3.      This Order is made pursuant to CPR 23.9.  Permission to the Claimant to apply to set aside or vary the same within 7 days of service.

4.      Defendant to draw up, file and serve this Order by 4.00pm on Wednesday 23 January 2008.

**Dated this**                          **day of January 2008**