**EXHIBIT 4**

# Application Notice

| | |
|---|---|
| **You should provide this information for listing the application** | **In the** High Court Of Justice |

| | |
|---|---|
| **You should provide this information for listing the application** | |

**In the** High Court Of Justice

Queen's Bench Division
Royal Courts of Justice

1. How do you wish to have your application dealt with

  a) at a hearing? [X]

  b) at a telephone conference? [ ] } *complete all questions below*

  c) without a hearing? [ ] *complete Qs 5 and 6 below*

2. Give a time estimate for the hearing/conference

  _____0_____ (hours) ___30___ (mins)

3. Is this agreed by all parties? [ ] Yes [X] No

4. Give dates of any trial period or fixed trial date

5. Level of judge __Master__

6. Parties to be served __Defendant__

| | |
|---|---|
| **Claim no.** | HQ07X04142 |
| **Warrant no.** (if applicable) | |
| **Claimant** (including ref) | Cannon Automotive Limited |
| **Defendant(s)** (including ref) | MacNeil Automotive products Limited |
| **Date** | 29 January 2008 |

**Note** You must complete Parts A **and** B, **and** Part C if applicable. Send any relevant fee and the completed application to the court with any draft order, witness statement or other evidence; and sufficient copies for service on each respondent.

## Part A

1. Enter your full name, or name of solicitor

(1) I (We) Manches LLP
(on behalf of)(the claimant)

Cannon Automotive Products Limited

2. State clearly what order you are seeking and if possible attach a draft

(2) intend to apply for an order (a draft of which is attached) that the Order of Master Fontaine dated 21 January 2008 be set aside

3. Briefly set out why you are seeking the order Include the material facts on which you rely, identifying any rule or statutory provision

(3) because the High Court is the right forum for the resolution of this matter and England and Wales the appropriate jurisdiction.

*[handwritten annotations]* 23 JAN 2008  MASTER Fontaine  £102  Tues  19th  February 08  11:00  30m  29/1/08

## Part B

I (We) wish to rely on: *tick one box*

the attached (witness statement)(affidavit) [X] my statement of case

4. If you are not already a party to the proceedings, you must provide an address for service of documents

evidence in Part C in support of my application [ ]

| | |
|---|---|
| **Signed** | |
| | (Applicant)('s Solicitor) |
| **Position or office held** (if signing on behalf of firm or company) | Partner |

(4) Address to which documents about this claim should be sent (including reference if appropriate)

| Manches LLP | | if applicable | |
|---|---|---|---|
| Aldwych House 81 Aldwych London | | fax no. | 020 7430 1133 |
| | | DX no. | DX 76   Chancery Lane |
| Tel. no. 020 7404 4433   Postcode WC2B 4RP | | e-mail | |

Claim No. HQ07Xo4142

**Part C**

I (We) wish to rely on the following evidence in support of this application:

<table>
<tr>
<td colspan="2"> <b>Statement of Truth</b>

*(I believe) *(The applicant believes) that the facts stated in Part C are true

*delete as appropriate</td>
</tr>
<tr>
<td><b>Signed</b>

<br><br><br>

(Applicant)('s Solicitor)('s litigation friend)</td>
<td><b>Position or office held</b>
(if signing on behalf of firm or company)

<br>

<b>Date</b></td>
</tr>
</table>

IN THE HIGH COURT OF JUSTICE                    CLAIM  NO: HQ07X04142
QUEENS BENCH DIVISION

B E T W E E N


CANNON AUTOMOTIVE LIMITED

<u>**Claimant**</u>


- and -


MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

<u>**Defendant**</u>

---

### ORDER

---

**UPON THE APPLICATION** of the Claimant made by the Application Notice dated
29 January 2008

**AND** upon reading the witness statement of Richard Gary Marshall dated 29
January 2008

**IT IS ORDERED THAT:-**

1.  The Order of Master Fontaine dated 21 January 2008 be set aside.

2.  That the Defendant is to pay the costs of this application.


Dated this        day of January 2008

IN THE HIGH COURT OF JUSTICE

CLAIM NO: HQ0704142

B E T W E E N

CANNON AUTOMOTIVE LIMITED

<u>Claimant</u>

- and -

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

<u>Defendant</u>

_____

ORDER

_____

**MANCHES LLP**
**ALDWYCH HOUSE**
**81 ALDWYCH**
**LONDON**
**WC2B 4RP**

**TEL: 020 7404 4433**
**FAX: 020 7430 1133**
**REF: RGM/LTA/250199**

**IN THE HIGH COURT OF JUSTICE**                    CLAIM  NO: HQ07X04142
**QUEENS BENCH DIVISION**

**B E T W E E N**

**CANNON AUTOMOTIVE LIMITED**

<u>Claimant</u>

- and -

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**

<u>Defendant</u>

---

### SECOND WITNESS STATEMENT OF RICHARD GARY MARSHALL

---

I, **RICHARD GARY MARSHALL** of Manches LLP, Aldwych House, 81 Aldwych, London WC2B 4RP, **WILL SAY AS FOLLOWS**:-

1.    I am a solicitor of the Supreme Court and a partner in the firm of Manches LLP, the solicitors for the Claimant ("Cannon"). I have the conduct of this action on behalf of Cannon and am duly authorised by Cannon to make this witness statement on its behalf. I make this witness statement in support of Cannon's application to set aside the order of Master Fontaine dated 21 January 2008.

