IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) | Honorable Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) | Magistrate Judge Arlander Keys |
| Defendant. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF CANNON'S MOTION TO DISMISS PURSUANT TO *FORUM NON CONVENIENS*

### INTRODUCTION

The parties' dispute centers on a long-term supply relationship that was solicited by MacNeil, and fully performed, in the United Kingdom ("UK"). MacNeil Automotive Products, Limited ("MacNeil"), a U.S. company, complains that it purchased from Cannon Automotive Limited ("Cannon"), a UK company located in London, England and incorporated under UK law, defective automobile floor mats. MacNeil desperately wants to litigate in the U.S. its claims against Cannon. But given the nature of MacNeil's complaint allegations, the UK is by far the more convenient and appropriate forum in which to resolve the parties' dispute. At its core, resolution of MacNeil's complaint allegations necessarily involves issues of: (i) product design (some of which are Cannon's), (ii) Cannon's manufacturing lines, (iii) Cannon's manufacturing processes, (iv) Cannon's manufacturing equipment and tooling, (v) Cannon's testing and testing protocols, and (vi) the product itself, which MacNeil took delivery of in the UK. Evidence regarding those issues and other key aspects of the parties' UK-centered supply relationship, are located in the UK. Naturally, the witnesses who will testify with respect to the manufacturing lines, processes, tooling and testing as well as to the manufacturing of the product itself, among other issues central to MacNeil's defective product claims, also are located in the UK.

Accordingly, application of *forum non conveniens* principles to those circumstances makes the UK the appropriate forum for MacNeil's claims.

MacNeil has engaged in chess-game like legal maneuvering in an effort to avoid having the UK Courts – which assess fees and costs against the losing party – adjudicate its complaint allegations. As the Court is aware from Cannon's Motion to Stay (Docket Nos. 17-18), on November 30, 2007, Cannon filed an action first against MacNeil, seeking payment for approximately $600,000.00 (U.S.) in unpaid invoices. Cannon filed that action only after giving MacNeil more than six weeks notice that it would pursue legal action unless MacNeil paid to Cannon the full amount MacNeil owed. Had it been concerned about forum, MacNeil could have filed its own complaint first. After all, its purported claims are years old. Instead, MacNeil initiated this action and sought to enjoin Cannon from proceeding with the UK action, cutting out of whole cloth as the basis for the injunction the contention that Cannon had agreed orally to litigate the parties' disputes in the U.S. (No written agreement exists that specifies the venue in which the parties are to resolve their disputes.) But, recognizing that no such agreement exists and that application of the *Colorado River* doctrine to the true circumstances compelled MacNeil to proceed in the UK, MacNeil did an abrupt about face. MacNeil abruptly withdrew its motion to enjoin (Docket No. 21) and agreed in the UK action to the entry of a default judgment against it.

MacNeil's plan to eliminate the dispute underlying the first-filed UK action, in reality, is an artifice, a ruse. Although it had agreed to the entry of a default judgment against it, MacNeil has now announced that it will oppose enforcement of the UK judgment and resist paying to Cannon the undisputed amounts owed for the unpaid invoices until its claims against Cannon are resolved. In other words, the dispute underlying the UK action lives on. And, in other words, MacNeil wrongly seeks to use the U.S. Court system to hide from its undisputed obligations to pay Cannon amounts MacNeil readily admits it owes.

And, although somewhat clever, MacNeil's plan to moot this Court's ability to determine which forum – the UK or the U.S. – is the appropriate one in which the parties are to proceed necessarily fails. MacNeil perhaps technically may have eliminated from the Court's consideration application of the *Colorado River* doctrine to the pendency of Cannon's first-filed UK action. But the notions underlying the *Colorado River* doctrine considerations – as well as the underlying notion of international comity – live on in the doctrine of *forum non conveniens*.

Thus, although by its legal posturing MacNeil to some extent may have altered the playing field, the outcome remains the same.[1] Application of convenience considerations to the parties' UK-centered supply relationship and the very nature of MacNeil's product defect claims renders the U.S. an inappropriate forum.

## BACKGROUND

In its memorandum in support of its motion to dismiss or stay proceedings, Cannon provided a detailed recitation of the parties' UK-centered supply relationship in order to put in proper context the circumstances and factors that render the UK the appropriate forum for resolution of the parties' dispute. (*See* Docket No. 18.) Cannon repeats most of those facts below, and attaches to this memorandum the exhibits to the prior motion. (See, Group Exhibit 1.)

