**Group Exhibit 1**

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) | |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) ) | Honorable Joan B. Gottschall  Magistrate Judge Arlander Keys |
| Defendant. | ) | |

## DECLARATION OF ROBERT PEACOCK

### CANNON IS A LONGSTANDING U.K. COMPANY

1.      I am, and have been, the Operations Manager for Cannon Automotive Limited ("Cannon") since its incorporation in June 2005.  I have personal knowledge of the statements made in this Declaration based upon my working knowledge, review of business records and communications with Cannon personnel and can competently testify to the facts contained herein.

2.      Prior to Cannon's incorporation, Cannon Rubber Limited carried on the same business now operated by Cannon.  I served as Operations Manager of Cannon Rubber for 11 years before its business was transferred to Cannon.  Practically, there was no change in operations when the business was so transferred.  When I refer to Cannon in my Declaration, I also include Cannon Rubber.

3.     Cannon designs, manufactures and supplies automotive floor mats and automobile boot protectors and boot mats.  Cannon has designed, manufactured and supplied automotive floor mats for over 60 years.

4.     Cannon manufactures automobile floor mats for leading automobile manufacturers in Europe, including Toyota, Nissan, Peugeot and Land Rover.  In addition, consumers are able to purchase directly from Cannon, through its website, Cannon-branded mats for various automobile vehicles. And of course Cannon supplies retail and wholesale outlets with its Cannon-branded products.  For the last 50 years, Cannon has been Europe's largest supplier of these mats.

5.     Cannon's headquarters, design and manufacturing facilities, principal place of business and workforce always have been located in London, England.  Cannon is incorporated under the laws of England and Wales.  Cannon has no other place of business or other facility. And, Cannon Automotive never has had a facility or an employee located in the United States.

6.     In my declaration, I refer to England or the United Kingdom as the "U.K."  And, I refer to the United States as the "U.S."

CANNON HAS HAD NO SYSTEMIC PROBLEMS WITH MATS IT HAS MANUFACTURED FOR ANY OTHER CUSTOMER

7.     As I stated above, Cannon manufactures floor mats for numerous leading automobile manufacturers throughout Europe.  In a typical year, Cannon produces approximately 8 to 10 million floor mats for those manufacturers, collectively.  In my years as Operations Manager, Cannon has not received any complaint from any of those automobile manufacturers of a systemic flaw or defect in a Cannon mat.

8.     MacNeil Automotive Products Limited ("MAPL") is the first party to complain of a systemic flaw or defect in mats Cannon has manufactured.  Mats that Cannon has

manufactured, and continues to manufacture, for some European automobile manufacturers without complaint are similar in design and manufacturing process to the mats that MAPL now alleges in its January 2008 U.S. Complaint were flawed.

**THE ENTIRETY OF THE CANNON/MAPL SUPPLY RELATIONSHIP TOOK PLACE IN THE U.K. – SOLICITATION; MANUFACTURING; DELIVERY; AND PAYMENT**

9.    In late 1988 – early 1989, David MacNeil, the owner of MAPL, solicited Cannon in the U.K. to enter into a supply relationship for automobile floor mats.  At the time, David MacNeil had yet to form MAPL.

10.    David MacNeil told Cannon that he was impressed with the quality of Cannon's automobile floor mats.  He desired to purchase mats from Cannon and to resell those mats in the United States and act as Cannon's sole U.S. distributor.

11.    Negotiation of the Cannon/MacNeil Automotive supply relationship took place in the U.K., initially by telephone and post and then by David MacNeil visiting the U.K.

12.    Eventually, Cannon and David MacNeil agreed to enter into a supply relationship and MacNeil incorporated MAPL in February 1989.

13.    The parties did not enter into a master written contract or otherwise subject the supply relationship to a set of written standard terms and conditions.

14.    Rather, sales by Cannon to MAPL were conducted and made in the following manner:

a.    MAPL sent purchase orders to Cannon;

b.    Cannon accepted orders by sending to MAPL an acknowledgment reflecting the price for the mats and the anticipated delivery dates;

c.    Cannon manufactured the mats at its facilities located in the U.K.;

d.    MAPL took delivery of the mats at Cannon's facilities in the U.K.

e.    MAPL was responsible for shipping the mats from the U.K. to the U.S.;

f.    Cannon sent to MAPL, after MAPL picked up the mats at Cannon's U.K. facility, an invoice for payment;

g.    Cannon allowed MAPL 90 days from receipt of the invoice in which to pay the invoice; and

h.    MAPL paid Cannon in the U.K. in U.K. currency, the pound sterling, by wiring payment to Cannon's bank account located in the U.K.

For a two-year period, mid 2004 to mid 2006, and as an accommodation to MAPL because of the weak position of the U.S. dollar compared to the pound sterling, Cannon allowed MAPL to pay Cannon in the U.K. in U.S. dollars at a fixed rate of $1.60 to the pound sterling. This was on average a 15% benefit to MAPL.

### THE MATS CANNON SOLD TO MAPL

15.    From 1989 to mid-2004, Cannon made floor mats for MAPL to be sold under the Cannon/WeatherTech brand name. These were all designed in the U.K. and all the tooling was made at Cannon's plant in the U.K.

16.    In 2003, BMW USA awarded to MAPL a contract for the provision to BMW of rubber car mats for BMW cars sold in the U.S. In July 2004, Hyundai USA awarded to MAPL a contract for the provision of car mats for Hyundai's Tuscon model vehicle sold in the U.S. In turn, MAPL ordered from Cannon the mats for the BMW and Hyundai programs. In its U.S. Complaint, MAPL alleges defects with certain mats that Cannon produced for the Hyundai and BMW programs.

17.    Until the parties terminated their relationship in the fall of 2007, Cannon made for MAPL Cannon-branded products, "WeatherTech" floor mats and the mats for the BMW and Hyundai programs.

4

**THE ENGINEERS WHO DESIGNED AND MANUFACTURED THE MATS FOR MAPL ARE LOCATED IN THE U.K.**

18.     From May 2005, MacNeil started to manufacture tooling for the Cannon/WeatherTech program in the US and shipped these tools to Cannon. By the end of 2007, the following tools had been made by Cannon for MacNeil:

Cannon/WeatherTech tooling:

104 sets made by Cannon

36 sets made by MacNeil

BMW tooling:

60 sets made by Cannon

4 sets made by MacNeil

Hyundai tooling:

6 sets made by Cannon

0 sets made by MacNeil

19.     MAPL designed the Hyundai mats and sent the specifications and drawings to Cannon in the U.K. Cannon engineers, in turn, created the tooling from those designs and drawings to manufacture the mats. Cannon engineers also created the assembly lines necessary for production of those mats, created the testing protocols, and tested mats before mass production. No physical specifications were provided by either Hyundai or MacNeil.

20.     With respect to the BMW program, MAPL forwarded to Cannon in the U.K. the specifications. Cannon engineers, in turn, created mat designs from those specifications. Other Cannon engineers created the tooling and assembly lines necessary for production of those mats, created the testing protocols, and tested mats before mass production. No MAPL employees

participated in Cannon's design, manufacture and testing of the BMW mats before mass production.

21.     The Cannon engineers and other employees who might be needed to provide testimony as to the quality of the Hyundai and BMW mats when MAPL picked up the mats at Cannon's U.K. facility, as well as to the designs, specifications, testing protocols test results, manufacturing processes, packaging and delivery of product to MAPL in the U.K., among other things, all are located in the U.K.  In addition, the physical evidence pertaining to those various processes is located in the U.K.

22.     Cannon anticipates that it will have to call in this litigation several witnesses, all of whom live in the U.K., including myself, Richard Bigood, Michael Wren, John Maul and Edward Atkin.   As I stated above, I am the Cannon Operations Manager.   All Cannon departments report to me, including, production, engineering, quality/technical, design/toolroom, personnel, accounts, planning, sales and security. In addition, I am responsible for Cannon's domestic and export sales of OEM and Cannon-branded products.  Richard Bigood is my deputy and he also deals with all technical aspects of the business.  Mr. Bigood and I generally are not off site at the same time.  Michael Wren is Cannon's only credit controller.  John Maul is project manager at Cannon. He is the Cam/Cad co-ordinator and provides MIS and internet support. Edward Atkin is the owner of Cannon and is also responsible for its overall operations.

23.     It would pose a substantial inconvenience, and likely an interruption and loss, to Cannon's business operations if these Cannon personnel are required to travel to the U.S. at the same time to participate in a trial of this matter.  The anticipated Cannon witnesses include key personnel who typically are not away at the same time from Cannon's U.K. facilities.

