**Exhibit 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company,  )<br><br>Defendant.  ) | No. 08 C 139<br><br>Honorable Joan B. Gottschall<br><br>Magistrate Judge Arlander Keys |

## DECLARATION OF ROBERT PEACOCK

### CANNON IS A LONGSTANDING U.K. COMPANY

1.     I am, and have been, the Operations Manager for Cannon Automotive Limited ("Cannon") since its incorporation in June 2005. I have personal knowledge of the statements made in this Declaration based upon my working knowledge, review of business records and communications with Cannon personnel and can competently testify to the facts contained herein.

2.     Prior to Cannon's incorporation, Cannon Rubber Limited carried on the same business now operated by Cannon. I served as Operations Manager of Cannon Rubber for 11 years before its business was transferred to Cannon. Practically, there was no change in operations when the business was so transferred. When I refer to Cannon in my Declaration, I also include Cannon Rubber.

3.      Cannon designs, manufactures and supplies automotive floor mats and automobile boot protectors and boot mats. Cannon has designed, manufactured and supplied automotive floor mats for over 60 years.

4.      Cannon manufactures automobile floor mats for leading automobile manufacturers in Europe, including Toyota, Nissan, Peugeot and Land Rover. In addition, consumers are able to purchase directly from Cannon, through its website, Cannon-branded mats for various automobile vehicles. And of course Cannon supplies retail and wholesale outlets with its Cannon-branded products. For the last 50 years, Cannon has been Europe's largest supplier of these mats.

5.      Cannon's headquarters, design and manufacturing facilities, principal place of business and workforce always have been located in London, England. Cannon is incorporated under the laws of England and Wales. Cannon has no other place of business or other facility. And, Cannon Automotive never has had a facility or an employee located in the United States.

6.      In my declaration, I refer to England or the United Kingdom as the "U.K." And, I refer to the United States as the "U.S."

## CANNON HAS HAD NO SYSTEMIC PROBLEMS WITH MATS IT HAS MANUFACTURED FOR ANY OTHER CUSTOMER

7.      As I stated above, Cannon manufactures floor mats for numerous leading automobile manufacturers throughout Europe. In a typical year, Cannon produces approximately 8 to 10 million floor mats for those manufacturers, collectively. In my years as Operations Manager, Cannon has not received any complaint from any of those automobile manufacturers of a systemic flaw or defect in a Cannon mat.

8.      MacNeil Automotive Products Limited ("MAPL") is the first party to complain of a systemic flaw or defect in mats Cannon has manufactured. Mats that Cannon has

manufactured, and continues to manufacture, for some European automobile manufacturers without complaint are similar in design and manufacturing process to the mats that MAPL now alleges in its January 2008 U.S. Complaint were flawed.

### THE ENTIRETY OF THE CANNON/MAPL SUPPLY RELATIONSHIP TOOK PLACE IN THE U.K. – SOLICITATION; MANUFACTURING; DELIVERY; AND PAYMENT

9.      In late 1988 – early 1989, David MacNeil, the owner of MAPL, solicited Cannon in the U.K. to enter into a supply relationship for automobile floor mats.  At the time, David MacNeil had yet to form MAPL.

10.     David MacNeil told Cannon that he was impressed with the quality of Cannon's automobile floor mats.  He desired to purchase mats from Cannon and to resell those mats in the United States and act as Cannon's sole U.S. distributor.

11.     Negotiation of the Cannon/MacNeil Automotive supply relationship took place in the U.K., initially by telephone and post and then by David MacNeil visiting the U.K.

12.     Eventually, Cannon and David MacNeil agreed to enter into a supply relationship and MacNeil incorporated MAPL in February 1989.

13.     The parties did not enter into a master written contract or otherwise subject the supply relationship to a set of written standard terms and conditions.

14.     Rather, sales by Cannon to MAPL were conducted and made in the following manner:

     a.      MAPL sent purchase orders to Cannon;

     b.      Cannon accepted orders by sending to MAPL an acknowledgment reflecting the price for the mats and the anticipated delivery dates;

     c.      Cannon manufactured the mats at its facilities located in the U.K.;

     d.      MAPL took delivery of the mats at Cannon's facilities in the U.K.

3

e.     MAPL was responsible for shipping the mats from the U.K. to the U.S.;

f.     Cannon sent to MAPL, after MAPL picked up the mats at Cannon's U.K. facility, an invoice for payment;

g.     Cannon allowed MAPL 90 days from receipt of the invoice in which to pay the invoice; and

h.     MAPL paid Cannon in the U.K. in U.K. currency, the pound sterling, by wiring payment to Cannon's bank account located in the U.K.

For a two-year period, mid 2004 to mid 2006, and as an accommodation to MAPL because of the weak position of the U.S. dollar compared to the pound sterling, Cannon allowed MAPL to pay Cannon in the U.K. in U.S. dollars at a fixed rate of $1.60 to the pound sterling. This was on average a 15% benefit to MAPL.

**THE MATS CANNON SOLD TO MAPL**

15.     From 1989 to mid-2004, Cannon made floor mats for MAPL to be sold under the Cannon/WeatherTech brand name. These were all designed in the U.K. and all the tooling was made at Cannon's plant in the U.K.

16.     In 2003, BMW USA awarded to MAPL a contract for the provision to BMW of rubber car mats for BMW cars sold in the U.S. In July 2004, Hyundai USA awarded to MAPL a contract for the provision of car mats for Hyundai's Tuscon model vehicle sold in the U.S. In turn, MAPL ordered from Cannon the mats for the BMW and Hyundai programs. In its U.S. Complaint, MAPL alleges defects with certain mats that Cannon produced for the Hyundai and BMW programs.

