**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No.  08 C 139 |
| v. | ) ) ) | Hon. Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Magistrate Arlander Keys |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

**MACNEIL'S MEMORANDUM IN OPPOSITION TO CANNON'S
MOTION TO DISMISS PURSUANT TO *FORUM NON CONVENIENS*** 

Plaintiff, MacNeil Automotive Products Limited ("MacNeil"), by its undersigned attorneys, submits the following Memorandum in Opposition to Cannon Automotive Limited's ("Cannon") Motion to Dismiss Pursuant to *Forum Non Conveniens*.

## I.   INTRODUCTION

The instant motion represents Cannon's third bite at the apple – in two forums – to prevent MacNeil from litigating its claims before this Court.  Arguing that England is the more convenient forum, Cannon seeks to dismiss a lawsuit brought by an Illinois citizen in an Illinois court, the plaintiff's chosen home forum.  MacNeil's lawsuit seeks damages for defective products distributed exclusively to Illinois and other American consumers.  All of the third party witnesses involved, which will offer significant testimony and evidence central to MacNeil's claims, are located in the United States, a majority of the evidence is located in this forum and it is likely that Illinois law applies.  Succinctly put, Cannon's new motion suffers from the same flaw that doomed Cannon's motion to dismiss based on the Colorado River doctrine – it is not supported by law or fact.[1]  The instant motion should be denied.

---

[1]   As many of those same arguments are presented by Cannon in this motion – often literally verbatim – MacNeil has attached as Exhibit A its brief in opposition to Cannon's motion to dismiss based on the Colorado River doctrine and incorporates the same by reference.  Further, MacNeil is a reasonable litigant, and, despite Cannon's "fears," does not argue that Cannon's motion is untimely.  Mot. at 3 n.1.

Cannon attempts to portray MacNeil as engaging in "chess-game like legal maneuvering" when nothing could be further from the truth. If this is a game, then it was Cannon that made the first move. On many occasions, MacNeil attempted to resolve the matter amicably between the parties to preserve an 18 year business relationship. Cannon ignored all of MacNeil's requests. When the matter finally came to a head in October of 2007, David MacNeil told Bob Peacock that if Cannon was to sue MacNeil in the United States, MacNeil's employees would be ready to testify. See Ex. A, ex. 6 at ¶ 10.[2] As a layperson, David MacNeil never anticipated that he was subject to suit in England and Cannon's letters requesting payment for outstanding invoices did not provide any such warning. Indeed, according to English protocols, Cannon's letters did not provide proper notice that it intended to file a lawsuit.[3] In any event, MacNeil filed its separate lawsuit less than a month after being served with Cannon's English lawsuit regarding its invoices. The argument that: "[h]ad it been concerned about forum, MacNeil could have filed its own complaint first" lacks merit. Mot. at 2. This "race to the courthouse" mentality has no bearing on the instant analysis. MacNeil is the master of its own Complaint.

The problems inherent in Cannon's motion become clear when one considers that it is based solely on the premise that it would be more convenient to litigate this case in England. However, Cannon cannot avoid the fact that *it was so inconvenient, expensive and vexatious* to conduct any litigation in the English courts, that MacNeil stopped defending Cannon's English action. In a "chess-like" maneuver, Cannon filed its own ***voluminous*** anti-suit injunction in the English court, apparently because it was concerned about the likelihood of success, or lack thereof, on its Colorado River motion pending before this Court. Responding to this U.K. anti-suit motion and continuing to defend the action would have been so expensive, in relation to the

---

[2]     As this very Court has stated, in a motion to dismiss based on *forum non conveniens* any conflicts in affidavits are resolved in the plaintiff's favor. Philiotis v. Executive Mfg. Tech., Inc., No. 04-C-3239, 2004 U.S. Dist. LEXIS 21723, at *1 n.1 (N.D. Ill. Oct. 25, 2004) (Gottschall, J.)

[3]     MacNeil has provided the affidavit of a solicitor explaining English protocols and Cannon's failure to abide by the same. See Ex. A, ex. 4 at ¶¶ 11-16. Curiously, Cannon makes no attempt to rebut Mr. Phillips' affidavit that Cannon's "notice" was not proper and did not explain that a lawsuit was imminent even though Cannon states that it: "filed [the English] action only after giving MacNeil more than six weeks notice that it would pursue legal action unless MacNeil paid to Cannon the full amount MacNeil owed." Mot. at 2. Regardless, Cannon in no way made MacNeil aware of the fact that it intended to file an *English* lawsuit.

underlying claim, that MacNeil informed the English court that it was simply refusing to defend the invoice action. Clearly, MacNeil does not consider England a convenient forum.