2.    The facts and matters to which I refer in this witness statement are either within my own knowledge and true or are derived from sources which are identified below (in which case they are true to the best of my information, knowledge and belief).

Page 2

3.   There is now produced and shown to me in a bundle marked "RGM2" copies of various documents. The page numbers referred to below correspond to the page numbers in that bundle.

4.   I make this statement further to my witness statement of 30 November 2007 in support of Cannon's successful application for leave to serve these proceedings out of the jurisdiction (see pages 1-11). I make this statement in conjunction with my previous statement and refer the Court, in particular, to paragraphs 25-26 of that witness statement which address the issue of jurisdiction and lay out Cannon's assertion that the UK is the appropriate jurisdiction in which to try the issues between the parties. I also make this statement in order to reply to points made in the statement of Kent Napier Phillips dated 21 January 2008.

5.   Cannon will be making an application for an anti-suit injunction which will set out in more detail Cannon's position as to jurisdiction.

**Order of 21 January 2008**

6.   The Order of Master Fontaine dated 21 January 2008 (see pages 12-14) was made following a without notice application of the same date (see pages 15-16) by the Defendant ("MacNeil") and granted MacNeil, pursuant to CPR 3.1(2)(a), an extension of time in which to file an application for orders declaring that the Court has no jurisdiction and further orders under CPR 11.

7.   The concurrent proceedings in the United States District Court for the Northern District of Illinois were started by MacNeil on 8 January 2008 and consisted of a Complaint seeking damages for the alleged supply of defective products by Cannon and a Motion to Enjoin preventing Cannon from pursuing proceedings in the England. MacNeil's application of 21 January 2008 was made on the basis that their Motion to Enjoin in the United States was due to be determined shortly after that

application and that such determination may obviate the need for further applications in the UK proceedings on the basis that those proceedings would be stayed by the United States Court. The statement in support of MacNeil's application made by Kent Napier Phillips and dated 21 January 2008 (see pages 17-21) sought the order made on 21 January 2008 on this basis.

**Statement of Kent Napier Phillips**

8.    Cannon wishes to comment on certain representations made by Mr Phillips in his statement. In paragraph 7(a) of his statement, Mr Phillips states that the Motion to Enjoin had been given a hearing date of 24 January 2008. At paragraph 10 of his statement, Mr Phillips states that "the Motion to Enjoin scheduled to be heard in Illinois on 24 January 2007" (the 2007 being, of course, a typographical error and Mr Phillips meaning 2008). Both of these statements were misleading. The Court appointment in Illinois on 24 January 2008 was only to set a briefing schedule on MacNeil's Motion to Enjoin and was one of 13 motions scheduled to be heard at 9.30am with a further criminal change of plea scheduled for 10.00am. At no point was MacNeil's Motion to Enjoin going to be heard or determined at this appointment as was clearly the implication made in Mr Phillips statement, as highlighted above.

9.    Furthermore, Mr Phillips would have been informed by US lawyers working on MacNeil's Motion to Enjoin that the Court appointment on 24 January 2008 was not a substantive hearing before he made his statement of 21 January 2008 and allowed the Court to believe that the US proceedings would make a ruling, one day before MacNeil's Defence was due to be filed at the High Court.

10.    The order of 21 January 2008 has been made on the basis of the Motion to Enjoin being determined on the 24 January 2008, or in any case, within a short space of

Page 4

time following the making of that order. This was not and was never going to be the case.

11. On 24 January 2008 the Illinois court laid out a briefing schedule with the following due dates for party submissions:
    - 14 February: Cannon opposition to Motion to Enjoin
    - 14 February: Cannon motion to dismiss or stay the US proceedings
    - 28 February: MacNeil reply in support of Motion to Enjoin
    - 6 March: MacNeil opposition to Cannon motion to dismiss or stay the US proceedings
    - 17 March: Cannon reply in support of motion to dismiss or stay the US proceedings

12. On the basis that the Motion to Enjoin was not heard and was never going to be heard on 24 January 2008, and that based on the timetable handed down by the Illinois Court listed above it will not be determined for some time, Cannon requests that the Order made on 21 January 2008 be set aside.

13. Cannon respectfully submits that to fail to set aside the Order, thereby allowing an extension of time to MacNeil until seven days after such time as the Illinois Court has determined MacNeil's Motion to Enjoin, would delay the UK proceedings for a significant period. As stated, England and Wales is the right jurisdiction and the Motion to Enjoin is vexatious and oppressive and an attempt to sabotage the UK proceedings.