In its response to the motion to dismiss or stay, MacNeil offered a few purported facts via the declarations of David MacNeil, founder of MacNeil, and Alan Thom, Vice President of MacNeil, that MacNeil claims establish additional contacts with the U.S. (*See* Docket No. 24-2, Exhs. 5 and 6.) In short, MacNeil claims that it has documents located in the U.S. as well as witnesses located in the U.S. who purportedly would testify regarding the defective nature of the mats MacNeil purchased.

Cannon does not attempt here to respond to each of those "assertions" other than to note that they are of no surprise and, even if true, that the existence of those documents and witnesses would not alter the outcome of the *forum non conveniens* analysis. Importantly, MacNeil does not assert that evidence exists in the U.S. regarding the manufacture, testing and tooling of the allegedly defective product – the information at the core of MacNeil's claims. Should MacNeil choose to offer the same or other assertions in opposition to Cannon's motion to dismiss for *forum non conveniens*, Cannon will address those assertions, as appropriate, in its reply.

But one additional point about the MacNeil and Thom declarations that MacNeil previously submitted does bear mentioning at this juncture. Neither MacNeil nor Thom declare that Cannon agreed to litigate the parties' dispute in the U.S.[2] In other words, MacNeil's sole

---

[1] Cannon anticipates that MacNeil may assert that this motion is not timely. But, there would be no merit to such an argument. First, MacNeil changed the circumstances. Cannon had no need to file this motion until MacNeil changed the circumstances as discussed above. Second, "there is no time limit on when a motion to dismiss based on *forum non conveniens* can be made." Wright, Miller & Cooper, Federal Practice and Procedure §3828, at 625 (3d ed. 2007).

[2] MacNeil now only claims that he told Cannon's Robert Peacock that MacNeil would sue Cannon if Cannon came after MacNeil in a U.S. Court. (MacNeil Decl. ¶ 10). MacNeil makes no representation

reason for seeking to prevent Cannon from proceeding in the UK in the first place, was, in short, false. No amount of post-motion spin will alter this demonstration of the lengths to which MacNeil apparently will go to avoid having to litigate against Cannon in the UK, the appropriate forum.

**Cannon/MacNeil Supply Relationship Was Made In, And Fully Performed In, The UK**

Cannon is incorporated under the laws of the UK and has no facility or an employee located in the United States. (Peacock Decl. I ¶ 5.)[3] With its headquarters and design and manufacturing facilities located in London, Cannon has designed and manufactured in the UK for over 60 years automotive floor mats for leading automobile manufacturers in Europe. (*Id.* ¶ 3-5.) Some of those mats are similar in design and manufacturing process to mats that MacNeil now alleges were flawed. During the past approximately 15 years, Cannon has not received complaints from any of those automobile manufacturers of a systemic flaw or defect in a Cannon mat. (*Id.* ¶ 2-5, 7-8.)

David MacNeil solicited Cannon in the UK to enter into a supply relationship. (*Id.* ¶ 9.) Eventually, the parties agreed in the UK to enter into a supply relationship pursuant to which MacNeil would purchase mats from Cannon in the UK for resale in the U.S. (*Id.* ¶ 10-12.) The parties did not enter into a master written contract or otherwise subject the supply relationship to a set of written standard terms and conditions. (*Id.* ¶ 13.) But, in light of MacNeil's solicitation of Cannon in the UK and the subsequent UK-centered supply arrangement, Cannon understood from the beginning of the relationship that any disputes between the parties requiring court intervention would be resolved in the UK, under UK law. (*Id.* ¶ 9-16, 48-49.) Cannon would not conduct business otherwise, as it did business in over sixty different markets. (*Id.*)

**The Evidence With Respect To The BMW And Hyundai Mats Is In The UK**

---

that Cannon ever uttered a word about suing in a U.S. Court, much less resolving the parties' disputes in a U.S. Court.

[3] Robert Peacock is the Cannon Operations Manager. The background section of this memorandum is based on (i) the Declaration dated February 20, 2008 that Robert Peacock provided in support of Cannon's motion to dismiss or stay; (ii) Mr. Peacock's Declaration dated April 2, 2008; and (iii) and publicly available court papers filed in the UK action. Cannon refers to Mr. Peacock's February 20 Declaration as Declaration I and his April 2, 2008 Declaration as Declaration II. Those Declarations are attached hereto as Exhibits 2 and 3, respectively and are incorporated herein by reference. Also, the court may take judicial notice of the proceedings in, and papers filed in, the UK Court. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F. Supp. 2d 864, 867 (N.D. Ill. 2007).