**NO DISPUTE EXISTS AS TO THE BMW MATS**

24.    From 2003 to 2007, Cannon supplied to MAPL approximately 500,000 sets of BMW mats.  MAPL paid to Cannon a total of £4 million for those mats.

25.    MAPL claimed that that 1100 pairs of BMW mats did not satisfy standards and requested credit of $11,652US for the expense in the credit.

26.    Cannon replaced those mats.  But is appears that MAPL still seeks reimbursement for the credit alleged.

27.    MAPL has submitted no warranty or other claim with respect to any other mats that Cannon produced for MAPL's BMW program.

**CANNON CONTESTS THE ACCURACY OF MAPL'S HYUNDAI CLAIM**

28.    Based on the facts, Cannon finds unbelievable MAPL's complaints with respect to the quality of the mats that Cannon produced for the Hyundai program.  Although MAPL now claims millions of dollars in damages, throughout the course of the Hyundai program, MAPL made Cannon aware in October 2007 of only $23,241.89US in alleged warranty claims from 2005 through 2007.  Instead, the facts suggest that Hyundai may have required MAPL to take back thousands of mats that MAPL had purchased from Cannon when Hyundai no longer had use for those mats.  And, now, MAPL improperly seeks to pass on to Cannon the cost MAPL incurred for mats Hyundai decided not to use.  And, in the process, MAPL seeks to use its fictitious claims, or at the very least hugely exaggerated claims, as a reason to deprive Cannon of its right to pursue in the U.K. Court its first-filed claim against MAPL for undisputed amounts owed.  It should be noted that MAPL started to manufacture mats itself for Hyundai in 2006 in breach of our distribution agreement and without informing us.  We were still under the impression that we were the sole Hyundai U.S. rubber mat supplier.

7

## A.   MAPL ONLY SOUGHT A SMALL CREDIT OVER THE FIRST YEAR OF THE PROGRAM

29.   As stated above, Hyundai USA awarded its mat program to MAPL in July 2004. Because of MAPL's immediate demands, Cannon had to produce mats quickly even though it did not have time to source carpeting for the mats that matched exactly Hyundai's specifications. MAPL was aware of, and requested, the production of these initial mats even though Cannon did not have time to source carpeting for the mats that matched exactly Hyundai's specifications.

30.   On November 26, 2004, MAPL requested a credit of £21,618.05 to reimburse it for (i) alleged defective products that it had rejected from the initial, hurried productions runs that Cannon delivered to MAPL for the Hyundai program, and (ii) alleged time MAPL spent repairing other Hyundai mat sets.  Specifically, MAPL claimed that it had rejected 275 out of 8,900 sets of grey mats and 235 out of 6,020 sets of beige mats, or 3.4% of the mat sets delivered, at £23.50 per set, for a total of £11,985.00.  MAPL also claimed that it had spent 523 hours, at a cost of £17.00 per hour, repairing other mat sets. Cannon did not pay the credit and MAPL did not pursue payment from Cannon.

31.   As of August 2005, Cannon had delivered to MAPL in the UK about 78,000 sets of mats for the Hyundai program.  Over the course of the first year of the program, the only other complaints that MAPL lodged with respect to mats that Cannon made for MAPL for the Hyundai program was to note in an October 4, 2005 email that Hyundai had received 23 warranty claims. In the same email, MAPL admitted that the alleged failure rate reported was quite small when compared to the total number of mats sold, that the alleged failures pertained to mats produced early in the program and that numerous improvements to the mat product had been made since production of mats early in the program.  At the time, MAPL did not seek reimbursement from Cannon for the warranty claims.

8

**B.  HYUNDAI CHANGES ITS SPECIFICATIONS MID-PROGRAM, REQUIRING HYUNDAI TO PURCHASE MAT SETS ALREADY PRODUCED THAT HYUNDAI DID NOT WANT**

32.    In June 2005, Hyundai had told MAPL that there would be no changes to the mat specifications.  At MAPL's direction, Cannon continued to produce mats for the Hyundai program based on the then current specifications.

33.    But in August 2005, MAPL notified Cannon that Hyundai had decided to change the carpet color for the 2006 Tuscon models.  In the same email notifying Cannon of this change, MAPL indicated that Hyundai had accepted full responsibility for the situation it had created and that Hyundai would purchase any stocks of mats held by Cannon or MAPL manufactured pursuant to the old specifications.  At the time, Cannon had in stock 7,124 sets of mats (3,450 grey and 3,674 beige) that Cannon already had produced pursuant to MAPL's orders.  Cannon delivered those mats to MAPL in the U.K. and MAPL paid Cannon for the mats.

**C.  HYUNDAI MADE FURTHER CHANGES TO ITS MAT PROGRAM THAT RESULTED IN HYUNDAI HAVE A STOCK OF MATS FOR WHICH IT HAD NO NEED**

34.    In November 2005, Hyundai finally decided on the new carpet color specifications for its Tuscon model mat program.  MAPL ordered from Cannon on a rush basis under the new specifications 2,600 sets of mats.  Later in November 2005, or in early December 2005, Hyundai changed the ferrule specifications for its Tuscon model mat program.  (Ferrules are used to attach the mat to pegs on the floor of the vehicle.)  As a result of this change, Hyundai would have been unable to use any unused stock of mats manufactured up to that time, including the 2,600 of mats that Cannon rushed to produce under the new carpet color specifications.

35.    From November 18, 2005 until May 22, 2006, Cannon manufactured and delivered to MAPL in the U.K. 20,025 sets of mats pursuant to Hyundai's new carpet color and

ferrule specifications. Of those 20,025 sets of mats, 8,025 bore product number 00281-T6P00-Z9 and 12,000 bore product number 00281-T6P00-U7.

36.     On July 4, 2006, approximately six weeks after Cannon had delivered to MAPL the last of the mats for the Hyundai program that MAPL had ordered up to that time, MAPL sent to Cannon an email it had received from Hyundai in which Hyundai alleged that the carpet did not properly adhere to the rubber bottom of some of the mats. Hyundai indicated that it had approximately 11,500 sets of mats in stock worth about $500,000US that it intended to inspect. In the same email, Hyundai indicated that it had used only 8,525 sets of the new mats out of the 20,025 that Cannon had delivered to MAPL. In a separate Hyundai email that MAPL forwarded to Cannon, Hyundai indicated that it also had 7,124 sets of mats in stock that were manufactured pursuant to old specifications that Hyundai had agreed to take when it changed the carpet color specifications.

### D.   MAPL OFFERS TO REPLACE THE MATS IN ORDER TO SECURE HYUNDAI'S RUBBER FLOOR MAT BUSINESS

37.     At approximately the same time, Hyundai decided in late July or early August 2006 that it would no longer use for its Tuscon model vehicles a rubber-based carpet mat. Instead, Hyundai decided to change its mat program completely and use all rubber mats.

38.     In an effort to secure Hyundai's rubber mat business, MAPL offered to replace the carpet mats with all rubber mats. On or about August 3, less than one month after Hyundai had first complained about the rubber-based carpet mats, Hyundai awarded to MAPL its rubber floor mat business for the Tuscon and Sante Fe models.

39.     MAPL placed with Cannon the orders for Hyundai's rubber mat floor program. MAPL submitted the first order to Cannon in October 2006.

**E.    MAPL DESTROYS THE EVIDENCE OF THE ALLEGEDLY DEFECTIVE MATS**

40.    On November 16, 2006, MAPL informed Cannon that MAPL had credited Hyundai for 18,189 sets of mats.  That amount included the 7,124 old mats that Hyundai had agreed to take when it decided in August 2005 to change the carpet color of the mats.  Curiously, MAPL also indicated on November 16 that it had destroyed the very mats about which it was complaining.

41.    In an email dated November 23, 2006, MAPL asked Cannon for credit corresponding to the destroyed mats together with freight and duties.  In the same email, MAPL acknowledge that 80,000 out of 98,035 sets of the Cannon-manufactured Hyundai mats had been sold without problem.

**F.    CANNON REJECTS MAPL'S REQUEST FOR A CREDIT**

42.    On December 1, 2006, Edward Atkin, the owner of Cannon, rejected MAPL's request for a credit for the destroyed mats.  Edward Atkin noted that it was clear to him that MAPL sought to pass on to Cannon the cost to MAPL for Hyundai's decision to convert the Hyundai mat program to all rubber floor mats.  As a result of Hyundai's decision to switch to rubber mats before it used up its stock of carpeted mats, Hyundai found themselves with a substantial stock of the carpeted mats for which they had no additional use.