17.     Until the parties terminated their relationship in the fall of 2007, Cannon made for MAPL Cannon-branded products, "WeatherTech" floor mats and the mats for the BMW and Hyundai programs.

THE ENGINEERS WHO DESIGNED AND MANUFACTURED THE MATS FOR MAPL ARE LOCATED IN THE U.K.

18.     From May 2005, MacNeil started to manufacture tooling for the Cannon/WeatherTech program in the US and shipped these tools to Cannon.  By the end of 2007, the following tools had been made by Cannon for MacNeil:

Cannon/WeatherTech tooling:

104 sets made by Cannon

36 sets made by MacNeil

BMW tooling:

60 sets made by Cannon

4 sets made by MacNeil

Hyundai tooling:

6 sets made by Cannon

0 sets made by MacNeil

19.     MAPL designed the Hyundai mats and sent the specifications and drawings to Cannon in the U.K.  Cannon engineers, in turn, created the tooling from those designs and drawings to manufacture the mats.  Cannon engineers also created the assembly lines necessary for production of those mats, created the testing protocols, and tested mats before mass production.  No physical specifications were provided by either Hyundai or MacNeil.

20.     With respect to the BMW program, MAPL forwarded to Cannon in the U.K. the specifications.  Cannon engineers, in turn, created mat designs from those specifications.  Other Cannon engineers created the tooling and assembly lines necessary for production of those mats, created the testing protocols, and tested mats before mass production.  No MAPL employees

participated in Cannon's design, manufacture and testing of the BMW mats before mass production.

21.    The Cannon engineers and other employees who might be needed to provide testimony as to the quality of the Hyundai and BMW mats when MAPL picked up the mats at Cannon's U.K. facility, as well as to the designs, specifications, testing protocols test results, manufacturing processes, packaging and delivery of product to MAPL in the U.K., among other things, all are located in the U.K. In addition, the physical evidence pertaining to those various processes is located in the U.K.

22.    Cannon anticipates that it will have to call in this litigation several witnesses, all of whom live in the U.K., including myself, Richard Bigood, Michael Wren, John Maul and Edward Atkin.   As I stated above, I am the Cannon Operations Manager.   All Cannon departments report to me, including, production, engineering, quality/technical, design/toolroom, personnel, accounts, planning, sales and security. In addition, I am responsible for Cannon's domestic and export sales of OEM and Cannon-branded products.  Richard Bigood is my deputy and he also deals with all technical aspects of the business.  Mr. Bigood and I generally are not off site at the same time.  Michael Wren is Cannon's only credit controller.  John Maul is project manager at Cannon. He is the Cam/Cad co-ordinator and provides MIS and internet support. Edward Atkin is the owner of Cannon and is also responsible for its overall operations.

23.    It would pose a substantial inconvenience, and likely an interruption and loss, to Cannon's business operations if these Cannon personnel are required to travel to the U.S. at the same time to participate in a trial of this matter.  The anticipated Cannon witnesses include key personnel who typically are not away at the same time from Cannon's U.K. facilities.

## No Dispute Exists As To The BMW Mats

24.     From 2003 to 2007, Cannon supplied to MAPL approximately 500,000 sets of BMW mats.  MAPL paid to Cannon a total of £4 million for those mats.

25.     MAPL claimed that that 1100 pairs of BMW mats did not satisfy standards and requested credit of $11,652US for the expense in the credit.

26.     Cannon replaced those mats.  But is appears that MAPL still seeks reimbursement for the credit alleged.

27.     MAPL has submitted no warranty or other claim with respect to any other mats that Cannon produced for MAPL's BMW program.

## Cannon Contests The Accuracy Of MAPL's Hyundai Claim

28.     Based on the facts, Cannon finds unbelievable MAPL's complaints with respect to the quality of the mats that Cannon produced for the Hyundai program.  Although MAPL now claims millions of dollars in damages, throughout the course of the Hyundai program, MAPL made Cannon aware in October 2007 of only $23,241.89US in alleged warranty claims from 2005 through 2007.  Instead, the facts suggest that Hyundai may have required MAPL to take back thousands of mats that MAPL had purchased from Cannon when Hyundai no longer had use for those mats.  And, now, MAPL improperly seeks to pass on to Cannon the cost MAPL incurred for mats Hyundai decided not to use.  And, in the process, MAPL seeks to use its fictitious claims, or at the very least hugely exaggerated claims, as a reason to deprive Cannon of its right to pursue in the U.K. Court its first-filed claim against MAPL for undisputed amounts owed.  It should be noted that MAPL started to manufacture mats itself for Hyundai in 2006 in breach of our distribution agreement and without informing us.  We were still under the impression that we were the sole Hyundai U.S. rubber mat supplier.

7

## A.   MAPL ONLY SOUGHT A SMALL CREDIT OVER THE FIRST YEAR OF THE PROGRAM

29.   As stated above, Hyundai USA awarded its mat program to MAPL in July 2004. Because of MAPL's immediate demands, Cannon had to produce mats quickly even though it did not have time to source carpeting for the mats that matched exactly Hyundai's specifications. MAPL was aware of, and requested, the production of these initial mats even though Cannon did not have time to source carpeting for the mats that matched exactly Hyundai's specifications.