Apart from this glaring point, if one steps back and views the facts in a light most favorable to Cannon, then it would be equally convenient to litigate this case in either England or Illinois. Thus, as MacNeil is the master of its own Complaint and this is its chosen home forum, Cannon's motion must be denied. However, when the factors relevant to a *forum non conveniens* motion are viewed in the proper light – factually and legally – it is clear that Cannon's motion lacks any foundation. To prevail on its motion, Cannon bears a heavy burden of proof that England is clearly the more convenient forum for this litigation and that it would be unjust, vexatious and oppressive for Cannon to litigate this case here. Summed up, Cannon's motion simply attempts to shift the inconvenience of litigation from Cannon to MacNeil. This fails to carry Cannon's burden. Cannon's Motion to Dismiss Pursuant to *Forum Non Conveniens* should be denied.

## II.   FACTUAL BACKGROUND

MacNeil is an Illinois corporation founded in 1989 by David F. MacNeil.[4] See Ex. A, ex. 6 at ¶¶ 3-4. MacNeil is a supplier of automotive accessories including, among other things, floor liners and mats. Id. at ¶ 3. MacNeil's corporate offices, design and manufacturing facilities and workforce are located in Downers Grove, Illinois. Id. at ¶ 4. MacNeil has no facilities, employees or other presence outside of Illinois. Id.

In about August 1989, about the time that he founded MacNeil, David MacNeil was visiting the United Kingdom and saw floor mats that had been manufactured by Cannon Rubber Limited N/K/A Cannon Automotive Limited. Ex. A, ex. 6, at ¶¶ 1-2. When he returned to the United States, Mr. MacNeil contacted Cannon and eventually spoke with Henry Carlton, one of Cannon's senior representatives. Id. at ¶ 2. Mr. MacNeil asked Mr. Carlton if Cannon had a distributor for its products in the United States, and, if not, whether it would be interested in having someone sell its mats here. Id. Mr. Carlton responded that Cannon might have an interest in pursuing a relationship with a U.S. distributor. Id. He then shipped MacNeil some mats to review in Chicago, and a couple of weeks later Mr. MacNeil traveled to England to meet with Edward Atkin, Cannon's Chief Executive Officer. Id. Although a possible

---

[4]   MacNeil also refers the Court to its Complaint, which must be accepted as true at this stage of the litigation, regarding the merits of its claims.

supplier/distributorship arrangement was discussed, no agreement was reached during this visit to England because Cannon wanted to review MacNeil's operations in Chicago. Id.

About two weeks after Mr. MacNeil's trip to England, Mr. Carlton came to Chicago to meet with Mr. MacNeil and review MacNeil's business operations. Id. at ¶ 4. Before Mr. Carlton returned to England, he and Mr. MacNeil agreed that MacNeil would wire Cannon payment for a twenty foot container of mats, Cannon would ship the mats to Chicago and MacNeil would sell them in the United States. Id. The agreement that Mr. Carlton and Mr. MacNeil reached in Chicago in 1989 formed the basis for the future business dealings between Cannon and MacNeil Automotive. Id. at ¶ 5. Over the next fifteen-plus years MacNeil would wire funds to Cannon and Cannon would supply the requested product to MacNeil. Id.

### The Hyundai and BMW Programs

In about May 2004, Hyundai Motors America, Inc. ("HMA") awarded MacNeil a contract to supply Hyundai with composite floor mats consisting of a molded rubber base with a carpet inset thermally bonded into a cavity in the rubber mat. Complaint at ¶ 6. The composite mats were to go in all Hyundai Tucson vehicles to be sold in the United States. Id. MacNeil, in turn, arranged with Cannon for Cannon to manufacture the composite floor mats for MacNeil. Id. at ¶ 7. Production of the mats began in the summer of 2004. Id. From the very first shipment, MacNeil found that over 87% of the Cannon manufactured mats showed major flaws in carpet adhesion and cracked corners in the rubber and informed Cannon of the same. Id. at ¶ 9. Subsequent deliveries also contained high percentages of defective mats. Id. at ¶¶ 10-25.

In about mid-May 2005, Cannon's Head of Design, James Ashley, and members of Cannon's design team, along with Cannon's Operation Manager, Bob Peacock, visited MacNeil's operations in Downers Grove to discuss Hyundai rejects and Cannon delivery delays. Ex. A, ex. 5 at ¶ 9. On September 28, 2005, Hyundai's Korean Quality Assurance Engineers notified MacNeil, through HMA personnel, about a report detailing various adhesion and other defects with the Cannon manufactured mats. Complaint at ¶ 18. MacNeil received the report in Downers Grove, Illinois. Id. The report included photographs of mats which showed the carpet delaminating around the corners and other areas of the mat, as well as the same tears that MacNeil had earlier identified but that Cannon had claimed did not exist. Id.