14. As Cannon has always stated, it is their firm belief that the English Court remains the only appropriate jurisdiction in which this case should be heard. By way of a Letter before Action dated 26 October 2007 (see page 22) Cannon made it clear to MacNeil that they would take legal action if unpaid invoices were not settled and it

Page 5

would have been obvious to MacNeil that any proceedings instigated by Cannon would be in the English courts. MacNeil had five weeks following this letter before Cannon issued these proceedings in which to initiate proceedings in the United States if it had so desired. It did not and subsequently only initiated proceedings in Illinois in reaction to Cannon initiating these English proceedings in an attempt to deprive Cannon of its choice of first-filed forum. As stated, further evidence will be filed as to jurisdiction in support of the Claimant's application for an anti-suit injunction.

I believe that the facts set out in this witness statement are true.

Signed: ...........................................

Dated: ...........................................

IN THE HIGH COURT OF JUSTICE
QUEENS BENCH DIVISION

CLAIM NO: HQ07X04142

B E T W E E N

CANNON AUTOMOTIVE LIMITED

<u>Claimant</u>

- and -

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS,USA)

<u>Defendant</u>

_____

**SECOND WITNESS STATEMENT OF RICHARD GARY MARSHALL**

_____

**MANCHES LLP
ALDWYCH HOUSE
81 ALDWYCH
LONDON
WC2B 4RP**

**TEL: 020 7404 4433
FAX: 020 7430 1133
REF: RGM/LTA/250199**

**EXHIBIT 5**

**IN THE HIGH COURT OF JUSTICE**                    **Claim No. HQ07X04142**

**QUEEN'S BENCH DIVISION**

**BETWEEN:**


**CANNON AUTOMOTIVE LIMITED**

**Claimant**

-and-


**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**

**(A COMPANY REGISTERED IN ILLINOIS, USA)**

**Defendant**

---

**THIRD WITNESS STATEMENT OF RICHARD GARY MARSHALL**

---

I, RICHARD GARY MARSHALL of Manches LLP, Aldwych House, 81 Aldwych, London WC2B 4RP, WILL SAY as follows:

1.    I am a solicitor of the Supreme Court and a partner in the firm of Manches LLP, the solicitors for the Claimant ("Cannon"). I have the conduct of this action on behalf of Cannon and am duly authorised by Cannon to make this witness statement on its behalf.

2.    I make this witness statement in support of Cannon's application for:

      (a)    an interim anti-suit injunction against the Defendant ("MAPL"); and

(b)    a permanent anti-suit injunction in the event that the Court sets aside the order of Master Fontaine made on 21 January 2008 and, either there is no application by MAPL challenging the Court's jurisdiction and/or the forum of this action, or if  such an application is made by MAPL, that application is resolved in Cannon's favour.

3.    Cannon also relies on my first witness statement dated 30 November 2007 in support of Cannon's application for permission to serve these proceedings on MAPL out of the jurisdiction under CPR 6.20 and my second witness statement dated 29 January 2008 in support of Cannon's application to discharge the order made by Master Fontaine on 21 January 2008. I would ask that the latter application and this application be heard at the same time as the matters are inextricably linked.

4.    The facts and matters set out in this witness statement are either within my own knowledge and are true or are derived from sources identified below, in which case they are true to the best of my information and belief.

5.    There is now produced and shown to me in a bundle marked "RGM3" copies of various documents. The page numbers referred to below correspond to the page numbers in the bundle.

6.    The matters set out in paragraphs 7 to 50 are derived from information provided to me by Robert Peacock, the operations manager at Cannon and the previous operations manager at Cannon Rubber Limited and from documentation provided to me by Cannon.

**Cannon's claim and MAPL's counterclaim**

7.    Cannon is a company which was incorporated on 30 March 2005 under the laws of England and Wales as a private company limited by shares. It is a wholly owned subsidiary of C A Holdings plc and its two directors are Edward Atkin and Celia Janet Atkin. At material times, it has carried on business as, inter alia, manufacturers and suppliers of rubber mats for motor vehicles. A copy of the company's details as recorded at Companies House is at page 1.

8.    MAPL is a company incorporated on 11 February 1989 under the laws of Illinois in the United States of America. Its sole director is David MacNeil.

9.    Prior to the incorporation of Cannon, Edward and Celia Atkin were involved with the Cannon Avent Group of companies. This group included Avent Limited, which made baby bottle feeding products and Cannon Rubber Limited, which carried on the same business as Cannon.

10.    MAPL's relationship was originally with Cannon Rubber Limited. From the date MAPL started to trade, it acted as a distributor of Cannon Rubber Limited's rubber mats in the United States. David MacNeil's relationship with Edward and Celia Atkin dates back to about 1989, when he first met them in London and agreed to be a car mat distributor for Cannon Rubber Limited in the United States.