MacNeil alleges that some of the mats that Cannon delivered in 2004 - 2006 to MacNeil for the BMW and Hyundai programs were defective. (*Id.* ¶ 17-18; Cmplt. ¶ 6-37.) The evidence needed to test MacNeil's allegations regarding the performance of those Cannon-produced mats is in the UK, which includes, among other things, Cannon mat designs, Cannon tooling, Cannon manufacturing processes and lines, Cannon testing protocols and Cannon test results. (Peacock Decl. I ¶ 18-21.) In addition to this tangible evidence in the UK, several Cannon witnesses who are likely to give testimony in this matter reside exclusively in the UK.   (*Id.* ¶ 21-22.) Of course, there are likely to be many other Cannon witnesses depending on the scope of any claims upon conclusion of discovery. (Peacock Decl. II. ¶ 2-3.)

In stark contrast, MacNeil has offered little evidence of information located in the U.S. save for the alleged existence of documents that purportedly relate to its claims that the mats were defective and witnesses who purportedly will testify consistent with the documents. It is notable that MacNeil did not forward those purported documents to Cannon at the time MacNeil allegedly discovered in 2004 – 2006 that it had purchased defective product (save for a few email communications that MacNeil references). Importantly, MacNeil does not point to evidence in the U.S. regarding the manufacturing processes, manufacturing lines, tooling and product testing, all of which are at the core of MacNeil's allegations and uniquely within the UK. And, it is notable that MacNeil does not refute that it destroyed virtually all of the mats in question. (Peacock Decl. I ¶ 40-41; Cmplt. ¶ 25.) In an effort to mask its destruction of evidence, MacNeil now claims for the first time to have saved 1,000 pounds of defective mats. (Thom Decl. ¶ 8.) But, MacNeil fails to mention that 1,000 pounds of mats equate only to about 70 mat sets – approximately 0.07% of the total number of Hyundai mats Cannon sold to MacNeil and approximately 0.38% of the total number of Hyundai mats MacNeil now claims to be defective. (Peacock Decl. II ¶ 8.)  Simply put, MacNeil has eliminated in the U.S. virtually all of the physical evidence most important to MacNeil's claims.[4]

---

[4] David MacNeil claims in his declaration that in October 2007 he offered to show Robert Peacock "hundreds of these sets of defective Cannon mats in [MacNeil's] possession." (MacNeil Decl. ¶ 9.) That is not true. (Peacock Decl. II ¶ 5.) David MacNeil only offered Mr. Peacock three mats to inspect, mats that Mr. Peacock had previously seen in 2006. (*Id.* ¶ 6.) Indeed, if David MacNeil's declaration were accurate, that would mean that MacNeil destroyed additional sets of mats when it clearly contemplated litigation against Cannon. Either way, given David MacNeil's admissions, Cannon is entitled to, at a minimum, a negative inference instruction from MacNeil's apparent admission of the destruction of evidence.

**MacNeil Overstates Its Claims And Distorts Their Accuracy**

Cannon disputes the accuracy of MacNeil's allegations as to product defects. (*See, e.g.*, Peacock Decl. I ¶ 24-28.) Of course, the merits of MacNeil's allegations are for determination at a later date once forum issues have been resolved. But it is important to note Cannon's position that MacNeil's allegations are inaccurate. In short, MacNeil's complaints during the course of the Hyundai program are significantly inconsistent with the mass defects MacNeil now claims.

**MacNeil Agrees To A Default Judgment Against It In The UK Action But MacNeil Opposes Enforcement Of The Judgment**

The procedural posture and history of the UK action is more fully set forth in Robert Peacock's Declaration I and Cannon's memorandum in support of its motion to dismiss or stay (Docket No. 18). *See, also*, Group Exhibit 1. Cannon does not repeat the entirety of that posture and history here. Rather, MacNeil has now admitted that it owed to Cannon the amounts claimed in the UK proceeding. But that is no surprise. On October 9, 2007, Robert Peacock, Cannon's Operations Manager, met with David MacNeil at MacNeil's place of business to discuss the parties' relationship going forward. David MacNeil admitted during that meeting that his company owed to Cannon the full amount claimed, but he offered only approximately $182,286.28 (U.S.), the full amount MacNeil owed Cannon less the amounts MacNeil claimed Cannon owed to MacNeil for defective Hyundai and BMW mats. (Peacock Decl. I ¶ 43-49.)