**MAPL FAILS TO PAY CANNON FOR RUBBER MATS**

43.    Cannon continued to manufacture for MAPL rubber mats.  Between about February 26, 2007 and August 28, 2007, Cannon manufactured and delivered in the U.K. to MAPL, pursuant to MAPL's orders, rubber mats totaling approximately £1.0 million.  During this time, MAPL did not mention payment from Cannon for the allegedly defective mats that MAPL destroyed.

11

44.     MAPL defaulted on its payment to Cannon for some of the rubber mats that Cannon produced in 2007.  On August 16, 2007, Cannon requested that MAPL pay to Cannon immediately all amounts owed – at that time approximately £379,301.20 and $45,954.64.  In September 2007, MAPL stopped placing orders with, and refused to pay, Cannon pending resolution of the parties' outstanding issues.  Cannon does not contend that the rubber mats that Cannon produced in 2007 were defective or otherwise flawed.

45.     At this time, the total amount owed to Cannon is approximately £384,020.60 and $53,795.80.

**THE PARTIES' ATTEMPTS TO RESOLVE THEIR DISPUTES ARE NOT SUCCESSFUL**

46.     I agreed to meet with MAPL at its Chicago area offices on October 9, 2007 in an effort to resolve the parties' disputes and to secure for Cannon payment of the amounts MAPL indisputably owes to Cannon.  During the meeting, David MacNeil admitted that MAPL owed to Cannon £384,020.60 ($719,723.88US) and $53,795.80US.  But MacNeil claimed that MAPL was entitled to offset that amount by $642,199.36 and $11,652.28 for allegedly defective Hyundai and BMW program floor mats, respectively.  MacNeil admitted that MAPL nevertheless owed to Cannon $182,386.28US even with the alleged offset.

47.     Unfortunately, the parties could not resolve their differences at the October 9 meeting.  At the conclusion of the October 9 meeting, I informed David MacNeil that his terms for resolution of the dispute were not acceptable and that Cannon would pursue full payment of the hundreds of thousands of dollars that MacNeil owed Cannon.  MacNeil then ended the distribution agreement without notice, leaving Cannon with unsold MacNeil stock and packaging materials.

**CANNON ALWAYS UNDERSTOOD THAT DISPUTES BETWEEN THE PARTIES WOULD BE RESOLVED IN THE U.K. UNDER U.K. LAW**

48.    MAPL contends in its U.S. Court papers that the parties agreed during the October 9 meeting that they would use the U.S. court system to resolve their disputes. Neither I, nor any other representative of Cannon, ever made such an agreement on October 9 or at any other time during the Cannon/MAPL relationship. I agreed to come to MAPL's Chicago area headquarters only for purposes of trying to secure the amounts MAPL owes to Cannon and to attempt to resolve the parties' differences. We never discussed litigation in Illinois or anywhere in the U.S. if the parties were unable to resolve their differences. The minutes that I prepared for the October 9 contain no suggestion that the parties mentioned or contemplated litigation in the U.S. Via email dated October 15, 2007, David MacNeil informed me that the minutes accurately captured our October 9 meeting.

49.    Had MAPL raised the issue, I would have rejected such a notion. Cannon has always been of the position that U.K. law governs the parties' supply relationship and that the parties would have resolve disputes in the U.K. court system. After all, the supply relationship was performed completely in the U.K. and MAPL was a startup when David MacNeil solicited Cannon in 1989 to do business. Cannon never would have agreed to application of U.S. law to the Cannon/MAPL relationship or to a venue in the U.S. should litigation between the parties ever ensue. We do business in over 60 markets and we cannot be expected to work under so many legal jurisdictions.

**CANNON SUED MAPL FIRST IN THE U.K.**

50.    Cannon did not race to the courthouse door as MAPL contends in its U.S. Court papers. Rather, by letter dated October 16, 2007 addressed to MAPL, Cannon again demanded payment from MAPL of outstanding amounts. Cannon warned that unless MAPL made payment

13

within 7 days, Cannon would take appropriate legal action. (A true and correct copy of the October 16 letter is attached hereto as Exhibit A.) But MAPL still refused to pay amounts to Cannon that it does not dispute it owed.

51.     On November 30, 2007, approximately six weeks after the October 16 letter, Cannon instituted in the U.K.'s High Court of Justice, Queen's Bench Division, litigation to recover from MAPL the amounts owed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  February 20, 2008

_____

Robert Peacock

14

**EXHIBIT A**

### *CANNON AUTOMOTIVE LTD,*
### 881 HIGH ROAD,
### TOTTENHAM,
### LONDON, N17 8EY,    *ENGLAND*

TEL: 0208 275 6024                    FAX: 0208 275 6011

October 16, 2007

MacNeil Automotive Products Ltd.,
2435 Wisconsin Street,
Downers Grove,
Illinois 60515,
U.S.A..

For the attention of Les Veatch

Dear Sirs,

Re: May, June & July Accounts (Statements Attached)

We note that despite previous reminders the May account £23476.80 & $6480.00, June account £97327.80 & $17525.00, and July accounts £78284.60 & $4710.00 are still outstanding for payment.

We must inform you that unless payment is received within the next 7 days, we will have to insist on future transactions being made on a payment in advance basis and that we will be taking the appropriate legal advice.

Yours Faithfully.

CANNON RUBBER LTD

M. R. WREN

Credit Controller

**EXHIBIT 2**



# Claim Form

CLAIMANTS COPY

| In the | High Court Of Justice |
| --- | --- |
| | Queen's Bench Division Division |

| | *for court use only* |
| --- | --- |
| Claim No. | HQ07x04142 |
| Issue Date | 0 3 DEC 2007 |

**Claimant:**

Cannon Automotive Limited
Brook House
881 High Road
Tottenham
London
N17 8EY

**Defendant:**

MacNeil Automotive Products Limited (A company incorporated in Illinois, USA)
2435 Wisconson Street
Downers Grove
Illinois 60515
USA

**Brief details of claim:**

The Claimant is entitled to and claims the sum of £297,544.87, being the balance of
monies due and payable by the Defendant to the Claimant for goods supplied by the
Claimant to the Defendant at the Defendant's request, together with interest
thereon pursuant to section 35A of the Supreme Court Act 1981 at the rate of 8% per
annum from 18 August 2007 until the date of issue of the Claim Form herein,
amounting to £3,377.54 and thereafter interest at the daily rate of £65.21 until
judgment or sooner payment.

**Value:**

The Claimant expects to recover more than £15,000.

*ASSIGNED TO MASTER*    Fontaine

| Defendant's name and address | MacNeil Automotive Products Lt | | £ |
| --- | --- | --- | --- |
| | 2435 Wisconsin Street | Amount claimed | 300,922.41 |
| | Downers Grove | Court fee | 1,530.00 |
| | Illinois 60515 | Solicitor's costs | 110.00 |
| | USA | Total amount | 302,562.41 |

The court office at **Strand, London, WC2A 2LL**

is open between 10 am and 4 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

N1 Claim form (CPR Part 7) (04.02)    Laserform International 3/02

| Claim No. | |
|-----------|--|

Does, or will, your claim include any issues under the Human Rights Act 1998?  ☐ Yes  ☒ No

Particulars of Claim (attached) XXXXXXXXX
See attached.

---

Statement of Truth

XXXXXXXXX (The Claimant believes) that the facts stated in these particulars of claim are true.

* I am duly authorised by the claimant to sign this statement

Full name  Richard Marshall

Name of claimant's solicitor's firm  Manches LLP

signed _____  position or office held  Partner

XXXXXXXX XXXXXXXXXXXX (Claimant's solicitor)  (if signing on behalf of firm or company)

*delete as appropriate

---

Manches LLP
Aldwych House
81 Aldwych
London
WC2B 4RP

DX 76   Chancery Lane
020 7430 1133

Claimant's or claimant's solicitor's address to
which documents or payments should be sent if
different from overleaf including (if appropriate)
details of DX, fax or e-mail.

IN THE HIGH COURT OF JUSTICE          CLAIM NO:
QUEENS BENCH DIVISION

B E T W E E N


CANNON AUTOMOTIVE LIMITED
                                                          **Claimant**

- and -

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)
                                                          **Defendant**

_____

**PARTICULARS OF CLAIM**
_____


**The Parties**

1.    At all material times:


    (a)    the Claimant is and was a company carrying on business as, inter alia,
           manufacturers and suppliers of rubber mats for motor vehicles;


    (b)    the Defendant is a company incorporated under the laws of Illinois in
           the United States of America;


    (c)    the Defendant has carried on business as suppliers of, inter alia,
           rubber mats for motor vehicles in the United States.