30.   On November 26, 2004, MAPL requested a credit of £21,618.05 to reimburse it for (i) alleged defective products that it had rejected from the initial, hurried productions runs that Cannon delivered to MAPL for the Hyundai program, and (ii) alleged time MAPL spent repairing other Hyundai mat sets.  Specifically, MAPL claimed that it had rejected 275 out of 8,900 sets of grey mats and 235 out of 6,020 sets of beige mats, or 3.4% of the mat sets delivered, at £23.50 per set, for a total of £11,985.00.  MAPL also claimed that it had spent 523 hours, at a cost of £17.00 per hour, repairing other mat sets. Cannon did not pay the credit and MAPL did not pursue payment from Cannon.

31.   As of August 2005, Cannon had delivered to MAPL in the UK about 78,000 sets of mats for the Hyundai program.  Over the course of the first year of the program, the only other complaints that MAPL lodged with respect to mats that Cannon made for MAPL for the Hyundai program was to note in an October 4, 2005 email that Hyundai had received 23 warranty claims. In the same email, MAPL admitted that the alleged failure rate reported was quite small when compared to the total number of mats sold, that the alleged failures pertained to mats produced early in the program and that numerous improvements to the mat product had been made since production of mats early in the program.  At the time, MAPL did not seek reimbursement from Cannon for the warranty claims.

**B.   HYUNDAI CHANGES ITS SPECIFICATIONS MID-PROGRAM, REQUIRING HYUNDAI
TO PURCHASE MAT SETS ALREADY PRODUCED THAT HYUNDAI DID NOT WANT**

32.   In June 2005, Hyundai had told MAPL that there would be no changes to the mat

specifications.   At MAPL's direction, Cannon continued to produce mats for the Hyundai

program based on the then current specifications.

33.   But in August 2005, MAPL notified Cannon that Hyundai had decided to change

the carpet color for the 2006 Tuscon models.   In the same email notifying Cannon of this change,

MAPL indicated that Hyundai had accepted full responsibility for the situation it had created and

that Hyundai would purchase any stocks of mats held by Cannon or MAPL manufactured

pursuant to the old specifications.   At the time, Cannon had in stock 7,124 sets of mats (3,450

grey and 3,674 beige) that Cannon already had produced pursuant to MAPL's orders.   Cannon

delivered those mats to MAPL in the U.K. and MAPL paid Cannon for the mats.

**C.   HYUNDAI MADE FURTHER CHANGES TO ITS MAT PROGRAM THAT RESULTED
IN HYUNDAI HAVE A STOCK OF MATS FOR WHICH IT HAD NO NEED**

34.   In November 2005, Hyundai finally decided on the new carpet color

specifications for its Tuscon model mat program.   MAPL ordered from Cannon on a rush basis

under the new specifications 2,600 sets of mats.   Later in November 2005, or in early December

2005, Hyundai changed the ferrule specifications for its Tuscon model mat program.   (Ferrules

are used to attach the mat to pegs on the floor of the vehicle.)   As a result of this change,

Hyundai would have been unable to use any unused stock of mats manufactured up to that time,

including the 2,600 of mats that Cannon rushed to produce under the new carpet color

specifications.

35.   From November 18, 2005 until May 22, 2006, Cannon manufactured and

delivered to MAPL in the U.K. 20,025 sets of mats pursuant to Hyundai's new carpet color and

ferrule specifications. Of those 20,025 sets of mats, 8,025 bore product number 00281-T6P00-Z9 and 12,000 bore product number 00281-T6P00-U7.

36. On July 4, 2006, approximately six weeks after Cannon had delivered to MAPL the last of the mats for the Hyundai program that MAPL had ordered up to that time, MAPL sent to Cannon an email it had received from Hyundai in which Hyundai alleged that the carpet did not properly adhere to the rubber bottom of some of the mats. Hyundai indicated that it had approximately 11,500 sets of mats in stock worth about $500,000US that it intended to inspect. In the same email, Hyundai indicated that it had used only 8,525 sets of the new mats out of the 20,025 that Cannon had delivered to MAPL. In a separate Hyundai email that MAPL forwarded to Cannon, Hyundai indicated that it also had 7,124 sets of mats in stock that were manufactured pursuant to old specifications that Hyundai had agreed to take when it changed the carpet color specifications.

**D.   MAPL OFFERS TO REPLACE THE MATS IN ORDER TO SECURE HYUNDAI'S RUBBER FLOOR MAT BUSINESS**

37. At approximately the same time, Hyundai decided in late July or early August 2006 that it would no longer use for its Tuscon model vehicles a rubber-based carpet mat. Instead, Hyundai decided to change its mat program completely and use all rubber mats.

38. In an effort to secure Hyundai's rubber mat business, MAPL offered to replace the carpet mats with all rubber mats. On or about August 3, less than one month after Hyundai had first complained about the rubber-based carpet mats, Hyundai awarded to MAPL its rubber floor mat business for the Tuscon and Sante Fe models.

39. MAPL placed with Cannon the orders for Hyundai's rubber mat floor program. MAPL submitted the first order to Cannon in October 2006.

### E.    MAPL DESTROYS THE EVIDENCE OF THE ALLEGEDLY DEFECTIVE MATS

40.    On November 16, 2006, MAPL informed Cannon that MAPL had credited Hyundai for 18,189 sets of mats.  That amount included the 7,124 old mats that Hyundai had agreed to take when it decided in August 2005 to change the carpet color of the mats.  Curiously, MAPL also indicated on November 16 that it had destroyed the very mats about which it was complaining.