In November 2005, Cannon's Operations Manager, Bob Peacock, again visited MacNeil's facility in Downers Grove to personally inspect the defective Cannon mats. Rather

than acknowledge the problems with the Cannon manufactured mats, Mr. Peacock told MacNeil's representatives that MacNeil's inspection process was "too stringent" and was "provoking the carpet's separation." Ex. A, ex. 5 at ¶ 10.

In May 2006 and again in October 2007, Cannon representatives, including Bob Peacock, visited MacNeil's facility to discuss further quality concerns regarding carpet adhesion and color consistency. Complaint at ¶¶ 23, 30. During the October 2007 meeting MacNeil demanded return of the compression mold tooling that it had loaned to Cannon. Id. It also demanded a solution to the defective mat issue. Id. In total, there were four face-to-face meetings between MacNeil and Cannon to discuss issues related to product defects. All of the meetings took place at MacNeil's facility in Downers Grove, Illinois. Id. at ¶¶ 15, 20, 23, 30; Ex. A, ex. 5 at ¶¶ 9-12. There were no meetings scheduled on this subject that were held in England. Ex. A, ex. 5 at ¶ 12. In addition to the Hyundai issues, there are extensive defects and other quality issues related to the BMW mats. Bob Peacock's email, which is attached hereto as Exhibit B, sums up the constant quality issues that MacNeil was forced to suffer because of Cannon.

MacNeil believes that there are at least seven current and former MacNeil employees who will need to testify at trial in this matter. They include David MacNeil (MacNeil's president); Allan Thom (MacNeil's vice-president); Michael Bishop (MacNeil's Warehouse Manager – responsible for receiving and inspecting goods); Del Hollingsworth (OEM Account Manager for BMW and Hyundai – responsible for order logistics and customer complaints); Roger Conner (independent contractor that represents MacNeil in its business relationship with HMA); Paul Mound (independent contractor that represents MacNeil in its business relationship with BMW); Dan Barton (Assistant Warehouse Manager and OEM Quality Assurance Manager – responsible for quality control with regard to OEM customer shipments) and Jason Houcek (Assistant Warehouse Manager and OEM Quality Assurance Manager – responsible for quality control with regard to OEM customer shipments). All of these individuals reside in Illinois except Roger Conner and Paul Mound who both reside in the United States. Id. at ¶ 5. In addition to these individuals, MacNeil anticipates calling as witnesses at trial certain Hyundai and BMW representatives to testify regarding the defects in the Cannon manufactured mats. These non-party witnesses include George Kurth (HMA); Daniel Cordes (BMW USA) and Michael Barrett (BMW USA). These individuals each reside in the United States. Id. at ¶ 6.

### III.  LEGAL STANDARDS

Again, like its Colorado River motion, references to many of the standards and burdens relevant to a *forum non conveniens* motion are noticeably missing from the *movant's* pleading. In any event, the movant bears the burden of persuading the Court that the plaintiff's lawsuit should be dismissed on *forum non conveniens* grounds.  In re Ford Motor Co., 344 F.3d 648, 652 (7th Cir. 2003).  Under the doctrine of *forum non conveniens*, a district court may dismiss an action over which it otherwise has jurisdiction "where trial in the plaintiffs' chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting this choice."  Berndorf Belt Systems, Inc. vs. Ascona Food Group (Canada) Ltd., No. 98-C-1055, 1998 U.S. Dist. Lexis 19141 at *27 (N.D. Ill. Dec. 2, 1998) (Gottschall, J.)  In determining whether to dismiss a case on grounds of *forum non conveniens*, a court must consider four factors:  (1) the availability of an adequate alternative forum; (2) appropriate deference to the plaintiff's choice of forum; (3) the "public interest" factors and (4) the "private interest" factors.  Id. at *28 (citations omitted).

The power to decline jurisdiction, however, should be exercised only in "exceptional circumstances."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947).  Indeed, a defendant seeking to dismiss a case on grounds of *forum non conveniens* bears a higher burden of demonstrating inconvenience than does a defendant seeking to transfer a case pursuant to 28 U.S.C. §1404(a).  See Philiotis, at *3 n.2 ("The distinction between transferring a case based on venue rules and standards and dismissing a case based on *forum non conveniens* is significant, as this court has broader discretion to transfer than to dismiss.")  Consequently, a trial court should dismiss an action before it only when a trial in the plaintiff's chosen forum would "result in vexation and oppression to the defendant which would far outweigh the plaintiff's convenience, or when the chosen forum would generate administrative and legal entanglements for the trial court."  In Re Ford, 344 F.3d at 651.