11.    In about June 2005, the Cannon Avent Group of Companies demerged. The Avent business was sold to the Charterhouse Group of companies and the Cannon rubber mat business was transferred to Cannon.

Rubber mats supplied to MAPL for Hyundai USA

12.  In July 2004, MAPL was awarded a contract by Hyundai USA ("Hyundai") to
     supply car mat sets made of rubber and carpet for all of Hyundai's Tuscon
     model vehicles to be sold in the United States. The contract was awarded to
     MAPL as a result of the joint efforts of MAPL and Cannon Rubber Limited
     (see MAPL's e-mail dated 16 July 2004, thanking Cannon Rubber Limited for
     its efforts (p. 2).

13.  Because of Hyundai's immediate demands and, because Cannon Rubber
     Limited had not had time to source a carpet colour which matched exactly
     Hyundai's requirements, for a period of 3 months, it supplied mats with its
     own standard colour ("the initial mats"). Thereafter, mats with the colour
     required by Hyundai ("the old mats") were supplied by Cannon Rubber
     Limited until the de-merger referred to in paragraph 11 above and
     thereafter by Cannon until about mid August 2005.. In all, Cannon Rubber
     Limited and Cannon supplied MAPL with about 78,000 initial and old mats
     for Hyundai's Tuscon models sold in the United States.

14.  From about August 2004 until November 2004, issues relating to the quality
     of the initial and old mats supplied by Cannon Rubber Limited were raised
     by MAPL. In particular, complaint was made that the carpet on some of the
     mats was not sticking properly to the rubber.

15.  In November 2004, MAPL sought a credit of £21,618.05 in relation to
     alleged defective products supplied (pages 4-5). The credit was, in fact,
     never given by Cannon Rubber Limited to MAPL and no further mention of it
     was made by MAPL after November 2004.

4

16.    Cannon Rubber Limited and Cannon (after the de-merger, referred to in Paragraph 11 above), continued to supply old mats to MAPL until about the middle of August 2005. As stated above, they supplied in total about 78,000 initial and old mats. As to these mats, apart from the complaints referred to above, the only other complaint made was in an e-mail dated 4 October 2005, in which MAPL notified Cannon that Hyundai had received a total of 23 warranty claims (page 7). However, as MAPL stated in its e-mail, when compared to the number of mats sold (namely, about 78,000), the failure rate reported was quite small and the failures reported related to the early mats in the programme. All invoices rendered by Cannon Rubber Limited and Cannon (from June 2005) to MAPL for initial and old mats were paid for by MAPL.

17.    In about the middle of August 2005, MAPL notified Cannon that Hyundai had decided to change its carpet colours for its 2006 Tuscon models, despite having told MAPL in June 2005 that there would be no changes to the carpet colour (see the e-mail dated 17 August 2005, pages 8-9). In its e-mail to Cannon, MAPL also stated that Hyundai accepted full responsibility for its oversight and accepted that it was under an obligation to take whatever stocks they had, including carpet stocks. Cannon still had 7,124 sets of old mats (product no. 00281-T5POOGR) which it had not yet dispatched, comprising 3,450 grey sets and 3674 sets of mats in the previous beige colour. All of these mats were subsequently delivered to MAPL and shipped by MAPL to the United States, where they were delivered to Hyundai. Cannon then stopped production of all mats, pending agreement between MAPL and Hyundai and MAPL and Cannon on the new mat to be produced ("the new mat").

18.  Final agreement relating to a change of colour of the carpet mat was not reached until November 2005, when orders were made from Hyundai to MAPL and from MAPL to Cannon for immediate shipment by air of 2,600 sets of new mats (see the e-mail dated 17.11.05, page 13).

19.  From 18 November 2005 until 22 May 2006, Cannon supplied to MAPL 20,025 sets of new mats. Of these, 8,025 were new mats with product no. 00281-T6P00-Z9 and 12,000 were new mats with product no. 00281-T6P00-U7. Schedules setting out the dates of each shipment, the quantity dispatched, how they were dispatched and the order number are at pages 25-26. All of these shipments were paid for by MAPL.

20.  In or about November/December 2005, Cannon was notified that because of changes made by Hyundai to its vehicles, new ferrules were required on all mats. Ferrules are the plastic knobs used to attach the mat to the floor of the vehicle. As a result of these changes, Hyundai would not have been able to use any unused stocks of initial, old or new mats in vehicles, which incorporated these changes.

21.  In June 2006, Cannon notified MAPL that because of significant increases in raw material prices, it would be invoicing MAPL in pounds sterling (page 27). Originally, Cannon Rubber Limited had invoiced MAPL in £ sterling, but, in order to assist MAPL, had agreed to invoice MAPL in $. This practice was continued by Cannon, but by June 2006, because of the increase in raw materials, it became uncommercial for Cannon to continue with it.