MacNeil's refusal to pay to Cannon the undisputed amounts owed prompted Cannon, after several notices to MacNeil and more than six weeks in between the initial warning and the filing of the UK proceeding, to commence the UK action. (*Id.* ¶ 50-51.) The parties spent considerable sums litigating in the UK whether the UK Court should exercise jurisdiction over Cannon's first-filed UK action and enjoin MacNeil from proceeding with its U.S. complaint. When the UK Court indicated on a preliminary basis its concern that MacNeil improperly was attempting to avoid the UK's jurisdiction over the parties' UK-centered relationship, MacNeil abruptly decided that it would agree to a default judgment. MacNeil's stratagem was obvious – to get away from the UK Court and to moot in this Court Cannon's motion to dismiss or stay pursuant to the *Colorado River* doctrine. But, practically, little has changed. MacNeil now opposes enforcement of the UK judgment pending completion of this action. And, technically, even though no action presently exists in the UK and the *Colorado River* doctrine may no longer

apply, notions of convenience nevertheless require the same outcome. The key evidence and witnesses remain in the UK. Thus, the Court should dismiss this action on the grounds of *forum non conveniens*.

**ARGUMENT**

**I.**   *FORUM NON CONVENIENS* **REQUIRES DISMISSAL.**

The Seventh Circuit has stated that "the principle of forum non conveniens comes down to this: a trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill-Rom Co., Inc.*, 108 F.3d 799, 802 (7th Cir. 1997). The Court applies a two-step analysis to determine whether to dismiss an action based on *forum non conveniens*. First, the Court determines whether the plaintiff has an adequate alternative forum in which to pursue its dispute. *Id.* Second, the Court balances private and public interest factors against the plaintiff's choice of forum. *Id.* at 803.

**A.**   **The UK Provides MacNeil With A More Than Adequate Alternative Forum.**

Another forum is "adequate" for purposes of the *forum non conveniens* analysis if the parties are amenable to process, and can pursue remedies, therein. *In re Bridgestone/Firestone, Inc.*, 420 F. 3d 702, 704 (7th Cir. 2005); *Kamel*, 108 F.3d at 802. Both considerations easily are satisfied here. With respect to service of process, Cannon is a UK company subject to the UK Court system. And, MacNeil solicited and entered into a UK-centered supply relationship and has agreed to a default judgment against it in the UK arising out of that relationship. *See, e.g., Alexander Proudfoot, PLC v. Federal Ins. Co.*, 860 F.Supp. 541, 544 (N.D. Ill. 1994) (holding that availability requirement was satisfied where defendant "represented that it is amenable to process in England").

With respect to the pursuit of remedies, U.S. Courts have long and oft held that the UK is an adequate forum for the resolution of a wide variety of disputes, including breach of contract and fraud. *See, e.g. In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F.Supp.2d 569, 571 (N.D. Ill. 2006) (negligence); *Hull 753 Corp., v. Elbe Flugzeugwerke, et al.*, 58 F. Supp. 2d 925, 926-27 (N.D. Ill. 1999) (breach of contract; fraud); *First Union Natl. Bank v. Paribas et.al.*, 135 F. Supp.2d 443, 445 (S.D.N.Y 2001) (fraud); *see also, Wiwa v. Royal Dutch Petro. Co.*, 226 F.3d 88, 101 (2nd Cir. 2000) ("British courts [are] … exemplary in their fairness and commitment to the rule of law"); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1363 (2nd Cir. 1993) ("United States courts consistently have found [English courts] to be neutral and just

7

forums"); *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248, 255-56 (D. Mass. 1999) ("because the United States and England share the same common law heritage, deference to British proceedings is consistent with notions of international comity").