**The Agreements**

2.    By a series of agreements made between the Claimant and the Defendant
      between about 26 February 2007 and 28 August 2007, the Claimant agreed

to manufacture and supply to the Defendant rubber mats to be incorporated into the boots of motor vehicles for the sum total of £278,729.00 and US$38,883.00, respectively.

3.   The said agreements are contained in:

    (a)   purchase orders which were e-mailed by the Defendant to the Claimant, particulars of which are set out in the schedule at Annexure 1;

    (b)   acknowledgement pro forma invoice forms which were e-mailed by the Claimant to the Defendant, particulars of which are set out in the schedule at Annexure 1.

4.   It was an express, alternatively, an implied term of the said agreements (such term being implied by the course of dealings between the parties) that the Defendant should pay for the rubber mats within 90 days of the date of the Claimant's invoice for the same.

**Breach**

5.   The rubber mats which were the subject of the said agreements were duly manufactured and delivered by the Claimant to the Defendant.

6.   By a series of invoices, the Claimant invoiced the Defendant for the said rubber mats in sums totalling £278,729.00 and US$38,883.00, respectively. Copies of sterling and dollar statement of accounts setting out the said invoices are attached hereto at Annexure 2.

2

7.   In breach of the terms of the said agreements, the Defendant has failed and/or refused to pay to the Claimant the said sums of £278,729.00 and US$38,883.00 or any part thereof.

8.   The sum of US$38,883.00 equates to the sum £18,815.87, using the Financial Times US$:£ exchange rate of 2.06650:1 as at today's date.

9.   The Claimant is, therefore, entitled to and claims the sum total of £297,544.87, together with interest thereon pursuant to Section 35A of the Supreme Court Act 1981 at the rate of 8% per annum from 17 August 2007 to the date of issue of the Claim Form herein amounting to £3,377.54 and thereafter further interest at the daily rate of £65.21 until judgment or sooner payment. A schedule setting out the calculation of interest is attached hereto at Annexure 3.

AND the Claimant claims:

(1) the sum of £297,544.87;

(2) interest pursuant to Section 35A of the Supreme Court Act 1981 at the rate of 8% per annum from 18 August 2007 to the date of issue of the Claim Form herein amounting to £3,377.54 and thereafter further interest at the daily rate of £65.21 until judgment or sooner payment.

Dated this 30th day of November 2007

The Claimant believes that the facts stated in these Particulars of Claim are true.

3

CANNON AUTOMOTIVE Ltd - v - MACNEIL AUTOMOTIVE
PRODUCTS Ltd

I am duly authorised by the Claimant to sign this statement.

Richard Marshall

**PARTNER**

Manches LLP of

Aldwych House

81 Aldwych

London WC2B 4RP

Tel +44 (0)207 404 4433

Fax +44 (0)207 430 1133

DX 76 Chancery Lane

Ref: RGM/LTA/250199

4

**IN THE INTENDED ACTION**
IN THE HIGH COURT OF JUSTICE

CLAIM NO:

B E T W E E N

CANNON AUTOMOTIVE LIMITED

Claimant

- and -

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

Defendant

PARTICULARS OF CLAIM

MANCHES LLP
ALDWYCH HOUSE
81 ALDWYCH
LONDON
WC2B 4RP

TEL: 020 7404 4433
FAX: 020 7430 1133
REF: RGM/LTA/250199

5

**EXHIBIT 3**



**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**                                    CLAIM NO: HQ07X04142

In the matter of an intended action

**BETWEEN**

**CANNON AUTOMOTIVE LIMITED**
                                                            **Intended Claimant**

                                        **and**

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**
                                                            **Intended Defendant**

---

**ORDER**

---

**UPON** the application of the Defendant made by Application Notice dated 21st January 2008

**AND UPON READING** the Witness Statement of Kent Napier Phillips dated 21st January 2008, together with its exhibits

**IT IS ORDERED THAT:**

1.   That pursuant to CPR 3.1(2)(a) the 14 day time period under CPR 11(4)(a) for the Defendant to file an application for orders declaring that the Court has no jurisdiction (and further orders under CPR 11) be extended until seven days after such time as the United States District Court for the Northern District of Illinois (Eastern Division) has determined the Defendant's Motion filed on 8 January 2008 to enjoin the Claimant from pursuing these proceedings.

LN:21472.1

2.    Costs reserved to the hearing of the application, or to the next convenient hearing.

3.    This Order is made pursuant to CPR 23.9.  Permission to the Claimant to apply to set aside or vary the same within 7 days of service.

4.    Defendant to draw up, file and serve this Order by 4.00pm on Wednesday 23 January 2008.

**Dated this**              day of **January 2008**

**EXHIBIT 4**

# Application Notice

| | |
|---|---|
| **You should provide this information for listing the application** | **In the** High Court Of Justice |
| 1. How do you wish to have your application dealt with | Queen's Bench Division<br>Royal Courts of Justice |

| | |
|---|---|
| a) at a hearing? [X] } *complete all questions below*<br>b) at a telephone conference? [ ]<br>c) without a hearing? [ ]  *complete Qs 5 and 6 below* | **Claim no.** HQ07X04142 |
| | **Warrant no.** *(if applicable)* |
| 2. Give a time estimate for the hearing/conference<br>_____0_____ (hours) ___30___ (mins) | **Claimant** *(including ref.)* Cannon Automotive Limited |
| 3. Is this agreed by all parties? [ ] Yes  [X] No<br>4. Give dates of any trial period or fixed trial date _____<br>5. Level of judge **Master**<br>6. Parties to be served **Defendant** | **Defendant(s)** *(including ref.)* MacNeil Automotive products Limited |
| | **Date** 29 January 2008 |

**Note** You must complete Parts A **and B, and** Part C if applicable. Send any relevant fee and the completed application to the court with any draft order, witness statement or other evidence; and sufficient copies for service on each respondent.

## Part A

*1 Enter your full name, or name of solicitor*

(1) I (We) Manches LLP
(on behalf of)(the claimant)          Cannon Automotive Products Limited

*2 State clearly what order you are seeking and if possible attach a draft*

(2) intend to apply for an order (a draft of which is attached) that the Order of Master Fontaine dated 21 January 2008 be set aside

*3 Briefly set out why you are seeking the order. Include the material facts on which you rely, identifying any rule or statutory provision*

(3) because
the High Court is the right forum for the resolution of this matter and England and Wales the appropriate jurisdiction.

## Part B

I (We) wish to rely on: *tick one box*

*4 If you are not already a party to the proceedings, you must provide an address for service of documents*

the attached (witness statement)(affidavit) [X]    my statement of case [ ]

evidence in Part C in support of my application [ ]

**Signed** _____    **Position or office held** Partner
*(if signing on behalf of firm or company)*

(Applicant)('s Solicitor)

(4) Address to which documents about this claim should be sent (including reference if appropriate)

| Manches LLP<br>Aldwych House<br>81 Aldwych<br>London | *if applicable* | |
|---|---|---|
| | fax no. | 020 7430 1133 |
| | DX no. | DX 76   Chancery Lane |
| Tel. no. 020 7404 4433    Postcode WC2B 4RP | e-mail | |

The court office at **Strand, London, WC2A 2LL**
is open from 10am to 4pm Monday to Friday. When corresponding with the court please address forms or letters to the Court Manager and quote the claim number.

N244 Application Notice (4.00)                    © Crown Copyright            Laserform International 5/00

Claim No. HQ07Xo4142

**Part C**

I (We) wish to rely on the following evidence in support of this application:

| | |
|---|---|
| **Statement of Truth** | |

*(I believe) *(The applicant believes) that the facts stated in Part C are true

*delete as appropriate*

**Signed**

(Applicant)('s Solicitor)('s litigation friend)

**Position or office held**
(if signing on behalf of firm or company)

**Date**

IN THE HIGH COURT OF JUSTICE
QUEENS BENCH DIVISION
                                         CLAIM  NO: HQ07X04142

B E T W E E N


CANNON AUTOMOTIVE LIMITED

                                                    **Claimant**


- and -


MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

                                                    **Defendant**

---

**ORDER**

---

**UPON THE APPLICATION** of the Claimant made by the Application Notice dated
29 January 2008

**AND** upon reading the witness statement of Richard Gary Marshall dated 29
January 2008

**IT IS ORDERED THAT:-**

1.  The Order of Master Fontaine dated 21 January 2008 be set aside.

2.  That the Defendant is to pay the costs of this application.


Dated this        day of January 2008


5917801/1

IN THE HIGH COURT OF JUSTICE

CLAIM NO: HQ0704142

B E T W E E N

CANNON AUTOMOTIVE LIMITED

Claimant

- and -

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

Defendant

_____

ORDER

_____

MANCHES LLP
ALDWYCH HOUSE
81 ALDWYCH
LONDON
WC2B 4RP

TEL: 020 7404 4433
FAX: 020 7430 1133
REF: RGM/LTA/250199

5917801/1

**IN THE HIGH COURT OF JUSTICE**                    CLAIM  NO: HQ07X04142
**QUEENS BENCH DIVISION**

**B E T W E E N**


**CANNON AUTOMOTIVE LIMITED**

**Claimant**


– and –


**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**

**Defendant**

---

### SECOND WITNESS STATEMENT OF RICHARD GARY MARSHALL

---

I, **RICHARD GARY MARSHALL** of Manches LLP, Aldwych House, 81 Aldwych, London WC2B 4RP, **WILL SAY AS FOLLOWS:-**


1.      I am a solicitor of the Supreme Court and a partner in the firm of Manches LLP, the solicitors for the Claimant ("Cannon"). I have the conduct of this action on behalf of Cannon and am duly authorised by Cannon to make this witness statement on its behalf. I make this witness statement in support of Cannon's application to set aside the order of Master Fontaine dated 21 January 2008.