41.    In an email dated November 23, 2006, MAPL asked Cannon for credit corresponding to the destroyed mats together with freight and duties.  In the same email, MAPL acknowledge that 80,000 out of 98,035 sets of the Cannon-manufactured Hyundai mats had been sold without problem.

### F.    CANNON REJECTS MAPL'S REQUEST FOR A CREDIT

42.    On December 1, 2006, Edward Atkin, the owner of Cannon, rejected MAPL's request for a credit for the destroyed mats.  Edward Atkin noted that it was clear to him that MAPL sought to pass on to Cannon the cost to MAPL for Hyundai's decision to convert the Hyundai mat program to all rubber floor mats.  As a result of Hyundai's decision to switch to rubber mats before it used up its stock of carpeted mats, Hyundai found themselves with a substantial stock of the carpeted mats for which they had no additional use.

### MAPL FAILS TO PAY CANNON FOR RUBBER MATS

43.    Cannon continued to manufacture for MAPL rubber mats.  Between about February 26, 2007 and August 28, 2007, Cannon manufactured and delivered in the U.K. to MAPL, pursuant to MAPL's orders, rubber mats totaling approximately £1.0 million.  During this time, MAPL did not mention payment from Cannon for the allegedly defective mats that MAPL destroyed.

44.     MAPL defaulted on its payment to Cannon for some of the rubber mats that Cannon produced in 2007.  On August 16, 2007, Cannon requested that MAPL pay to Cannon immediately all amounts owed – at that time approximately £379,301.20 and $45,954.64.  In September 2007, MAPL stopped placing orders with, and refused to pay, Cannon pending resolution of the parties' outstanding issues.  Cannon does not contend that the rubber mats that Cannon produced in 2007 were defective or otherwise flawed.

45.     At this time, the total amount owed to Cannon is approximately £384,020.60 and $53,795.80.

THE PARTIES' ATTEMPTS TO RESOLVE THEIR DISPUTES ARE NOT SUCCESSFUL

46.     I agreed to meet with MAPL at its Chicago area offices on October 9, 2007 in an effort to resolve the parties' disputes and to secure for Cannon payment of the amounts MAPL indisputably owes to Cannon.  During the meeting, David MacNeil admitted that MAPL owed to Cannon £384,020.60 ($719,723.88US) and $53,795.80US.  But MacNeil claimed that MAPL was entitled to offset that amount by $642,199.36 and $11,652.28 for allegedly defective Hyundai and BMW program floor mats, respectively.   MacNeil admitted that MAPL nevertheless owed to Cannon $182,386.28US even with the alleged offset.

47.     Unfortunately, the parties could not resolve their differences at the October 9 meeting.  At the conclusion of the October 9 meeting, I informed David MacNeil that his terms for resolution of the dispute were not acceptable and that Cannon would pursue full payment of the hundreds of thousands of dollars that MacNeil owed Cannon.  MacNeil then ended the distribution agreement without notice, leaving Cannon with unsold MacNeil stock and packaging materials.

**CANNON ALWAYS UNDERSTOOD THAT DISPUTES BETWEEN THE PARTIES WOULD BE RESOLVED IN THE U.K. UNDER U.K. LAW**

48.     MAPL contends in its U.S. Court papers that the parties agreed during the October 9 meeting that they would use the U.S. court system to resolve their disputes. Neither I, nor any other representative of Cannon, ever made such an agreement on October 9 or at any other time during the Cannon/MAPL relationship. I agreed to come to MAPL's Chicago area headquarters only for purposes of trying to secure the amounts MAPL owes to Cannon and to attempt to resolve the parties' differences. We never discussed litigation in Illinois or anywhere in the U.S. if the parties were unable to resolve their differences. The minutes that I prepared for the October 9 contain no suggestion that the parties mentioned or contemplated litigation in the U.S. Via email dated October 15, 2007, David MacNeil informed me that the minutes accurately captured our October 9 meeting.

49.     Had MAPL raised the issue, I would have rejected such a notion. Cannon has always been of the position that U.K. law governs the parties' supply relationship and that the parties would have resolve disputes in the U.K. court system. After all, the supply relationship was performed completely in the U.K. and MAPL was a startup when David MacNeil solicited Cannon in 1989 to do business. Cannon never would have agreed to application of U.S. law to the Cannon/MAPL relationship or to a venue in the U.S. should litigation between the parties ever ensue. We do business in over 60 markets and we cannot be expected to work under so many legal jurisdictions.

**CANNON SUED MAPL FIRST IN THE U.K.**

50.     Cannon did not race to the courthouse door as MAPL contends in its U.S. Court papers. Rather, by letter dated October 16, 2007 addressed to MAPL, Cannon again demanded payment from MAPL of outstanding amounts. Cannon warned that unless MAPL made payment

within 7 days, Cannon would take appropriate legal action.  (A true and correct copy of the October 16 letter is attached hereto as Exhibit A.)  But MAPL still refused to pay amounts to Cannon that it does not dispute it owed.

    51.    On November 30, 2007, approximately six weeks after the October 16 letter, Cannon instituted in the U.K.'s High Court of Justice, Queen's Bench Division, litigation to recover from MAPL the amounts owed.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 20, 2008

Robert Peacock

14

**EXHIBIT A**

### CANNON AUTOMOTIVE LTD,
### 881 HIGH ROAD,
### TOTTENHAM,
### LONDON, N17 8EY,   ENGLAND
TEL: 0208 275 6024                     FAX: 0208 275 6011

October 16, 2007

MacNeil Automotive Products Ltd.,
2435 Wisconsin Street,
Downers Grove,
Illinois 60515,
U.S.A..