### IV.  ARGUMENT

Like its previous Colorado River motion, Cannon's instant brief lacks any objectivity and contradicts its own arguments when convenient.  For example, according to Cannon's brief, an English court would have no trouble applying Illinois law when, in the very next breath, Cannon argues that it would be too much of a burden for this Court to apply English law. Mot. at 8; 11. Similarly, Cannon withdrew its Colorado River motion because the litigation in England had

ended, yet, in this very motion, Cannon states: "the dispute underlying the UK action lives on." Mot. at 2. Respectfully, Cannon withdrew its motion to dismiss based on the Colorado River doctrine because it had no chance of success. The same holds true for the instant motion.

As a further example, in its previous motion to dismiss, Cannon bemoaned the "fact" that MacNeil had destroyed all of the defective mats. This of course was not true. Now that it is clear that MacNeil has over 1,000 pounds of these defective mats at its Downer's Grove location, Cannon takes a different tact, feigning shock and surprise that MacNeil destroyed some of these defective mats. Cannon even goes so far with its charade as to request a negative inference regarding MacNeil's destruction of these mats. Mot. at 5 n.4. Of course, Cannon's entire argument on this point is patently ridiculous. MacNeil simply did not have the room to store over 200 pallets of defective mats and Cannon has made no argument as to what these other defective mats could have proven that the mats that MacNeil retained could not. Regardless, MacNeil informed Cannon in 2006 that it was going to destroy these defective mats, and invited Cannon to attend said destruction and help with the same. See Ex. C. MacNeil went so far as to carefully document and photograph the destruction of the defective mats, thereby preserving this evidence. At that time, MacNeil did not contemplate litigation against Cannon; MacNeil thought that the two parties would be able to work things out between themselves.

Faced with this fact, Cannon concocts a convoluted argument positing that 1,000 pounds of mats "equate only to about 70 mat sets – approximately 0.07% of Hyundai mats Cannon sold to MacNeil and 0.38% of the total number of Hyundai mats MacNeil now claims to be defective." Mot. at 5. With all due respect, there are lies, damn lies, and there are statistics. 1,000 pounds of evidence is 1,000 pounds of evidence. Most important, there are 0 pounds of defective mats in England, representing 0.00% of the defective mats that Cannon sold MacNeil. Try as it might, Cannon cannot avoid the fact that a significant number of defective mats are located at MacNeil's facilities in Downers Grove. Moreover, Cannon argued and emphasized several times in its Colorado River motion that MacNeil destroyed *all of the defective mats*, yet now concedes that MacNeil showed Bob Peacock of Cannon three defective mats to inspect during the parties October 9, 2007 meeting. Mot. at 5 n.4. Cannon disputes that David MacNeil offered to show Bob Peacock "hundreds" of these mats during this meeting, but Mr. MacNeil's sworn affidavit states that he did and his testimony must be accepted as true for the purposes of this motion.

When one drills down to the basics, Cannon's motion should be denied. MacNeil has filed a lawsuit in its home forum. The lawsuit concerns mats that were distributed to Illinois and other American consumers, the third-party witnesses and evidence regarding the damages that MacNeil has suffered are located exclusively in the United States (and perhaps Korea). A review of its motion makes clear that Cannon will make whatever argument it can to avoid litigation in this forum. The concluded English lawsuit is nothing more than a red herring and has no bearing on the instant motion. MacNeil has its witnesses in this forum. MacNeil has extensive documentation, approximately 1,000 pounds of the defective mats, as well as other physical evidence in this forum. Cannon has its witnesses, which it controls, in London. Cannon also has its manufacturing equipment and documents in London. This does not suffice to carry the day. The instant motion should be denied.

> 1. **MacNeil's Chosen Home Forum Is Entitled to Significant Deference**

"The plaintiff is the master of the complaint, and his or her choice of forum generally must be accorded significant deference." Philiotis, 2004 U.S. Dist. LEXIS 21723, at *9. Therefore, in order to prevail on a motion to dismiss on grounds of *forum non conveniens* a defendant must overcome a strong presumption in favor of the plaintiff's choice of forum. In re Bridgestone/Firestone, Inc., 420 F.3d 702, 703-04 (7th Cir. 2005). This strong presumption "may be overcome only when the private and public interest factors clearly point toward trial in the alternative forum." Philiotis, at *9. "When the plaintiff chooses his home forum, it is reasonable to assume that this choice is convenient." Id.