22.  On 4 July 2006, being about 6 weeks after the final shipment of new mats had been made Cannon, MAPL sent to Cannon an e-mail it had received from Hyundai the day before in which Hyundai referred to bonding problems

6

in some mats returned by a Tuscon AZ dealer and sample mats inspected by them (pages 29-31). Hyundai then stated that further inspections would be carried out with a view to seeing whether the mats were suitable for installation or would have to be repaired or scrapped. Hyundai asserted that there were about 11,500 mats at their PDC's or at the ports and that their exposure was about $US500,000. The e-mail revealed that whilst by this stage Cannon had delivered 20,025 new mats and orders had continued throughout from November 2005 to May 2006, Hyundai had only used 8,525 new mats.

23.    On 7 July 2006, MAPL e-mailed to Cannon a further e-mail received from Hyundai dated 6.7.07, in which Hyundai alleged that it had inspected 50 mats at each of its 4 ports (that is, 200 mats out of a total stock of 11,568 unused mats, amounting to a sample of 1.7% of those mats) and that 80% to 100% of the mats exhibited carpet separation (page 32). Hyundai then stated that it had accordingly "shut off all installation of MacNeil mats at the ports", that it was going to substitute the Mobis carpet mat until it ran out of them and that as of 26 June 2006, Hyundai had 11,568 mats in stock which were no longer useable. Mobis was the authorised company, which Hyundai Korea had wanted Hyundai to use for the supply of its mats for Tuscon models, instead of MAPL.

24.    In its e-mail to MAPL, Hyundai gave a further breakdown of its unused stock: it stated that it had 2,718 new mats with product number T6POO-Z9 (out of 8,025 delivered) and 7,792 new mats with product number T6P00-U7 (out of a total of 12,000 delivered) (p 34-35). Hyundai also stated that it had discovered that it still had 7,124 old mats in stock. These were the mats which had been delivered by MAPL to Hyundai after Hyundai had decided to change its colour specifications, but had agreed to take delivery

of stock already manufactured, although it no longer had any use for that stock.

25.    In about late July/early August, Hyundai decided it would no longer use carpeted rubber mats in its vehicles, but would use all rubber mats instead. Despite the fact that both Hyundai and MAPL were alleging that over 50% of the new mats were defective, as became apparent from e-mails sent and forwarded to Cannon in early August 2006 (pages 33-35),   MAPL had offered to replace the new mats with all rubber mats and was also seeking to obtain the whole of Hyundai's rubber mat business. On or about 3 August 2006, about a one month after Hyundai had first complained about the new mats, Hyundai awarded to MAPL its rubber floor business for its Tuscan and new Santa Fe models (see MAPL's e-mail dated 3 August 2006 (p 36). Subsequently, orders were placed by MAPL with Cannon for the all rubber mats, the first order being made in October 2006 (p 37).

26.    Nothing further about the alleged defective new mats was heard from MAPL until MAPL's e-mail dated 16 November 2006 (p 38). In its e-mail, MAPL asserted that it had credited Hyundai for 18,189 sets of mats (this clearly included the 7,124 old mats), that it had had no choice but to destroy all of the new mats and that it had taken photographs of the defective mats and the mats dumped into the dumpsters. Curiously, in an e-mail sent 6 days later on 22 November 2006 (p 39) MAPL stated that it was then in the process of getting rid of the alleged defective new and old mats and in an e-mail sent the following day on 23 November 2006 (p 41), it changed this by stating that it would be dumping the mats into dumpsters the following week.

8

27.   In its e-mail dated 23 November 2006 (p 41), MAPL also asked Cannon for
      a credit in respect of the destroyed mats, together with freight and duties
      paid in respect of the same, but made it clear that it was not asking for
      alleged lost profits, alleged damage to reputation  or profits from alleged
      lost  business. MAPL also stated that the action it had allegedly taken had
      avoided a lawsuit with Hyundai. The email did not give any details of the
      amount of credit ever wanted, nor was any credit note ever issued.

28.   At no stage before its e-mail dated 16 November 2006, in which it stated
      that it had got rid of the mats referred to above, did MAPL give Cannon any
      notice of its intention to destroy the same or any opportunity before doing
      so of inspecting the mats. Further, at no stage has Cannon been provided
      with any inspection or quality reports from either MAPL or Hyundai, a copy
      of any return notes from Hyundai, a copy of any credit note raised by MAPL
      in favour of Hyundai or, indeed, any documentary evidence proving that the
      alleged defective mats were mats manufactured and supplied by Cannon. In
      its e-mail dated 4 July 2006 to Cannon (p 29), MAPL had stated that if
      Hyundai returned US$500,000 worth of mats, then MAPL intended to return
      to Cannon US$500,000 in mats. Instead, MAPL decided to destroy all of the
      evidence.

29.   By an e-mail dated 1 December 2006, Edward Atkin, on behalf of Cannon,
      formally rejected MAPL's claim, which MAPL responded to in its e-mail of the
      same date (p 42).