Cannon anticipates that MacNeil may argue that the UK is not adequate because it would not be able to pursue in the UK each Illinois cause of action MacNeil asserts here. Any such argument would be without merit for at least three reasons. First, UK, and not US law, governs the parties' relationship. *See, infra*, Sec. B.2.a. Second, even if Illinois law were to apply, it would make no difference for purposes of the *forum non conveniens* analysis. As an initial matter, Cannon notes that UK Courts can apply Illinois law. (*See* Docket No. 18 at p. 12.) Regardless, the UK Court system provides MacNeil with ample remedies against Cannon given MacNeil's complaint allegations. Third, and in any event, an alternative forum is adequate for purposes of *forum non conveniens* if it affords the plaintiff remedies. In other words, there is no requirement that the alternative forum provide the same remedies. *See Kamel*, 108 F.3d at 803 (finding that Saudi Arabia was an adequate forum despite the fact that the plaintiff was limited to his breach of contract claim); *Phillips Electronics, N.V., v. New Hampshire Ins. Co. et al.*, 728 N.E.2d 656, 669 (1st Dist. 2000) (even if UK court were unable to hear Illinois Consumer Fraud Act claim, a U.S. litigant would not be deprived of any remedy or treated unfairly because "English courts are capable of adjudicating [] other common law fraud causes of action."); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981) (alternative forum is not adequate only "where the alternative forum does not permit litigation of the subject matter of the dispute").

**B.      The Balance Of Private And Public Interests Also Favors The UK.**

A balance of relevant private and public interests also favors dismissal.

**1.      Private Interest Factors Heavily Favor Dismissal.**

Private interest factors relate to the private interests of the litigants. *Am. Dredging Co. v. MacNeil*, 510 U.S. 443, 448 (1994). Private interest considerations include: (1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) possibility of viewing of the premises; and (5) all other practical problems that may make trial of a case easy, expeditious and inexpensive. *Id.*

Here, the UK provides a far more convenient forum in which to litigate the parties' dispute. The facts and circumstances that give rise to the parties' dispute over the quality of the mats that Cannon sold to MacNeil, like the UK-centered nature of their supply relationship in the first place, necessarily took place in the UK. As indicated above, virtually all aspects of the processes required to manufacture and deliver the mats took place at Cannon's place of business in the UK and involved Cannon employees. Thus, all of the evidence regarding, and witnesses who can speak directly to, those processes required to engineer and manufacture and deliver a final product are located in the UK. (Peacock Decl. I ¶ 18-23; Peacock Decl. II ¶ 3-4.) And, the location of those witnesses and the physical evidence that pertains to those processes and protocols renders the UK the more appropriate forum. *See, e.g., Europe & Overseas, Commodity Traders, v. Banque Pribas London*, 940 F.Supp. 528, 538 (S.D.N.Y. 1996).

Litigation in the UK may present MacNeil with some inconvenience. But any such burden was foreseeable when MacNeil decided to solicit Cannon in the UK, do business with a UK company, and form and complete the supply relationship in the UK.[5] Moreover, MacNeil has destroyed virtually all of the purportedly most important evidence in this case that was located in the U.S. – the very mats about which it now complains. At best, MacNeil now claims to have in the U.S. various documents and photographs that purport to support its claims, a tiny fraction (0.38%) of the total number of mats about which it complains, and a few employees who will testify as to the quality of the mats that MacNeil received. (See, MacNeil Decl.¶ 5-8; Peacock Decl. II ¶ 8.)   That so-called evidence of Cannon's wrongdoing is, of course, easily transmitted to any proceeding in the UK. This is in contradistinction to the Cannon evidence in the UK which, in large part, consists of several tons of manufacturing equipment, tooling and production lines, and myriad employees involved in those processes. (Peacock Decl. II ¶ 3-4.) *See, Finova Capital Corp. v. Ryan Helicopter U.S.A., Inc.*, 180 F.3d 896, 899 (7th Cir. 1999) (considering the equipment that will be at issue in the case, including the current location of the equipment and where the equipment was operated, when reviewing the convenience of an alternative forum).

---

[5] Indeed, "some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Borden Inc., v. Meiji Milk Products, Co.*, 919 F.2d 822, 829 (2nd Cir. 1990).

Additionally, thus far, MacNeil has identified only three potential witnesses who are not MacNeil employees – George Kurth, Daniel Cordes and Michael Barrett. (See, Thom Decl. ¶ 5.) If these witnesses were unwilling to attend proceedings, issuing process and forcing testimony will pose problems in either forum because none live in Illinois. *Id.* Finally, MacNeil cannot tip the balance of convenience in its favor by suggesting that it might call automotive-mat end-users as witnesses. Indeed, those individuals are not parties to these proceedings. MacNeil makes no argument as to what testimony those purported witnesses might offer, nor can it articulate any real importance of such witnesses to resolve the dispute. *See, e.g., Household Financial Services, Inc., v. Northern Trade Mortgage Corp.*, Case No. 99 C 2840, 1999 WL 782072 at *5 (N.D.Ill. Sept. 27, 1999) ("court must consider not only the number of witnesses located in each forum but also the nature and importance of their testimony"). In sum, the private interests weigh in favor of the UK forum because litigating this dispute in the United States would be impractical and unduly expensive given that most of the material witnesses, documents and immovable equipment are located in the UK.