2.      The facts and matters to which I refer in this witness statement are either within my own knowledge and true or are derived from sources which are identified below (in which case they are true to the best of my information, knowledge and belief).

Page 2

3.    There is now produced and shown to me in a bundle marked "RGM2" copies of various documents. The page numbers referred to below correspond to the page numbers in that bundle.

4.    I make this statement further to my witness statement of 30 November 2007 in support of Cannon's successful application for leave to serve these proceedings out of the jurisdiction (see pages 1-11). I make this statement in conjunction with my previous statement and refer the Court, in particular, to paragraphs 25-26 of that witness statement which address the issue of jurisdiction and lay out Cannon's assertion that the UK is the appropriate jurisdiction in which to try the issues between the parties. I also make this statement in order to reply to points made in the statement of Kent Napier Phillips dated 21 January 2008.

5.    Cannon will be making an application for an anti-suit injunction which will set out in more detail Cannon's position as to jurisdiction.

**Order of 21 January 2008**

6.    The Order of Master Fontaine dated 21 January 2008 (see pages 12-14) was made following a without notice application of the same date (see pages 15-16) by the Defendant ("MacNeil") and granted MacNeil, pursuant to CPR 3.1(2)(a), an extension of time in which to file an application for orders declaring that the Court has no jurisdiction and further orders under CPR 11.

7.    The concurrent proceedings in the United States District Court for the Northern District of Illinois were started by MacNeil on 8 January 2008 and consisted of a Complaint seeking damages for the alleged supply of defective products by Cannon and a Motion to Enjoin preventing Cannon from pursuing proceedings in the England. MacNeil's application of 21 January 2008 was made on the basis that their Motion to Enjoin in the United States was due to be determined shortly after that

application and that such determination may obviate the need for further applications in the UK proceedings on the basis that those proceedings would be stayed by the United States Court. The statement in support of MacNeil's application made by Kent Napier Phillips and dated 21 January 2008 (see pages 17-21) sought the order made on 21 January 2008 on this basis.

**Statement of Kent Napier Phillips**

8.   Cannon wishes to comment on certain representations made by Mr Phillips in his statement. In paragraph 7(a) of his statement, Mr Phillips states that the Motion to Enjoin had been given a hearing date of 24 January 2008. At paragraph 10 of his statement, Mr Phillips states that "the Motion to Enjoin scheduled to be heard in Illinois on 24 January 2007" (the 2007 being, of course, a typographical error and Mr Phillips meaning 2008). Both of these statements were misleading. The Court appointment in Illinois on 24 January 2008 was only to set a briefing schedule on MacNeil's Motion to Enjoin and was one of 13 motions scheduled to be heard at 9.30am with a further criminal change of plea scheduled for 10.00am. At no point was MacNeil's Motion to Enjoin going to be heard or determined at this appointment as was clearly the implication made in Mr Phillips statement, as highlighted above.

9.   Furthermore, Mr Phillips would have been informed by US lawyers working on MacNeil's Motion to Enjoin that the Court appointment on 24 January 2008 was not a substantive hearing before he made his statement of 21 January 2008 and allowed the Court to believe that the US proceedings would make a ruling, one day before MacNeil's Defence was due to be filed at the High Court.

10.  The order of 21 January 2008 has been made on the basis of the Motion to Enjoin being determined on the 24 January 2008, or in any case, within a short space of

time following the making of that order. This was not and was never going to be the case.

11.   On 24 January 2008 the Illinois court laid out a briefing schedule with the following due dates for party submissions:

-    14 February: Cannon opposition to Motion to Enjoin

-    14 February: Cannon motion to dismiss or stay the US proceedings

-    28 February: MacNeil reply in support of Motion to Enjoin

-    6 March: MacNeil opposition to Cannon motion to dismiss or stay the US proceedings

-    17 March: Cannon reply in support of motion to dismiss or stay the US proceedings

12.   On the basis that the Motion to Enjoin was not heard and was never going to be heard on 24 January 2008, and that based on the timetable handed down by the Illinois Court listed above it will not be determined for some time, Cannon requests that the Order made on 21 January 2008 be set aside.

13.   Cannon respectfully submits that to fail to set aside the Order, thereby allowing an extension of time to MacNeil until seven days after such time as the Illinois Court has determined MacNeil's Motion to Enjoin, would delay the UK proceedings for a significant period. As stated, England and Wales is the right jurisdiction and the Motion to Enjoin is vexatious and oppressive and an attempt to sabotage the UK proceedings.

14.   As Cannon has always stated, it is their firm belief that the English Court remains the only appropriate jurisdiction in which this case should be heard. By way of a Letter before Action dated 26 October 2007 (see page 22) Cannon made it clear to MacNeil that they would take legal action if unpaid invoices were not settled and it

Page 5

would have been obvious to MacNeil that any proceedings instigated by Cannon would be in the English courts. MacNeil had five weeks following this letter before Cannon issued these proceedings in which to initiate proceedings in the United States if it had so desired. It did not and subsequently only initiated proceedings in Illinois in reaction to Cannon initiating these English proceedings in an attempt to deprive Cannon of its choice of first-filed forum. As stated, further evidence will be filed as to jurisdiction in support of the Claimant's application for an anti-suit injunction.

I believe that the facts set out in this witness statement are true.

Signed: ....................................................

Dated: ....................................................

**IN THE HIGH COURT OF JUSTICE**
**QUEENS BENCH DIVISION**

**CLAIM NO: HQ07X04142**

**B E T W E E N**

**CANNON AUTOMOTIVE LIMITED**

<u>Claimant</u>

- and -

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**

<u>Defendant</u>

---

**SECOND WITNESS STATEMENT OF RICHARD GARY MARSHALL**

---

**MANCHES LLP**
**ALDWYCH HOUSE**
**81 ALDWYCH**
**LONDON**
**WC2B 4RP**

**TEL: 020 7404 4433**
**FAX: 020 7430 1133**
**REF: RGM/LTA/250199**

**EXHIBIT 5**

**IN THE HIGH COURT OF JUSTICE**                    Claim No. HQ07X04142

**QUEEN'S BENCH DIVISION**

**BETWEEN:**

**CANNON AUTOMOTIVE LIMITED**

**Claimant**

-and-

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**

**(A COMPANY REGISTERED IN ILLINOIS, USA)**

**Defendant**

---

**THIRD WITNESS STATEMENT OF RICHARD GARY MARSHALL**

---

I, RICHARD GARY MARSHALL of Manches LLP, Aldwych House, 81 Aldwych, London WC2B 4RP, WILL SAY as follows:

1.    I am a solicitor of the Supreme Court and a partner in the firm of Manches LLP, the solicitors for the Claimant ("Cannon"). I have the conduct of this action on behalf of Cannon and am duly authorised by Cannon to make this witness statement on its behalf.

2.    I make this witness statement in support of Cannon's application for:

(a)    an interim anti-suit injunction against the Defendant ("MAPL"); and

(b)    a permanent anti-suit injunction in the event that the Court sets aside the order of Master Fontaine made on 21 January 2008 and, either there is no application by MAPL challenging the Court's jurisdiction and/or the forum of this action, or if such an application is made by MAPL, that application is resolved in Cannon's favour.

3.    Cannon also relies on my first witness statement dated 30 November 2007 in support of Cannon's application for permission to serve these proceedings on MAPL out of the jurisdiction under CPR 6.20 and my second witness statement dated 29 January 2008 in support of Cannon's application to discharge the order made by Master Fontaine on 21 January 2008. I would ask that the latter application and this application be heard at the same time as the matters are inextricably linked.