For the attention of Les Veatch

Dear Sirs,

Re: May, June & July Accounts (Statements Attached)

We note that despite previous reminders the May account £23476.80 & $6480.00, June account £97327.80 & $17525.00, and July accounts £78284.60 & $4710.00 are still outstanding for payment.

We must inform you that unless payment is received within the next 7 days, we will have to insist on future transactions being made on a payment in advance basis and that we will be taking the appropriate legal advice.

Yours Faithfully.

CANNON RUBBER LTD

M. R. WREN

Credit Controller

**Exhibit 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MACNEIL AUTOMOTIVE PRODUCTS )
LIMITED, an Illinois Corporation, )
                                                      )
        Plaintiff, )        No. 08 C 139
                                                      )
           v. )
                                                      )        Honorable Joan B. Gottschall
CANNON AUTOMOTIVE LIMITED, f/k/a )
CANNON RUBBER LIMITED, )        Magistrate Judge Arlander Keys
AUTOMOTIVE DIVISION, )
a United Kingdom Company, )
                                                      )
        Defendant. )

## DECLARATION OF ROBERT PEACOCK

    1.     I am, and have been, the Operations Manager for Cannon Automotive Limited ("Cannon") since its incorporation in June 2005. I have personal knowledge of the statements made in this Declaration based upon my working knowledge, review of business records and communications with Cannon personnel and can competently testify to the facts contained herein.

    2.     I submitted in this matter a Declaration dated February 20, 2008. In that Declaration, I identified various individuals who likely would give testimony regarding the supply-agreement dispute with MacNeil Automotive Products Limited ("MacNeil"). That list was not exhaustive.

    3.     There are likely to be many other Cannon witnesses depending on the scope of claims and issues, including but not limited to designers, toolmakers and employees involved in the manufacture of the mats as well as various middle and senior management at Cannon who

were involved in the service of the MacNeil account. Moreover, Cannon employees involved in the packaging and inspection of the final product may also be witnesses.

4.      Cannon used several different pieces of machinery at its plant located in London to manufacture Hyundai, BMW and other automobile floor mats for MacNeil. That machinery is substantial in size and weighs many tons.

5.      I read David MacNeil's Declaration dated March 12, 2008. In his Declaration, David MacNeil stated that in October 2007, he offered to show me hundreds of sets of "defective Cannon mats in [MacNeil's] possession." David MacNeil's statement is not true.

6.      During that meeting in October 2007, David MacNeil only offered me three mats to inspect, mats that I had previously seen in May 2006. And the mats that were shown to me were not mats returned by Hyundai. Rather, David MacNeil claimed that his inspection team found those mats.

7.      I read Allan Thom's Declaration dated March 12, 2008. In his Declaration, Allan Thom stated that MacNeil "is currently storing approximately 1,000 pounds of defective mats rejected by Hyundai."

8.      If true, 1,000 pounds of mats equate only to about 70 mat sets, which is approximately 0.07% of the total number of Hyundai mats Cannon sold to MacNeil and approximately 0.38% of the total number of Hyundai mats MacNeil now claims to be defective.

9.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  April 2, 2008

_____

Robert Peacock

**Exhibit 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MACNEIL AUTOMOTIVE PRODUCTS )
LIMITED, an Illinois Corporation, )
                                  )
        Plaintiff,                )        No. 08 C 139
                                  )
            v.                    )
                                  )        Honorable Joan B. Gottschall
CANNON AUTOMOTIVE LIMITED, f/k/a  )
CANNON RUBBER LIMITED,            )        Magistrate Judge Arlander Keys
AUTOMOTIVE DIVISION,              )
a United Kingdom Company,         )
                                  )
        Defendant.                )

## DECLARATION OF RICHARD G. MARSHALL

1.    I am a solicitor of the Supreme Court of the United Kingdom and a partner in the

      solicitors firm of Manches LLP.  Manches LLP is located in London, England.

2.    Manches LLP are the solicitors for Cannon Automotive Limited in the claim that Cannon

      filed against MacNeil Automotive Products, Limited on November 30, 2007 in the High

      Court of Justice, Queens Bench Division.  I have the conduct of that action on behalf of

      Cannon and am duly authorized by Cannon to make this declaration.

3.    I am aware that in the United States, MacNeil commenced on January 8, 2008, an action

      against Cannon in the Federal Court sitting in Chicago, Illinois.  Cannon's United States

      counsel have asked me to review Cannon's (i) Opposition to MacNeil's Motion To

      Enjoin Defendant from Pursuing a Collateral Proceeding in a Foreign Jurisdiction; and

(ii) Memorandum in Support of Cannon's Motion to Dismiss or Stay Proceedings for the purpose of confirming the accurate nature of the assertions in those U.S. court papers with respect to English law.

4.      I hereby confirm that the assertions with respect to English law set forth in the U.S. court papers described in preceding paragraph are accurate.