Furthermore, when the plaintiff is an American citizen suing in his or her home forum, courts are to give even greater deference to his or her choice of an American court and should only dismiss the action when the choice would be "unjust, oppressive or vexatious, rather than merely inconvenient." Bruemmer v. Marriott Corp., 1991 U.S. Dist. Lexis 2514 *6 (N. D. Ill. 1991). See also In re Ford Motor Co., 344 F.3d 648, 651 (7th Cir. 2003). As the Supreme Court has explained:

> [Plaintiff] should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems. In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his

home forum will normally outweigh the inconvenience the defendant may have shown.

Koster v. Lumbermens Mut. Casualty Co., 330 U.S. 518, 524 (1947).  Moreover, "when the alternative forum is another country, the choice of a United States forum by a plaintiff who is a citizen of this country should be given a great amount of deference."  Wasendorf v. DBH Brokerhaus AG, No. 04-C-1904, 2004 U.S. Dist. LEXIS 25107, at *19 (N.D. Ill. Dec. 10, 2004). Accordingly, MacNeil's choice of this forum should not be disturbed unless the private and public interest factors clearly point toward trial in England.  Philiotis, at *10.

Given such a clear standard, one might expect Cannon to concede that MacNeil's choice of its home forum is entitled some deference.  Incredibly, however, Cannon argues that MacNeil's choice of forum should be accorded "little deference" because "MacNeil has engaged in extensive foreign business."  Mot. at 13.  Cannon makes no attempt to explain how MacNeil has engaged in "extensive foreign business," nor does it provide any evidence that it has done so. This argument is yet another example of the duplicitous nature of Cannon's motion.  MacNeil distributes 98% its product to one market, North America (mostly the U.S.).  Yet in the very next breath Cannon informs this Court that "[Cannon] did business in over sixty markets."  Mot. at 4. It is Cannon, not MacNeil, that has engaged in extensive foreign business.

Moreover, the prior Cannon entity, with which MacNeil did business for years, had employees and facilities in the United States, specifically *in this forum*.  In a statement for Cannon Avent Group, PLC, Edward Atkin states:  "I would like to thank all our employees in the UK, Singapore and the USA who have helped to produce these excellent results."  Ex. D.  This document further reveals:  "CANNON AVENT Group plc. manufactures at two sites in the UK and has marketing and distribution subsidiaries **in Chicago** and Singapore."  Id.  Cannon's current stance that Chicago is highly inconvenient and that it never had a connection to this forum lacks all credibility.  In contrast, MacNeil has never had an employee or facility outside of this forum.  MacNeil's choice of this Court, its home forum, is entitled to significant deference and should only be disturbed if Cannon meets its burden of proof that litigating in this forum is "unjust, oppressive or vexatious" and not merely inconvenient.  Cannon has not met its burden.

    **2.**    **Adequate Forum**

Cannon's motion fails before it gets off the ground, as it has not met its burden that England is an available forum.  The viability of an adequate forum depends on two factors:

availability and adequacy. Dryco, LLC v. ABM Indus., Inc., No. 07-C-0069, 2007 U.S. Dist. LEXIS 47656, at *6-7 (N.D. Ill. June 28, 2007). A forum is considered available "if all parties are amendable to process and are within the forum's jurisdiction." Kamel v. Hill-Rom, Co., Inc., 108 F.3d 799, 803 (7th Cir. 1997). A forum is adequate if the parties "will not be deprived of all remedies or treated unfairly" there and the burden of proving adequacy is with the defendant. Id.

Cannon contends that England is both an available and adequate forum for this litigation. Neither England's availability nor its adequacy, however, is entirely clear. MacNeil has objected to English jurisdiction.[5] See Ex. E. MacNeil never conceded that the English court had jurisdiction over it, and in fact challenged the English court's jurisdiction (MacNeil simply stopped defending the English lawsuit). MacNeil continues to assert that it is not subject to the jurisdiction of the English court. Regardless if MacNeil is correct, Cannon has made *no attempt* to argue that MacNeil was subject to the process and jurisdiction of the English court. By failing to address this issue, Cannon has waived this argument as MacNeil has had no chance to hear Cannon's arguments and address the same with its experts on English law.[6] Therefore, the availability of the English forum has not been established. On this basis alone, Cannon's motion should be denied.