30.   From January 2007 until September 2007, when MAPL ceased to place
      orders with Cannon, business continued as normal between Cannon and
      MAPL and, save for an e-mail dated 9 July 2007 from Hyundai forwarded by
      MAPL to Cannon (p 49) (which was the first time that Cannon learnt that

9

Hyundai had billed MAPL for the returned mats), MAPL made no further mention of its claims relating to the alleged defective mats. However, unbeknown to Cannon at the time, MAPL and Hyundai had reached agreement regarding all rubber mats in January 2007 and yet Cannon was not informed of this agreement until July 2007.

31. Although business continued as normal and MAPL continued to submit orders to Cannon, MAPL started to default in paying its invoices; this it had never previously done. Cannon started to press for payment of its invoices (the e-mails relating to this are at pages 12 to 32 of "RGM1") as a result of which in September 2007, MAPL stated that it had placed a stop on orders with, and payments to, Cannon until all outstanding issues had been resolved. The total amount of Cannon's unpaid sterling invoices is £384,020.60 and of its dollar invoices is US$53,795.80, which MAPL does not dispute.

Rubber mats supplied to BMW

32. In 2003 MAPL was awarded a contract by BMW to supply rubber car mats for all BMW cars in the United States. Until about July 2007, there had been no problems as regards the supply of mats to MAPL for BMW. However, about 1875 defective mats were supplied by Cannon, but these were all subsequently replaced by Cannon.

Attempts to resolve the dispute

33. On 9 October 2007, a meeting was held in Chicago between Robert Peacock, acting on behalf of Cannon, and David MacNeil and Al Thom, acting on behalf of MAPL. At the meeting, David MacNeil raised the issue of alleged defective products which had been supplied by Cannon and then sold by MAPL to Hyundai. He also referred to defective products which had

10

been supplied by Cannon and had been sold by MAPL to BMW. David MacNeil accepted that Cannon was owed the sums of £354,020.60 and US$53,795.80, but claimed that MAPL was entitled to set-off against these sums the sum of US$642,199.36 in respect of the Hyundai mats and the sum of US$11,652.28 which MAPL had allegedly reimbursed or credited to BMW for mats supplied to them. Having regard to its alleged claim, David MacNeil accepted that even on MAPL's own case, MAPL owed to Cannon the sum of US$182,386.28 (see: the minutes of the meeting, incorporating a reference to David MacNeil's e-mail dated 11 October 2007, which were approved by MAPL (pages 50-52).

34.   At the meeting, David MacNeil also supplied Cannon with a detailed breakdown of MAPL's claim (p 53-54).

35.   From the breakdown, it will be seen that for the years 2005, 2006 and 2007, the total warranty claims from Hyundai totalled US$23,241.89. Save for the 23 warranty claims referred to in paragraph 15 above, no notice of any further warranty claims had ever been given by MAPL to Cannon. Of the warranty claims alleged, it is unlikely that those referred to as having been made in 2005 related to the new mats, bearing in mind that deliveries to MAPL only started after mid-November 2005.

36.   Cannon does not believe that MAPL's claims against it are genuine, having regard to the actions of MAPL and the matters set out above. At the very least, the claims have clearly been grossly exaggerated.

37.    As stated above, MAPL ceased placing orders with Cannon in September 2007. This was because it had set up its own manufacturing business. Whilst setting up that business, it continued to place orders with Cannon,

11

but ceased paying for the same. As MAPL had always been a good payer, it would appear that it had consciously taken the decision to cease making payments and then later to use as an excuse for non-payment its alleged claims for defective products.

## The Tooling claim

38.     MAPL started to produce rubber car mat tools in or about the summer of 2005. Over an 18 month period MAPL shipped these tools to Cannon for use by Cannon in the manufacture of the mats. However, Cannon's own manufactured tools account for 81.9% of tools used in the manufacture of the MAPL product. Cannon still retains the MAPL tools; MAPL has never formally requested for these tools to be returned nor has it sought in its Complaint referred to in paragraph 42 below, to identify the tools which it alleges belong to it. The tools supplied by MAPL to Cannon as set out above were not lent to Cannon but given to it. It has never been a term of the parties arrangements that these tools were to be returned at the termination of the parties business dealings. In the premises Cannon denies that MAPL are entitled to the return of any tools. It will further be seen from the Complaint referred to in paragraph 42 below that MAPL allege that these tools have a value of $2.8m. In Cannon's estimation, they are worth no more than $400,000.

## The Procedural History

39.     On 26 October 2007 Cannon wrote to MAPL demanding payment of its outstanding accounts and informed MAPL that if payment was not made within 7 days, the matter would placed in the hands of their legal advisors (p 55).

12

40.  Nothing was heard from MAPL and on 30 November 2006 a without notice application was made to serve these proceedings out of the jurisdiction on MAPL. Permission to serve out of the jurisdiction was given on that date by Master Yoxall and the Claim Form and Particulars of Claim were served on MAPL on 20 December 2007.