### 2.    Public Interest Factors Heavily Favor Dismissal.

The public interest factors to be balanced include the:  (1) avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; (2) interest in having a trial of a diversity case in a forum that is at home with the law that must govern the action; (3) local interest in having localized disputes decided at home; (4) unfairness of burdening citizens in an unrelated forum with jury duty; and (5) administrative difficulties stemming from court congestion. *Kamel*, 103 F. 2d at 803. The balance of these factors here heavily favors the UK.

### a.    It Is More Appropriate For A UK Court To Apply UK law.

No agreement, written or oral, specifies the parties' choice of law. Therefore, this Court must apply the Illinois "most significant contacts" test to determine whether UK or U.S. law applies. *See CSX Transp., Inc. v. Chicago and North Western Transp. Co.*, 62 F.3d 185, 188 (7th Cir. 1995). The Court considers five factors:  the place of contracting; negotiation; performance; location of the subject matter of the contract; and the domicile, residence, place of incorporation, and business of the parties. *Wildey v. Springs,* 47 F.3d 1475, 1481-83 (7th Cir. 1995); *Palmer v. Beverly Enters.,* 823 F.2d 1105, 1109-10 (7th Cir. 1987). In light of the UK-centered nature of the supply relationship, including MacNeil's solicitation of Cannon in the UK and Cannon's delivery of product to MacNeil in the UK, it is clear that the UK has the most significant

contacts.[6]    *See* Restatement (Second) of Conflicts § 188(3) (1971) (if the place of contract negotiation and performance are the same, that state's law usually will apply).

Where, as here, a Federal Court is asked to apply the law of a foreign forum, dismissal is favored.  *Alexander Proudfoot*, 860 F.Supp. at 545 ("Perhaps the most salient consideration in the analysis of public factors is the determination of the law governing the dispute").  Naturally, a UK Court is best suited for hearing disputes governed by UK law, and there is no reason for MacNeil to burden this Court with UK law.  In short, dismissal is especially appropriate here given the adequacy and availability of the UK Courts for resolution of MacNeil's claims against Cannon.[7]  *See Hull 753 Corp. v. Elbe Flugzeugwerk Gmbh*, 58 F. Supp. 2d 925, 930 (N.D. Ill. 1999) (stating that the considerable resources that would be expended in determining German contract law and its application favors dismissal on *forum non conveniens* because foreign forum would not impose the additional expense); *McDonald's Corp. v Bukele*, 960 F. Supp. 1311, 1320 (N.D. Ill. 1997) (dismissing an action based on *forum non conveniens* because resolution of the dispute would necessarily require the application of foreign law); *see also Piper Aircraft*, 454 U.S. at 260.

### b.    The UK Can Protect MacNeil's Interests.

A UK court is uniquely well-suited to protect MacNeil's rights.  As indicated, UK law applies.  And, as indicated above, UK law offers MacNeil several causes of action that are similar to those its now asserts under Illinois law.  For example, English law provides remedies

---

[6] MacNeil has based its complaint on U.S. law.  But in light of its solicitation of Cannon in the UK and the parties' UK-centered relationship, MacNeil erred. MacNeil should have expected that it would be required to defend its conduct in the UK under UK law.  *See, e.g., Midwest Grain Prods. of Illinois v. Productization, Inc.*, 228 F.3d 784, 787-88 (7th Cir. 2000) (in choice of law analysis, the place of performance governs; Oklahoma law applied were the contract was for the manufacture of goods and the manufacturing took place in Oklahoma); *Crown Prods., Inc. v. Wilkinson Mfring. Co.*, Case No. 89 C 5374, 1989 WL 165068, at *3 (N.D. Ill. Dec. 22, 1989) (Illinois law applied to parties' dispute where defendant initially approached plaintiff in Illinois and the manufacture of the product took place in Illinois even though the events underlying defendant's counterclaim for improper design and installation took place in Nebraska).  UK choice of law principals, which like Illinois focus on the country having the closest connection to the contractual relationship, compel application of UK law.  *See* UK The Contracts (Applicable Law) Act 1990, which gives the Rome Convention force of law; *see also* Rome Convention Article 4(1).  UK solicitors for Cannon, Manches LLP, have confirmed for Cannon's U.S. counsel the accuracy of the representations with respect to UK law. (*See* Richard Marshall Declaration, attached hereto as Exhibit 4; Same attached as Exhibit 6 to Dkt No. 18) (confirming identical representations).