4.    The facts and matters set out in this witness statement are either within my own knowledge and are true or are derived from sources identified below, in which case they are true to the best of my information and belief.

5.    There is now produced and shown to me in a bundle marked "RGM3" copies of various documents. The page numbers referred to below correspond to the page numbers in the bundle.

6.    The matters set out in paragraphs 7 to 50 are derived from information provided to me by Robert Peacock, the operations manager at Cannon and the previous operations manager at Cannon Rubber Limited and from documentation provided to me by Cannon.

**Cannon's claim and MAPL's counterclaim**

7.  Cannon is a company which was incorporated on 30 March 2005 under the laws of England and Wales as a private company limited by shares. It is a wholly owned subsidiary of C A Holdings plc and its two directors are Edward Atkin and Celia Janet Atkin. At material times, it has carried on business as, inter alia, manufacturers and suppliers of rubber mats for motor vehicles. A copy of the company's details as recorded at Companies House is at page 1.

8.  MAPL is a company incorporated on 11 February 1989 under the laws of Illinois in the United States of America. Its sole director is David MacNeil.

9.  Prior to the incorporation of Cannon, Edward and Celia Atkin were involved with the Cannon Avent Group of companies. This group included Avent Limited, which made baby bottle feeding products and Cannon Rubber Limited, which carried on the same business as Cannon.

10. MAPL's relationship was originally with Cannon Rubber Limited. From the date MAPL started to trade, it acted as a distributor of Cannon Rubber Limited's rubber mats in the United States. David MacNeil's relationship with Edward and Celia Atkin dates back to about 1989, when he first met them in London and agreed to be a car mat distributor for Cannon Rubber Limited in the United States.

11. In about June 2005, the Cannon Avent Group of Companies demerged. The Avent business was sold to the Charterhouse Group of companies and the Cannon rubber mat business was transferred to Cannon.

Rubber mats supplied to MAPL for Hyundai USA

12.    In July 2004, MAPL was awarded a contract by Hyundai USA ("Hyundai") to supply car mat sets made of rubber and carpet for all of Hyundai's Tuscon model vehicles to be sold in the United States. The contract was awarded to MAPL as a result of the joint efforts of MAPL and Cannon Rubber Limited (see MAPL's e-mail dated 16 July 2004, thanking Cannon Rubber Limited for its efforts (p. 2).

13.    Because of Hyundai's immediate demands and, because Cannon Rubber Limited had not had time to source a carpet colour which matched exactly Hyundai's requirements, for a period of 3 months, it supplied mats with its own standard colour ("the initial mats"). Thereafter, mats with the colour required by Hyundai ("the old mats") were supplied by Cannon Rubber Limited until the de-merger referred to in paragraph 11 above and thereafter by Cannon until about mid August 2005.. In all, Cannon Rubber Limited and Cannon supplied MAPL with about 78,000 initial and old mats for Hyundai's Tuscon models sold in the United States.

14.    From about August 2004 until November 2004, issues relating to the quality of the initial and old mats supplied by Cannon Rubber Limited were raised by MAPL. In particular, complaint was made that the carpet on some of the mats was not sticking properly to the rubber.

15.    In November 2004, MAPL sought a credit of £21,618.05 in relation to alleged defective products supplied (pages 4-5). The credit was, in fact, never given by Cannon Rubber Limited to MAPL and no further mention of it was made by MAPL after November 2004.

4

16.    Cannon Rubber Limited and Cannon (after the de-merger, referred to in Paragraph 11 above), continued to supply old mats to MAPL until about the middle of August 2005. As stated above, they supplied in total about 78,000 initial and old mats. As to these mats, apart from the complaints referred to above, the only other complaint made was in an e-mail dated 4 October 2005, in which MAPL notified Cannon that Hyundai had received a total of 23 warranty claims (page 7). However, as MAPL stated in its e-mail, when compared to the number of mats sold (namely, about 78,000), the failure rate reported was quite small and the failures reported related to the early mats in the programme. All invoices rendered by Cannon Rubber Limited and Cannon (from June 2005) to MAPL for initial and old mats were paid for by MAPL.

17.    In about the middle of August 2005, MAPL notified Cannon that Hyundai had decided to change its carpet colours for its 2006 Tuscon models, despite having told MAPL in June 2005 that there would be no changes to the carpet colour (see the e-mail dated 17 August 2005, pages 8-9). In its e-mail to Cannon, MAPL also stated that Hyundai accepted full responsibility for its oversight and accepted that it was under an obligation to take whatever stocks they had, including carpet stocks. Cannon still had 7,124 sets of old mats (product no. 00281-T5POOGR) which it had not yet dispatched, comprising 3,450 grey sets and 3674 sets of mats in the previous beige colour. All of these mats were subsequently delivered to MAPL and shipped by MAPL to the United States, where they were delivered to Hyundai. Cannon then stopped production of all mats, pending agreement between MAPL and Hyundai and MAPL and Cannon on the new mat to be produced ("the new mat").

18. Final agreement relating to a change of colour of the carpet mat was not reached until November 2005, when orders were made from Hyundai to MAPL and from MAPL to Cannon for immediate shipment by air of 2,600 sets of new mats (see the e-mail dated 17.11.05, page 13).

19. From 18 November 2005 until 22 May 2006, Cannon supplied to MAPL 20,025 sets of new mats. Of these, 8,025 were new mats with product no. 00281-T6P00-Z9 and 12,000 were new mats with product no. 00281-T6P00-U7. Schedules setting out the dates of each shipment, the quantity dispatched, how they were dispatched and the order number are at pages 25-26. All of these shipments were paid for by MAPL.

20. In or about November/December 2005, Cannon was notified that because of changes made by Hyundai to its vehicles, new ferrules were required on all mats. Ferrules are the plastic knobs used to attach the mat to the floor of the vehicle. As a result of these changes, Hyundai would not have been able to use any unused stocks of initial, old or new mats in vehicles, which incorporated these changes.

21. In June 2006, Cannon notified MAPL that because of significant increases in raw material prices, it would be invoicing MAPL in pounds sterling (page 27). Originally, Cannon Rubber Limited had invoiced MAPL in £ sterling, but, in order to assist MAPL, had agreed to invoice MAPL in $. This practice was continued by Cannon, but by June 2006, because of the increase in raw materials, it became uncommercial for Cannon to continue with it.

22. On 4 July 2006, being about 6 weeks after the final shipment of new mats had been made Cannon, MAPL sent to Cannon an e-mail it had received from Hyundai the day before in which Hyundai referred to bonding problems

6

in some mats returned by a Tuscon AZ dealer and sample mats inspected by them (pages 29-31). Hyundai then stated that further inspections would be carried out with a view to seeing whether the mats were suitable for installation or would have to be repaired or scrapped. Hyundai asserted that there were about 11,500 mats at their PDC's or at the ports and that their exposure was about $US500,000. The e-mail revealed that whilst by this stage Cannon had delivered 20,025 new mats and orders had continued throughout from November 2005 to May 2006, Hyundai had only used 8,525 new mats.

23.    On 7 July 2006, MAPL e-mailed to Cannon a further e-mail received from Hyundai dated 6.7.07, in which Hyundai alleged that it had inspected 50 mats at each of its 4 ports (that is, 200 mats out of a total stock of 11,568 unused mats, amounting to a sample of 1.7% of those mats) and that 80% to 100% of the mats exhibited carpet separation (page 32). Hyundai then stated that it had accordingly "shut off all installation of MacNeil mats at the ports", that it was going to substitute the Mobis carpet mat until it ran out of them and that as of 26 June 2006, Hyundai had 11,568 mats in stock which were no longer useable. Mobis was the authorised company, which Hyundai Korea had wanted Hyundai to use for the supply of its mats for Tuscon models, instead of MAPL.

24.    In its e-mail to MAPL, Hyundai gave a further breakdown of its unused stock: it stated that it had 2,718 new mats with product number T6POO-Z9 (out of 8,025 delivered) and 7,792 new mats with product number T6P00-U7 (out of a total of 12,000 delivered) (p 34-35). Hyundai also stated that it had discovered that it still had 7,124 old mats in stock. These were the mats which had been delivered by MAPL to Hyundai after Hyundai had decided to change its colour specifications, but had agreed to take delivery

7

of stock already manufactured, although it no longer had any use for that stock.