5.      I also confirm that Manches LLP forwarded to U.S. counsel for Cannon true and correct copies of the papers from the U.K. Court proceeding referenced in the U.S. motion papers described in the third paragraph of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 20, 2008

Richard G. Marshall
MANCHES LLP

**Exhibit 5**

## Table C.
### U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 2006 and 2007

| Circuit | Filings 2006 | Filings 2007 | Filings Percent Change[1] | Terminations 2006 | Terminations 2007 | Terminations Percent Change[1] | Pending 2006[2] | Pending 2007 | Pending Percent Change[1] |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 259,541 | 257,507 | -0.8 | 273,193 | 239,678 | -12.3 | 247,253 | 265,082 | 7.2 |
| DC | 2,382 | 2,415 | 1.4 | 2,836 | 2,456 | -13.4 | 2,803 | 2,762 | -1.5 |
| 1ST | 5,887 | 5,890 | 0.1 | 6,267 | 5,959 | -4.9 | 6,521 | 6,452 | -1.1 |
| ME | 385 | 449 | 16.6 | 430 | 409 | -4.9 | 257 | 297 | 15.6 |
| MA | 3,085 | 3,131 | 1.5 | 3,397 | 3,266 | -3.9 | 3,327 | 3,192 | -4.1 |
| NH | 501 | 450 | -10.2 | 495 | 461 | -6.9 | 428 | 417 | -2.6 |
| RI | 583 | 593 | 1.7 | 545 | 564 | 3.5 | 805 | 834 | 3.6 |
| PR | 1,333 | 1,267 | -5.0 | 1,400 | 1,259 | -10.1 | 1,704 | 1,712 | 0.5 |
| 2ND | 23,369 | 27,165 | 16.2 | 21,274 | 22,771 | 7.0 | 32,953 | 37,347 | 13.3 |
| CT | 2,087 | 2,056 | -1.5 | 2,300 | 2,382 | 3.6 | 2,732 | 2,426 | -11.2 |
| NY,N | 1,590 | 1,453 | -8.6 | 1,415 | 1,689 | 19.4 | 2,681 | 2,445 | -8.8 |
| NY,E | 6,993 | 5,751 | -17.8 | 5,909 | 5,940 | 0.5 | 8,353 | 8,164 | -2.3 |
| NY,S | 10,793 | 16,125 | 49.4 | 9,766 | 10,804 | 10.6 | 16,248 | 21,569 | 32.7 |
| NY,W | 1,631 | 1,492 | -8.5 | 1,568 | 1,667 | 6.3 | 2,655 | 2,480 | -6.6 |
| VT | 275 | 288 | 4.7 | 316 | 309 | -2.2 | 284 | 263 | -7.4 |
| 3RD | 44,792 | 32,521 | -27.4 | 41,536 | 23,141 | -44.3 | 28,098 | 37,478 | 33.4 |
| DE | 930 | 870 | -6.5 | 1,284 | 817 | -36.4 | 1,262 | 1,315 | 4.2 |
| NJ | 6,274 | 6,657 | 6.1 | 6,433 | 6,558 | 1.9 | 5,873 | 5,972 | 1.7 |
| PA,E | 31,997 | 19,739 | -38.3 | 27,962 | 10,341 | -63.0 | 15,396 | 24,794 | 61.0 |
| PA,M | 2,745 | 2,416 | -12.0 | 2,747 | 2,422 | -11.8 | 2,038 | 2,032 | -0.3 |
| PA,W | 2,472 | 2,476 | 0.2 | 2,828 | 2,687 | -5.0 | 2,297 | 2,086 | -9.2 |
| VI | 374 | 363 | -2.9 | 282 | 316 | 12.1 | 1,232 | 1,279 | 3.8 |
| 4TH | 17,610 | 17,331 | -1.6 | 18,480 | 17,624 | -4.6 | 13,379 | 13,086 | -2.2 |
| MD | 3,391 | 3,601 | 6.2 | 3,537 | 3,547 | 0.3 | 2,877 | 2,931 | 1.9 |
| NC,E | 1,264 | 1,367 | 8.1 | 1,435 | 1,424 | -0.8 | 1,304 | 1,247 | -4.4 |
| NC,M | 1,176 | 1,003 | -14.7 | 1,221 | 1,138 | -6.8 | 1,015 | 880 | -13.3 |
| NC,W | 1,068 | 1,049 | -1.8 | 1,133 | 1,211 | 6.9 | 959 | 797 | -16.9 |
| SC | 3,625 | 4,403 | 21.5 | 3,961 | 4,314 | 8.9 | 2,918 | 3,007 | 3.1 |
| VA,E | 3,891 | 3,239 | -16.8 | 3,865 | 3,091 | -20.0 | 1,690 | 1,838 | 8.8 |
| VA,W | 1,339 | 1,146 | -14.4 | 1,407 | 1,240 | -11.9 | 754 | 660 | -12.5 |
| WV,N | 598 | 633 | 5.9 | 622 | 611 | -1.8 | 708 | 730 | 3.1 |
| WV,S | 1,258 | 890 | -29.3 | 1,299 | 1,048 | -19.3 | 1,154 | 996 | -13.7 |