However, were the Court to find that the English forum was available, the adequacy of said forum is also uncertain. MacNeil is aware of the case law in this court stating that England is usually an adequate forum, and that it is likely that this Court would also find it an adequate forum according to said precedent. MacNeil respectfully submits that while it is uncertain what causes of action and remedies would be available to MacNeil in England, it is a certainty that MacNeil would lose its fundamental right to a jury trial and certain potential causes of action. See Ex. A, ex. 7. MacNeil submits that these facts should be considered in the overall analysis of whether or not it would be proper to force MacNeil to litigate its case in England.

### 3. Public Interest Factors

In determining whether the public interest factors favor dismissal of a plaintiff's case the court must analyze (1) the administrative difficulties flowing from court congestion; (2) the

---

[5] In contrast, Cannon admitted in its Colorado River doctrine motion that it was likely that this Court and the English court had jurisdiction over it.

[6] "[I]t is axiomatic that arguments raised for the first time in a reply brief are waived." Local 710 I.B.T. Pension Fund v. United Parcel Service, Inc., No. 02-C-4420, 2003 U.S. Dist. LEXIS 19457, at *6 n.2 (N.D. Ill. Oct. 28, 2003).

"local interest in having localized controversies decided at home"; (3) avoidance of unnecessary problems in conflicts of laws, or in the application of foreign law, and the preference for having a forum apply law with which it is familiar; and (4) the unfairness of burdening citizens in an unrelated forum with jury duty. Philiotis, at *10. On balance, these factors are either neutral or weigh in favor of MacNeil.

### a. Court Congestion

Cannon asserts that "this court's docket already is crowded with an abundance of cases" and therefore "there is no need to burden the court with this lawsuit which has only a tenuous connection to the U.S." Mot. at 13. To simply state that there are a lot of cases filed in the Northern District of Illinois really says nothing at all. This very Court made this point:

> [Movant] asserts that the Northern District of Illinois has a more congested docket than Ontario, although it has not provided evidence regarding the comparative congestion of this court and the Ontario forum. Accordingly, the court will not weigh this factor in [movant's] favor.

Philiotis, at *10. As this Court stated, the relevant inquiry is the level of crowding between the Northern District of Illinois and its counterpart in England. Cannon offers no evidence that would suggest that London courts are less crowded than Chicago courts. Consequently, Cannon has waived its argument on this point as MacNeil has not had the chance to meet any arguments Cannon would make with its own English law experts. In any event, even if the courts of this forum are more congested than the courts of England, they are not so congested as to make litigation here "unjust, vexatious or oppressive," which is the standard Cannon must meet. Due to Cannon's failure to make the proper argument, this factor should be given no weight.

### b. Local Interests

Cannon contends that "the U.K.'s interest in the resolution of this lawsuit significantly outweighs any local interest that might exist." Mot. at 12. As support for this statement, Cannon argues that "[t]his dispute involves a UK Corporation, a UK-centered supply relationship, and processes and events occurring in the UK that purportedly give rise to defective product complaint allegations." Id. Putting aside the obvious flaws with these assertions, Cannon also fails to point out that this dispute involves an Illinois corporation that received defective product in Illinois, that it paid for from Illinois, and which was intended to be supplied to end users in Illinois and other states which could and did lead to warranty and other claims in the United States. Indeed, on many occasions Cannon would ship this product directly to MacNeil's

Downers Grove location, at which time MacNeil would take possession of the goods. On many occasions, Cannon employees visited MacNeil's facility in Downers Grove to discuss the defective mat issues. These facts make it clear that the parties' distributor relationship was equally Illinois-centered, if not more so, than U.K.-centered. See P.H. Int'l Trading Co. v. Confezioni S.p.A., No. 04-C-0903, 2005 U.S. Dist. LEXIS 22138, at *18-19 (N.D. Ill. Sept. 29, 2005) (denying *forum non conveniens* motion to dismiss and finding "the relationship between the Parties was as much centered in the United States as in Italy given Plaintiff's marketing and distribution of [the foreign] products throughout North America. The Parties' dispute is localized in that the Plaintiff conducts business from its facilities in Glencoe, Illinois.") Consequently, any local interest that an English court might have in this action is more than offset by the local interest this Court has in seeing that an Illinois corporation recoups monies paid to a foreign corporation for defective product distributed in Illinois and the United States, and is compensated for the damages it has suffered as a result of this defective product. This factor weighs in favor of MacNeil.