41.  On 11 January 2007, MAPL filed an Acknowledgement of Service indicating that it intended to contest the Court's jurisdiction.

42.  On the same day, it served on Cannon a Complaint which it had filed in the United States District Court for the Northern District of Illinois Eastern Division ("the Illinois Court") on 7 January 2008 alleging that it was entitled to damages of not less than US$4 million primarily out of the alleged defective mats supplied to it by Cannon for Hyundai and US$2.8million being the alleged value of the Tooling claim. On the same day, it filed a Motion seeking to enjoin Cannon from pursuing these proceedings ("the Motion"). Copies of the Complaint and the Motion are now produced and shown to me marked "RGM4". The Complaint is at pages 1-41 of "RGM4"; the Motion is at pages 42-96 of "RGM4".

43.  On 21 January 2007, MAPL made a without notice application before Master Fontaine seeking an extension of time for making an application declaring that the Court had no jurisdiction and further orders under CPR Part 11 until 7 days after such time as the Illinois Court should have determined MAPL's Motion to enjoin Cannon from pursuing these proceedings. The application was supported by a witness statement from Kent Napier Phillips dated 21 January 2008. An order was made by Master Fontaine in the terms sought.

13

44. On 29 January 2008, Cannon issued an application that the order of Master Fontaine be discharged. One of the grounds of that application is that the Court was misled into believing that the Motion was due to be heard on 24 January 2008, one day before the time limit for making an application under CPR Part 11 expired, when, in fact, the court appointment on 24 January 2008 was only set for a briefing schedule. In this respect, I would refer to my second witness statement dated 29 January 2008.

45. It would appear that the steps taken by MAPL in the United States are a deliberate and blatant tactical manoeuvre to interfere with this court's jurisdiction to decide whether it is the appropriate forum for the parties' disputes to be tried and to arrogate to the Illinois Court that decision. The English court was the first court seised with this matter. The normal procedure for a defendant who wishes to dispute either jurisdiction or forum is to make an application under CPR Part 11.

46. As will be seen from the matters set out above, MAPL has been asserting on and off an alleged counterclaim since July 2006. Further, it knew that Cannon did not accept its counterclaim, that Cannon was pressing hard for payment of its invoices and by the end of October 2007 that matters were to be placed into the hands of Cannon's lawyers. Despite having had every opportunity to do so had it wanted to, MAPL did not seek to bring any claim against Cannon whether in the Illinois Court or elsewhere. Meanwhile, Cannon has instituted a claim in this jurisdiction as it was entitled to do.

**The natural forum**

47. England is the natural forum for the determination of its own jurisdiction and whether to exercise that jurisdiction over the parties. It is also the natural forum for this dispute for the following reasons:

14

(a)    MAPL sought out an English supplier to supply goods to it in the USA;

(b)    the whole of the contract was performed in England; the mats were manufactured and delivered to MAPL in this jurisdiction and payment was made to Cannon in this jurisdiction (see paragraph 8 of my first witness statement dated 30 November 2007);

(c)    the breaches of contract, namely, the failure to make payment have all occurred in this jurisdiction. If, which is denied, defective goods were delivered to MAPL, as they were delivered to MAPL in this jurisdiction, any breach by Cannon would, therefore, also have been committed within this jurisdiction;

(d)    the contracts between Cannon and MAPL are all governed by English law for the reasons set out in my first witness statement;

(e)    Cannon now estimates that it is likely that it will call at least five witness as follows:

    (i)    Robert Peacock, who is the Operations Manager at Cannon. All of the departments at Cannon, namely, production, engineering, the quality/technical department, the design/toolroom, personnel, accounts, planning, sales and security, report to him. Further, he is responsible for the entire domestic and export sales operation of OEM and Cannon branded products;

15

(ii)    Dick Bidgood, who is the only other senior manager on site at Cannon's factory premises in Tottenham, London N17 8EY (apart from Mr. Peacock) and is Mr. Peacock's deputy. The general rule is that either Mr. Bigood or Mr. Peacock must be on site at Cannon's factory premises in Tottenham, London N17; neither can be off the site at the same time. Mr. Bigood is a technologist who deals with all technical aspects of the business;

(iii)    Mike Wren, who is Cannon's one and only credit controller;

(iv)    John Mall, who is the project manager at Cannon. He is the Cam/Cad co-ordinator and provides MIS and internet support. Cannon will not progress tooling projects in his absence as his input is essential; and

(v)    Edward Atkin.