[7] Moreover, application of UK law in this Court may require the assistance of experts, the time and expense of which also renders the UK the more appropriate forum. *Interpane Coatings, Inc. v. Australia and New Zealand Banking Group Ltd.*, 732 F.Supp 909, 917 (N.D.Ill. 1990).

for breach of contract and express and implied warranties. MacNeil may assert fraud under English law as well. *See Phillips*, 728 N.E.2d at 669 (even if UK court were unable to hear Illinois Consumer Fraud Act claim, a U.S. litigant would not be deprived of any remedy or treated unfairly because "English courts are capable of adjudicating [] other common law fraud causes of action."). Moreover, English law allows a buyer to set-off its damages for defective goods against the price for those goods and also for defective goods against the price of those goods where the parties operate a running account.

There is, of course, one substantial difference between the U.S. and UK court systems. Under English law, the norm is that the Court would award the prevailing party the legal costs of its action as additional relief the "English rule". *See e.g., In re Factor*, 408 F.Supp.2d at 581 (referring to rule as "loser pays" rule). This is a difference it would seem MacNeil would embrace if it truly put stock in its own claims. That "difference" aside, the substantial similarities between UK and U.S. law and the respective court systems render the UK the more appropriate forum. *See Kamel*, 108 F.3d at 803 ("A court may dismiss on *forum non conveniens* grounds even though the foreign forum does not provide the same range of remedies as are available in the home forum." (citation omitted)).

### c.    The Remaining Public Factors Heavily Favor Dismissal.

As indicated, the UK's interest in the resolution of this lawsuit significantly outweighs any local interest that might exist. This dispute involves a UK corporation, a UK-centered supply relationship, and processes and events occurring in the UK that purportedly give rise to defective product complaint allegations. Further, resolution of this dispute requires the application of UK law.[8] And, the application of UK law here also gives rise to another important interest that weighs heavily in favor of the UK as the appropriate forum. The UK has a significant interest in ensuring that its laws are accurately interpreted and applied – a task that is most easily left to a UK court.

MacNeil's insistence that its claims be heard in this Court also may needlessly inconvenience U.S. citizens (if MacNeil's allegations were to survive dispositive motions) –

---

[8] *See Piper Aircraft Co.*, 454 U.S. at 268 (holding that public interest factors favored the alternative foreign forum because events giving rise to the dispute occurred in the foreign forum); *Kamel*, 108 F. 3d at 805 (stating that a defendant's home forum always has an interest in providing a forum for redress for injuries allegedly caused by one of its citizens); *McDonald's Corp.*, 960 F. Supp. at 1320 (dismissing on

another factor that weighs in favor of a UK forum. In short, there is no reason to burden a U.S. jury with claims involving agreements entered into, and which could and should be resolved in, the UK. *See In re Factor*, 408 F.Supp.2d. at 590 (concluding that jury burden weighed in favor of a UK forum where the dispute was centered in the UK and noting that noting that "[t]he case would be tried by a judge, a professional trier of fact whose full-time occupation it is to preside over trials of all kinds...").

Finally, this Court's docket already is crowded with an abundance of cases.[9] There is no need to burden the Court with this lawsuit which has only a tenuous connection to the U.S. (namely, a U.S.-based plaintiff which has already submitted to the jurisdiction of the UK and agreed to a default judgment in the UK), especially where the complaint concerns no question of federal law.[10]

### C.    MacNeil's Choice Of Forum Does Not Warrant Deference.

A U.S. plaintiff's choice of forum is given little deference where, as here, the plaintiff has engaged in extensive foreign business. *See Kamel*, 108 F. 3d at 804 ("given the ever-expanding realm of international commerce, many courts have somewhat discounted a plaintiff's United States citizenship when that plaintiff is an American corporation with extensive foreign business and it brings an action for an injury occurring in a foreign country"). MacNeil's choice here particularly should be given little deference in light of the parties' 15-year, UK-centered supply relationship, MacNeil's solicitation of that relationship (not the other way around), the and fact that the processes and events giving rise to MacNeil's allegations occurred in the UK.[11]

---

the grounds of *forum non conveniens* where events giving rise to the suit occurred in a foreign forum and resolution of the dispute required application of foreign law).