25. In about late July/early August, Hyundai decided it would no longer use carpeted rubber mats in its vehicles, but would use all rubber mats instead. Despite the fact that both Hyundai and MAPL were alleging that over 50% of the new mats were defective, as became apparent from e-mails sent and forwarded to Cannon in early August 2006 (pages 33-35), MAPL had offered to replace the new mats with all rubber mats and was also seeking to obtain the whole of Hyundai's rubber mat business. On or about 3 August 2006, about a one month after Hyundai had first complained about the new mats, Hyundai awarded to MAPL its rubber floor business for its Tuscan and new Santa Fe models (see MAPL's e-mail dated 3 August 2006 (p 36). Subsequently, orders were placed by MAPL with Cannon for the all rubber mats, the first order being made in October 2006 (p 37).

26. Nothing further about the alleged defective new mats was heard from MAPL until MAPL's e-mail dated 16 November 2006 (p 38). In its e-mail, MAPL asserted that it had credited Hyundai for 18,189 sets of mats (this clearly included the 7,124 old mats), that it had had no choice but to destroy all of the new mats and that it had taken photographs of the defective mats and the mats dumped into the dumpsters. Curiously, in an e-mail sent 6 days later on 22 November 2006 (p 39) MAPL stated that it was then in the process of getting rid of the alleged defective new and old mats and in an e-mail sent the following day on 23 November 2006 (p 41), it changed this by stating that it would be dumping the mats into dumpsters the following week.

8

27. In its e-mail dated 23 November 2006 (p 41), MAPL also asked Cannon for a credit in respect of the destroyed mats, together with freight and duties paid in respect of the same, but made it clear that it was not asking for alleged lost profits, alleged damage to reputation or profits from alleged lost business. MAPL also stated that the action it had allegedly taken had avoided a lawsuit with Hyundai. The email did not give any details of the amount of credit ever wanted, nor was any credit note ever issued.

28. At no stage before its e-mail dated 16 November 2006, in which it stated that it had got rid of the mats referred to above, did MAPL give Cannon any notice of its intention to destroy the same or any opportunity before doing so of inspecting the mats. Further, at no stage has Cannon been provided with any inspection or quality reports from either MAPL or Hyundai, a copy of any return notes from Hyundai, a copy of any credit note raised by MAPL in favour of Hyundai or, indeed, any documentary evidence proving that the alleged defective mats were mats manufactured and supplied by Cannon. In its e-mail dated 4 July 2006 to Cannon (p 29), MAPL had stated that if Hyundai returned US$500,000 worth of mats, then MAPL intended to return to Cannon US$500,000 in mats. Instead, MAPL decided to destroy all of the evidence.

29. By an e-mail dated 1 December 2006, Edward Atkin, on behalf of Cannon, formally rejected MAPL's claim, which MAPL responded to in its e-mail of the same date (p 42).

30. From January 2007 until September 2007, when MAPL ceased to place orders with Cannon, business continued as normal between Cannon and MAPL and, save for an e-mail dated 9 July 2007 from Hyundai forwarded by MAPL to Cannon (p 49) (which was the first time that Cannon learnt that

9

Hyundai had billed MAPL for the returned mats), MAPL made no further mention of its claims relating to the alleged defective mats. However, unbeknown to Cannon at the time, MAPL and Hyundai had reached agreement regarding all rubber mats in January 2007 and yet Cannon was not informed of this agreement until July 2007.

31.  Although business continued as normal and MAPL continued to submit orders to Cannon, MAPL started to default in paying its invoices; this it had never previously done. Cannon started to press for payment of its invoices (the e-mails relating to this are at pages 12 to 32 of "RGM1") as a result of which in September 2007, MAPL stated that it had placed a stop on orders with, and payments to, Cannon until all outstanding issues had been resolved. The total amount of Cannon's unpaid sterling invoices is £384,020.60 and of its dollar invoices is US$53,795.80, which MAPL does not dispute.

Rubber mats supplied to BMW

32.  In 2003 MAPL was awarded a contract by BMW to supply rubber car mats for all BMW cars in the United States. Until about July 2007, there had been no problems as regards the supply of mats to MAPL for BMW. However, about 1875 defective mats were supplied by Cannon, but these were all subsequently replaced by Cannon.

Attempts to resolve the dispute

33.  On 9 October 2007, a meeting was held in Chicago between Robert Peacock, acting on behalf of Cannon, and David MacNeil and Al Thom, acting on behalf of MAPL. At the meeting, David MacNeil raised the issue of alleged defective products which had been supplied by Cannon and then sold by MAPL to Hyundai. He also referred to defective products which had

been supplied by Cannon and had been sold by MAPL to BMW. David MacNeil accepted that Cannon was owed the sums of £354,020.60 and US$53,795.80, but claimed that MAPL was entitled to set-off against these sums the sum of US$642,199.36 in respect of the Hyundai mats and the sum of US$11,652.28 which MAPL had allegedly reimbursed or credited to BMW for mats supplied to them. Having regard to its alleged claim, David MacNeil accepted that even on MAPL's own case, MAPL owed to Cannon the sum of US$182,386.28 (see: the minutes of the meeting, incorporating a reference to David MacNeil's e-mail dated 11 October 2007, which were approved by MAPL (pages 50-52).

34.    At the meeting, David MacNeil also supplied Cannon with a detailed breakdown of MAPL's claim (p 53-54).

35.    From the breakdown, it will be seen that for the years 2005, 2006 and 2007, the total warranty claims from Hyundai totalled US$23,241.89. Save for the 23 warranty claims referred to in paragraph 15 above, no notice of any further warranty claims had ever been given by MAPL to Cannon. Of the warranty claims alleged, it is unlikely that those referred to as having been made in 2005 related to the new mats, bearing in mind that deliveries to MAPL only started after mid-November 2005.

36.    Cannon does not believe that MAPL's claims against it are genuine, having regard to the actions of MAPL and the matters set out above. At the very least, the claims have clearly been grossly exaggerated.

37.    As stated above, MAPL ceased placing orders with Cannon in September 2007. This was because it had set up its own manufacturing business. Whilst setting up that business, it continued to place orders with Cannon,

but ceased paying for the same. As MAPL had always been a good payer, it would appear that it had consciously taken the decision to cease making payments and then later to use as an excuse for non-payment its alleged claims for defective products.

The Tooling claim

38. MAPL started to produce rubber car mat tools in or about the summer of 2005. Over an 18 month period MAPL shipped these tools to Cannon for use by Cannon in the manufacture of the mats. However, Cannon's own manufactured tools account for 81.9% of tools used in the manufacture of the MAPL product. Cannon still retains the MAPL tools; MAPL has never formally requested for these tools to be returned nor has it sought in its Complaint referred to in paragraph 42 below, to identify the tools which it alleges belong to it. The tools supplied by MAPL to Cannon as set out above were not lent to Cannon but given to it. It has never been a term of the parties arrangements that these tools were to be returned at the termination of the parties business dealings. In the premises Cannon denies that MAPL are entitled to the return of any tools. It will further be seen from the Complaint referred to in paragraph 42 below that MAPL allege that these tools have a value of $2.8m. In Cannon's estimation, they are worth no more than $400,000.

The Procedural History

39. On 26 October 2007 Cannon wrote to MAPL demanding payment of its outstanding accounts and informed MAPL that if payment was not made within 7 days, the matter would placed in the hands of their legal advisors (p 55).

12

40.   Nothing was heard from MAPL and on 30 November 2006 a without notice application was made to serve these proceedings out of the jurisdiction on MAPL. Permission to serve out of the jurisdiction was given on that date by Master Yoxall and the Claim Form and Particulars of Claim were served on MAPL on 20 December 2007.

41.   On 11 January 2007, MAPL filed an Acknowledgement of Service indicating that it intended to contest the Court's jurisdiction.

42.   On the same day, it served on Cannon a Complaint which it had filed in the United States District Court for the Northern District of Illinois Eastern Division ("the Illinois Court") on 7 January 2008 alleging that it was entitled to damages of not less than US$4 million primarily out of the alleged defective mats supplied to it by Cannon for Hyundai and US$2.8million being the alleged value of the Tooling claim. On the same day, it filed a Motion seeking to enjoin Cannon from pursuing these proceedings ("the Motion"). Copies of the Complaint and the Motion are now produced and shown to me marked "RGM4". The Complaint is at pages 1-41 of "RGM4"; the Motion is at pages 42-96 of "RGM4".

43.   On 21 January 2007, MAPL made a without notice application before Master Fontaine seeking an extension of time for making an application declaring that the Court had no jurisdiction and further orders under CPR Part 11 until 7 days after such time as the Illinois Court should have determined MAPL's Motion to enjoin Cannon from pursuing these proceedings. The application was supported by a witness statement from Kent Napier Phillips dated 21 January 2008. An order was made by Master Fontaine in the terms sought.