## Table C. (September 30, 2007—Continued)

| Circuit | Filings 2006 | Filings 2007 | Filings Percent Change [1] | Terminations 2006 | Terminations 2007 | Terminations Percent Change [1] | Pending 2006 [2] | Pending 2007 | Pending Percent Change [1] |
|---|---|---|---|---|---|---|---|---|---|
| 5TH | 34,310 | 34,662 | 1.0 | 31,364 | 37,129 | 18.4 | 39,590 | 37,123 | -6.2 |
| LA,E | 9,805 | 10,484 | 6.9 | 3,247 | 6,194 | 90.8 | 11,786 | 16,076 | 36.4 |
| LA,M | 1,064 | 999 | -6.1 | 1,546 | 7,365 | 376.4 | 8,743 | 2,377 | -72.8 |
| LA,W | 2,337 | 2,468 | 5.6 | 2,536 | 2,378 | -6.2 | 2,176 | 2,266 | 4.1 |
| MS,N | 1,128 | 947 | -16.0 | 1,187 | 999 | -15.8 | 1,367 | 1,315 | -3.8 |
| MS,S | 2,780 | 2,702 | -2.8 | 2,873 | 2,873 | 0.0 | 2,745 | 2,574 | -6.2 |
| TX,N | 4,516 | 4,213 | -6.7 | 4,581 | 4,483 | -2.1 | 3,249 | 2,979 | -8.3 |
| TX,E | 3,001 | 3,222 | 7.4 | 3,014 | 2,919 | -3.2 | 2,462 | 2,765 | 12.3 |
| TX,S | 6,467 | 6,434 | -0.5 | 7,225 | 6,528 | -9.6 | 4,512 | 4,418 | -2.1 |
| TX,W | 3,212 | 3,193 | -0.6 | 3,419 | 3,390 | -0.8 | 2,550 | 2,353 | -7.7 |
| 6TH | 21,394 | 21,322 | -0.3 | 38,052 | 21,611 | -43.2 | 22,600 | 22,311 | -1.3 |
| KY,E | 1,940 | 1,604 | -17.3 | 2,241 | 1,694 | -24.4 | 1,536 | 1,446 | -5.9 |
| KY,W | 1,411 | 1,309 | -7.2 | 1,431 | 1,294 | -9.6 | 1,280 | 1,295 | 1.2 |
| MI,E | 5,655 | 5,580 | -1.3 | 20,133 | 5,377 | -73.3 | 5,355 | 5,558 | 3.8 |
| MI,W | 1,578 | 1,593 | 1.0 | 1,410 | 1,482 | 5.1 | 1,308 | 1,357 | 3.8 |
| OH,N | 4,393 | 4,543 | 3.4 | 5,980 | 5,313 | -11.2 | 6,099 | 5,329 | -12.6 |
| OH,S | 2,374 | 2,836 | 19.5 | 2,575 | 2,616 | 1.6 | 2,816 | 3,036 | 7.8 |
| TN,E | 1,257 | 1,181 | -6.0 | 1,417 | 1,255 | -11.4 | 1,456 | 1,382 | -5.1 |
| TN,M | 1,535 | 1,548 | 0.8 | 1,516 | 1,270 | -16.2 | 1,293 | 1,571 | 21.5 |
| TN,W | 1,251 | 1,128 | -9.8 | 1,349 | 1,310 | -2.9 | 1,457 | 1,275 | -12.5 |
| 7TH | 16,096 | 15,594 | -3.1 | 16,463 | 15,945 | -3.1 | 14,464 | 14,113 | -2.4 |
| IL,N | 7,265 | 7,620 | 4.9 | 7,432 | 7,169 | -3.5 | 6,615 | 7,066 | 6.8 |
| IL,C | 1,021 | 1,009 | -1.2 | 1,087 | 1,001 | -7.9 | 953 | 961 | 0.8 |
| IL,S | 1,160 | 1,025 | -11.6 | 1,226 | 1,209 | -1.4 | 1,241 | 1,057 | -14.8 |
| IN,N | 1,843 | 1,516 | -17.7 | 1,826 | 1,779 | -2.6 | 1,733 | 1,470 | -15.2 |
| IN,S | 2,673 | 2,411 | -9.8 | 2,786 | 2,580 | -7.4 | 2,358 | 2,189 | -7.2 |
| WI,E | 1,396 | 1,231 | -11.8 | 1,414 | 1,394 | -1.4 | 1,272 | 1,109 | -12.8 |
| WI,W | 738 | 782 | 6.0 | 692 | 813 | 17.5 | 292 | 261 | -10.6 |
| 8TH | 16,516 | 15,569 | -5.7 | 18,431 | 15,221 | -17.4 | 16,990 | 17,338 | 2.0 |
| AR,E | 2,987 | 2,063 | -30.9 | 2,302 | 1,727 | -25.0 | 4,412 | 4,748 | 7.6 |
| AR,W | 848 | 803 | -5.3 | 944 | 755 | -20.0 | 656 | 704 | 7.3 |
| IA,N | 551 | 549 | -0.4 | 605 | 624 | 3.1 | 532 | 457 | -14.1 |
| IA,S | 845 | 779 | -7.8 | 886 | 794 | -10.4 | 812 | 797 | -1.8 |
| MN | 4,714 | 5,412 | 14.8 | 6,725 | 4,964 | -26.2 | 5,391 | 5,839 | 8.3 |
| MO,E | 2,455 | 2,414 | -1.7 | 2,668 | 2,374 | -11.0 | 1,948 | 1,988 | 2.1 |
| MO,W | 2,401 | 2,037 | -15.2 | 2,734 | 2,167 | -20.7 | 1,703 | 1,573 | -7.6 |
| NE | 1,086 | 891 | -18.0 | 991 | 1,165 | 17.6 | 913 | 639 | -30.0 |
| ND | 211 | 203 | -3.8 | 224 | 217 | -3.1 | 218 | 204 | -6.4 |
| SD | 418 | 418 | 0.0 | 352 | 434 | 23.3 | 405 | 389 | -4.0 |