   **c.**  **Conflict of Laws**

Cannon correctly points out that no agreement, written or oral, specifies the parties' choice of law. Mot. at 10. Cannon then argues that English, rather than Illinois law applies. Id. This is incorrect. MacNeil already has addressed this argument in detail in its response to Cannon's prior motion to dismiss. See Ex. A at 13-14. However, it is likely that Illinois law governs the parties dealings. Illinois applies the "significant contacts" test to determine which law should apply. Wildey v. Springs, 47 F.3d 1475, 1481-83 (7th Cir. 1995). For a contract action, for example, the court considers five factors: the place of contracting; negotiation; performance; location of the subject matter of the contract; and the domicile, residence, place of incorporation, and business of the parties. Id. The parties' initial contract was negotiated and formed in Chicago; Cannon has made no attempt to rebut Mr. MacNeil's affidavit stating that fact. During the parties' relationship, many times the product was shipped directly to MacNeil's facilities in Chicago, thus performance was accomplished in Chicago. MacNeil is domiciled in this forum and distributes Cannon's product to American consumers. The only connection that this dispute has to the United Kingdom is that is where Cannon is located and MacNeil conducted business with Cannon.

Even if Cannon was correct about the application of English law, the potential need to apply foreign law "is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate." Philiotis, at *11. This is especially true where, as here, the causes of action are similar under Illinois and English law. It would not be difficult or burdensome for this Court to determine the elements of a claim for breach of contract or for breach of express and implied warranties.[7] This factor weighs in favor of MacNeil.

### d.    The Burden of Jury Duty

The final factor of the public interest analysis requires a court to determine if it would be unfair to burden "citizens in an unrelated forum with jury duty." Philiotis, supra, at *10. (emphasis added). This is not an "unrelated forum." There are strong local interests involved in this litigation as was demonstrated above, given that a significant portion of the events giving rise to MacNeil's suit occurred in Illinois and that the defective product was destined for Illinois and American consumers. This factor weighs in MacNeil's favor.

In sum, the public interest factors weigh in favor of denying Cannon's motion.

### 4.    Private Interest Factors

The final prong of a *forum non conveniens* analysis requires the court to weigh the "private interest" factors involved in the litigation. The private interest factors include: (1) the relative ease of access to sources of proof; (2) the ability to compel unwilling witnesses to attend and the cost of procuring the attendance of willing witnesses; (3) the possibility of viewing the premises involved in the suit, if relevant; and (4) all other practical problems that make a trial of a case easy, expeditions and inexpensive. Berndorf Belt Systems, Inc., at *32. Cannon contends that these factors "heavily" favor dismissal, as if use of that word will sway the Court. A proper analysis of the private interest factors, however, leads to the opposite conclusion.

Cannon argues that virtually all of the evidence relevant to MacNeil's claims – Cannon's manufacturing equipment, tooling and production lines – resides in England. Yet Cannon fails to explain how or why these items of evidence will be relevant at trial. MacNeil does not allege in

---

[7]    Cannon is not sure which way it wants to come down on this point, so it argues both sides. On the one hand Cannon argues that "[g]iven the common law nature of MacNeil's causes of action, this action does not involve application of legal rights or principles unique to the U.S. Federal Courts." Mot. at 13 n.10. On the other hand, Cannon claims that "application of UK law in this Court may require the assistance of experts, the time and expense of which also renders the UK the more appropriate forum." Mot. at 11 n.7. Rather than argue both sides to its advantage, Cannon should simply concede the obvious point; this Court will have no difficulty applying English law if it needs to since the elements of MacNeil's common law claims are basically identical under Illinois and English law.

its Complaint that Cannon's manufacturing equipment or tooling was defective, or that its designs were improper.  MacNeil simply alleges that the carpet on the composite mats that Cannon manufactured for MacNeil did not adhere to the rubber, among other defects.  In other words, MacNeil's claim is simply that Cannon's mats are defective.  Surely, Cannon is not suggesting that it intends to bring its entire manufacturing line into the courtroom.  This is the only "tangible" evidence located in England, the rest is documentary.[8]

Regardless, even assuming evidence regarding the manufacturing line is relevant, the precedent of this court is clear that, "the court can view pictures and video through the powers of modern technology.  As we doubt that the Italian court would take a field trip to [the premises]…, we assume that any photographs or other pictures can easily be viewed in Illinois as in Italy."  Santora v. Starwood Hotel and Resorts Worldwide, Inc., No. 05-C-6391, 2006 U.S. Dist. LEXIS 34080, at *7 (N.D. Ill. May 15, 2006).  Indeed, this Court is as capable as an English court to review pictures and hear testimony regarding the same.  In contrast, the "tangible" evidence that is likely to be brought into the courtroom is all located in Illinois.  To be sure, the very best evidence that Cannon sold MacNeil shoddy mats is the shoddy mats themselves.  Presenting the mats themselves will be far more economical and convenient in Illinois than in England since MacNeil has stored at least one thousand pounds of defective mats at its facility in Downer's Grove.  Getting some or all of them to this Court will be simple compared to shipping them back and forth to the U.K. and MacNeil would not want to take the chance that Cannon could argue that they were damaged during the shipping process, in light of the far-fetched arguments it resorts to in its pleadings before this Court.