(f)    if a trial of this matter were to take place in the United States, the attendance of the above persons as witnesses in the trial would not only be costly, but could seriously disrupt Cannon's business. It would mean that no senior managers would be on site; nor would there be any OEM account managers. There would also no one who was sufficiently trained or experienced to make day to day decisions for Cannon in order for it to function properly. This is likely to result in delays to projects and a reduction in sales by Cannon;

16

(g)   Cannon does not yet know who MAPL will call as witnesses. It is envisaged that they would probably call David MacNeil, Al Thom and possibly George Kurth from Hyundai;

(h)   the mats themselves have all been destroyed. There is, therefore, no physical evidence of the alleged defective mats in the United States;

(i)   the tools in respect of which the claim in conversion is made are in this jurisdiction;

(j)   there is also a substantial amount of documentation in this jurisdiction, for example, purchase orders, pro forma invoices, invoices, designs and drawings (which will also be on computers in this jurisdiction) and so forth;

(k)   Cannon is an English company which has no assets in the United States of America;

(l)   it will also be seen from the complaint that MAPL wants a jury trial. I am informed by Freeborn Peters, the US Attorneys instructed by Cannon, that if a jury is instructed, it is likely to increase the costs of trial for the following two reasons: (i) about one half to one court day will be taken up with the selection of the jury; (ii) this will be followed by a jury instruction conference with the Court, which is likely to last a few hours;

**The justice of the case**

It is Cannon's case that it would be vexatious and oppressive for both the issue of jurisdiction and forum to be decided by the Illinois Court and for the dispute itself to be decided by that Court.

48.   In support of the above, Cannon relies on the matters set out in paragraphs 39 to 46 above and also on the following matters:

(a)   Cannon are paying its US Attorneys on a time/cost basis. I am advised by Freeborn and Peters  that this means that if Cannon wins its claim and defeats MAPL's counterclaim, its victory is likely to be a pyrrhic one in that what it will recover is likely to be subsumed in the costs it will have to pay to its Attorneys. I am informed by Freeborn and Peters that in the United States, as a general rule, a winning party is not entitled to recover its costs from the other side;

(b)   secondly, if as Cannon believe, MAPL's claims are not genuine or, at best have been vastly inflated, MAPL will be able to proceed with them in the United States without fear of any costs consequences against it, whereas if the action proceeded in this jurisdiction, MAPL would have to take into account its risks in having a costs order made against it. At present, Cannon does not know whether MAPL is instructing its US Attorneys on a contingent fee basis or on the same basis as Cannon is instructing its Attorneys;

(c)   thirdly although a judge and a jury should decide the issue of liability and damages on the same principles, a jury may be inclined to find that a foreign company has wronged an American Company and award higher damages; and

18

(d)    finally, it is oppressive for there to be the same set of proceedings in the two jurisdictions with the risk that there will be two inconsistent judgments.

49.    In the premises, I would ask the Court to set aside the order of Master Fontaine. If MAPL genuinely intends to dispute the jurisdiction of this Court and/or to take issue with this forum, then it can in the normal way make its application under CPR Part 11 and allow the English court to make its own determination. In the meantime, Cannon would ask the Court to grant an interim injunction against MAPL effectively to hold the position in the Illinois Court pending the determination by this Court of the above issues. If they are determined in Cannon's favour or if MAPL decides that it does wish to make an application under CPR Part 11, then Cannon would ask the Court to make a permanent anti-suit injunction against MAPL.

50.    I believe that the facts set out in this witness statement are true.

## STATEMENT OF TRUTH

I believe the facts stated in this Witness Statement are true. I am duly authorised to sign this Witness Statement on behalf of the Claimant.

Signed...........................................    Dated. 18th February 2008

RICHARD GARY MARSHALL
Partner
Manches LLP
Aldwych House
81 Aldwych
London WC2B 4RP
RGM/250119

19

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) | Honorable Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Magistrate Judge Arlander Keys |
| Defendant. | ) ) | |

## DECLARATION OF RICHARD G. MARSHALL

1.    I am a solicitor of the Supreme Court of the United Kingdom and a partner in the solicitors firm of Manches LLP. Manches LLP is located in London, England.

2.    Manches LLP are the solicitors for Cannon Automotive Limited in the claim that Cannon filed against MacNeil Automotive Products, Limited on November 30, 2007 in the High Court of Justice, Queens Bench Division. I have the conduct of that action on behalf of Cannon and am duly authorized by Cannon to make this declaration.

3.    I am aware that in the United States, MacNeil commenced on January 8, 2008, an action against Cannon in the Federal Court sitting in Chicago, Illinois. Cannon's United States counsel have asked me to review Cannon's (i) Opposition to MacNeil's Motion To Enjoin Defendant from Pursuing a Collateral Proceeding in a Foreign Jurisdiction; and

(ii) Memorandum in Support of Cannon's Motion to Dismiss or Stay Proceedings for the purpose of confirming the accurate nature of the assertions in those U.S. court papers with respect to English law.

4.     I hereby confirm that the assertions with respect to English law set forth in the U.S. court papers described in preceding paragraph are accurate.

5.     I also confirm that Manches LLP forwarded to U.S. counsel for Cannon true and correct copies of the papers from the U.K. Court proceeding referenced in the U.S. motion papers described in the third paragraph of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 20, 2008

Richard G. Marshall
MANCHES LLP