[9] Publicly available data reveals that the docket for the District Court for the Northern District of Illinois is becoming increasingly congested. From 2006 to 2007, filings for civil cases have increased by 4.9 %, terminations of cases has declined by 3.5%, and the level of pending cases has actually increased by 6.8%. See, Administrative Office of the United States Courts, J. Duff, Judicial Business of the United States Courts, 2007 Report of the Director, 139-141, Table C, attached as Exhibit 5.

[10] Given the common law nature of MacNeil's causes of action, this action does not involve application of legal rights or principles unique to the U.S. Federal Courts.

[11] Considerations of international comity also dictate that the case should be dismissed. This is particularly true where, as here, MacNeil purposefully availed itself of the UK for the purpose of making a substantial profit. "[N]otions of international comity are at an apex when parties inject themselves into the economy of another nation for profit, particularly one as close as Great Britain, and then try to extricate themselves from its jurisdiction." *Goldhammer*, 59 F. Supp. 2d at 255-56 (D. Mass. 1999). MacNeil has benefited tremendously from its relationship in the UK with Cannon.

13

*Hull 753 Corp., v. Elbe Flugzeugwerke, et al.*, 58 F. Supp. 2d 925 (N.D. Ill. 1999), is squarely on point. There, an Illinois-based corporation sued a German corporation in a U.S. Court, alleging breach of contract and violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act. *Id.* at 927. The district court dismissed the action under the doctrine of *forum non conveniens* in favor of the German forum. *Id.* at 930. The court recognized Illinois' interest in protecting its citizens and the plaintiff's interest in litigating at home, but nevertheless gave the plaintiff's forum selection little deference because it chose to do business with the German corporation. *Id.* As the court succinctly noted: "In other words, this forum's interest in protecting [the plaintiff] is no greater than Germany's interest in regulating its citizen [defendant]." *Id.* at fn 4.

It is apparent that MacNeil initiated this litigation, and has engaged in "procedural fencing" in Cannon's first-filed UK action (even agreeing to a default judgment against it in the UK), in a concerted effort to avoid litigating in the UK. In the determination of which forum is appropriate, such tactics do not go unnoticed. *See e.g., Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 750 (7th Cir. 1987) (holding lawsuits should not be used as "an instrument of procedural fencing either to secure delay or choose a forum"); *Basic v. Fitzroy Eng'g, Ltd.*, 949 F. Supp. 1333, 1340 (N.D. Ill. 1996) (declining jurisdiction where lawsuit "was filed as a method of forum shopping").

In the end, however, even if the Court were to afford MacNeil's choice of forum more than little deference, the outcome would remain the same. The *forum non conveniens* analysis focuses on whether this District or another forum is the most convenient and appropriate forum in light of the circumstances underlying, and involved in the resolution of, the parties' dispute. The balance of public and private interest factors here clearly favors dismissal in this case in favor of the UK – that is, the most convenient and most appropriate forum.

## CONCLUSION

It is clear that the UK is the appropriate forum for resolution of the parties' dispute. MacNeil's complaint allegations arise out of processes, conduct and events that occurred in the UK as part of the parties' 15-year, UK-centered supply relationship. Try as it might, no amount of spin by MacNeil will alter that reality. It thus is not surprising that the notion of convenience underlying the *forum non conveniens* analysis – with respect to both the parties and this Court – weighs substantially in favor of the UK. The UK affords MacNeil with an adequate, appropriate

15

and convenient forum in which to air its complaints against Cannon. Indeed, if MacNeil truly believed in its claims, it should jump at the chance to litigate in the UK because it might be able to recoup in that jurisdiction the cost of prosecuting its action. The Court thus should grant Cannon's motion dismiss MacNeil's complaint on the grounds of *forum non conveniens*.

Respectfully submitted,

CANNON AUTOMOTIVE LIMITED.

By:___/s/ Terrence J. Sheahan_____
One of Its Attorneys

William N. Howard
John T. Shapiro
Terrence J. Sheahan
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000

Dated: April 2, 2008