13

44. On 29 January 2008, Cannon issued an application that the order of Master Fontaine be discharged. One of the grounds of that application is that the Court was misled into believing that the Motion was due to be heard on 24 January 2008, one day before the time limit for making an application under CPR Part 11 expired, when, in fact, the court appointment on 24 January 2008 was only set for a briefing schedule. In this respect, I would refer to my second witness statement dated 29 January 2008.

45. It would appear that the steps taken by MAPL in the United States are a deliberate and blatant tactical manoeuvre to interfere with this court's jurisdiction to decide whether it is the appropriate forum for the parties' disputes to be tried and to arrogate to the Illinois Court that decision. The English court was the first court seised with this matter. The normal procedure for a defendant who wishes to dispute either jurisdiction or forum is to make an application under CPR Part 11.

46. As will be seen from the matters set out above, MAPL has been asserting on and off an alleged counterclaim since July 2006. Further, it knew that Cannon did not accept its counterclaim, that Cannon was pressing hard for payment of its invoices and by the end of October 2007 that matters were to be placed into the hands of Cannon's lawyers. Despite having had every opportunity to do so had it wanted to, MAPL did not seek to bring any claim against Cannon whether in the Illinois Court or elsewhere. Meanwhile, Cannon has instituted a claim in this jurisdiction as it was entitled to do.

**The natural forum**

47. England is the natural forum for the determination of its own jurisdiction and whether to exercise that jurisdiction over the parties. It is also the natural forum for this dispute for the following reasons:

14

(a)    MAPL sought out an English supplier to supply goods to it in the USA;

(b)    the whole of the contract was performed in England; the mats were manufactured and delivered to MAPL in this jurisdiction and payment was made to Cannon in this jurisdiction (see paragraph 8 of my first witness statement dated 30 November 2007);

(c)    the breaches of contract, namely, the failure to make payment have all occurred in this jurisdiction. If, which is denied, defective goods were delivered to MAPL, as they were delivered to MAPL in this jurisdiction, any breach by Cannon would, therefore, also have been committed within this jurisdiction;

(d)    the contracts between Cannon and MAPL are all governed by English law for the reasons set out in my first witness statement;

(e)    Cannon now estimates that it is likely that it will call at least five witness as follows:

(i)    Robert Peacock, who is the Operations Manager at Cannon. All of the departments at Cannon, namely, production, engineering, the quality/technical department, the design/toolroom, personnel, accounts, planning, sales and security, report to him. Further, he is responsible for the entire domestic and export sales operation of OEM and Cannon branded products;

15

(ii)    Dick Bidgood, who is the only other senior manager on site at Cannon's factory premises in Tottenham, London N17 8EY (apart from Mr. Peacock) and is Mr. Peacock's deputy. The general rule is that either Mr. Bigood or Mr. Peacock must be on site at Cannon's factory premises in Tottenham, London N17; neither can be off the site at the same time. Mr. Bigood is a technologist who deals with all technical aspects of the business;

(iii)    Mike Wren, who is Cannon's one and only credit controller;

(iv)    John Mall, who is the project manager at Cannon. He is the Cam/Cad co-ordinator and provides MIS and internet support. Cannon will not progress tooling projects in his absence as his input is essential; and

(v)    Edward Atkin.

(f)    if a trial of this matter were to take place in the United States, the attendance of the above persons as witnesses in the trial would not only be costly, but could seriously disrupt Cannon's business. It would mean that no senior managers would be on site; nor would there be any OEM account managers. There would also no one who was sufficiently trained or experienced to make day to day decisions for Cannon in order for it to function properly. This is likely to result in delays to projects and a reduction in sales by Cannon;

16

(g)    Cannon does not yet know who MAPL will call as witnesses. It is envisaged that they would probably call David MacNeil, Al Thom and possibly George Kurth from Hyundai;

(h)    the mats themselves have all been destroyed. There is, therefore, no physical evidence of the alleged defective mats in the United States;

(i)    the tools in respect of which the claim in conversion is made are in this jurisdiction;

(j)    there is also a substantial amount of documentation in this jurisdiction, for example, purchase orders, pro forma invoices, invoices, designs and drawings (which will also be on computers in this jurisdiction) and so forth;

(k)    Cannon is an English company which has no assets in the United States of America;

(l)    it will also be seen from the complaint that MAPL wants a jury trial. I am informed by Freeborn Peters, the US Attorneys instructed by Cannon, that if a jury is instructed, it is likely to increase the costs of trial for the following two reasons: (i) about one half to one court day will be taken up with the selection of the jury; (ii) this will be followed by a jury instruction conference with the Court, which is likely to last a few hours;

17

**The justice of the case**

It is Cannon's case that it would be vexatious and oppressive for both the issue of jurisdiction and forum to be decided by the Illinois Court and for the dispute itself to be decided by that Court.

48.    In support of the above, Cannon relies on the matters set out in paragraphs 39 to 46 above and also on the following matters:

(a)    Cannon are paying its US Attorneys on a time/cost basis. I am advised by Freeborn and Peters  that this means that if Cannon wins its claim and defeats MAPL's counterclaim, its victory is likely to be a pyrrhic one in that what it will recover is likely to be subsumed in the costs it will have to pay to its Attorneys. I am informed by Freeborn and Peters that in the United States, as a general rule, a winning party is not entitled to recover its costs from the other side;

(b)    secondly, if as Cannon believe, MAPL's claims are not genuine or, at best have been vastly inflated, MAPL will be able to proceed with them in the United States without fear of any costs consequences against it, whereas if the action proceeded in this jurisdiction, MAPL would have to take into account its risks in having a costs order made against it. At present, Cannon does not know whether MAPL is instructing its US Attorneys on a contingent fee basis or on the same basis as Cannon is instructing its Attorneys;

(c)    thirdly although a judge and a jury should decide the issue of liability and damages on the same principles, a jury may be inclined to find that a foreign company has wronged an American Company and award higher damages; and

18

(d)    finally, it is oppressive for there to be the same set of proceedings in the two jurisdictions with the risk that there will be two inconsistent judgments.

49.   In the premises, I would ask the Court to set aside the order of Master Fontaine. If MAPL genuinely intends to dispute the jurisdiction of this Court and/or to take issue with this forum, then it can in the normal way make its application under CPR Part 11 and allow the English court to make its own determination. In the meantime, Cannon would ask the Court to grant an interim injunction against MAPL effectively to hold the position in the Illinois Court pending the determination by this Court of the above issues. If they are determined in Cannon's favour or if MAPL decides that it does wish to make an application under CPR Part 11, then Cannon would ask the Court to make a permanent anti-suit injunction against MAPL.

50.   I believe that the facts set out in this witness statement are true.

### STATEMENT OF TRUTH

I believe the facts stated in this Witness Statement are true. I am duly authorised to sign this Witness Statement on behalf of the Claimant.

Signed.......................................     Dated...8th..February..2008

RICHARD GARY MARSHALL
Partner
Manches LLP
Aldwych House
81 Aldwych
London WC2B 4RP
RGM/250119

19

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) | Honorable Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Magistrate Judge Arlander Keys |
| Defendant. | ) | |

## DECLARATION OF RICHARD G. MARSHALL

1.    I am a solicitor of the Supreme Court of the United Kingdom and a partner in the

solicitors firm of Manches LLP.  Manches LLP is located in London, England.

2.    Manches LLP are the solicitors for Cannon Automotive Limited in the claim that Cannon

filed against MacNeil Automotive Products, Limited on November 30, 2007 in the High

Court of Justice, Queens Bench Division.  I have the conduct of that action on behalf of

Cannon and am duly authorized by Cannon to make this declaration.

3.    I am aware that in the United States, MacNeil commenced on January 8, 2008, an action

against Cannon in the Federal Court sitting in Chicago, Illinois.  Cannon's United States

counsel have asked me to review Cannon's (i) Opposition to MacNeil's Motion To

Enjoin Defendant from Pursuing a Collateral Proceeding in a Foreign Jurisdiction; and

(ii) Memorandum in Support of Cannon's Motion to Dismiss or Stay Proceedings for the purpose of confirming the accurate nature of the assertions in those U.S. court papers with respect to English law.

4.    I hereby confirm that the assertions with respect to English law set forth in the U.S. court papers described in preceding paragraph are accurate.

5.    I also confirm that Manches LLP forwarded to U.S. counsel for Cannon true and correct copies of the papers from the U.K. Court proceeding referenced in the U.S. motion papers described in the third paragraph of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 20, 2008

Richard G. Marshall
MANCHES LLP