## Table C. (September 30, 2007—Continued)

| Circuit | | Filings 2006 | Filings 2007 | Filings Percent Change [1] | Terminations 2006 | Terminations 2007 | Terminations Percent Change [1] | Pending 2006 [2] | Pending 2007 | Pending Percent Change [1] |
|---|---|---|---|---|---|---|---|---|---|---|
| 9TH | | 41,178 | 40,637 | -1.3 | 40,760 | 39,223 | -3.8 | 38,913 | 40,327 | 3.6 |
| | AK | 363 | 347 | -4.4 | 347 | 326 | -6.1 | 388 | 409 | 5.4 |
| | AZ | 4,369 | 3,477 | -20.4 | 5,296 | 3,968 | -25.1 | 3,560 | 3,069 | -13.8 |
| | CA,N | 7,812 | 7,074 | -9.4 | 6,159 | 5,853 | -5.0 | 7,097 | 8,318 | 17.2 |
| | CA,E | 4,534 | 4,595 | 1.3 | 3,824 | 4,259 | 11.4 | 6,093 | 6,429 | 5.5 |
| | CA,C | 11,104 | 11,904 | 7.2 | 11,732 | 11,491 | -2.1 | 9,531 | 9,944 | 4.3 |
| | CA,S | 2,860 | 2,829 | -1.1 | 2,582 | 2,855 | 10.6 | 2,160 | 2,134 | -1.2 |
| | HI | 726 | 663 | -8.7 | 739 | 758 | 2.6 | 720 | 625 | -13.2 |
| | ID | 538 | 542 | 0.7 | 618 | 554 | -10.4 | 633 | 621 | -1.9 |
| | MT | 624 | 620 | -0.6 | 669 | 741 | 10.8 | 769 | 648 | -15.7 |
| | NV | 2,282 | 2,463 | 7.9 | 2,026 | 2,200 | 8.6 | 2,568 | 2,831 | 10.2 |
| | OR | 2,396 | 2,524 | 5.3 | 2,561 | 2,375 | -7.3 | 2,355 | 2,504 | 6.3 |
| | WA,E | 701 | 640 | -8.7 | 725 | 625 | -13.8 | 544 | 559 | 2.8 |
| | WA,W | 2,772 | 2,874 | 3.7 | 3,398 | 3,147 | -7.4 | 2,409 | 2,136 | -11.3 |
| | GUAM | 44 | 38 | -13.6 | 49 | 32 | -34.7 | 38 | 44 | 15.8 |
| | NMI | 53 | 47 | -11.3 | 35 | 39 | 11.4 | 48 | 56 | 16.7 |
| 10TH | | 10,000 | 9,994 | -0.1 | 10,616 | 10,153 | -4.4 | 9,138 | 8,979 | -1.7 |
| | CO | 2,809 | 2,796 | -0.5 | 2,993 | 2,793 | -6.7 | 2,098 | 2,101 | 0.1 |
| | KS | 1,498 | 1,551 | 3.5 | 1,659 | 1,487 | -10.4 | 1,382 | 1,446 | 4.6 |
| | NM | 1,328 | 1,449 | 9.1 | 1,317 | 1,339 | 1.7 | 1,492 | 1,602 | 7.4 |
| | OK,N | 730 | 745 | 2.1 | 890 | 818 | -8.1 | 834 | 761 | -8.8 |
| | OK,E | 549 | 487 | -11.3 | 513 | 620 | 20.9 | 554 | 421 | -24.0 |
| | OK,W | 1,506 | 1,536 | 2.0 | 1,602 | 1,509 | -5.8 | 1,066 | 1,093 | 2.5 |
| | UT | 1,272 | 1,141 | -10.3 | 1,347 | 1,237 | -8.2 | 1,337 | 1,241 | -7.2 |
| | WY | 308 | 289 | -6.2 | 295 | 350 | 18.6 | 375 | 314 | -16.3 |
| 11TH | | 26,007 | 34,407 | 32.3 | 27,114 | 28,445 | 4.9 | 21,804 | 27,766 | 27.3 |
| | AL,N | 2,675 | 4,843 | 81.0 | 3,132 | 3,508 | 12.0 | 2,340 | 3,675 | 57.1 |
| | AL,M | 1,226 | 1,187 | -3.2 | 1,322 | 1,278 | -3.3 | 1,149 | 1,058 | -7.9 |
| | AL,S | 822 | 980 | 19.2 | 741 | 974 | 31.4 | 742 | 748 | 0.8 |
| | FL,N | 1,633 | 1,635 | 0.1 | 1,484 | 1,614 | 8.8 | 1,321 | 1,342 | 1.6 |
| | FL,M | 6,739 | 12,660 | 87.9 | 6,715 | 7,368 | 9.7 | 6,588 | 11,880 | 80.3 |
| | FL,S | 6,716 | 7,072 | 5.3 | 7,076 | 7,452 | 5.3 | 4,881 | 4,501 | -7.8 |
| | GA,N | 3,879 | 3,900 | 0.5 | 4,180 | 3,950 | -5.5 | 2,866 | 2,816 | -1.7 |
| | GA,M | 1,167 | 1,210 | 3.7 | 1,173 | 1,169 | -0.3 | 1,072 | 1,113 | 3.8 |
| | GA,S | 1,150 | 920 | -20.0 | 1,291 | 1,132 | -12.3 | 845 | 633 | -25.1 |

NOTE: PENDING CASES EXCLUDE ASBESTOS CASES TRANSFERRED TO PA,E UNDER ORDER 875 OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION.
[1] PERCENT CHANGE NOT COMPUTED WHEN FEWER THAN 10 CASES REPORTED FOR THE PREVIOUS PERIOD.
[2] REVISED.