It also is clear that the factor of witness convenience weighs in MacNeil's favor.  MacNeil's employee-witnesses are located in this forum and Cannon's employee-witnesses are located in England.  This factor is usually accorded little weight however because as a practical

---

[8]  As to documentation, MacNeil has voluminous records in this forum relating to MacNeil and Hyundai warranty claims, substantial correspondence with both Hyundai and BMW, numerous inspection reports, documentation regarding product rejects, quality checklists and protocols, purchase orders and correspondence between Cannon and MacNeil, and hundreds, if not thousands of photographs documenting the defective Cannon mats.  MacNeil assures the Court that it has much more documentation than Cannon regarding these defect issues since MacNeil was forced to deal with these defects, when Cannon simply ignored the issue and looked the other way.  Most important, however, is that the third-parties – BMW and Hyundai – undoubtedly have extensive documentation regarding the defective mats from Cannon and related quality control issues, as they, like MacNeil, were forced to deal with these defects.

matter it is assumed that witnesses within the control of the parties will appear voluntarily. Kittinger v. Temple Bay Lodge, No. 04-C-5516, 2006 U.S. Dist. LEXIS 3077, at *7-8 (N.D. Ill. Jan. 25, 2006). And despite Cannon's vague references to additional employees, which it does not list, merely piling on to the number of employee-witnesses does not change the equation. Id. Thus, "more attention should be given to the location of the non-party witnesses…" Id. at *8. At this time, MacNeil anticipates calling at least three third-party witnesses, all of whom reside in the United States. Ex. A, ex. 5 at ¶ 6. These third-party witnesses are central to MacNeil's claims. They are the very witnesses who dealt with the defect issues, and will offer testimony as to the systemic nature of Cannon's defects, among other facts. Most important, these witnesses are fundamental to MacNeil's claims of lost profits, as MacNeil lost business with these customers due to Cannon's constant quality problems. Litigation in Chicago would be much more convenient for these third-party witnesses than litigation in England.

Finally, the expense and difficulty of litigating in England weighs in MacNeil's favor. The prevailing exchange rate means that it is twice as expensive for MacNeil to litigate in England. Conversely, it is half as expensive for Cannon to litigate here. This is the very reason MacNeil stopped defending the English suit, the cost considerations did not make sense. Further, Cannon's floor mat business is much larger than MacNeil's floor mat business. It would not unduly burden Cannon to pay half-price for an American lawyer. Moreover, Cannon's incredible and repeated assertion that: "if MacNeil truly believed in its claims, it should jump at the chance to litigate in the UK because it might be able to recoup in that jurisdiction the cost of prosecuting its action" must be highlighted. Mot. at 15. Does Cannon really believe that this Court is not aware that recovery of half one's costs, let alone full recovery, is rarely ever achieved in complex civil litigation – even when one is entitled to recovery of fees? This "point" needs no response and accurately sums up the nature of Cannon's motion.

In sum, the private interest factors weigh in favor of denying Cannon's motion.

### V.     CONCLUSION

It is not unjust, vexatious or oppressive for Cannon to litigate this case before this Court. Cannon has failed to meet its heavy burden to overcome the strong presumption that MacNeil is entitled to proceed in its home forum. For the foregoing reasons, MacNeil respectfully requests that the Court deny Cannon's motion to dismiss on grounds of *forum non conveniens*.

-16-

Respectfully submitted,

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**

Dated: April 21, 2008      By:    /s/ Robert S. Grabemann
                                                     One of Its Attorneys

Robert S. Grabemann
Timothy M. Schaum
DASPIN & AUMENT, LLP
227 West Monroe Street
Suite 3500
Chicago, Illinois 60606
(312) 258-1600

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing MACNEIL'S MEMORANDUM IN OPPOSITION TO CANNON'S MOTION TO DISMISS PURSUANT TO *FORUM NON CONVENIENS* via electronic filing, on or about the 21th day of April, 2008 on:

| | |
|---|---|
| William N. Howard<br>John T. Shapiro<br>Terrence J. Sheahan<br>Suzanne M. Rose<br>Freeborn & Peters LLP<br>311 South Wacker Drive<br>Suite 3000<br>Chicago, Illinois 60606<br>(312) 360-6000<br>(312) 360-6520 | |

                    /s/   Robert S. Grabemann
                              Robert S. Grabemann