## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | **No.  08 C 139** |
| **v.** | ) ) ) | **Hon. Joan B. Gottschall** |
| **CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company,** | ) ) ) ) ) | **Magistrate Arlander Keys** |
| **Defendant.** | ) ) | **JURY TRIAL DEMANDED** |

### Exhibit Index

Exhibit A……………………………Response to <u>Colorado River</u> doctrine motion, with exhibits

Exhibit B……………………………………………………………6/8/06 email from Bob Peacock

Exhibit C…………………………11/06 email exchange between David MacNeil and Bob Peacock

Exhibit D…………………………………………………………Cannon Avent Group PLC document

Exhibit E……………………………………...MacNeil's objection to English court's jurisdiction

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No.  08 C 139 |
| v. | ) ) ) | Hon. Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Magistrate Arlander Keys |
| Defendant. | ) | JURY TRIAL DEMANDED |

MACNEIL'S RESPONSE TO CANNON'S
MOTION TO DISMISS OR STAY PROCEEDINGS

Plaintiff MacNeil Automotive Products Limited ("MacNeil"), by its undersigned

attorneys, hereby responds to and opposes Cannon Automotive Limited's ("Cannon") motion to

dismiss or stay proceedings.

## INTRODUCTION

The litigation in England, for all practical purposes, is now over.  MacNeil has

informed Cannon and the English court that it will no longer defend against Cannon's invoice

claims in the United Kingdom.  MacNeil also has filed a motion to withdraw its antisuit motion

before this Court.  Consequently, Cannon's motion to stay or dismiss has been rendered moot

and should be denied in its entirety.  Moreover, even if the litigation in England was still

pending, Cannon's motion to dismiss or stay this litigation should be denied on its merits as,

under the applicable facts and law, MacNeil is entitled to proceed on its claims before this Court.

MacNeil respectfully requests that the Court deny Cannon's motion to dismiss or stay.

## ARGUMENT

Instead of focusing on the legal analysis relevant to its motion, Cannon spends the first 8 pages of its one-and-a-half spaced brief arguing the merits of the case. Such a discussion is entirely inappropriate at this stage of the litigation. Nonetheless, in the sections that follow, MacNeil will refute many of the factual misrepresentations that Cannon purports to rely on to support its motion. In any event, Cannon's motion is now moot because the litigation, for all practical purposes, has concluded in England. Consequently, on this point alone, Cannon's motion to dismiss or stay this action based on the pendency of the English action should be denied.

However, assuming *arguendo* that Cannon had a reason to continue pursuing its motion to a full consideration on the merits, it still should be denied in its entirety. First, the Illinois action and English action are not parallel. The English action by Cannon is simply an invoice claim that does not cover the defective mats that are at issue in the Illinois litigation. In other words, the English action is merely an account stated claim covering a different grouping of mats. In contrast, MacNeil's Illinois lawsuit seeks damages for certain other defective mats provided by Cannon, a declaratory judgment that Cannon is liable for any damages resulting from the defects, and damages suffered by MacNeil – such as lost profits and harm to business reputation – due to Cannon's supply of defective mats.

Despite Cannon's mischaracterizations, MacNeil's claims are not "defenses" to Cannon's English lawsuit. To the contrary, MacNeil's claims are *offensive* and separate and distinct from the claims that Cannon brought in England. Moreover, in this forum MacNeil has a claim for conversion of its tooling that is entirely unrelated to Cannon's supply of defective mats and the English proceeding. The conversion claim alone requires a finding that the English and

Illinois actions are not parallel. Furthermore, the legal presumptions and the ten factors relevant to an analysis under the *Colorado River* doctrine – when viewed in the appropriate factual light – weigh heavily in favor of exercising jurisdiction over MacNeil's claims. Thus, even under a consideration of Cannon's motion on the merits, the Court should deny Cannon's motion to dismiss or stay the instant lawsuit.

## I.     Legal standards for a *Colorado River* doctrine motion to dismiss or stay

The only basis on which Cannon brings the instant motion is founded upon the *Colorado River* doctrine.[1]  However, the full legal standard, such as the burden of proof and certain presumptions applicable to a motion to stay or dismiss under the *Colorado River* doctrine in this Circuit, are noticeably missing from the *movant's* papers.  In any event, *Colorado River* permits a district court, under exceptional circumstances, to abstain from hearing a suit and await the outcome of parallel proceedings as a matter of wise judicial administration.  Of course, a requisite element of applying this doctrine *requires* that a parallel proceeding is pending.  As explained in detail below, the proceeding in England, for all practical purposes, has ended.  On this basis alone Cannon's motion should be denied in its entirety by this Court as moot.

"Federal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred on them by Congress." AAR Int'l, Inc. v. Nimelias Enterprises S.A., 250 F.3d 510, 517 (7th Cir. 2001) (citation omitted).  "A federal court cannot lightly abjure its responsibility to assert jurisdiction." Lumen Construction, Inc. v. Brant Construction Co. Inc., 780 F.2d 691, 694 (7th Cir. 1985).  Under "limited" and "exceptional" circumstances, a federal district court may stay or dismiss an action when there is an ongoing parallel action in state court. Colorado River

---

[1]     If Cannon had any other bases to support its motion (such as *forum non conveniens*), then it was required to raise said arguments in its opening brief.  Therefore, any additional arguments – apart from those based on the *Colorado River* doctrine – have been waived. See Local 710 I.B.T. Pension Fund v. United Parcel Service, Inc., No. 02-C-4420, 2003 U.S. Dist. LEXIS 19457, at *6 n.2 (N.D. Ill. Oct. 28, 2003) ("it is axiomatic that arguments raised for the first time in a reply brief are waived.").

Water Conservation District v. United States, 424 U.S. 800, 818 (1976). "[I]f there is any substantial doubt that the parallel litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to parallel litigation." AAR Int'l, 250 F.3d at 518.

The court's task is "not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26 (1983) (emphasis in original). Indeed, in light of this authority the Seventh Circuit has recognized a general presumption against the abstention that Cannon advocates here. AXA Corp. Solutions v. Underwriters Reinsurance Corp., 347 F.3d 272, 278 (7th Cir. 2003).

**II.    Cannon's motion to dismiss or stay is now moot and should be denied in its entirety.**

Apparently concerned about its likelihood of success with regard to the instant motion, Cannon took a second bite at the apple and filed its own antisuit motion before the English court on February 18, 2008. See Ex. 1. At a scheduling hearing on February 28th, the English court expressed concern that MacNeil had filed a motion for antisuit and scheduled the hearing for determining Cannon's English antisuit motion for March 13th. In the interim, MacNeil decided that it did not make economic sense to defend against Cannon's claim on the unpaid invoices. This decision was hastened by the extremely high cost of litigation in the United Kingdom (especially given the current exchange rate) compared to the amount being sought on Cannon's invoice claims. Consequently, MacNeil informed Cannon and the English

court that it will no longer defend against Cannon's invoice claims in the English court. <u>See</u> Exs. 2 and 3.

Here, Cannon moved to dismiss or stay this lawsuit "pending resolution of Cannon's first-filed UK (sic) lawsuit." However, as a result of MacNeil's actions discussed above, Cannon's first-filed U.K. action now has been resolved. <u>See</u> Ex. 4, Affidavit of Kent Phillips at ¶¶ 5-6. MacNeil will no longer defend Cannon's invoice claims in England. Thus, the purpose of Cannon's instant motion to dismiss or stay has been rendered moot. Moreover, MacNeil's actions clearly refute the main points of Cannon's instant motion, to wit, this lawsuit is merely a procedural maneuver and that MacNeil's action on the merits of its claims is weak. In any event, there is no longer a parallel proceeding pending. Therefore, Cannon's motion is now moot and should be denied in its entirety.

**III.    <u>The Illinois lawsuit and the English action are not parallel.</u>**

For a stay or dismissal under the *Colorado River* doctrine to be appropriate, the actions must be parallel. Actions are parallel if "substantially the same parties are litigating substantially the same issues simultaneously in two fora." <u>Schneider Nat'l Carriers, Inc. v. Carr</u>, 903 F.2d 1285, 1287 (7th Cir. 1988). However, "any doubt regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction..." <u>Eisenmann Corp. v. Tek-Mor, Inc.</u>, No. 03-C-4375, 2004 U.S. Dist. LEXIS 1517, at *12-13 (N.D. Ill. Feb. 4, 2004). "If the two cases are not parallel, the *Colorado River* doctrine does not apply." <u>TruServ Corp. v. Flegles, Inc.</u>, 419 F.3d 584, 592 (7th Cir. 2005).

Surprisingly, Cannon devotes only two short paragraphs on this crucial issue. Here, it is true that the parties are identical in the English and Illinois action. However, the issues in the two actions are nowhere near the same. Resolution of Cannon's claim for unpaid

invoices in England in no way will resolve MacNeil's claims in Illinois based on the supply of a different grouping of defective mats. The parties' claims involve entirely different sets of mats. Knowing this, Cannon takes the following statement entirely out of context from MacNeil's motion to enjoin – "both sets of litigation will involve many of the same facts and issues" – and argues that "MacNeil may not avoid that admission now." Mot. at 9.

Of course, Cannon fails to mention that in the same paragraph MacNeil argues that Illinois is the proper forum because it recognizes Cannon's account stated cause of action, whereas England does not appear to recognize many of the claims MacNeil asserts against Cannon in MacNeil's Illinois lawsuit. Moreover, Cannon fails to inform the Court that MacNeil was simply pointing out that the same witnesses that would likely be involved in Cannon's English action would likely also be involved in MacNeil's lawsuit pending in Illinois, and it would be much more convenient to proceed entirely in Illinois on both MacNeil's and Cannon's claims.

Further, even if MacNeil could bring all of its claims as a counterclaim in the English court, as Cannon states, this does not mean that the actions are parallel. Indeed, "[n]o authority ... suggests that a federal action is parallel to a state or foreign action for *Colorado River* abstention purposes when the claim upon which the federal action is based is pleadable as a compulsory counterclaim in the other action." AAR Int'l, 250 F.3d at 522 (explaining and *rejecting* the argument that the actions were parallel because the action in federal court would be a compulsory counterclaim in the foreign action that would be "'disposed of' one way or another ... [because] it would either be asserted as a counterclaim in the foreign action and decided there, or lost if not asserted before the conclusion of the foreign action. Either way, the conclusion of

the foreign action would leave nothing left for the federal court to decide."); see also TruServ, 419 F.3d at 592-93 (same).

Cannon, citing MacNeil's second count for declaratory judgment, also argues that: "each cause of action that MacNeil asserts against Cannon serves as MacNeil's defense to Cannon's UK (sic) claim." Mot. at 9. With all due respect, this assertion is simply preposterous. MacNeil's claims, apart from its declaratory judgment claim, serve as no defense to Cannon's invoice claim. To the contrary, MacNeil seeks the damages it incurred with regard to Cannon's supply of defective mats – a group of mats entirely different than those concerning Cannon's English lawsuit – and MacNeil seeks damages in the million dollar amount, for its costs, harm to business reputation, lost profits, etc. To argue that the claims MacNeil asserts merely serve as a defense to Cannon's English lawsuit is disingenuous at best. Moreover, Cannon has yet to address the question regarding how MacNeil's claim for conversion would be a defense to Cannon's account stated claim. Clearly, it is not.

Finally, apart from the separate and distinct claims involving a different grouping of defective mats, MacNeil's federal action has an entirely separate cause of action that has nothing to do with floor mats – its count for the conversion of its tooling. This fact alone requires the denial of Cannon's motion. Indeed, "[b]ecause [a] federal action contained claims independent of the state action, the court could not find that litigation in a foreign court would resolve all claims in the federal action." Comtel Technologies Inc. v. Schwendener, Inc., No. 04-C-3879, 2005 U.S. Dist. LEXIS 8370, at *48 (N.D. Ill. Feb. 22, 2005) (holding federal and foreign action were not parallel) (citation omitted). Consequently, because the Illinois and English actions clearly are not parallel, the Court should deny Cannon's motion to stay or dismiss this litigation.

**IV.     The *Colorado River* factors weigh heavily in favor of denying Cannon's motion.**

MacNeil strongly argues that the two actions are not parallel and that fact alone should end the inquiry. However, even if the Court determines that an analysis of the *Colorado River* factors is necessary, these factors favor MacNeil. If Cannon's brief is to be believed, then it may be the first time in the history of the *Colorado River* doctrine that *every* factor weighs in one side's favor. Cannon's "advocacy" notwithstanding, an objective view of the facts – as they truly are – make it clear that the Court should exercise its jurisdiction here. Further, unlike Cannon, MacNeil will not address the merits in great detail.[2] However, MacNeil will respond where appropriate to Cannon's factual misrepresentations with regard to applying the *Colorado River* factors. Under the *Colorado River* doctrine, ten factors (not nine) may be considered in deciding whether the circumstances are exceptional enough to support a stay:

> 1) whether the state has assumed jurisdiction over the property; 2) the inconvenience of the federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the order in which jurisdiction was obtained by the concurrent forums; 5) the source of governing law, state or federal; 6) the adequacy of state-court action to protect the federal plaintiff's rights; 7) the relative progress of state and federal proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the availability of removal; and 10) the vexatious or contrived nature of the federal claim.

Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc., 962 F.2d 698, 700 (7th Cir. 1992). Each relevant factor is addressed below. Before one considers each relevant factor, however, it is important to note that in this Circuit – as with the presumption in favor of exercising jurisdiction – the "balance is heavily weighted in favor of the exercise of federal jurisdiction." Schneider, 903 F.2d at 1157-58.

---

[2]     For the most part, MacNeil refers the Court to its Complaint, which must be accepted as true at this stage of the litigation, regarding the merits of its claims.

### A.    Jurisdiction over person and property.

Cannon is correct in its assertion that the English court has in rem jurisdiction over the property wrongly held by Cannon at its location in London.  However, as Cannon has conceded in its motion, this Court has personal jurisdiction over Cannon and can easily compel Cannon to return MacNeil's tooling or reimburse MacNeil for the same.  Mot. at 14.  This factor therefore is likely neutral.

### B.    Litigation in England would be more inconvenient than in Illinois.

Again, there is no longer any litigation pending in England, so it is difficult to see how that litigation would be more convenient.  Moreover, for some inexplicable reason, Cannon states:  "MacNeil has destroyed the only physical evidence located in the U.S. important to its claim – the very mats it claims defective."  Mot. at 10.  Indeed, Cannon apparently feels this "fact" is so important that they place it in bold and italics in another section of their motion. Mot. at 2.  However, despite Cannon's assertions that MacNeil destroyed all of the defective mats, this could not be further from the truth.  *MacNeil has approximately 1,000 lbs of defective Cannon mats at its locations in Downers Grove, Illinois.*  See Ex. 5, Declaration of Allan Thom at ¶ 8.

This should be of no surprise to Cannon, as Mr. MacNeil informed Mr. Peacock of this very fact at the parties' last meeting in Chicago on October 9, 2007 when he told Mr. Peacock that MacNeil had hundreds of sets of the defective mats and asked Mr. Peacock directly if he would like to go review all of the defective Cannon mats.  Mr. Peacock declined this offer. See Ex. 6, Declaration of David MacNeil at ¶ 9.  Even more confusing about this claim that MacNeil destroyed all the evidence is that David MacNeil showed Mr. Peacock at least three to five samples of the defective mats at this very meeting.  Id.  It is true that MacNeil destroyed

more than 200 pallets of defective Cannon floor mats, but that was only after MacNeil had repeatedly requested that Cannon visit Chicago, not only to review the defective mats for themselves, but to help with the destruction process. Id. at ¶ 7. After all, MacNeil could not store these defective mats indefinitely. Not once did Cannon accept MacNeil's numerous invitations to visit Chicago to discuss and review the situation. Id.

Moreover, aside from the high number of defective mats here in Chicago, MacNeil has voluminous other evidence, such as extensive documentation relating to both the MacNeil and Hyundai warranty claims, substantial correspondence with both Hyundai and BMW, numerous inspection reports, documentation regarding product rejects, quality checklists and protocols, purchase orders and correspondence between MacNeil and Cannon, and hundreds if not thousands of photographs documenting the defective Cannon mats for both Hyundai and BMW. Ex. 5 at ¶ 7. Additionally, it is assured that BMW and Hyundai have extensive documentation regarding the defective mats from Cannon and quality control issues related to these defects. These documents are also located here in the United States, and perhaps Korea.

The number of witnesses factor weighs in MacNeil's favor as well. MacNeil would likely call the following witnesses on its behalf: David F. MacNeil (CEO of MacNeil), Allan Thom (V.P. of MacNeil), Mike Bishop, Del Hollingsworth, Roger Conner, Jason Houcek, Dan Burton and Paul Mound. Ex. 5 at ¶ 5. All of these individuals have detailed knowledge of some, if not all, of the facts of this case and all are located here in Illinois or the United States. Thus, at the very least, the parties would be equally burdened by litigating in a foreign forum. Most important, however, is that the third-party witnesses from Hyundai and BMW,[3] whom are all located in the United States, would be seriously inconvenienced if forced to testify in

---

[3] At this time, MacNeil anticipates it would call as witnesses George Kurth from Hyundai and Dan Cordes and Michael Barret from BMW. Ex. 5 at ¶ 6.

England.  Cannon attempts to downplay this fact by referring to them simply as "end-user" witnesses.  However, these witnesses are anything but.  To the contrary, these witnesses are *central* to MacNeil's claims, such as for lost profits and harm to business reputation.  Moreover, these so-called "end-user" witnesses are the very people that also identified the systematic defects in Cannon's mats and brought the same to MacNeil's attention.  Ex. 5 at ¶ 6.  These witnesses are vital to key issues in this case.  Thus, the location of the witnesses, party and third-party, weighs heavily in MacNeil's favor.

Finally, MacNeil must address Cannon's "assertions" that it never imagined it would be subject to litigation in the United States.  In no less than three places, Cannon makes the following statements:

> Cannon understood from the beginning of the relationship that any disputes between the parties requiring court intervention would be resolved in the UK, under UK law...  *MacNeil never stated or suggested anything to the contrary*.
>
> \*     \*     \*
>
> *Nor did MacNeil indicate at the October 9 meeting* or at any other time before this litigation is (sic) purported position that the parties should resolve their disputes in the U.S. court system.
>
> \*     \*     \*
>
> [Mr. Peacock's] minutes reflect *no mention or suggestion that the parties litigate in the U.S.* even though Mr. Peacock informed MacNeil at the October 9 meeting (as reflected in the minutes) that Cannon would pursue full payment.

Mot. at 4; 6 (emphasis added).  To call these statements disingenuous would be putting it mildly.

At the October 9th meeting, when Mr. Peacock brought up the fact that Cannon would pursue payment of its invoices, Mr. MacNeil responded, discussing the possibility that Cannon would sue MacNeil in the United States, that if Cannon comes after MacNeil in a U.S.

court I will have damages for my reputation, my lost profits, lost business and my legal fees. Id. at ¶ 10. MacNeil also went on to inform Mr. Peacock that his employees would gladly testify in a U.S. court, and get in front of a judge or jury and testify about what happened with the Cannon defective product. This makes sense, because as a lay person, MacNeil would not have known (and did not know) that Cannon could sue MacNeil in the United Kingdom as MacNeil has no presence in England. Clearly, based on this conversation, Cannon was aware that it might face or would be expected to bring litigation in the United States; as MacNeil had suggested.

Considering all of the above facts, the convenience factor clearly weighs heavily in MacNeil's favor and against Cannon's motion to dismiss or stay.

### C.    There is no chance for piecemeal litigation.

As the action in England is effectively ended, there is no chance for piecemeal litigation. This factor weighs in MacNeil's favor and against Cannon's motion.

### D.    The two actions were filed close together.

No less than five times does Cannon cite Basic Fitzroy Eng'g, Ltd., 949 F. Supp. 1333, 1340 (N.D. Ill. 1996) for the exact same quote. However, despite Cannon's repeated chant of the "first-filed" mantra, the fact that Cannon raced to the courthouse first lacks any persuasive value. MacNeil first received notice of Cannon's claim in England when it was served with the same on December 20, 2007, right before the Christmas holiday. Approximately two weeks later, on January 7, 2008, MacNeil filed its Complaint in this Court. The closeness in time of the parties respective filings does not render this factor "meaningful." See Eisenmann, 2004 U.S. Dist. LEXIS 1517, at *14-15 (the court found that although the Canadian action was first-filed, it was filed only one month before the federal action, "which does not render this [Colorado River] factor particularly meaningful.").

If anything, Cannon's race to the courthouse is an attempt to do what it now also seeks to do with this motion, which is deprive MacNeil of its right to litigate its claims in Illinois. Cannon's tactical maneuvering becomes clear when one considers that Cannon did not follow the proper pre-action protocols applicable to filing its claim in England. See Ex. 4, Declaration of Kent Phillips at ¶ 16.   According to English procedure, before a party files a claim it is required to give the potential defendant clear notice that the plaintiff will file a legal action and inform the potential defendant of the possible consequences of such an action.  Cannon did none of this.   Therefore, at the very least this factor is likely neutral and, considering Cannon's litigation tactics, should weigh in MacNeil's favor if it is to be given any weight.

**E.      Illinois is the source of governing law.**

It is curious that Mr. Peacock considers himself competent to testify as to how the relationship between MacNeil and Cannon began, which started in 1989, considering that Mr. Peacock did not begin to work for Cannon until the mid-1990s.   Regardless, he is incorrect. Mot. at 3.   The terms of the contract were negotiated in Chicago and the initial contract formation between Cannon and MacNeil occurred in Chicago.   The parties initial contract negotiations and formation occurred as follows:

1)   David MacNeil saw Cannon's floor mats on a visit to Scotland;

2)   When Mr. MacNeil returned to Chicago, he called Cannon and spoke with a Mr. Henry Carlton, a senior representative of Cannon, about becoming Cannon's U.S. distributor;

3)   Mr. Carlton sent some samples of Cannon floor mats to Mr. MacNeil in Chicago;

4)   Mr. MacNeil then visited Cannon in England to discuss the matter further, and met with Cannon's senior representatives;

5)   Before Cannon could agree to use MacNeil as a distributor, Mr. Carlton flew to Chicago to review his business operation and references;

      6)    Mr. Carlton came to Chicago for approximately a week and it was at that time that the terms of MacNeil's first purchase of Cannon floor mats was negotiated and the contract between the two parties was formed.

See Ex. 6, Declaration of David MacNeil at ¶¶ 2-6. Cannon also fails to mention that on many occasions it shipped its floor mats directly to Chicago, where MacNeil first took possession of this product in Chicago. Almost every factor Cannon lists on page 4 of its motion has equal connections to Illinois as it does to the U.K. (e.g., MacNeil originated purchase orders in Illinois and sent them to Cannon in the U.K., Cannon responded and sent an acknowledgement to MacNeil in Illinois). Moreover, every time the parties met to discuss issues related to the defects MacNeil has filed its lawsuit on, Cannon representatives would visit MacNeil in Chicago. See Ex. 5 at ¶¶ 9-11. At no time did MacNeil representatives schedule a visit to Cannon in the U.K. related to these defects. If anything, the facts make it clear that this relationship, and the dispute at hand, is Illinois-centered, not U.K.-centered.

      Cannon is correct that no agreement specifies the parties' choice of law. However, although this issue may be for another day, Cannon is incorrect that English law would govern the parties dealings here. Under the "significant contacts" test employed by Illinois courts, it is clear that Illinois law governs the instant dispute. See Wildey v. Springs, 47 F.3d 1475, 1481-83 (7th Cir. 1995). This Court, not an English court, is better suited to hear a dispute governed by Illinois law. This factor weighs heavily in MacNeil's favor and against Cannon's motion to dismiss or stay.

**F.**    **MacNeil would lose substantial rights and remedies if forced to litigate in England.**

      As laid out in MacNeil's motion to enjoin, MacNeil likely would lose substantial remedies and rights if forced to litigate in England. Cannon disputes this, but it essentially

comes down to the dueling affidavits of the parties' solicitors. See Ex. 7. What is clear and undeniable, however, is that MacNeil would lose its fundamental right to a jury trial in England. Thus, this factor weighs in MacNeil's favor.

>    **G.    The proceedings in England are effectively over and there is no danger of inefficiency or inconsistent results from a concurrent jurisdiction.**

The litigation in England is effectively over and there is no danger of inefficiency or inconsistent results. These factors weigh in MacNeil's favor.

>    **I.    MacNeil's claims are neither vexatious nor contrived.**

Given MacNeil's recent actions, it is clear that MacNeil is confident in its claims and they are anything but vexatious or contrived. The fact that MacNeil did not run to the courthouse immediately on its claims is simply a reflection of an 18 year relationship with Cannon, and a desire to work the parties' disputes out amicably if possible, and has no bearing on the validity or strength of MacNeil's claims. Cannon's point on this issue has no merit.

*        *        *

Of the *Colorado River* factors that are still arguably applicable, all are neutral or weigh in MacNeil's favor. Given that the scale is already tipped in MacNeil's favor due to the presumption employed by the Seventh Circuit, it is clear that the Court should exercise its jurisdiction here.

<h2 align="center">CONCLUSION</h2>

WHEREFORE, for the foregoing reasons, MacNeil respectfully requests that the Court deny Cannon's motion to dismiss or stay in its entirety.

Respectfully submitted,

**MACNEIL AUTOMOTIVE PRODUCTS
LIMITED**

Dated:  March 12, 2008                    By:    _____ /s/ Robert S. Grabemann ____
                                                 One of Its Attorneys

Robert S. Grabemann
Timothy M. Schaum
DASPIN & AUMENT, LLP
227 West Monroe Street
Suite 3500
Chicago, Illinois 60606
(312) 258-1600

# EXHIBIT 1

# Application Notice

*IHG/08/0107*

<table>
<tr><td colspan="2">

**You should provide this information for listing the application**

1. How do you wish to have your application dealt with

   a) at a hearing?        [X]    } *complete all questions below*

   b) at a telephone conference?  [ ]   }

   c) without a hearing?       [ ]    *complete Qs 5 and 6 below*

2. Give a time estimate for the hearing/conference

   ———— (hours) ———— (mins)  *½ day – 1 day*

3. Is this agreed by all parties?    [ ] Yes   [X] No

4. Give dates of any trial period or fixed trial date _____

5. Level of judge   *Judge*

6. Parties to be served   *The Defendant*

</td></tr>
</table>

<table>
<tr><td colspan="2">In the High Court Of Justice<br><br>Queen's Bench Division<br>Royal Courts of Justice</td></tr>
<tr><td>Claim no.</td><td>HQ07X04142</td></tr>
<tr><td>Warrant no.<br>(if applicable)</td><td></td></tr>
<tr><td>Claimant<br>(including ref.)</td><td>Cannon Automotive Limited</td></tr>
<tr><td>Defendant(s)<br>(including ref.)</td><td>MacNeil Automotive Products Limited</td></tr>
<tr><td>Date</td><td>18 February 2008</td></tr>
</table>

**Note** You must complete Parts A and B, and Part C if applicable. Send any relevant fee and the completed application to the court with any draft order, witness statement or other evidence; and sufficient copies for service on each respondent.

## Part A

*1. Enter your full name, or name of solicitor*

(1) (We)   Manches LLP

(on behalf of)(the claimant)

*2. State clearly what order you are seeking and if possible attach a draft*

intend to apply for an order (a draft of which is attached) that

(1) the Defendant be restrained from taking any further steps in the action in the United States District Court for the Northern District Court of Illinois Eastern Division, the short title of which is <u>MacNeil Automotive Products Limited, an Illinois Corporation v Cannon Automotive Limited, f/k/a Cannon Rubber Limited, Automotive Division, a United Kingdom Company, No. 08 C 139</u> ("the US Action") until after judgment in any application which the Defendant may make under CPR Part 11 disputing the jurisdiction of this Court and/or the exercise by this Court of its jurisdiction or, in the event that no such application is made by the Defendant under CPR Part 11, until after judgment of the Claimant's application set out in paragraph 3 below for a permanent anti-suit injunction against the Defendant;

(2) that if pursuant to the application dated 29 January 2008 made by the Claimant, the Court sets aside the order made by Master Fontaine dated 21 January 2008, the Court give directions as to when any application by the Defendant under CPR Part 11 must be filed and served and, if so filed and served within that period, directions for the filing and serving of any further evidence and the hearing of that application and the application set out in paragraph (3) below;

(3) that if the Defendant is unsuccessful in relation to any application made under CPR Part 11, alternatively, if no such application is made by the Defendant within the time ordered by the Court, the Defendant be restrained from taking any further steps in the US Action;

(4) that the Defendant do pay the costs of and occasioned by this application

NOTICE OF HEARING:

AP.....ON WILL BE HEARD AT THE ROYAL COURTS OF JUSTICE, STRAND, LONDON WC2A 2LL ON:

DATE: _28 FEB 08_

TIME: _TBC_

IN A COURT TO BE CONFIRMED

The court office at   Strand, London, WC2A 2LL

is open from 10am to 4pm Monday to Friday. When corresponding with the court please address forms or letters to the Court Manager and quote the claim number.

N244 Application Notice (4.00)               © Crown Copyright        Laserform International 5/00

Claim No. HQ07X04142

3. Briefly set out why you are seeking the order. Include the material facts on which you rely, identifying any rule or statutory provision

(3) because

(1) it is for the English Court itself to decide whether it has jurisdiction in this action and whether to exercise that jurisdiction;

(2) in any event, England is the natural forum for the dispute between the parties to be tried;

(3) although this action was commenced first in this jurisdiction and although the normal procedure for a defendant who wishes to dispute the court's jurisdiction or the exercise by it of its jurisdiction is to make an application under CPR Part 11, the Defendant has, as part of a deliberate and blatant tactical manoeuvre, started proceedings in the United States and applied in that action for an anti-suit injunction against the Claimant to prevent the Claimant from pursuing this action and this Court from: (i) determining itself whether it is appropriate forum for this matter to be tried and (ii) from determining the dispute itself, although it is the natural forum;

(4) the action taken by the Defendant in commencing and seeking to continue with the US Action and applying for an anti-suit injunction in that action is vexatious and oppressive;

(5) the ends of justice will not be met if the US Action is allowed to proceed and/or if the English court is precluded from determining whether it should exercise jurisdiction in this matter.

## Part B

I (We) wish to rely on: *tick one box*

the attached witness statements    [X]    my statement of case    [ ]

4. If you are not already a party to the proceedings, you must provide an address for service of documents

evidence in Part C in support of my application    [ ]

| Signed | | Position or office held<br>(if signing on behalf of firm or company) | Partner |
|---|---|---|---|
| | (Applicant)('s Solicitor) | | |

(4) Address to which documents about this claim should be sent (including reference if appropriate)

| Manches LLP<br>Aldwych House<br>81 Aldwych<br>London | | if applicable | |
|---|---|---|---|
| | | fax no. | 020 7430 1133 |
| | | DX no. | DX 76   Chancery Lane |
| Tel. no. 020 7404 4433 | Postcode | WC2B 4RP | e-mail | |

## Part C

I (We) wish to rely on the following evidence in support of this application:

Claim No. HQ07X04142

## Statement of Truth

*(I believe) *(The applicant believes) that the facts stated in Part C are true

*delete as appropriate*

**Signed**

(Applicant)('s Solicitor)('s litigation friend)

**Position or office held**
(if signing on behalf of firm or company)

**Date**



# EXHIBIT 2

# WINSTON & STRAWN

## LONDON

99 GRESHAM STREET
LONDON EC2V 7NG

+44 (0)20 7105 0000

FACSIMILE +44 (0)20 7105 0100

www.winston.com

**BY FAX ONLY**

5 March 2008

Manches LLP
Aldwych House
81 Aldwych
London WC2B 4RP

*For the attention of: Richard Marshall*

Dear Sirs

**Cannon Automotive Limited v MacNeil Automotive Products Limited**
**High Court of Justice (Queen's Bench Division) - HQ07X04142**

We refer to the Applications listed to be heard on 13 March 2008.

As you are aware, the present position is as follows:

(i)     Your client has issued proceedings in England (the "English Proceedings"), while our client has issued proceedings in Illinois (the "US Proceedings");

(ii)    In the English Proceedings, your client claims for the payment of invoices. In the US Proceedings, our client claims damages for defective goods and brings a separate claim for the return of tooling machinery;

(iii)   On foot in the US Proceedings are two motions: our client's motion to enjoin the English Proceedings; and your client's motion to dismiss or stay. Filings will close on both motions on 2 April 2008;

(iv)    In the English Proceedings, our client is disputing jurisdiction, while your client is seeking an anti-suit injunction against the entire US Proceedings.

Our client is due to reply to your evidence filed in support of its application for an anti-suit injunction in England by this Friday, 7 March 2008. Needless to say, our client disputes many of the assertions made in your evidence in support. However, we do not propose to rehearse such arguments now, but to put forward proposals for disposing of this matter without the need to expend further costs.

| Zoë J. Ashcroft | Thomas J. Benz | Jamie Harrison | Laurette Petersen | Kent Phillips | Barry S. Vitou |
| *Solicitor, England & Wales* | *Attorney, New York* | *Solicitor, England & Wales* | *Attorney, Illinois* | *Solicitor, England & Wales* | *Solicitor, England & Wales* |

**WINSTON & STRAWN LLP**  Chicago • Geneva • Los Angeles • Moscow • New York • Paris • San Francisco • Washington, D.C.

A multinational partnership of Solicitors & Registered Foreign Lawyers, regulated by The Solicitors Regulation Authority of England & Wales.
LN:22003.1
Vat No. 815 5105 54

# WINSTON & STRAWN
## LONDON

Manches LLP
5 March 2008
Page 2

Our client hereby undertakes the following (subject to necessary and agreed wording alterations), and is content to give the undertakings to the English Court in appropriate form to this effect:

1.  MacNeil will no longer pursue its motion in the US Proceedings to enjoin the English Proceedings. MacNeil will withdraw the motion and/or will take all reasonable steps to have the US Court no longer determine the motion to enjoin;

2.  MacNeil will no longer dispute Cannon's claim in the UK proceedings, **either as to jurisdiction or substance.**

In light of the above, it will be for the US Court to determine whether it will hear MacNeil's claim brought before it. The English authorities, such as Hoffmann J's decision in Barclays Bank plc v Homan [1992] BCC 757 (cited with approval by Rix J in Simon Engineering v Butte Mining [1996] 1 Lloyd's Rep 104), make clear that it is for the foreign court to decide if it has jurisdiction over the claim brought before it. The US Court will no longer be interfering with the English Court's right to determine its jurisdiction over Cannon's claim.

Given the above, there can be no proper basis for your client to pursue its anti-suit injunction in England and we would invite you to withdraw it forthwith. In the event that you do not, we will offer such undertakings to the English Court on 13 March 2008 and will resist the application accordingly, seeking our costs of doing so.

Costs issues can no doubt be agreed or dealt with on 13 March 2008.

In offering the undertakings set out above, **our client reserves its rights to bring its claims in England in the event that your client's motion to dismiss/stay succeeds in the US.**

We look forward to hearing from you by return.

Yours faithfully

**Winston & Strawn**

LN:22003.3

# EXHIBIT 3

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

**CLAIM NO: HQ07X04142**

In the matter of an intended action

**BETWEEN**

**CANNON AUTOMOTIVE LIMITED**

**Intended Claimant**

and

**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**

**Intended Defendant**

---

**FIRST WITNESS STATEMENT OF**
**JAMIE EDWARD HARRISON**

---

I, **JAMIE EDWARD HARRISON**, of Winston & Strawn, 99 Gresham Street, London, EC2V 7NG, **WILL SAY AS FOLLOWS:-**

1.    I am a Solicitor of the Supreme Court of England and Wales, and a Partner in the firm of Winston & Strawn resident in the firm's London office. My firm acts for the Intended Defendant in this matter ("MacNeil"). I make this Witness Statement in response to the Third Witness Statement of Richard Gary Marshall ("Marshall 3[rd]") made on 18 February 2008 in support of the Claimant's application for (inter alia) Orders restraining MacNeil from taking further steps in the proceedings ("the Illinois proceedings") commenced in the United States District Court for the Northern District of Illinois ("Illinois Court").

2.    MacNeil also relies on the facts and matters contained in the two witness statements of Kent Phillips, another partner of Winston & Strawn, already filed in these proceedings:

2.1    Mr Phillips' First Statement (dated 21 January 2008) ("Phillips 1[st]") in support of MacNeil's application for an order granting an extension of time to file an

1

application that this Court has no jurisdiction (and for further orders under CPR 11) until 7 days after such time as the Illinois Court had determined MacNeil's Motion to Enjoin Cannon from continuing with these proceedings. Of its own volition the Court determined to dispose of this application without service of a copy of the Application Notice under CPR 23.9, and the orders sought were made by Master Fontaine on 21 January 2008; and

2.2     Mr Phillips' Second Statement (dated 15 February 2008) ("Phillips 2nd") in response to the Second Statement of Richard Marshall ("Marshall 2nd"), seeking to set aside the Order of Master Fontaine (dated 21 January 2008).

3.     To the extent that facts and matters set out in my witness statement are within my own knowledge, they are true. To the extent that I have relied upon information provided to me by others, it is true to the best of my information knowledge and belief. I have prepared this statement based on information provided to me following consultations between David MacNeil and Allan Thom of MacNeil via the firm Daspin & Aument LLP in Illinois, lawyers acting for MacNeil in the United States.

4.     There is now shown to me a bundle of documents paginated from pages 1 to 47 and marked "JEH1". References to page numbers in this statement are references to this bundle unless otherwise indicated.

**Procedural Issues**

5.     As set out in the various other statements in these proceedings, and as appears from the documents I exhibit to this statement:

5.1     The present proceedings ("the English Proceedings") were issued on 3 December 2007 and served on MacNeil in the United States on 20 December 2007. As amended, Cannon is seeking some £400,000 in total for unpaid invoices for the supply of car mats to MacNeil.

5.2     On 7 January 2008, MacNeil filed a complaint against Cannon in the Illinois Court ("the US Proceedings"), the nature of which I shall address further below.

5.3     On 8 January 2008, MacNeil filed a Motion before the Illinois Court to enjoin Cannon from pursuing the English Proceedings ("the Motion to Enjoin"). As I

explain further below, this motion has now been or will shortly be withdrawn.

5.4    On 20 February 2008, as it had indicated that it would on 24 January 2008, Cannon filed in the US Proceedings a motion to dismiss or stay the US Proceedings ("Cannon's Motion to Dismiss"). Pages 1 to 20 are a copy of that motion, together with the Memorandum in Support, without its exhibits.

5.5    I address the nature of Cannon's Motion to Dismiss further below, but in that motion, Cannon has invited the Illinois Court to decline jurisdiction on what can be conveniently described as *forum non conveniens* grounds. However, it should be noted that paragraph 8 on page 14 of the Memorandum in Support (page 18) accepts that: "*It would appear that both the UK and the U.S. Courts can obtain jurisdiction over the parties*". Thus, Cannon appears to accept that the Illinois Court has jurisdiction over the US Proceedings, but is presently inviting the US Court to decline to exercise that jurisdiction on forum grounds.

5.6    On 18 February 2008, Cannon issued the application presently before the Court, seeking an anti-suit injunction against MacNeil from taking any further steps in the US Proceedings.

5.7    In the US Proceedings, on 24 January 2008, the judge set a timetable for the two motions that were either before it, or had been indicated. This has been extended by agreement, but the present position is that the final filings (i.e. submissions) on the motions are to be completed by 2 April 2008. In particular, MacNeil's opposition to Cannon's Motion to Dismiss is to be filed on 12 March 2008, while Cannon's reply on its Motion to Dismiss is due to be filed on 2 April 2008.

5.8    As set out in paragraph 8 of Phillips 2nd, the Illinois Court has indicated that it is aware of the need for an urgent decision on the matters before it and the judge stated that she would put the matter on "*our special quick ruling list, because I do think you need a quick resolution*". It is therefore reasonable to assume that the Illinois Court will be ruling in the not too distant future upon the matters still before it, i.e. Cannon's Motion to Dismiss.

6.    Since Cannon issued its present application, the following important development has occurred. On 5 March 2008, my firm wrote to Cannon's solicitors (pages 21 and 22),

3

offering the following undertakings from MacNeil:

    6.1    To withdraw MacNeil's Motion to Enjoin.

    6.2    Not to defend the English Proceedings any further.

7.    I am informed by Mr Schaum of MacNeil's US lawyers that a motion to withdraw McNeil's' motion to enjoin has now been filed with the Illinois Court. A copy of that motion to withdraw is at pages 23 to 29.

8.    MacNeil has also undertaken in the letter of 5 March 2008 not to defend the English Proceedings further, either as to jurisdiction or substance. In other words, Cannon can now proceed to default judgment in the English Proceedings. MacNeil still disputes that England is the appropriate forum for the determination of its claim, but it is prepared to confine its argument to that effect to the Illinois Court, where it will continue to resist Cannon's Motion to Dismiss. Assuming that the Illinois Court rejects Cannon's Motion to Dismiss, MacNeil will then pursue its claim in the Illinois Court. However, as set out in the letter of 5 March 2008, if the Illinois Court grants Cannon's Motion to Dismiss, MacNeil reserves the right to bring its claim in the English Courts. Moreover, while MacNeil will not defend the English Proceedings, it obviously does not accept that the goods supplied were not defective. As I explain further below, MacNeil has never disputed the fact of the invoices or that the goods were supplied: its claim is that the goods supplied were defective.

9.    The result of the above is that:

    9.1    MacNeil is no longer pursuing its US application to enjoin the English Proceedings;

    9.2    The English Proceedings have effectively come to an end.

10.    In light of the above, the issue before the English Court on Cannon's anti-suit application is effectively whether the English Court should injunct MacNeil from pursuing a free standing claim in the Courts of Illinois. There can be no suggestion that MacNeil is in any way interfering with the English Proceedings, or that the English Proceedings are being affected in any way by the US Proceedings. Although it is a matter for legal submission, I believe that it is clear that there can be no basis upon which the English Court can injunct MacNeil from pursuing its claim in the US

Proceedings. It will be for the Illinois Court to determine whether it wishes to exercise its (accepted) jurisdiction over the dispute or to decline to do so on *forum non conveniens* grounds.

### The Nature of the US Proceedings

11.  I would refer the Court in this respect to the Complaint in the US Proceedings at pages 59 to 77 of KP1 (exhibit to Phillips 2nd). The claim has two essential elements:

11.1  A claim for substantial damages for the supply by Cannon of defective mats, together with a claim for a declaration that, as a result of those defects, MacNeil is not obliged to pay the invoices to which the English Proceedings relate, but Cannon is obliged to pay MacNeil substantial damages;

11.2  A claim for conversion of tooling machinery by Cannon.

12.  The basis for the first claim for supply of defective mats is set out in detail in the Complaint. I deal further below with the efforts of Mr Marshall, in Marshall 3rd, to suggest that these claims are without merit or grossly exaggerated. However, I would at this stage draw the Court's attention to the following matters:

12.1  Although there are various Counts (i.e. roughly the equivalent of causes of action) set out in paragraphs 38 and following of the Complaint, in each one of them MacNeil seeks the same remedy, namely damages for "lost profits, lost business opportunities, damage to its reputation, replacement of goods, and other such actual and consequential damages, in an amount not yet determined, but which are not less than $4 million". There is no plea for anything like exemplary or aggravated damages.

12.2  As is clear from Count II (page 70 of KP1), MacNeil does not dispute in the US Proceedings that the mats were supplied and have been invoiced for, which invoices are unpaid. What it claims in the US Proceedings is, to use English terminology, a right to set-off against those sums the damages it has suffered.

13.  Count VIII (page 77) deals with the second aspect of MacNeil's claim in the US Proceedings, which is a claim for conversion of tooling loaned to Cannon by MacNeil. As I explain further below, Cannon's apparent defence to this claim is the

5

surprising assertion that MacNeil gifted the relevant tooling to Cannon. However, the Court should note that this is an entirely separate claim. While it arises from the circumstances of the relationship between Cannon and MacNeil, there is a distinct and separate issue as to the basis upon which the tooling was provided to Cannon, which is, in effect, a free-standing claim that will have no bearing on the issues surrounding the mats.

## Marshall 3rd and the allegations relating to the merits of the US Proceedings

14.    A great deal of Marshall 3rd is devoted to analysing Cannon's view of the alleged merits of MacNeil's Complaint. Mr Marshall asserts that Cannon does not believe that MacNeil's claims are genuine; and that, *"At the very least, the claims have clearly been grossly exaggerated"* (paragraph 36). In paragraph 48(b) he asserts that Cannon believes that MacNeil's claims are *"not genuine or, at best have been vastly inflated" (paragraph 48(b))*.

15.    I do not propose to canvass the merits of MacNeil's claims in detail here, since I do not believe that this is appropriate for what is an interlocutory application. These will plainly be the issues to be determined in any trial, whether in the US, or in England. However, I am instructed that MacNeil and its US lawyers hotly dispute Mr Marshall's assertions, some of which are plainly wrong. Moreover, some of these incorrect assertions relate to matters which are of relevance to matters relating to the present application.

16.    First, there is ample support for MacNeil's allegations that the mats supplied were, over a long period, defective. (What follows is largely based upon my instructions from Mr Schaum, mentioned above.)

16.1    Marshall 1st itself refers to MacNeil's claims as to the defective mats.

16.2    As set out in the US Complaint, there were significant problems with the mats being supplied for Hyundai from the start. 87% of the first delivery of mats in August 2004 were found to be defective. MacNeil sent samples of the defective mats to Cannon and emailed pictures of the mats (see page 45 of RGM3 for email of 8 September 2004, the pictures being at pages 30 to 33 of JEH1). Mr Conway, Cannon's Managing Director, apologised by email of 9 September 2004, offering to pay for the return of the entire shipment (pages

29A and 29B).

16.3   In February 2005, another shipment contained mats of which 61% were defective, of which defects MacNeil informed Cannon on 10 February 2005. Cannon's Managing Director, Mr Conway, emailed Cannon staff stating that *"if this defect rate is correct, I want this programme stopped today...I do not want the late shift making any more of these mats if there is a problem with the tools of this magnitude. I am really not happy about the manner in which this whole programme has been run from start to finish both internally and with DM's team. I want a full autopsy on this project so that we can all learn from it."* (see pages 46 to 47 of RGM3).

16.4   I am informed that in mid-May 2005 (as set out in paragraph 15 of the US Complaint, which allegation Mr Marshall does not deny), Cannon's head of design and other members of its team, visited the US to discuss the rejects and the delays in supply, with Cannon promising to rectify the problems.

16.5   On 28 September 2005, Hyundai sent MacNeil a report detailing the various adhesion and other defects with the Cannon mats, which report included photos of the various problems with the mats (pages 34 to 36).

16.6   On 16 November 2006, Mr MacNeil emailed Cannon about the continuing problems with Hyundai, (see page 38 of RGM3). This email referred to a *"serious problem with Hyundai"* and the fact that MacNeil had had to credit Hyundai for 18,189 sets of defective mats.

16.7   The email exchange at pages 43 to 47 of RGM3 shows the extent of the problems over a longer period.

16.8   Contrary to the suggestion in Marshall 3rd, paragraph 26, Mr MacNeil's email of 16 November 2006 did not state that all of the defective mats had been destroyed. I am instructed that, while some were, MacNeil retains approximately 1,000 lbs of defective mats.

16.9   Cannon should be well aware of the fact that all the mats have not been destroyed. Equally, Mr Marshall, is wrong to assert that MacNeil gave Cannon no opportunity to inspect the mats before they were destroyed. I

7

would refer in this respect to page 45 of RGM3. In this email of 1 December 2006, Mr MacNeil stated, amongst other things:

> "*We invited Mr Peacock to accompany us to visit Hyundai, help us find a solution, inspect the mats, send people to repair the mats, come up with a repair procedure and absolutely not one of those items has ever happened.*
>
> *Edward, we have reams of documentation, emails and photographs of defective and poor quality Hyundai floormats from virtually the very first shipment received from Cannon. We are compiling all of this documentation and I invite you to visit Chicago to seek examples of the mats, plenty of them, and to personally view the documentation, the hundreds of emails between MacNeil and Cannon on this very issue and the hundreds if not thousands of photographs.*"

16.10 Mr Marshall is also wrong to assert that during 2007, until September, MacNeil made no further mention of is claims. (In any event, I do not see how this casts any light on the merits of MacNeil's claims.) On 12 January 2007 and again on 24 January 2007, Mr MacNeil invited Mr Atkin, by email, to visit Chicago to discuss the defective Hyundai and BMW mats (pages 37 to 39). I am instructed that these invitations were ignored. Of course, by October 2007, the parties were again meeting to discuss the problems and MacNeil's claims.

16.11 Finally, I would refer to paragraphs 31 to 35 of the US Complaint for details of the problems with the mats Cannon supplied for BMW. I would draw the Court's attention in particular to the email from Mr Peacock of Cannon referred to in paragraph 35, produced as pages 40 and 41 which makes clear the extent of the problems. Surprisingly, despite this email and the other matters raised in the complaint, Mr Marshall asserts that "*until about July 2007, there had been no problems as regards the supply of mats... for BMW*". That statement is obviously wrong and Mr Marshall provides no response to the allegations relating to BMW.

17. As to Mr Marshall's assertions about quantum, these appear to be based upon the

matters set out in paragraphs 33 to 35 of Marshall 3rd. I am instructed that MacNeil and its US lawyers firmly reject Mr Marshall's allegations that MacNeil's US Claim has been grossly exaggerated. However, I do note that Mr Marshall ignores the fact that MacNeil's claim is not simply for credit for defective mats. MacNeil also claims for consequential losses, including loss of business. As set out in paragraph 16 of the US Complaint, MacNeil's claim, which Mr Marshall does not address, is that it lost a valuable potential contract with Hyundai for the supply of all-weather rubber mats for all of Hyundai's vehicles as a result of the problems experienced by Hyundai with the Cannon mats. Further, as set out in paragraph 22 of the US Complaint (again not addressed by Mr Marshall), in April 2006, Hyundai awarded its new mat programme to another vendor.

18.    Finally, in this section, I should address the other claim made by MacNeil, namely for conversion of tooling by Cannon. MacNeil's claim is for conversion resulting from the failure of Cannon to return tooling belonging to MacNeil. MacNeil estimates the value of this tooling at US$2.8 million.

19.    Mr Marshall addresses this claim in paragraph 38 of Marshall 3rd. In that paragraph he alleges that MacNeil actually gifted the tooling to Cannon. He further asserts that Cannon's own estimate (on what basis is unclear) is that the tooling is only worth US$400,000. Even if that were right, the sum is still significant. Obviously, this court will not be able to determine the merits of Cannon's assertion that MacNeil gifted Cannon tooling worth between US$400,000 and US$2.8 million. However, I am instructed that this (surprising) assertion is very hard to reconcile with the facts that, as I am instructed:

19.1    All the tooling is clearly marked "PROPERTY OF MACNEIL AUTOMOTIVE PRODUCTS LIMITED, DOWNERS GROVE, IL U.S.A.", as well as being engraved with tool and part numbers (see example photos at pages 42 to 45).

19.2    Further, the invoices relating to the supply of the tooling clearly state that the tools are the property of MacNeil so that no tariffs were paid on the tooling (see examples at pages 46 and 47).

LN:22058.2

**Mr Marshall's claims about the "natural forum"**

20.    For the reasons set out above, I do not believe that there can be any issue before the English Court about the natural forum for MacNeil's claim. Cannon has accepted in its US filings that the Illinois Court has jurisdiction to hear MacNeil's claim. Whether the Illinois Court wishes to exercise that jurisdiction is a matter for it. However, MacNeil does not accept Mr Marshall's assertions that England is the natural forum for the determination of MacNeil's claim.

21.    First, MacNeil does not accept Mr Marshall's general characterisation of the nature of the relationship as being a simple series of contracts for sale, performed in England. This is for a number of reasons:

21.1    In fact, as Mr Marshall actually acknowledges in paragraph 10 of Marshall 3rd, the relationship was one under which MacNeil acted as Cannon's distributor in the USA.

21.2    MacNeil disputes that the goods were all delivered in the UK. I am instructed that, in fact, many of the deliveries were made in the USA.

21.3    Whether or not the goods were technically "delivered" in the UK, the fact is that the goods were being supplied to MacNeil in the USA where MacNeil would then distribute them to American customers. Indeed, paragraph 47(a) of Marshall 3rd precisely refers to the goods being *"supplied to [MacNeil] in the USA"*.

21.4    MacNeil does not accept that English law governs the contract between the parties. I do not propose to set out the arguments here, because this will be a matter for the US Court to determine in the proceedings before it. However, I would note that this is precisely an issue raised in the US Proceedings (see paragraph 5 on page 11 of Cannon's Memorandum at page 15). Even if English law did apply, there is no reason why the Illinois Court could not apply it. Moreover, even if English law did apply to the issues of breach of contract, this would not apply to the issues raised by the conversion claim. Further, all issues relating to MacNeil's onward liability to others, i.e. issues relating to quantum, would be governed by US law.

21.5    While Cannon believes it may need 5 witnesses to attend any trial, I am instructed that MacNeil and its US lawyers believe that it would need the following witnesses from MacNeil:

21.5.1  David F. MacNeil (CEO of MacNeil);

21.5.2  Allan Tom (V.P. of MacNeil);

21.5.3  Mike Bishop;

21.5.4  Del Hollingsworth;

21.5.5  Roger Conner;

21.5.6  Paul Mound.

21.6    All of these witnesses live and work in the US, in Illinois. MacNeil would also wish to call its former employee, also resident in the US, Jason Houcek.

21.7    Apart from MacNeil witnesses, MacNeil's claim also raises issues relating to its relationship with Hyundai and BMW. These witnesses would be relevant not only to the existence of the defects, but also as to the loss of business for MacNeil. MacNeil and its US lawyers anticipate that it would wish to call at least the following witnesses from Hyundai and BMW, again all resident in the US:

21.7.1  George Kurth (Hyundai USA);

21.7.2  Dan Cordes (BMW USA);

21.7.3  Mike Barrett (BMW USA).

21.8    In relation to paragraph 47(f) of Mr Marshall's 3rd statement, MacNeil can hardly be held responsible for any decision by Cannon to have all its witnesses in the US at any one time, despite the fact that they will obviously only be called one at a time.

21.9    It is wrong to assert, as Mr Marshall does, that all the mats have been destroyed. As set out above, they have not, and an estimated 1,000 lbs remain on site in the US.

21.10   Moreover, while Mr Marshall claims (paragraph 47(j)) that there is a substantial amount of documentation in England, most of these will also be in the US (for example, purchase orders, invoices etc). However, only available in the US will be all the other evidence relating to the defects, including all the photos and evidence compiled by MacNeil. I am instructed that this documentation would include:

21.10.1   Purchase orders, invoices etc passing between the parties;

21.10.2   Documents relating to MacNeil warranty claims;

21.10.3   Documents relating to Hyundai warranty claims;

21.10.4   Numerous photos of defective mats;

21.10.5   Voluminous inspection reports;

21.10.6   Substantial correspondence with Hyundai;

21.10.7   Substantial correspondence with BMW;

21.10.8   Reject documents, quality checklists and protocols.

Any third party documents (i.e. those with Hyundai and BMW) will also be in the US.

21.11   While Mr Marshall asserts that Cannon is an English company which has no assets in the US, equally, MacNeil is based in Illinois and has no business presence or assets in England (apart from the tooling being wrongfully retained by Cannon).

22.   Finally, in this respect, I would refer to paragraph 47(l) of Mr Marshall's statement. In that paragraph he alleges that the use of a jury would increase the costs of a trial, by requiring about a day to a day and a half on jury issues. What Mr Marshall does not say is that any trial in the US would be more expensive than one in England. From my knowledge (as partner in a US law firm, practising in London), I believe that any US trial, even with a jury, is likely to prove considerably cheaper than equivalent English proceedings, in light of the highly favourable exchange rate at the present time.

23.    For all of these reasons, MacNeil does not accept that England is the "natural forum" for MacNeil's claim. The relationship was of distributorship, for goods to be supplied to the USA for sale in the USA, which goods were sold in the USA to US companies and customers. There are more witnesses and more evidence in the USA and Mr Marshall's assertions to the contrary are largely founded upon the false assertion that the mats have been destroyed.

**Vexatious or oppressive**

24.    Finally, in paragraph 48 of Marshall 3rd, Mr Marshall sets out the grounds upon which he alleges that it would be "vexatious and oppressive" for the Illinois Court proceedings not to be stayed entirely.

25.    The first point to note is that there is no longer any question of the Illinois Court interfering with the UK proceedings. MacNeil has withdrawn (or will withdraw) its motion to enjoin.

26.    Secondly, there are no longer any effective English proceedings. MacNeil is not going to defend them, and Cannon will no doubt proceed to default judgment.

27.    In these circumstances, while it is obviously a matter for submission, I believe that the authorities are clear that there can be nothing "vexatious or oppressive" about MacNeil pursuing its claim in the US. English defendants are regularly sued in the US and nothing about these proceedings make them vexatious or oppressive. Far from this being a case of opportunistic forum shopping in the hope of exemplary and/or aggravated damages, MacNeil has exercised its right to bring its claim in its home court, for good reasons, and is not seeking anything other than the recovery of its losses.

28.    As to the particular points in paragraph 48 of Marshall 3rd:

28.1    Cannon has no claim in the US and will never have one. This point can only relate to its costs of defeating MacNeil's claim. I accept that, as a general rule, costs are not awarded in the US. However, Cannon's complaint is only good insofar as it succeeds. Obviously, if Cannon loses, it will not be volunteering to pay MacNeil's costs. If this amounted to "vexation or oppression", the English courts would have to injunct every claim brought in the US legal

system, which generally does not award costs.

28.2  I have addressed above Mr Marshall's assertions on the merits.  MacNeil vigorously denies them.  Again, this cannot be a ground to injunct the US proceedings as "vexatious or oppressive".

28.3  Mr Marshall advances no evidence at all to support his assertion about Illinois juries.  I imagine that the Illinois Court and much of the US legal system would reject any such suggestion.

28.4  Finally, there have never been the same set of proceedings in the US and the UK. In the UK there have been a claim for invoices. In the US there has been a claim for damages, conversion and set-off.  There was no risk of irreconcilable judgments.  In any event, any such argument has been removed as a result of MacNeil's undertaking not to defend the English Proceedings.

**Conclusions**

29.  For all of these reasons, I would invite the Court to dismiss MacNeil's application for an anti-suit injunction, both temporary and permanent.  There has never been any basis for such an injunction in the form sought, i.e. to injunct the entire US Proceedings.  The Illinois Court has jurisdiction to hear MacNeil's claim and it is shortly to determine whether it will or not.  It is doing so in light of Cannon's own motion to dismiss or stay.  This application is nothing more than an attempt to achieve in England what Cannon apparently fears it will not be able to achieve in the US.  I would invite this Court not to interfere with the process of the Illinois proceedings and to dismiss the application.

Signed:............................................................................

**Jamie Edward Harrison**

Dated:............7 March 2008..........................................

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

CLAIM NO: HQ07X04142

In the matter of an intended action

BETWEEN

CANNON AUTOMOTIVE LIMITED

Intended Claimant

and

MACNEIL AUTOMOTIVE
PRODUCTS LIMITED
(A COMPANY REGISTERED IN
ILLINOIS, USA)

Intended Defendant

FIRST WITNESS STATEMENT OF
JAMIE EDWARD HARRISON

WINSTON & STRAWN
LONDON

99 Gresham Street
London
EC2V 7NG
Tel: 44 (0) 7105 0000
Fax: 44 (0) 7105 0100
jharrison@winston.com
Ref: JEH/KP/11115.1

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) | Hon. Joan B. Gottschall |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Magistrate Arlander Keys |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

## DECLARATION OF KENT NAPIER PHILLIPS

I, Kent Napier Phillips, make this Declaration in opposition to Cannon's Motion to Stay and/or Dismiss these proceedings.

1.    I am a partner in the firm of Winston & Strawn LLP, resident in the London office.  My firm acts as solicitors to the Plaintiff ("MacNeil") in England.  I am a Solicitor of the Supreme Court of England & Wales, and for the last 8 years have specialized in the field of international commercial litigation and arbitration.  I am authorised to make this Declaration on behalf of MacNeil.  I make this Declaration of my own personal knowledge and based upon information and belief, and would and could competently testify to the matters set forth below if called upon to do so.

2.    Mr Timothy Schaum of Daspin & Aument, LLP, MacNeil's Illinois attorney, has asked me to comment on two matters, namely (1) the present position in the

proceedings currently before the High Court in London, and (2) the usual procedure which it is expected that Claimants will follow, prior to issuing proceedings in England.

*The English Proceedings*

3.    Cannon issued proceedings in England on 30 November 2007, and served them on MacNeil in Illinois on 21 December 2007. In those proceedings, Cannon claims for the payment of invoices. MacNeil indicated that it disputed the jurisdiction of the English Court, and obtained an Order granting it an extension of time to do so until the Illinois Court had determined MacNeil's anti-suit injunction filed in Illinois.

4.    However, by letter from Winston & Strawn to Manches dated 5 March 2008 MacNeil undertook that it would no longer defend Cannon's claim in the English proceedings. There is now produced and shown to me marked "KNP1" a copy of this letter. This means that Cannon can now move for a default judgment in England. MacNeil provided its undertaking reserving its rights to bring its claims in England should Cannon's motion to stay or dismiss filed in the Illinois proceedings succeed.

5.    Cannon has sought in England an anti-suit injunction restraining the proceedings in Illinois. Following the undertaking provided by MacNeil, Cannon's solicitors have indicated by letter dated 10 March 2008 that it was prepared to withdraw its anti-suit injunction application in England, albeit on terms which were not acceptable to MacNeil. There is now produced and shown to me marked "KNP2" a copy of Manches' letter dated 10 March 2008 and Winston & Strawn's response dated 11 March 2008. Since the terms of the withdrawal could not be agreed, the anti-suit injunction technically remains scheduled to be heard on 13 March 2008. However, it is clear from Cannon's skeleton argument (now produced and shown to me marked "KNP3" that Cannon is no longer pursuing the substance of its application for an

anti-suit injunction. Instead, it seeks to have it stayed, pending compliance by MacNeil with undertakings to withdraw its Motion to Enjoin in the US Proceedings. Assuming that the English judge orders this, rather than dismissing the application as MacNeil will argue he should (see MacNeil's skeleton argument, attached as "KNP4"), the anti-suit application will become moot when the Illinois Court agrees to the withdrawal of MacNeil's Motion to Enjoin.

6. The only issues effectively remaining before the English Court, therefore, are arguments about costs and the entering of default judgment on claim itself, which will follow, if Cannon has its way, on 13 March 2008, or at a later date (once the relevant time periods have expired). In short, for all practical purposes, the English Proceedings are now at an end.

*Pre-Action Procedure in England*

7. Civil procedure in England is governed by the Civil Procedure Rules ("CPR") which, according to rule 1.1(1) have the *"overriding objective of enabling the court to deal with cases justly"*.

8. Rule 1.2(2) sets out what "dealing with a case justly" involves, and provides that the Court should:

> *"2 (a)  ensure the parties are on an equal footing;*
>
> *(b)  save expense;*
>
> *(c)  deal with the case in ways which are proportionate:*
>
> *(i)  to the amount of money involved;*
>
> *(ii)  to the importance of the case;*

> (iii)    to the complexity of the issues; and
>
> (iv)    to the financial position of each party;
>
> (d)    ensure it is dealt with expeditiously and fairly."

9.    In order to assist parties to litigation to comply with the "overriding objective", the CPR contains a number of "Pre Action Protocols" which are designed to set out the procedures to be followed by the parties before proceedings are issued.  These establish a process for exchange of information between the parties to a dispute so that the parties can make early and informed judgments on the merits of cases before they have recourse to the Courts.  Some "Pre Action Protocols" have been in effect for some time (for example in relation to personal injury, defamation, clinical negligence and professional negligence cases), but some classes of cases do not yet have Protocols and the area is still in development.

10.    However, the Practice Direction in relation to "Pre Action Protocols" also prescribes "Pre Action Behaviour" in cases where a specific "Pre Action Protocol" is not in force.

11.    There is now produced and shown to me marked "KNP5" a copy of the Practice Direction of "Pre Action Behaviour in other cases".  Of particular note are Rules 4.2 and 4.3, which set out a *"reasonable procedure suitable to [the parties'] particular circumstances, which is intended to avoid litigation.  The procedure should not be regarded as a prelude to inevitable litigation."* (Rule 4.2).

12.    Rule 4.3 sets out clear guidelines as to what details should be included in a

letter sent by the Claimant which Rule 4.2 (a) suggests should be the starting point of this *"reasonable procedure"*. This letter should:

    (a)    give sufficient concise details to enable the recipient to understand and investigate the claim without extensive further information;

    (b)    enclose copies of the essential documents which the claimant relies on;

    (c)    ask for a prompt acknowledgement of the letter, followed by a full written response within a reasonable stated period;

    (For many claims, a normal reasonable period for a full response may be one month.)

    (d)    state whether court proceedings will be issued if the full response is not received within the stated period;

    (e)    identify and ask for copies of any essential documents, not in his possession, which the Claimant wishes to see;

    (f)    state (if this is so) that the Claimant wishes to enter into mediation or other alternative method of dispute resolution; and

    (g)    draw attention to the court's powers to impose sanctions for failure to comply with this practice direction and, of the recipient is likely to be unrepresented, enclose a copy of this practice direction.

13.    Rules 4.4, 4.5 and 4.6 set out what steps a Defendant might take upon receipt of such a letter.

14.    The notes of guidance appended to the CPR suggest (at paragraph C1A-008) that where Pre Action Protocols *"...do not currently apply, it is still good practice for the Claimant or their solicitor to send a detailed letter to the prospective Defendant and to wait a reasonable period for the Defendant to respond before issuing proceedings"*.

15.    It is also noted that *"failure to send a letter of claim at all is unreasonable conduct, which will invariably attract a sanction"*.  This sanction will usually take the form of an award of costs (calculated on an "indemnity basis", rather than on the usual "standard basis").

16.    I understand that in this case MacNeil received a letter from Cannon dated 26 October 2007 noting that payments for May, June and July (being some but not all of the amount now claimed by MacNeil in its English proceedings) were outstanding, saying only that unless payment was received within 7 days *"we will have to insist that this matter be placed in the hands of our legal advisors and take the appropriate legal advice"*.  I understand that no further correspondence or letter was received by MacNeil in relation to any part of the claim before Cannon served the English proceedings (filed on 30 November 2007, but clearly in preparation well before that date) on 21 December 2007.  In these circumstances it is difficult to see how Cannon has acted in accordance with the pre-action practices I have described above.

**FURTHER AFFIANT SAYETH NOT**

Dated:  March __12__, 2008

Kent Phillips

Subscribed and sworn to

before me this __12__

of March, 2008

Solicitor/Commissioner for Oaths

LN:22158.1

05/03 2008 18:24 FAX 442071531125          WINSTON_STRAWN                      @002/003

# WINSTON & STRAWN
## LONDON

99 GRESHAM STREET
LONDON EC2V 7NG

+44 (0)20 7105 0000

FACSIMILE +44 (0)20 7105 0100

www.winston.com

## BY FAX ONLY

5 March 2008

Manches LLP
Aldwych House
81 Aldwych
London WC2B 4RP

*For the attention of: Richard Marshall*

Dear Sirs

**Cannon Automotive Limited v MacNeil Automotive Products Limited
High Court of Justice (Queen's Bench Division) - HQ07X04142**

We refer to the Applications listed to be heard on 13 March 2008.

As you are aware, the present position is as follows:

(i)    Your client has issued proceedings in England (the "English Proceedings"), while our client has issued proceedings in Illinois (the "US Proceedings");

(ii)   In the English Proceedings, your client claims for the payment of invoices. In the US Proceedings, our client claims damages for defective goods and brings a separate claim for the return of tooling machinery;

(iii)  On foot in the US Proceedings are two motions: our client's motion to enjoin the English Proceedings and your client's motion to dismiss or stay. Filings will close on both motions on 2 April 2008;

(iv)   In the English Proceedings, our client is disputing jurisdiction, while your client is seeking an anti-suit injunction against the entire US Proceedings.

Our client is due to reply to your evidence filed in support of its application for an anti-suit injunction in England by this Friday, 7 March 2008. Needless to say, our client disputes many of the assertions made in your evidence in support. However, we do not propose to rehearse such arguments now, but to put forward proposals for disposing of this matter without the need to expend further costs.

| Zoë J. Ashcraft | Thomas J. Benz | Justin Harrison | Laurette Peterson | Kent Phillips | Barry S. Vitou |
|---|---|---|---|---|---|
| Solicitor, England & Wales | Attorney, New York | Solicitor, England & Wales | Attorney, Illinois | Solicitor, England & Wales | Solicitor, England & Wales |

WINSTON & STRAWN LLP · Chicago · Geneva · Los Angeles · Moscow · New York · Paris · San Francisco · Washington, D.C.

A multinational partnership of Solicitors & Registered Foreign Lawyers, regulated by The Solicitors Regulation Authority of England & Wales.
LN:22003.1                                    Vat No. 815 5106 54

# WINSTON & STRAWN
### LONDON

Manches LLP
5 March 2008
Page 2

Our client hereby undertakes the following (subject to necessary and agreed wording alterations), and is content to give the undertakings to the English Court in appropriate form to this effect:

1.  MacNeil will no longer pursue its motion in the US Proceedings to enjoin the English Proceedings. MacNeil will withdraw the motion and/or will take all reasonable steps to have the US Court no longer determine the motion to enjoin;

2.  MacNeil will no longer dispute Cannon's claim in the UK proceedings, either as to jurisdiction or substance.

In light of the above, it will be for the US Court to determine whether it will hear MacNeil's claim brought before it. The English authorities, such as Hoffmann J's decision in Barclays Bank plc v Homan [1992] BCC 757 (cited with approval by Rix J in Simon Engineering v Butte Mining [1996] 1 Lloyd's Rep 104), make clear that it is for the foreign court to decide if it has jurisdiction over the claim brought before it. The US Court will no longer be interfering with the English Court's right to determine its jurisdiction over Cannon's claim.

Given the above, there can be no proper basis for your client to pursue its anti-suit injunction in England and we would invite you to withdraw it forthwith. In the event that you do not, we will offer such undertakings to the English Court on 13 March 2008 and will resist the application accordingly, seeking our costs of doing so.

Costs issues can no doubt be agreed or dealt with on 13 March 2008.

In offering the undertakings set out above, our client reserves its rights to bring its claims in England in the event that your client's motion to dismiss/stay succeeds in the US.

We look forward to hearing from you by return.

Yours faithfully

*Winston Strawn.*

Winston & Strawn

LN:22003.3

*KNP2*

Our reference: RGM/EJS/1677687250199

# MANCHES

Winston & Strawn
99 Gresham Street
London

Manches LLP
Aldwych House
81 Aldwych
London WC2B 4RP

Tel +44 (0)20 7404 4433
Fax +44 (0)20 7430 1133
DX 76 Chancery Lane
www.manches.com

**By Fax Only: 020 7105 0100**

10th March 2008

Dear Sirs

**Claim No. HQ07X04142**
**Cannon Automotive Limited -v- MacNeil Automotive Products Limited**

We have now had an opportunity to consider your letter dated 5 March 2008 ("the Undertakings Letter") and take our client's instructions.

Whilst your client offered the undertaking to file a Motion to withdraw its Motion to enjoin the English Proceedings, we note that such a Motion was, in fact, filed during the afternoon of 6 March 2008. We find it odd that we were not informed of your client's position. Indeed, we only found out about the Motion to withdraw from our client's US Counsel.

Whilst we do not accept that there is now no basis for our client's application for an anti-suit injunction, we are instructed by our client that it is prepared to accept the offer contained in the Undertakings Letter provided that your client agrees to the following:

(i) that the order made Master Fontaine on 21 January 2008 is set aside;

(ii) that our client be given leave to amend its Claim Form and its Particulars of Claim to claim the full amount now due from your client in respect of its invoices, together with interest. The sums owed are £384,020.60 and US$53,795.80, which at the current rate of US$2.01059 to the £, converts to £26,732.18. Interest on those sums from 17 August 2007 at the rate of 8% per annum comes to £26,166.72).

(iii) your client agrees to our client entering judgment on 18 March 2008 for the sums set out in (ii) above;

(iv) your client agrees to pay our client's costs of the action, including its applications dated 30 November 2007, 29 January 2008 and 18 February 2008, such costs to be the subject of detailed assessment, if not agreed. For the record, we do not accept any arguments that your client may have with respect to costs incurred in preparing and serving the witness statement of Jamie Edward Harrison and Exhibit "JEH1". Pursuant to paragraph 1. of the Order of Mr R. Purchas Q.C. dated 28 January 2008, your client's evidence needed to filed in any event and would have been substantially prepared by the time that we received the Undertakings Letter. In this regard, your client agrees to

Manches LLP is a limited liability partnership, registered in England and Wales, registered number OC305595. The registered office is at Aldwych House, 81 Aldwych, London WC2B 4RP. A list of members' names is available for inspection at that address. The firm is regulated by the Solicitors Regulation Authority.

Also at:
9400 Garsington Road
Oxford Business Park
Oxford OX4 2HN

5951794/1

Page 2
Winston & Strawn
10th March 2008

# MANCHES

pay our client the sum of £50,000 on account of costs by way of interim payment on or before 13 March 2008;

(v) your client agrees to widen its undertakings as set out in the draft consent order enclosed with this letter.

As regards our client's application dated 18 February 2008 for the anti-suit injunction, our client will agree to this application being stayed with liberty to restore it only in the event that your client breaches any of the undertakings.

In the circumstances, we enclose a draft form order. We invite you to agree to the terms of the draft order in advance of the hearing in order to save costs.

Yours faithfully

Manches LLP

5951794/1

IN THE HIGH COURT OF JUSTICE          Claim No. HQ07X04142

QUEEN'S BENCH DIVISION

BEFORE H.H JUDGE MACKIE SITTING AS A JUDGE OF THE HIGH

COURT

THURSDAY 13 MARCH 2008

BETWEEN:


CANNON AUTOMOTIVE LIMITED

Claimant

-and-


MACNEIL AUTOMOTIVE PRODUCTS LIMITED

(A COMPANY REGISTERED IN ILLINOIS, USA)

Defendant


---

DRAFT ORDER

---


UPON the applications made by the Claimant by application notices dated 29 January

2008 and 18 February 2008 respectively ("the Applications")


AND UPON hearing Counsel for the Claimant and Counsel for the Defendant.

AND UPON reading the evidence and the letter from Winston Strawn to Manches LLP dated 5 March 2008.

AND UPON the Defendant by their Counsel undertaking:

(1) to withdraw its Motion to enjoin the Claimant from pursuing the proceedings herein ("the Motion") which was filed by the Defendant on 8 January 2008 in the Illinois Court for the Northern District of Illinois Eastern Division ("the Illinois Court") in its action against the Claimant in that Court, the short title of which is MacNeil Automotive Products Limited, an Illinois Corporation v Cannon Automotive Limited, f/k/a Cannon Rubber Limited, Automotive Division, a United Kingdom Company, No. 08-C 139;

(2) pending withdrawal of the Motion or, if for any reason, withdrawal of the Motion is not permitted by the Illinois Court or the Defendant is otherwise unable to withdraw it:

   (a) not to take any further steps whatsoever to prosecute the Motion against the Claimant, including any steps to obtain any judgment on the Motion or, in the event that any judgment is given on the Motion by the Illinois Court which is unfavourable to the Claimant, any steps to enforce that judgment against the Claimant, whether in the United States of America or in this jurisdiction;

2

(b) to take all reasonable steps to ensure that the Illinois Court does not make any determination on the Motion;

(3) not to dispute the Court's jurisdiction in relation to this action or to dispute the merits of the Claimant's claim in this action

AND BY CONSENT

IT IS ORDERED that:

(1) the order made by Master Fontaine on 21 January 2008 be set aside;

(2) the Claimant do have permission to amend its Claim Form and Particulars of Claim in the form of the drafts before the Court;

(3) judgment be entered for the Claimant on the basis of the Amended Claim Form and the Amended Particulars of Claim for the sum of £410,758.78, together with interest in the sum of £20,160.72, such sums to be paid within 14 days of today's date;

(4) the Defendant do pay to the Claimant the costs of and occasioned by this action, including the costs of and occasioned by (i) the Claimant's application dated 30 November 2007 and (ii) the Applications; such costs to be assessed, if not agreed;

(5) the Defendant do pay to the Claimant the sum of £50,000 as an interim payment on account of costs on or before 13 March 2008;

(6) the Claimant's application dated 18 February 2008 be stayed;

(7) In the event that the Defendant breaches any of the Undertakings set out above, the Claimant have permission to restore its application dated 18 February 2008.

4

# WINSTON & STRAWN

## LONDON

99 GRESHAM STREET
LONDON EC2V 7NG

+44 (0)20 7105 0000

FACSIMILE +44 (0)20 7105 0100

www.winston.com

**BY FAX ONLY**

11 March 2008

Manches LLP
Aldwych House
81 Aldwych
London WC2B 4RP

*For the attention of: Richard Marshall*

Dear Sirs

**Cannon Automotive Limited v MacNeil Automotive Products Limited**
**High Court of Justice (Queen's Bench Division) - HQ07X04142**

We refer to your letter dated 10 March 2008.

We are unclear as to the point you seek to make in the second paragraph of your letter. Our client's Motion was filed in Illinois on 6 March 2008 in order to fulfill the undertaking given by our client in our letter dated 5 March 2008. In the circumstances, it is not correct to suggest, as you appear to do in your letter, that you were not informed of our client's position and that the only notice you received about the Motion to Withdraw was via your client's US counsel.

Your letter purports to accept our client's offer. However, the undertakings contained in our letter dated 5 March 2008 were given, not offered. As such, they were not intended to be accepted, whether conditionally or otherwise.

In any event, so that our client's position is clear in advance of the hearing on Thursday, we make following comments on your letter, following your numbering:

(i)   Given our client's undertaking no longer to *"dispute Cannon's claim in the UK proceedings, either as to jurisdiction or substance"* we take no position on whether Master Fontaine's Order is set aside;

(ii)  Our client takes no position on the proposed amendments to your client's claim. Of course to obtain a judgment on them your client would need to serve any amendments allowed, or to obtain an order allowing them to dispense with service, and then meet the procedural requirements and timetable for a default judgment contained in CPR 12;

| Zoë J. Ashcroft | Thomas J. Benz | Jamie Harrison | Laurette Petersen | Kent Phillips | Barry S. Viton |
|---|---|---|---|---|---|
| *Solicitor, England & Wales* | *Attorney, New York* | *Solicitor, England & Wales* | *Attorney, Illinois* | *Solicitor, England & Wales* | *Solicitor, England & Wales* |

**WINSTON & STRAWN LLP**  Chicago • Geneva • Los Angeles • Moscow • New York • Paris • San Francisco • Washington, D.C.

A multinational partnership of Solicitors & Registered Foreign Lawyers, regulated by The Solicitors Regulation Authority of England & Wales.
Vat No. 815 5105 54

LN:22111.1

# WINSTON & STRAWN
## LONDON

Manches LLP
11 March 2008
Page 2

(iii)   We have made clear only that our client will not defend your client's claim, either as to jurisdiction or substance; our client will not consent to judgment at all. As mentioned for item (ii) above, your client will need to meet the CPR's requirements for obtaining a judgment by default. In any event, pursuant to CPR 12.3, the time period for obtaining a default judgment has not yet expired (not least for the claim with the amendments proposed) and, in the circumstances, there is no reason why our client should consent to judgment being entered on 13 March 2008;

(iv)    Our client will not agree to paying your client's costs. As to costs:

- The costs of your client's 30 November 2007 application and the costs of the action itself are not before the Court on 13 March 2008, and would fall to be considered by the Court on any application for default judgment.

- Our client's costs of your client's application dated 18 February 2008 should be paid by your client, and will be sought on 13 March 2008. Your client was never going to be entitled to the relief sought (which sought to restrain our client from bringing its claim in Illinois), a position we explained in full at the outset in our letter dated 19 February 2008. In that letter we drew your attention to the lack of any evidence to show that the tests for an injunction had been met (in particular the failure to show that the Illinois proceedings are in any way oppressive or vexatious), and – referring to the issue of costs - concluded by inviting you to withdraw the application.

   In the event your client is entitled to any costs, we see no basis upon which you could claim an interim payment, particularly one at such an exorbitant level. The quantum sought suggests that any costs orders made in your client's favour will require very careful scrutiny on a detailed assessment. Furthermore, we have made clear our reservation on the costs wasted in preparing and serving the Witness Statement of Jamie Edward Harrison and for preparing for the hearing on 13 March 2008, both of which could have been saved (or dramatically curtailed) had you addressed the contents of the Undertakings Letter promptly.

(v)    We enclose a mark-up of your draft Order to reflect our comments. Consistent with our comments above you will see that it would not take the form of a consent Order.

Yours faithfully

**Winston & Strawn**

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION                    CLAIM NO: HQ07X04142

BEFORE H.H JUDGE MACKIE SITTING AS A JUDGE OF THE HIGH COURT

THURSDAY 13 MARCH 2008

BETWEEN

CANNON AUTOMOTIVE LIMITED

**Claimant**

and

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

**Defendant**

DRAFT ORDER

UPON the Applications made by the Claimant by Application Notices dated 29 January 2008 and 18 February 2008 respectively,

> Deleted: ("the Applications")

AND UPON hearing Counsel for the Claimant and Counsel for the Defendant

AND UPON reading the evidence and the letter from Winston & Strawn to Manches LLP dated 5 March 2008

> Deleted: n

AND UPON the Defendant having on 6 March 2008 filed a motion to withdraw its Motion to enjoin the Claimant from pursuing the proceedings herein ("the Motion") which was filed by the Defendant on 8 January 2008 in the Illinois Court for the Northern District of Illinois Eastern Division ("the Illinois Court") in its action against the Claimant in that Court, the short title of which is MacNeil Automotive Products Limited, an Illinois Corporation v Cannon Automotive Limited, f/k/a Cannon Rubber Limited, Automotive Division, a United Kingdom Company, No. 08 C 139

> Deleted: LN:22113.1

LN:27113.4,

**AND UPON** the Defendant by their Counsel undertaking:

(1)   if for any reason, withdrawal of the Motion is not permitted by the Illinois Court or the Defendant is otherwise unable to withdraw it not to take any further steps whatsoever to prosecute the Motion against the Claimant, including any steps to obtain any judgment on the Motion or, in the event that any judgment is given on the Motion by the Illinois Court which is unfavourable to the Claimant, any steps to enforce that judgment against the Claimant, whether in the United States of America or in this jurisdiction;

(2)   not to dispute the Court's jurisdiction in relation to this action or to defend the the Claimant's claim in this action, while reserving all its other rights in the United States and to bring an action in the English Courts relating to the matters forming the subject of its Complaint filed before the Illinois Court on 7 January 2008 (the "Complaint") in the event that the Illinois Court declines to hear its Complaint.

**IT IS ORDERED** that:

(1)   the Order made by Master Fontaine on 21 January 2008 be set aside;

(2)   the Claimant do have permission to amend its Claim Form and Particulars of Claim in the form of the drafts before the Court;

(3)   the Defendant do pay to the Claimant the costs of and occasioned by the Claimant's application dated 29 January 2008 such costs to be assessed, if not agreed;

(4)   the Claimant's application dated 18 February 2008 be dismissed, and the Claimant do pay the Defendant the costs of and occasioned by that application, such costs to be assessed, if not agreed.

Dated this                    day of March 2008

---

**Deleted:** <#>to withdraw its Motion to enjoin the Claimant from pursuing the proceedings herein ("the Motion") which was filed by the Defendant on 8 January 2008 in the Illinois Court for the Northern District of Illinois Eastern Division ("the Illinois Court") in its action against the Claimant in that Court, the short title of which is MacNeil Automotive Products Limited, an Illinois Corporation v Cannon Automotive Limited, f/k/a Cannon Rubber Limited, Automotive Division, a United Kingdom Company, No. 08 C 139;¶ pending withdrawal of the Motion or, of

**Formatted:** Bullets and Numbering

**Deleted:** ¶

**Deleted:** <#>to take all reasonable steps to ensure that the Illinois Court does not make any determination on the Motion.¶

**Deleted:** dispute

**Deleted:** merits of

**Deleted:** .

**Deleted:** AND BY CONSENT¶

**Deleted:** <#>judgment in default be entered for the Claimant on the basis of the Amended Claim Form and the Amended Particulars of Claim for the sum of £410,758.78, together with interest in the sum of £20,166.72, such sums to be paid within 14 dates of today's date;¶

**Formatted:** Bullets and Numbering

**Deleted:** this action, including the costs of and occasioned by (i)

**Deleted:** A

**Deleted:** 30 November 2007 and (ii) the Applications,

**Deleted:** <#>the Defendant do pay to the Claimant the sum of £50,000 as an interim payment on account of costs on or before 13 March 2008;¶

**Deleted:** stayed

**Deleted:** ;¶ in the event that the Defendant breaches any of the Undertakings set out above, the Claimant have permission to restore its application dated 18 February 2008.

**Deleted:** LN:22113.1

LN:22113.4

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
                    CLAIM NO: HQ07X04142

BEFORE H.H JUDGE MACKIE SITTING AS
A JUDGE OF THE HIGH COURT

THURSDAY 13 MARCH 2008

BETWEEN


**CANNON AUTOMOTIVE LIMITED**
                                        **Claimant**


and


**MACNEIL AUTOMOTIVE PRODUCTS LIMITED**
**(A COMPANY REGISTERED IN ILLINOIS, USA)**
                                        **Defendant**


---

**DRAFT ORDER**

---


**WINSTON & STRAWN**
**LONDON**

99 Gresham Street
London
EC2V 7NG
Tel: 44 (0) 7105 0000
Fax: 44 (0) 7105 0100
jharrison@winston.com
Ref: JEH/KP/11115.1

Deleted: LN:22113.1

" *KNP 2* "

**IN THE HIGH COURT OF JUSTICE**            **Claim No. HQ07X04142**

**QUEEN'S BENCH DIVISION**


BETWEEN:


CANNON AUTOMOTIVE LIMITED

**Claimant**

-and-


MACNEIL AUTOMOTIVE PRODUCTS LIMITED

(A COMPANY REGISTERED IN ILLINOIS, USA)

**Defendant**


---

SKELETON ARGUMENT ON BEHALF OF THE CLAIMANT

---


**The Applications**

1.      There are two applications ("the Applications") before the Court as follows:


    (a)     an application by C to set aside the order made by Master Fontaine on 21

            January 2008 that the 14 day time period under CPR 11(4)(a) for D to file

            an application under CPR 11 be extended until 7 days after such time as

            the United States District Court for the Northern District of Illinois

(Eastern Division) ("the Illinois Court") has determined D's Motion filed on 8.1.08 to enjoin C from pursuing these proceedings ("the First Application") (pp 182-185);

(b)    an application by C for an interim injunction restraining D from proceeding with its action in the Illinois Court until after this Court has determined the application to be made by D under CPR 11, alternatively, if no application is made, until after judgment in C's application for a permanent anti-suit injunction against D ("the Second Application") (pp227-232).

**Background to the Applications**

The Parties

2.    C, a company incorporated on 30.3.05, has, at all material times, carried on business as, inter alia, manufacturers and suppliers of rubber mats for motor vehicles.

3.    D is a company, which was incorporated on 11.2.89 under the laws of Illinois in the United States of America. Its sole director is David O'Neil.

The Parties' Claims against each other

C's claims

4.    Between June 2005 and September 2007, C manufactured and supplied to D mats for distribution in the United States.

2

5. C's claim against D in these proceedings is for the sums of £278,729 and US$38,883, being the total price of mats manufactured and supplied by C to D pursuant to a series of contracts made between the parties between about 26.2.07 and 28.8.07 (see: P/C, pp 68-79).

6. Since the issue by C of its Claim Form, further invoices totalling £105,291.60 and US$14,912.50 have become payable. C will be applying at the hearing of the Applications to amend its Claim Form and Particulars of Claim to include these sums.

D's claims

7. D claims against C damages of at least US$4 million for the supply of alleged defective mats; it also claims damages of US$2.8 million for the alleged conversion of tooling used by C to manufacture the mats. For the reasons set out in the 3rd w/s of Richard Marshall, C does not believe that D's claims are genuine; alternatively, they have been grossly exaggerated.

The Procedural Background

8. On 26.10.07 C wrote to D demanding payment of all outstanding accounts and informing D that if payment was not made within 7 days, the matter would be placed into the hands of C's legal advisors (p. 308).

3

9.   D did not make any payment and on 30.11.07 C obtained an order to serve proceedings on D out of the jurisdiction. The order was made on the basis that the contracts made between C and D were governed by English law (CPR 6.20(5)(c) and that C's claims against D were for breaches made within the jurisdiction (CPR 6.20(6)). The Claim Form was issued on the same date and on 20.12.07, the Claim Form and the Particulars of Claim were served on D.

10.  However, instead of issuing an application under CPR 11, which is the normal procedure to adopt if a defendant wishes to dispute the jurisdiction and/or forum of the English Court, and without having sent to C any letter before action or otherwise given C any indication at all that it intended to issue proceedings, on 8.1.08, D filed a Complaint against C in the Illinois Court (pp 310-350) ("the Complaint") and at the same time filed a Motion seeking to enjoin C from continuing with its proceedings in this jurisdiction (pp 351-405) ("the Motion"). The grounds of the Motion were that C's and D's claims should be heard together and that the proceedings in this jurisdiction were "collateral, duplicative and vexatious" (see pp 351, 361, 362 and 363).

11.  The Complaint and the Motion were served on C on 11.1.08.

12.  On 15.1.08 D's solicitors requested C to agree to extend D's time for issuing an application under CPR 11 until 7 days after such time as the Illinois Court should have determined its Motion (p 174). C refused to agree to an extension and invited D to make its application under CPR 11 (p. 178).

4

13. On 21.1.08 D applied on a without notice basis to Master Fontaine seeking an extension of time for issuing an application under CPR 11 until 7 days after the Illinois Court had determined its Motion. The application was supported by a w/s from Kent Napier Phillips dated 21.1.08 (pp 90-93). In that w/s, Mr. Phillips made the following statements:

   (a) in paragraph 7(a), that the Motion had a hearing date of 24.1.08 (p. 91);

   (b) in paragraph 9, that a 14 day period was prescribed for making an application under CPR 11(4) and that this period expired on Friday 25.1.08, that is, just one day after the Illinois Court was scheduled to consider the Motion (p. 92);

   (c) in paragraph 10, that the application under CPR 11 would need to be supported by evidence covering forum non-conveniens related issues, which would require a considerable amount of preparation and which would be entirely wasted if the Motion to be heard in Illinois was successful. This formed the basis on which D asked the Court to grant the relief sought.

14. When D made its without notice application before Master Fontaine on 21.1.08, D was under a duty to the Court to make full and frank disclosure of all relevant matters. D failed in that duty and, indeed, misled the Court as set out below:

5

(a)    first, Master Fontaine was not told by D that what she was, in fact, being asked to decide on a without notice basis was whether the English Court or the Illinois Court should decide whether the English Court was the appropriate forum for the determination of C's and D's claims. It is C's case that the Illinois Complaint and Motion and the without notice application before Master Fontaine were blatant and deliberate tactical manoeuvres on the part of D to prevent the English Court from deciding whether it should exercise its jurisdiction over these matters and to arrogate that decision to the Illinois Court;

(b)    secondly, Master Fontaine was not shown any authority which was relevant to her decision. In particular, she was not shown the case of General Star International Indemnity Limited v Stirling Cooke Browne Reinsurance Brokers Limited [2003] EWHC 3 (Comm) (which, it is submitted, is almost on all fours with the present case), where the Court held, where similar tactics had been employed by the defendant to interfere with the jurisdiction of the English court, that England was the appropriate forum to determine the issue of forum;

(c)    thirdly, Master Fontaine was misled into believing that the Motion was very shortly to be determined. The Court appointment in Illinois on 24.1.08 was, in fact, only a briefing schedule and was only one of 13 motions scheduled to be heard at 9.30 a.m with a criminal change of plea

6

scheduled for 10 a.m. (see RMs' 2nd w/s, pp 187-190). In his 2nd w/s (pp 215-219), Mr. Phillips asserts that he did not at any stage lead the Court to believe that the Motion would be "determined" on 24.1.08, but rather that it would be "considered" on that date and, in any event, as at 21.1.08, C had not entered an appearance and it appeared feasible that the Court would grant its Motion in fairly short order on 24.1.08 (pp 215-219). It is submitted that these statements are disingenuous for the following reasons:

(i)     D envisaged that it might take up to 14 days for C to enter an appearance as reflected in the footnote on page 1 of its Motion (p. 351) and, therefore, that there was still time for such an appearance to be entered;

(ii)    D did not inform Master Fontaine, in any event, that C had not entered an appearance in the US proceedings as at the date of its application;

(iii)   D made no attempt to explain to Master Fontaine what was likely to happen on 24.2.08, particularly, if C entered an appearance;

(iv)    D did not explain to the Court that it was only one of 13 Motions in a half an hour list. Whilst D asserts that if C had not entered an appearance by 24.2.08, it was feasible that the court would have

7

granted its Motion in fairly short order, it is submitted that it is extremely unlikely that the Court would have considered the Motion on its merits on 24.2.08, having regard to the length of the Motion and authorities which the Court needed to consider and the time allotted for the Motion on 24.2.08.

15.    On 24.1.08 the Illinois Court set a briefing schedule. At that hearing, C was represented and indicated to the Court that it would be filing a Motion to stay or dismiss D's Complaint (this, in fact, was filed on 20.2.08). The timetable was set and subsequently extended by agreement between the parties as follows:

20.2.08: C to file its opposition to the Motion

20.2.08: C to file its own Motion to dismiss or stay the Illinois proceedings;

12.3.08: D to file its reply in respect of the Motion;

12.3.08: D to file its opposition to C's Motion to dismiss or stay the Illinois proceedings;

2.4.08: C to file its reply in respect of its Motion to dismiss or stay the Illinois proceedings.

16.    The Judge in the Illinois Court also stated that the matter would be dealt with on an expedited basis and indicated that she would give her judgment as soon as possible after 2.4.08. The Motions will be decided on paper without hearing any oral argument.

8

17. On 29.1.08 C issued the First Application supported by the 2nd w/s of Richard Gary Marshall (pp 182-190). In his w/s, Mr. Marshall made it clear that C also intended to issue an application for an anti-suit injunction and that further evidence would follow.

18. On 18.2.08, D served its evidence in answer to Richard Marshall's 2nd w/s (pp 215-219).

19. On 18.2.08 C issued the Second Application supported by the 3rd w/s of Mr. Marshall (pp234-252) and the w/s of Robert Peacock (p 406). The Second Application envisaged that there would be a two stage process as follows pp227-232):

   (a)  first, a hearing would take place at which the Court would determine whether or not it was the appropriate forum to decide whether the claims of the parties should be determined by this jurisdiction or by the Illinois Court;

   (b)  if the court decided that it was the appropriate forum to determine the issue of forum, the Court would then have to decide at the same hearing whether or not it made an interim anti-suit injunction holding the Illinois proceedings in abeyance until the forum issued had been resolved and would also have to make directions relating to when D was required to issue a CPR 11 application, directions for evidence on that application

9

and for the hearing of that application as well as C's application for a permanent anti-suit injunction (see para. 3 of the Second Application Notice). C was also seeking directions that if D did not make an application under CPR 11 by the time ordered, then C could proceed independently with its application for a permanent anti-suit injunction at a further hearing.

20.    On 19.2.08, by consent, the First Application was adjourned to the Judge to be heard at the same time as the Second Application. The Second Application had been listed to come on before a Judge for a full day on 28.2.08.

21.    On 19.2.08, D's solicitors wrote to C's solicitors and stated that D needed 21 days from 19.3.08 to file its evidence in answer (p 423). The reason given was as follows: "..*the witness statement in support goes into the broader matter of the merits of our client's case in Illinois, and making serious allegations about the destruction of evidence. We will need to gather evidence and respond to this, evidence which is entirely located in Illinois.*" D's solicitors, therefore, suggested that D should serve its evidence by Tuesday, 11.3.08, C should serve its reply evidence by 18.3.08 and that Counsel's clerks should attend to have the hearing fixed for the first available date after 19.3.08 with a time estimate of 1 day. The 19.3.08 is the last date of term. The new term does not start until 1.4.08.

22.   The parties agreed that the hearing on 28.2.08 should be treated as a directions hearing, but were unable to agree on the directions. C's position was that it wanted the first part of its application (namely, whether England was an appropriate forum to decide the forum issue and, if so, for an interim anti-suit injunction to be made pending the determination of any CPR 11 application made by D) to be heard before 2 April 2008, which was the date from which a determination might be made by the Illinois Court on the Motions, and for the evidential timetable to be fitted in accordingly.

23.   As stated above, D wanted 21 days to serve its evidence, with there then being reply evidence and a hearing date being fixed after the close of evidence. C did not understand why D needed 21 days to serve its evidence, bearing in mind that the merits of D's claims must already have been investigated in order for the Complaint to have been filed in the Illinois Court. Further, the assertion that D's solicitors needed to investigate "the serious allegation" made by C in its evidence that D had destroyed the evidence (namely, the mats returned by Hyundai) was untrue as it was part of C's own case as set out in its Complaint and Motion that it had destroyed the evidence (see: para. 25 of the Complaint, pp 316-317; the Motion at p.353). It appeared to C that the reason why D wanted to extend the timetable was part of a delaying tactic to try and secure a judgment being made by the Illinois Court first.

24.   On 28.2.08, the matter came on before Mr. R. Purchas Q.C, sitting as a deputy High Court Judge. After hearing the parties' submissions, he held that there was

11

a very real issue which needed to be heard by the English court prior to any decision being made by the Illinois Court and, after investigating when the Court could accommodate a day's hearing, ordered that the first part of C's application be heard on 13 March 2008 and gave directions that D should serve and file its evidence by 4 p.m. on Friday 7.3.08 (giving D 17 days) and that C should file and serve any reply evidence by 4 p.m. on Tuesday 11.3.08. As C had stated that it needed 21 days from 19.2.08 in order to prepare its evidence, by the hearing on 28.2.08, such preparation should have been well underway.

25.   On 5.3.08, less than 48 hours before D was due to file and serve its evidence (and 6 days after the hearing held on 28.2.08 and over 2 weeks after C had issued its application for an anti-suit injunction) D's solicitors faxed to C's solicitors a letter in which D undertook: (i) (subject to agreeing the wording) to withdraw the Motion and/or to take all reasonable steps to ensure that the Illinois Court no longer determined it; and (ii) no longer to dispute C's claim in this jurisdiction either as to jurisdiction or as to substance. On the basis of those undertakings, D contended that the US Court would no longer be interfering with the English's court's right to determine jurisdiction over C's claim and, therefore, invited C to withdraw its application for an anti-suit injunction. As was made clear, however, in D's solicitors' letter dated 7.3.08, D has no intention of paying any default judgment obtained by C, but intends to use its claim in the Illinois Court to prevent C from enforcing its judgment in the US.

26. On 6.3.08, C's solicitors wrote to D's solicitors stating that they needed to obtain C's instructions and to consult with C's US lawyers, which they would not be able to do until the afternoon (Illinois being 7 hours behind).

27. During the evening of 6.3.08 D filed in the Illinois Court a Motion to withdraw the Motion. Although there had been communications between C's and D's solicitors that day, no notification was given by D's solicitors to C's solicitors that a Motion to withdraw was to be filed later that day. C's solicitors only learnt of the Motion from C's US lawyers on the morning of 7.3.08. The Motion to withdraw is listed to come on before the Illinois Court at 9.30 a.m. on 13.3.08.

28. As a result of issuing the Motion to withdraw, C's solicitors needed to consult further with C and C's US lawyers. C was not in a position to respond to D's offer prior to 4 p.m. on 7.3.08, which was when D was due to file its evidence.

29. D's served its evidence by 4p.m. on Friday 7.3.08. At about 6 p.m. on Monday 10.3.08 C's solicitors faxed to D's solicitors C's response to D's offer together with a proposed draft consent order. In short, C agreed not to pursue its application for an anti-suit provided that: (i) D agreed to the order made by Master Fontaine on 21.1.08 being set aside; (ii) D agreed to C having leave to amend its claim to plead the full amount of its invoices now owed, namely, the sum total of £410,752.78, together with interest of £20,166.72 (D's solicitors had previously indicated in a letter dated 15.1.08 (p. 413) that but for the fact

13

that D was disputing jurisdiction, they doubted that it would object to these amendments); (iii) D agreed to judgment being entered against it for the sums referred to in (ii); (iv) D agreed to pay the costs of the action, including C's costs of an occasioned by the application dated 30.11.07, the First Application and the Second Application, such costs to be subject to detailed assessment, if not agreed; (v) D agreed to pay the sum of £50,000 on account of costs on or before 13.3.08; and (vi) D agreed to widen its undertakings as set out in the proposed consent order.

30.    To date, D has not responded to the above letter.

**The orders which C invites the Court to make**

31.    As D no longer intends to dispute the jurisdiction of this Court, C would invite the Court to set aside the order made by Master Fontaine on 21.1.08.

32.    C then asks the Court to give C leave to amend its Claim Form and Particulars of Claim so that C can claim the full amount of its invoices now payable, namely, the sums of £354,020.60 and US$53,795.80 (this converts to £26,732.18, applying the current exchange rate of US$2.01059 to £), together with interest on those sums pursuant to section 35A of the Supreme Court Act 1981 at the rate of 8% per annum. As at 30.11.07 when C issued its Claim Form, the 90 credit period in respect of some of its invoices had not yet expired, so that they could not be included in the original claim (see: para. 9 of RM's 1st w/s, p. 8). However, D has always accepted that it owes C the above sums (see:

14

para. 21 of RM's 1ˢᵗ w/s (p. 11) and pp 61 and 59) and, as stated above, in their letter dated 15.1.08 (p. 413), Ds' solicitors did not envisage that D would object to the amendments.

33. Further, as D does not intend to dispute C's claim on the merits and, therefore, admits C's claim, C would ask the Court to enter judgment under CPR 14.1 in C's favour for the sums set out in the Amended Claim Form.

34. In view of the undertakings given by D (which C would ask the Court to be in the form of the undertakings in C's draft order), C will no longer proceed with its anti-suit injunction and invites the Court to stay paragraph 3 of the Second Application with liberty to restore in the event that D breaches any of its undertakings. It is C's case that the undertakings given are yet further tactical manoeuvrings on the part of D designed to ensure that its claims and the issue of forum relating to its claims are decided by the Illinois Court. C accepts, however, that the undertakings (if carried out) have the effect of depriving the Claimant of its argument that the jurisdiction of the English Court to decide the issue of forum in proceedings before it is being interfered with.

35. Finally, C invites the Court to make an order in its favour that D pays to it the costs of this action, including those of its application dated 30.11.07, the First Application and the Second Application, such costs to be subject to detailed assessment, if not agreed. C submits that such an order should be made on the following grounds:

15

(a)    D has now admitted C's claim and submitted to the Court's jurisdiction. Costs, therefore, should follow the event;

(b)    as regards the First Application:

(i)    C has by its conduct conceded that this order should be set aside, because it no longer intends to contest jurisdiction;

(ii)    it is submitted that the order would have been set aside, in any event, because it was obtained in circumstances where D did not make full and frank disclosure to the Court and, indeed, misled the Court (see: para. 14 above);

(c)    as regards the Second Application:

(i)    the action taken by C so far in relation to the Second Application has been to secure a hearing in this Court on 13.3.08 with a view to this Court deciding whether it is the appropriate forum for deciding whether the parties' claims should be determined in this jurisdiction or in the US. Up until D's solicitors' letter dated 5.3.08, C and D had both agreed that their claims should be heard together in the same jurisdiction. As stated above, the fact that "duplicitous" and "collateral" proceedings were proceeding in

16

England was one of the main grounds which D relied on in support of its Motion;

(ii)    C's case was that England was the appropriate forum to determine the issue of forum for the parties' claims and that by taking action in the Illinois Court and also by obtaining the order of Master Fontaine, D had as part of a deliberate tactical manoeuvre sought to interfere with the English court's jurisdiction to determine that issue and had wrongly procured that issue to be arrogated to the Illinois Court (see: <u>General Star Indemnity Limited v Sterling Cooke Browne Reinsurance Brokers Limited)</u>;

(iii)   by accepting the English court's jurisdiction and forum, D has expressly conceded that England is the appropriate jurisdiction for the determination of C's claim;

(iv)    further, by withdrawing its Motion in the United States and not disputing the merits of C's claim, D has taken steps to ensure that its claims and the issue of forum relating to its claims are determined in the US separately from C's claims in this jurisdiction. By yet further tactical manoeuvring on its part, it has now secured the position whereby its previous oppressive conduct in procuring the US court to interfere with the English court's <u>right</u> (such right being admitted in D's solicitors' letter dated

17

5.3.08) to determine its jurisdiction over C's and D's claims (which up 5.3.08 both parties had agreed should be determined in the same jurisdiction) was removed. Up until this point, D had fought vigorously to have C's and D's claims, and the issue of which forum should determine such claims, decided by the Illinois Court. D has, therefore, conceded C's Second Application that England was the appropriate jurisdiction to determine whether it or the Illinois Court was the appropriate forum to try the disputes between the parties;

(v)    if D had from the beginning not disputed the English court's jurisdiction or the merits of C's claims and had not filed the Motion in the Illinois Court, none of the costs relating to the First and Second Applications would have been incurred.

(d)    finally, C would ask the Court to make an order that D pay to C £50,000 on account of its costs under CPR 44(8). C's total costs are about £75,000.

Tina Kyriakides
11 Stone Buildings
Lincolns Inn
London WC2A 3TG

19

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

CLAIM NO: HQ07X04142

In the matter of an intended action

BETWEEN

CANNON AUTOMOTIVE LIMITED

Intended Claimant

and

MACNEIL AUTOMOTIVE PRODUCTS LIMITED
(A COMPANY REGISTERED IN ILLINOIS, USA)

Intended Defendant

SKELETON ARGUMENT OF INTENDED DEFENDANT
FOR HEARING ON 13 MARCH 2008

## INTRODUCTION

1. This is the skeleton argument of the Intended Defendant ("MacNeil") for the hearing on 13 March 2008 on the application of the Intended Claimant ("Cannon") for an interim anti-suit injunction.

2. The issues before the Court are likely to be ones of procedure and form, rather than substance. However, should Cannon maintain its present position, i.e. that it seeks the order unless MacNeil agrees to a raft of matters to which MacNeil has no obligation to agree, it may be that the Court will be required to consider the merits of the anti-suit application.

3. For the reasons set out below, Cannon's application for an anti-suit injunction should be dismissed. There are disputes between the parties that remain in any event, particularly as to costs. MacNeil should have its costs of the anti-suit

injunction. It has always been (a) too widely drawn and (b) without merit. Other issues on costs also arise.

4.     The Court is invited to pre-read, if possible, the application at **B1/11**, Marshall 3rd, in support of the application **B1/12** and Harrison 1st ([!!]). In reading these two witness statements, it is suggested that the Court should not get bogged down in the detail of the merits arguments. Otherwise the Court is invited to read documents and parts of documents cited below. It is estimated that this pre-reading will take less than 2 hours.

## THE PROCEDURAL BACKGROUND

5.     The procedural background to Cannon's application is as follows:

(1)     The present proceedings ("the English Proceedings") were issued on 3 December 2007 and served on MacNeil in the United States on 20 December 2007. As amended, Cannon is seeking some £400,000 in total for unpaid invoices for the supply of car mats to MacNeil. **[B1/4]**[1]

(2)     On 7 January 2008, MacNeil filed a complaint against Cannon in the Illinois Court ("the US Proceedings") **[B1/6/154]**, the nature of which is addressed further below.

(3)     On 8 January 2008, MacNeil filed a Motion before the Illinois Court to enjoin Cannon from pursuing the English Proceedings ("the Motion to Enjoin") **[B1/6/96]**. As set out further below, MacNeil has now filed a motion to withdraw its Motion to Enjoin.

(4)     On 20 February 2008, as it had indicated that it would on 24 January 2008, Cannon filed in the US Proceedings a motion to dismiss or stay the US Proceedings ("Cannon's Motion to Dismiss"). That motion, together with the Memorandum in Support, without its exhibits, are at [!!].

(5)     In its Motion to Dismiss, Cannon has invited the Illinois Court to decline jurisdiction on what can be conveniently described as *forum non conveniens* grounds. It should be noted that paragraph 8 on page

---

[1]     References are to the Tab and then page number of the draft Bundle produced by the Claimants. A final bundle is to be provided only after this skeleton is due. References now incomplete will then be completed.

14 of the Memorandum in Support (page [!!]) accepts that: "*It would appear that both the UK and the U.S. Courts can obtain jurisdiction over the parties*". Thus, Cannon accepts that the Illinois Court has jurisdiction over the US Proceedings, but is presently inviting the US Court to decline to exercise that jurisdiction on forum grounds.

(6)    On 18 February 2008, Cannon issued the application presently before the Court, seeking an anti-suit injunction against MacNeil from taking any further steps in the US Proceedings **[B1/11]**. The order sought has always sought to restrain the entire US Proceedings, including even restraining MacNeil from responding to Cannon's Motion to Dismiss.

(7)    In the US Proceedings, on 24 January 2008, the judge set a timetable for the two motions that were either before it, or had been indicated. This has been extended by agreement, but the present position is that the final filings (i.e. submissions) on the motions are to be completed by 2 April 2008. In particular, MacNeil's opposition to Cannon's Motion to Dismiss is to be filed on 12 March 2008, while Cannon's reply on its Motion to Dismiss is due to be filed on 2 April 2008 (see Phillips 2nd, paragraph 7 **[B1/10/217]**).

(8)    The Illinois Court has indicated that it is aware of the need for an urgent decision on the matters before it and the judge stated that she would put the matter on "*our special quick ruling list, because I do think you need a quick resolution*" paragraph 8 of Phillips 2nd **[B1/10/8]**. It is therefore reasonable to assume that the Illinois Court will be ruling in the not too distant future upon the matters still before it, i.e. Cannon's Motion to Dismiss.

(9)    On 5 March 2008, MacNeil's UK solicitors (Winston & Strawn) wrote to Cannon's solicitors (page [!!]), offering the following undertakings from MacNeil (which it is prepared to give to this Court):

(i)    To withdraw MacNeil's Motion to Enjoin.

(ii)    Not to defend the English Proceedings any further.

(10)    On 6 March 2008, MacNeil carried into effect its undertaking to withdraw the Motion to Enjoin, by filing a motion to withdraw in the US (see !!).

6.  Thus, the present position is that:

    (1)  The English Proceedings have effectively come to an end with Cannon being able to proceed to default judgment;

    (2)  There is no longer any anti-suit motion in the US by MacNeil (or it has been withdrawn);

    (3)  The Illinois Court is shortly to decide whether to exercise its accepted jurisdiction in the US.

7.  While MacNeil has undertaken to withdraw the Motion to Enjoin and not to defend the English Proceedings, it has not consented to anything else. Cannon needs to proceed to default judgment in the normal way, i.e. by having the order of Master Fontaine set aside and then proceeding to default judgment in the manner prescribed by CPR Part 12. (In this respect, and in others, the draft order suggested by Manches' letter of 10 March 2008 is wrong: see further below and Winston & Strawn's letter of 11 March 2008).

**THE LAW**

8.  The law on anti-suit injunctions is now well-established. The applicable principles are set out in the decision of the Privy Council in *Societe Nationale Industrielle Aerospatial v Lee Kui Jak* [1987] 1 AC 871 at 892-6 and 899:

    (1)  The jurisdiction is to be exercised where the "ends of justice" require it (892A).

    (2)  Where the court grants the injunction restraining proceedings in a foreign court, its order is directed not against the foreign court but against the parties so proceeding or threatening to proceed (892B-C).

    (3)  It follows that an injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy (892E).

(4)     Since such an order indirectly affects the foreign court, the jurisdiction is one which must be exercised with caution (892E).

(5)     The purpose of the injunction may be to protect the jurisdiction of the English Court, for example where a party seeks to avoid the pari passu rule in a winding-up by means of the foreign proceedings (892H-893A).

(6)     An injunction may be granted where a party has commenced proceedings in two jurisdictions relating to the same subject matter, such that the English Court may compel the party to elect where to bring the proceedings (893B-C).

(7)     The court will only restrain the plaintiff from pursuing the foreign proceedings if the pursuit of such proceedings is vexatious or oppressive.  These notions should not be restricted by definition (893E-F).

(8)     Pure vexation occurs when the proceedings are so utterly absurd that they cannot possibly succeed (893H).

(9)     Vexation also occurs when the plaintiff, not intending to annoy or harass the defendant, but thinking he could get some fanciful advantage sues him in two courts at the same time under the same jurisdiction (893H-894A).

(10)    Proceedings are not vexatious merely because they are brought in an inconvenient place (894C).

(11)    Proceedings may also be restrained where they are oppressive. Litigants may now be encouraged to proceed in foreign jurisdictions, having no connection with the subject matter of the dispute, which exercise an exceptionally broad jurisdiction and which offer such great

- 5 -

inducements, in particular greatly enhanced, even punitive, damages, that they may tempt litigants to pursue their remedies there (894D-E).

(12)    If the English Court concludes that it is the natural forum for the adjudication of the relevant dispute, and that by proceeding in the foreign court the plaintiff is acting oppressively, the English court may, in the interests of justice, grant an injunction restraining the plaintiff from pursuing the proceedings in the foreign court (894F-G).

(13)    It is **insufficient** to show that (1) the English Court is the natural forum and (2) justice does not require that the action should be allowed to proceed in the foreign court. If that were the test it would allow the English court, in circumstances where there is simply a difference of view between the English and the foreign court as to which is the natural forum, to arrogate to itself by the grant of an injunction the power to resolve that dispute. This would be inconsistent with the principle of comity and to disregard the fundamental requirement that an injunction will only be granted where the ends of justice so require (895D-G).

(14)    What is required is that the English court should conclude that (1) it is the natural forum for the trial of the action and (2) since an injunction will only be granted to prevent injustice, that the pursuit of the foreign proceedings would be vexatious or oppressive (896F-G).

(15)    As part of this inquiry account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. The court will not grant an injunction if by doing so it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him. (896G-H).

9.    In short, in order to obtain an anti-suit injunction it is necessary both that England is the natural forum and, in addition, that the pursuit of the foreign proceedings is vexatious or oppressive.

10.    A useful summation of the correct approach is contained in *Simon Engineering plc v Butte Mining plc* [1996] 1 Lloyd's Rep 104 at 106-107. After referring to *Aerospatiale* Rix J went on at 107 to quote from the judgment of Hoffmann J in *Barclays Bank plc v Homan* [1992] BCC 757 as follows:

> "*In Homan an English bank sought to injunct the administrators of an English company, whose principal assets were American, from taking proceedings in the United States Bankruptcy Court to recover as a preference a payment of U.S.$30 m. made by the company to the bank out of the proceeds of sale of American assets. The Court of Appeal upheld the decision of Mr. Justice Hoffmann refusing the injunction. The company had filed a petition under Chapter 11 in the United States Bankruptcy Court on the day before it entered into administration in England. The United States Court had jurisdiction for these purposes on the ground that the company had assets in the United States. The American and the English statutory provisions relating to preference were very similar. The jurisdictional issue was whether the connecting factors with the United States were sufficient to justify maintenance of the proceedings to recover the preference there. That was a decision that the U.S. court had yet to make. There was nothing vexatious or oppressive about the U.S. proceedings. In the course of his judgment Mr. Justice Hoffmann said this:*
>
> > *Today the normal assumption is that an English court has no superiority over a foreign court in deciding what justice between the parties requires and in particular, that both comity and common sense suggest that the foreign judge is usually the best to decide whether in his own court he should accept or decline jurisdiction, stay proceedings or allow them to continue. The principle, as Lord Scarman said in Laker (at p. 95) is that:*
> >
> > > *(The) equitable right not to be sued abroad arises only if the inequity is such that the English court must intervene to prevent injustice.*
> >
> > *In other words, there must be good reason why the decision to stop the foreign proceedings should be made here rather than there. Although the injustice which can justify an anti-suit injunction must inevitably be judged according to English notions of justice, it will usually be assumed that a similar quality of justice is available in the foreign court. So the fact that proceedings would, if brought in England, be struck out as vexatious or oppressive in the domestic sense, will not ordinarily in itself justify the grant of an injunction to*

*restrain their prosecution in a foreign court. **The defendant will be left to avail himself of the foreign procedure for dealing with vexation or oppression**: Midland Bank plc v. Laker Airways Ltd. [1986] 1 Q.B. 689 per Lawton L.J. at p. 700.*

*It is the exceptional cases in which justice requires the English Court to intervene which cannot be categorised or restricted. **But a theme common to certain recent decisions is that the foreign Court is, judged by its own jurisprudence, likely to assert a jurisdiction so wide either as to persons or subject-matter that to English notions it appears contrary to accepted principles of international law. In such cases the English court has sometimes felt it necessary to intervene by injunction to protect a party from the injustice of having to litigate in a jurisdiction with which he has had little, if any, connection, or in relation to subject-matter which had insufficient contact with that jurisdiction, or both.** Since the foreign court is per hypothesi likely to accept jurisdiction, this is a decision which has to be made here if it is to be made at all. There are cases in which the judicial or legislative policies of England and the foreign court are so at variance that comity is overridden by the need to protect British national interests or prevent what it regards as a violation of the principles of customary international law [at p. 762D-H].*

*The fact that a U.S. court might take a different view of the weight of the relevant connecting factors is not in itself a ground upon which this court would grant an injunction. This was made clear by Lord Goff in Aerospatiale, when he dealt with what seems to me the analogous case of the discretion to stay proceedings on grounds of forum non conveniens (at p. 895F):*

*. . .in a case where there is simply a difference of view between the English court and the foreign court as to which is the natural forum, the English court (cannot) arrogate to itself, by the grant of an injunction, the power to resolve that dispute.*

*In other words, the normal assumption is that the foreign judge is the best person to decide whether an action in his own court should proceed. Comity requires a policy of non- intervention not only for the same reason that appellate courts are reluctant to interfere with the exercise of a discretion, namely that in the weighing of the various factors, different judges may legitimately arrive at different answers. It is also required because the foreign court is entitled, without thereby necessarily occasioning a breach of international law or manifest injustice, to give effect to the policies of its own legislation. Such legislation may have a broader reach than English legislation without necessarily attracting the international opprobrium which the US antitrust jurisdiction has done (at 765H/766A). "*

## THE LAW AND THE PRESENT FACTS

11.     These issues are still relevant because Cannon maintains that it is entitled to
        an anti-suit injunction, of which it is only prepared to agree a stay.
        Moreover, there are issues on costs. Cannon claims that it is entitled to all of
        its costs of the present anti-suit application. However, it has not achieved
        what it (improperly) set out to achieve, i.e. a stay of the entire US
        Proceedings. On any basis, Cannon has never been entitled to this. From the
        outset, MacNeil has consistently pointed out that there was no basis for
        seeking an injunction in the form sought, because there was nothing
        vexatious or oppressive about the US Proceedings (see Winston & Strawn's
        letter of 19 February 2008 **[B1/15/424]**).

12.     Before going on to consider the application of the law to the facts, it is first
        necessary to appreciate the nature of MacNeil's claim in the US.

13.     The Court is referred in this respect to the Complaint in the US Proceedings
        at pages 59 to 77 of KP1 (exhibit to Phillips 2nd) **[B1/6/154]**. The claim has
        two essential elements:

        (1)     A claim for substantial damages for the supply by Cannon of
                defective mats, together with a claim for a declaration that, as a result
                of those defects, MacNeil is not obliged to pay the invoices to which
                the English Proceedings relate, but Cannon is obliged to pay MacNeil
                substantial damages;

        (2)     A claim for conversion of tooling machinery by Cannon.

14.     The basis for the first claim for supply of defective mats is set out in detail in
        the Complaint. The Court should note the following matters:

        (1)     Although there are various Counts (i.e. roughly the equivalent of
                causes of action) set out in paragraphs 38 and following of the
                Complaint, in each one of them MacNeil seeks the same remedy,
                namely damages for "lost profits, lost business opportunities, damage
                to its reputation, replacement of goods, and other such actual and
                consequential damages, in an amount not yet determined, but which

are not less than \$4 million" **[B1/6/165]**. There is no plea for anything like exemplary/punitive or aggravated damages.

(2)    As is clear from Count II (page 70 of KP1) **[B1/6/165]**, MacNeil does not dispute in the US Proceedings that the mats were supplied and have been invoiced for, which invoices are unpaid. What it claims in the US Proceedings is, to use English terminology, a right to set-off against those sums the damages it has suffered.

(3)    Count VIII (page 77) **[B1/6/172]** deals with the second aspect of MacNeil's claim in the US Proceedings, which is a claim for conversion of tooling loaned to Cannon by MacNeil. The Court should note that this is an entirely separate claim. While it arises from the circumstances of the relationship between Cannon and MacNeil, there is a distinct and separate issue as to the basis upon which the tooling was provided to Cannon, which is, in effect, a free-standing claim that will have no bearing on the issues surrounding the mats.

15.    There is no basis for any anti-suit injunction against MacNeil's US Proceedings. Nor has there ever been. Even if England were the natural forum (which it is not), there would be nothing "vexatious or oppressive" about MacNeil bringing its claim in the US. Cannon itself has conceded that the Illinois Court has jurisdiction and, on well established principles set out above, it is for that court to decide whether it wishes to exercise that jurisdiction, or to decline to do so on the grounds that England is a more appropriate forum. This is the issue that Cannon is asking the Illinois Court to determine in its current Motion to Dismiss. In other words, Cannon has quite inappropriately been seeking two bites at the cherry in trying to stop the US Proceedings.

16.    In seeking permanently (and on an interim basis) to injunct the entire US Proceedings, Cannon has always been seeking a remedy that it could only obtain from the Illinois Court.

17.    The first point to note is that England is **not** the natural forum for MacNeil's claim. For the reasons set out in paragraphs 22 to 23 of Harrison 1st, Illinois

is a more suitable jurisdiction than England for deciding MacNeil's claims. Since Cannon cannot even satisfy the test that England is the "natural forum", it is clear that it is not entitled to an anti-suit injunction.

18.    In any event, there is nothing "vexatious or oppressive" about the US Proceedings. This has always been clear. It appears from Cannon's own evidence in support. Marshall 3rd, paragraph 48 **[B1/12/251]** does not set out anything approaching a valid case for the US Proceedings being "vexatious or oppressive". Looking at the individual subparagraphs:

(1)    Cannon has never had a claim in the US and will never have one. This point can only relate to its costs of defeating MacNeil's claim. As a general rule, costs are not awarded in the US. However, Cannon's complaint is only good insofar as it succeeds in the US Proceedings. Obviously, if Cannon loses, it will not be volunteering to pay MacNeil's costs. If this amounted to "vexation or oppression", the English courts would have to injunct every claim against English defendants brought in the US legal system, which generally does not award costs.

(2)    Mr Marshall's assertions on the merits are addressed in detail in Harrison 1st, paragraphs 14 to 19. MacNeil vigorously denies them. Of course, this Court cannot assess the merits of the claims at this interlocutory stage, but, as noted in Harrison 1st, Cannon has no given response to the claim on the BMW mats, while its assertion that MacNeil gifted the tooling to Cannon is not only surprising, but plainly belied by the documentation. In any event, even if Cannon were right that MacNeil's claim was weak or inflated, this would not be a ground to injunct the US proceedings as "vexatious or oppressive". This would be a matter for Cannon to take up in Illinois (see dicta of Hoffman J, cited above).

(3)    Mr Marshall advances no evidence at all to support his assertion about Illinois juries. There is no foundation for it at all and this Court cannot proceed upon any assumptions about what an Illinois jury might or might not do.

(4)    Finally, there have never been the same set of proceedings in the US

and the UK. In the UK there have been a claim for invoices. In the US there has been a claim for damages, conversion and set-off. There has been no risk of irreconcilable judgments *at any time*. Even if there had been, this would not amount to "vexation or oppression". In any event, any such argument has been removed as a result of MacNeil's undertaking not to defend the English Proceedings.

19. In short, the authorities make clear that Cannon's application for an anti-suit injunction has always been doomed to failure. Cannon's own evidence shows that it has no proper argument of "vexation or oppression". Equally, authorities such as *Simon Engineering plc v Butte Mining plc* and *Barclays Bank plc v Homan* made it clear long ago that it was for the foreign court to decide whether it wished to restrain jurisdiction and that the English Courts should not interfere in such process, absent very peculiar circumstances, none of which are present now.

20. For these reasons, the Court should simply dismiss the application for an anti-suit injunction, for which there has never been, and can never be, any proper basis.

21. For the same reasons, Cannon is not entitled to its costs of its anti-suit application. On the contrary, these should be awarded to MacNeil. The application has always been misconceived in seeking to injunct the US Proceedings, instead of letting the Illinois Court decide whether it wishes to exercise its accepted jurisdiction, as it is shortly to do pursuant to Cannon's own motion. This was pointed out as early as Winston & Strawn's letter of 19 February 2008 **[B1/15/424]**.

22. In any event, the following points also arise on the costs of Cannon's anti-suit application:

(1) The Court should disallow the costs of Marshall 3rd. The vast bulk of that statement goes into the merits of the case. This is wholly inappropriate for what is an interlocutory application of this sort. There is no sensible basis upon which the Court could ever have

decided these issues, which are for trial. Moreover, it provided a highly slanted version of events, as shown by Harrison 1st. All the costs expended in dealing with such matters have been wasted.

(2)    The Court should also reduce any costs awarded to Cannon on the basis of its delay in responding to Winston & Strawn's letter of 5 March 2008. This was sent within office hours in the UK (and relatively early in the US working day). Yet Manches did not respond in any way until 10 March 2008 (after close of business in the UK). As a result of this delay, MacNeil was forced to file Harrison 1st, in particular to respond to all the issues on the merits raised by Marshall 1st. Contrary to the assertion in Manches letter of 10 March 2008, most of the costs of preparing Harrison 1st were incurred in the last 24 hours before it was served. Had Manches replied on a timely basis (i.e. by the afternoon of 6 March), these costs would have been avoided.

## MANCHES' DRAFT ORDER

23.    MacNeil's position on the terms of the draft order suggested by Manches' letter of 10 March 2008 ([!!]) are set out in the letter of Winston & Strawn dated 11 March 2008 ([!!]). This also enclosed a revised draft order.

24.    The first point to note is that the draft order purports to be a consent order. MacNeil has consented to nothing and will not consent to the matters set out.

25.    As to the detail, the undertaking is unsatisfactory:

(1)    MacNeil has already issued its motion to withdraw in the US Proceedings. The court cannot order it to do what it has already done. Paragraph (1) of the undertaking needs to become a recital.

(2)    Undertaking 2 is satisfactory, save for paragraph (b). Given that MacNeil has now filed its motion to withdraw, it is not understood what this paragraph might require and the Court should not make such an order in such general and vague terms.

26.    As to the remainder of the order, MacNeil has not consented and will not consent to any of these matters. As to the individual sub-paragraphs:

(1)    MacNeil makes no opposition to this order;

(2)    MacNeil makes no opposition to this order;

(3)    MacNeil does not accept that Cannon is entitled to judgment on 13 March 2008. The procedure for obtaining judgment in default is set out in CPR Part 12. Cannon has not complied with this and the time limits have not yet expired, particularly given that the amendment has only just been permitted. Cannon should proceed to default judgment in the prescribed manner.

(4)    As to the costs sought:

(i)    MacNeil does not oppose an order for costs for Cannon's application 19 January 2008, to be assessed if not agreed. This application is before the Court and MacNeil is no longer defending the English Proceedings.

(ii)    The issue of Cannon's costs of the action and the issue of Cannon's costs of its application to serve out are not before the Court at this hearing and will fall to be dealt with in any default judgment.

(iii)    MacNeil **does** oppose, for the reasons set out above, any order that Cannon should obtain its costs of its application dated 18 February 2008. On the contrary, MacNeil should have its costs of the application.

(5)    MacNeil further opposes any order for interim costs. On any basis, the figure of £50,000 is extraordinarily high, particularly for an interim order, and is entirely unsupported. Nor is there any application for such an order. Nor should the Court be making any order relating to the costs of the action in light of the fact that there should be no default judgment. Finally, MacNeil is entitled to its costs of the application for an anti-suit injunction and such costs would need to be offset against any order for costs in favour of Cannon.

(6)    The Cannon's application should not be stayed, but dismissed, for the

reasons set out above.

(7)    See (6).

**EDMUND NOURSE**

12 March 2008

**1 Essex Court,**

**Temple**

*KNTS*

# PRACTICE DIRECTION – PROTOCOLS

## 4.    PRE-ACTION BEHAVIOUR IN OTHER CASES

4.1  In cases not covered by any approved protocol, the court will expect the parties, in accordance with the overriding objective and the matters referred to in CPR 1.1(2)(a), (b) and (c), to act reasonably in exchanging information and documents relevant to the claim and generally in trying to avoid the necessity for the start of proceedings.

4.2  Parties to a potential dispute should follow a reasonable procedure, suitable to their particular circumstances, which is intended to avoid litigation. The procedure should not be regarded as a prelude to inevitable litigation. It should normally include –

(a) the claimant writing to give details of the claim;

(b) the defendant acknowledging the claim letter promptly;

(c) the defendant giving within a reasonable time a detailed written response; and

(d) the parties conducting genuine and reasonable negotiations with a view to settling the claim economically and without court proceedings.

4.3  The claimant's letter should –

(a) give sufficient concise details to enable the recipient to understand and investigate the claim without extensive further information;

(b) enclose copies of the essential documents which the claimant relies on;

(c) ask for a prompt acknowledgement of the letter, followed by a full written response within a reasonable stated period;

(For many claims, a normal reasonable period for a full response may be one month.)

(d) state whether court proceedings will be issued if the full response is not received within the stated period;

(e) identify and ask for copies of any essential documents, not in his possession, which the claimant wishes to see;

(f) state (if this is so) that the claimant wishes to enter into mediation or another alternative method of dispute resolution; and

(g) draw attention to the court's powers to impose sanctions for failure to comply with this practice direction and, if the recipient is likely to

be unrepresented, enclose a copy of this practice direction.

4.4 The defendant should acknowledge the claimant's letter in writing within 21 days of receiving it. The acknowledgement should state when the defendant will give a full written response. If the time for this is longer than the period stated by the claimant, the defendant should give reasons why a longer period is needed.

4.5 The defendant's full written response should as appropriate –

(a) accept the claim in whole or in part and make proposals for settlement; or

(b) state that the claim is not accepted.

If the claim is accepted in part only, the response should make clear which part is accepted and which part is not accepted.

4.6 If the defendant does not accept the claim or part of it, the response should –

(a) give detailed reasons why the claim is not accepted, identifying which of the claimant's contentions are accepted and which are in dispute;

(b) enclose copies of the essential documents which the defendant relies on;

(c) enclose copies of documents asked for by the claimant, or explain why they are not enclosed;

(d) identify and ask for copies of any further essential documents, not in his possession, which the defendant wishes to see; and

(The claimant should provide these within a reasonably short time or explain in writing why he is not doing so.)

(e) state whether the defendant is prepared to enter into mediation or another alternative method of dispute resolution.

4.7 The parties should consider whether some form of alternative dispute resolution procedure would be more suitable than litigation, and if so, endeavour to agree which form to adopt. Both the Claimant and Defendant may be required by the Court to provide evidence that alternative means of resolving their dispute were considered. The Courts take the view that litigation should be a last resort, and that claims should not be issued prematurely when a settlement is still actively being explored. Parties are warned that if this paragraph is not followed then the court must have regard to such conduct when determining costs;

It is not practicable in this Practice Direction to address in detail how the parties might decide which method to adopt to resolve their

particular dispute. However, summarised below are some of the options for resolving disputes without litigation:

- Discussion and negotiation.
- Early neutral evaluation by an independent third party (for example, a lawyer experienced in that field or an individual experienced in the subject matter of the claim).
- Mediation – a form of facilitated negotiation assisted by an independent neutral party.

The Legal Services Commission has published a booklet on 'Alternatives to Court', CLS Direct Information Leaflet 23 (www.clsdirect.org.uk/legalhelp/leaflet23.jsp), which lists a number of organisations that provide alternative dispute resolution services.

It is expressly recognised that no party can or should be forced to mediate or enter into any form of ADR.

4.8    Documents disclosed by either party in accordance with this practice direction may not be used for any purpose other than resolving the dispute, unless the other party agrees.

4.9    The resolution of some claims, but by no means all, may need help from an expert. If an expert is needed, the parties should wherever possible and to save expense engage an agreed expert.

4.10   Parties should be aware that, if the matter proceeds to litigation, the court may not allow the use of an expert's report, and that the cost of it is not always recoverable.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) |  |
| Plaintiff, | ) ) | No. 08 C 139 |
| v. | ) ) ) |  |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | Hon. Joan B. Gottschall  Magistrate Arlander Keys |
| Defendant. | ) ) |  |

## DECLARATION OF ALLAN THOM

Allan Thom, pursuant to 28 U.S.C §1746, declares as follows:

1.    I am the Vice-President of MacNeil Automotive Products Limited ("MacNeil"). I have been MacNeil's Vice-President since 1999.

2.    As MacNeil's Vice-President I am, and have been, responsible for operational affairs particularly pertaining to product development.

3.    MacNeil was formed in 1989 by David F. MacNeil. Since its formation, MacNeil has been a supplier of automotive accessories including, among other things, floor liners and mats. MacNeil now manufacturers most of the automotive accessories that it sells.

4.    MacNeil's corporate offices, design and manufacturing facilities and workforce are located in Downers Grove, Illinois. MacNeil is an Illinois corporation. MacNeil has no facilities, employees or other presence outside of Illinois.

5.    The following MacNeil representatives played important roles in the Hyundai and/or BMW programs: David MacNeil, myself, Michael Bishop, Del Hollingsworth, Roger

Conner, Paul Mound and Dan Barton. Additionally, Jason Houcek, a former MacNeil employee, was also involved in the Hyundai program. All of these individuals (except for Roger Conner and Paul Mound – who both reside in the United States) reside in Illinois.

6.    The individuals involved in the Hyundai and BMW programs from these companies include George Kurth (HMA); Daniel Cordes (BMW USA) and Michael Barrett (BMW USA). To the best of my knowledge, Mr. Kurth resides in California. Messrs. Cordes and Barrett reside in New Jersey and Connecticut, respectively. These individuals have extensive knowledge regarding the Cannon defects at issue with the BMW and Hyundai programs.

7.    MacNeil has extensive documentation related to MacNeil and Hyundai warranty claims, substantial correspondence with both Hyundai and BMW, numerous inspection reports, documentation regarding product rejects, quality checklists and protocols, purchase orders and correspondence between MacNeil and Cannon, and hundreds if not thousands of photographs documenting the defective Cannon mats for both Hyundai and BMW.

8.    All of MacNeil's documentary evidence regarding the Hyundai and BMW programs is maintained in Downers Grove, Illinois. Furthermore, all of the physical evidence regarding the defective Hyundai and BMW mats is located in Downers Grove, Illinois where MacNeil also is currently storing approximately 1,000 pounds of defective mats rejected by Hyundai.

9.    With regard to the defect issues, in about mid-May, 2005, Cannon's Head of Design, James Ashley, and members of Cannon's design team, along with Bob Peacock, visited MacNeil's operations in Downers Grove, Illinois. During the meeting, MacNeil and Cannon representatives discussed Hyundai rejects and delivery delays. The Cannon representatives

promised that Cannon would rectify the problems by developing a third set of tools and increasing the thickness of the rubber pad to retain more heat during adhesion of the carpet to the mat.

10.    In November 2005, Cannon's Operation Manager, Bob Peacock again visited MacNeil's facility in Downers Grove, Illinois to personally inspect some of the defective mats which Cannon had manufactured. Rather than acknowledge the problems with the Cannon manufactured mats, Mr. Peacock told me and other representatives of MacNeil that MacNeil's inspection process was "too stringent" and was "provoking the carpet's separation".

11.    On May 10, 2006, Cannon representatives Bob Peacock and James Ashley again visited MacNeil at its Downers Grove, Illinois headquarters to discuss further quality concerns regarding carpet adhesion and color consistency.

12.    In October 2007, Mr. Peacock again came to Chicago for a meeting at MacNeil to discuss Cannon's invoice claims and MacNeil's claims regarding the defective mats. This was the fourth meeting in Chicago attended by one or more Cannon representatives to discuss the quality issues concerning the Hyundai and BMW mats. There were no meetings specifically requested in England regarding these issues.

13.    I am over the age of twenty one years and have personal knowledge of the matters set forth herein.

14.    I declare under penalty of perjury that the foregoing is true and correct. I have executed this Declaration on March 12, 2008.

Allan Thom

## CERTIFICATE OF SERVICE

        The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing DECLARATION OF ALLAN THOM via electronic filing, on or about the 12th day of March, 2008 on:

William N. Howard
John T. Shapiro
Terrence J. Sheahan
Suzanne M. Rose
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
(312) 360-6520



          /s/   Robert S. Grabemann
             Robert S. Grabemann

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MACNEIL AUTOMOTIVE PRODUCTS )
LIMITED, an Illinois Corporation, )
                                  )
        Plaintiff,                )       No. 08 C 139
                                  )
    v.                            )
                                  )       Hon. Joan B. Gottschall
CANNON AUTOMOTIVE LIMITED, f/k/a  )
CANNON RUBBER LIMITED,            )       Magistrate Arlander Keys
AUTOMOTIVE DIVISION,              )
a United Kingdom Company,         )
                                  )
        Defendant.                )

## DECLARATION OF DAVID F. MACNEIL

David F. MacNeil, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the founder of MacNeil Automotive Products Limited ("MacNeil
Automotive"). I founded MacNeil Automotive in 1989.

2.      In about August 1989, I was visiting the United Kingdom and saw floor mats that
had been manufactured by Cannon Rubber Limited A/K/A Cannon Automotive Limited
("Cannon"). When I returned to the United States, I contacted Cannon and eventually spoke
with Henry Carlton, one of Cannon's senior representatives. I asked Mr. Carlton whether
Cannon had a distributor for its products in the United States and, if not, whether it would be
interested in having someone sell its mats in the United States.

3.      Mr. Carlton responded that Cannon might have an interest in pursuing a
relationship with a U.S. distributor. He then shipped me some mats to review, and a couple of
weeks later I traveled to England to meet with Edward Atkin, Cannon's chief executive officer,
at which time we discussed a possible supplier/distributor arrangement.

4.     About two weeks after my trip to England, Mr. Carlton came to Chicago to meet with me. He spent about a week meeting with me and reviewing my business. Before he returned to England, Mr. Carlton and I agreed that I would wire Cannon payment for a twenty foot container of mats, and Cannon would ship the mats to Chicago and then I would sell them in the United States.

5.     The oral agreement that Mr. Carlton and I reached in Chicago in 1989 formed the basis for the future business dealings between Cannon and MacNeil Automotive. In the years that followed, MacNeil Automotive would simply wire funds to Cannon and Cannon would supply the requested product to MacNeil Automotive.

6.     Since Mr. Carlton's first visit in 1989, Cannon representatives have come to Chicago at least once a year to meet with MacNeil Automotive representatives regarding various aspects of our business relationship. This includes several occasions in which Cannon representatives have come to Chicago to meet with MacNeil Automotive representatives regarding the quality control issues concerning the Hyundai and BMW programs.

7.     In or about November 2006, I communicated several times to both Edward Atkin, Cannon's principal officer, and Bob Peacock, Cannon's Operations Manager, that MacNeil would be forced to take back and destroy Cannon's defective Hyundai mats – approximately 240 pallets worth. On numerous occasions I invited both Mr. Atkin and Mr. Peacock – or any Cannon representative – to visit Chicago to review the situation for themselves, and so that we could discuss the relevant issues. No representative of Cannon ever visited MacNeil to review the defective Hyundai mats or their destruction.

8.    In October 2007, Mr. Peacock came to Chicago for a meeting with myself and Al Thorn at MacNeil's location in Downers Grove to discuss Cannon's invoice claims and MacNeil's claims regarding the defective mats.

9.    At this meeting, I informed Mr. Peacock that MacNeil had hundreds of these sets of defective Cannon mats in its possession and that we could review these mats if he so desired. Mr. Peacock declined my invitation to review the numerous sets of defective Cannon mats that MacNeil had in its possession at its Downers Grove facility. Even though Mr. Peacock declined my invitation to view all of the defective mats MacNeil had in its possession, I showed him three to five examples of these defective mats, which were in the room in which we held the meeting.

10.    I also informed Mr. Peacock at this meeting that if Cannon comes after MacNeil in a U.S. court I will have damages for my reputation, my lost profits, lost business and my legal fees. I also told Mr. Peacock that MacNeil employees would gladly testify in front of a judge and jury in a U.S. court as to what happened with regard to Cannon's defective product.

11.    I am over the age of twenty one years and have personal knowledge of the matters set forth herein.

12.    I declare under penalty of perjury that the foregoing is true and correct. I have executed this Declaration on March 12, 2008.

_____
David F. MacNeil

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing DECLARATION OF DAVID F. MACNEIL via electronic filing, on or about the 12th day of March, 2008 on:

William N. Howard
John T. Shapiro
Terrence J. Sheahan
Suzanne M. Rose
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
(312) 360-6520


/s/   Robert S. Grabemann
Robert S. Grabemann

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS LIMITED, an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) | |
| CANNON AUTOMOTIVE LIMITED, f/k/a CANNON RUBBER LIMITED, AUTOMOTIVE DIVISION, a United Kingdom Company, | ) ) ) ) ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

### DECLARATION OF KENT NAPIER PHILLIPS

I, Kent Napier Phillips, make this Declaration in support of MacNeil's Motion to Enjoin Defendant From Pursuing a Collateral Proceeding in a Foreign Jurisdiction.

1.    I am a partner in the firm of Winston & Strawn LLP, resident in the London office.  My firm acts as solicitors to the Plaintiff ("MacNeil") in England.  I am a Solicitor of the Supreme Court of England & Wales, and for the last 8 years have specialized in the field of international commercial litigation and arbitration.  I am authorized to make this Declaration on behalf of MacNeil.  I make this Declaration of my own personal knowledge and based upon information and belief, and would and could competently testify to the matters set forth below if called upon to do so.

2.    Mr Timothy Schaum of Daspin & Aumont, LLP, MacNeil's Illinois attorney, has supplied me with a copy of the Claim Form issued on 6 December 2007 in the High Court of Justice (Queens Bench Division) in London, England (Claim No. HQ07X04142), and served with the Particulars of Claim on MacNeil on 20 December 2007.  I have also been

supplied with a copy of the Application Notice dated 30 November 2007 (in which the Defendant, "Cannon" applied for permission to serve the Claim Form and Particulars of Claim on MacNeil who is located outside the jurisdiction of the English court), together with the witness statement of Richard Gary Marshall (Cannon's English solicitor) which was filed in support. I have reviewed these documents and a final draft of the Complaint, to be filed on behalf of MacNeil in this proceeding.

3.    I understand from my review of these documents that Cannon's claim in the English proceedings (totaling approximately £297,544.87 plus interest) relates to payment for its supply to MacNeil in Illinois of floor mats for automobiles. Cannon maintains that English law applies to the dispute. I understand that MacNeil's claim relates to losses arising out of defects in the floor mats supplied by Cannon, including losses of profits on additional business from existing customers in the US. I understand from Mr Schaum that MacNeil intends to recover its losses – exceeding $4 million - through the Courts in Illinois which would apply American law.

4.    I have not undertaken any comparative analysis of the legislation referred to in the Complaint as against English law equivalents, nor of the respective jurisdictions' laws of damages. However, the allegations made on behalf of MacNeil in Illinois would differ from those which would need to be brought if the matter were to proceed under English law. In particular:

4.1    the Complaint places reliance on the Illinois Consumer Fraud and Business Practices Act - relating to a prohibition on unfair and/or deceptive acts or practices in the normal course of trade or commerce – but I am not aware of any equivalent legislation applicable in England.

4.2    the Complaint places reliance on a covenant of good faith and fair dealing under the contracts implied by law. Again, I am not aware of any equivalent applicable at English law.

4.3    the Complaint is framed in terms of breach of certain warranties with reference to the Uniform Commercial Code; although these concepts have broad equivalents at English law these may not be co-extensive.

4.4    the scope of damages available under English law were these allegations proven (as well as those available for the breaches of contract alleged) may not be co-extensive with those available to MacNeil in Illinois. Perhaps more significantly, MacNeil may be exposed to claims from customers for damages under American law which may not necessarily be recoverable from Cannon at English law.

5.    I note that the Complaint demands a jury trial. Were MacNeil required to bring the matter before the Courts of England, it would lose any right it may have to jury trial, since the only material provision for a jury trial in civil matters in England exists in fraud, libel and slander actions, and even then is subject to the Court's discretion.

6.    I have also been asked to comment on the method of service of foreign documents required by English law. Section 1139 of the Companies Act 2006 ("Service of Documents on Company") allows service of a document by post, or by *"leaving it at the company's registered office"*. The Companies Register shows Cannon's registered office as 881 High Road, London N17 8EY. At English law service of foreign process may (but need not) follow the Hague Convention process, and may be effected by process server. In this case a solicitor of Winston & Strawn will personally serve Cannon by delivery of the Complaint and Motion to its registered office at this address, with a copy delivered to Cannon's English

solicitors, Manches LLP of Aldwych House, 81 Aldwych London WC2B 4RP (reference Mr RG Marshall).

**FURTHER AFFIANT SAYETH NOT**

Dated: January *8*, 2008

_____
Kent Phillips

Subscribed and sworn to
before me this *8th*
of January, 2008

~~Solicitor/Commissioner for Oaths~~
Notary Public

```
OFFICIAL  SEAL
TAYLOR YVES HARRINGTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2-13-2011
```

LN:21334.2

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing MACNEIL'S RESPONSE TO CANNON'S MOTION TO DISMISS OR STAY PROCEEDINGS via electronic filing, on or about the 12th day of March, 2008 on:

William N. Howard
John T. Shapiro
Terrence J. Sheahan
Suzanne M. Rose
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
(312) 360-6520


_____ /s/   Robert S. Grabemann _____
Robert S. Grabemann

# EXHIBIT B

**From:** Bob Peacock [mailto:Bob.Peacock@cannonauto.co.uk]
**Sent:** Thursday, June 08, 2006 1:39 AM
**To:** Dick Bidgood; Ruby King; Thelma Brett; Redif Husein; Steve Parish; Tony Lucciola; Andy Huggett; Trudy Smith; Alan Jackson - Junior; Alan Jackson; Dee Jackson
**Cc:** Al Thom; David F. MacNeil; Del Hollingsworth
**Subject:** FW: BMW Grey mat issue!
**Importance:** High

Can all of you please read all the emails below plus the attached photographs.

This is another example where we have let down our major customer but much more serious give him major problems with his customer !!! This is totally unacceptable and is down totally to a lack of control in our process....from mixing...to moulding...to packing !!!!!

I have personally given everybody at MacNeil Automotive assurance that this will not happen again . But why should they believe this !!!!! Later on they will get further problems from Cannon....they have lost trust in our creditability and who can blame them.

Ruby everyday somebody needs to check MacNeil products to ensure we are giving him the correct colours....the correct labels....the correct quality in all aspects....if we cannot get this right then we need to get people who can.

Dick/Ruby ...please ensure we have systems that prevent serious quality problems from ever reaching this customer or any others.

Bob


-----Original Message-----
**From:** Al Thom [mailto:arthom@macneil.com]
**Sent:** 08 June 2006 00:30
**To:** Bob Peacock
**Cc:** Dick Bidgood; David Macneil; Del Hollingsworth
**Subject:** BMW Grey mat issue!
**Importance:** High

Bob,

Our worst fears have been realized, as BMW dealers are beginning to complain of the color change to the grey mats!  We officially have a collossal mess on our hands...please see the attached photos and read below:

Another quote from BMW: a dealer in Birmingham Al. that claimes to have "several" sets that are off color and it is having an impact on his sales.
The most recent complaint came from Park Ave in NJ.  They have mats from E39 with

2003 and 2004 production dates and they are saying they have E90 mats with more current production with a similar issue. We all know the distance between front an back often makes this point moot, however, they are saying the color variation from 1 to the other is causing customer complaints.

There is a pretty good chance that BMW will require one (or more) of our people to visit every one of they're 6 warehouses in the US to "isolate" all the inferior mats so we can collect them (at our expense), and replace them by airfreight.

This is going to be ugly!

P.S. we never got a good explanation as to why-or-how the change took place in the first place!


Allan Thom


---

**From:** SSA12866@aol.com [mailto:SSA12866@aol.com]
**Sent:** Wednesday, June 07, 2006 3:12 PM
**To:** David F. MacNeil
**Cc:** Al Thom; Del Hollingsworth
**Subject:** Fwd: FW: Stock Check.

Guy's

Here is another photo of the color issue. Mt. Olive is looking at all the gray mats they have and they are telling me that there are numerous sets off color.

Paul

---

This email and any files transmitted with it are confidential and

intended solely for the use of the individual or entity to whom they

are addressed. If you have received this email in error please notify

the system manager.


This footnote also confirms that this email message has been swept by MIMEsweeper for the presence of computer viruses.

www.cannonauto.co.uk

# EXHIBIT C

**From:** Bob Peacock [mailto:Bob.Peacock@cannonauto.co.uk]
**Sent:** Thursday, November 23, 2006 4:24 PM
**To:** David F. MacNeil
**Cc:** Edward Atkin; Al Thom
**Subject:** Re: Hyundai


I fully agree we need t move forward but a half million dollars is out of my league regardless of the rights or wrongs of this issue.

So whether you see me in Chicago next week is how Edward and you decide the best way forward for both our companies.

Bob
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: David F. MacNeil <dfmacneil@macneil.com>
To: Bob Peacock <Bob.Peacock@cannonauto.co.uk>
CC: Edward Atkin <EdwardAtkin@caholdings.co.uk>; Al Thom <arthom@macneil.com>
Sent: Thu Nov 23 22:06:16 2006
Subject: Re: Hyundai

Bob, I hope you can make it to Chicago, as we all need closure on this issue.
David
--------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Bob Peacock <Bob.Peacock@cannonauto.co.uk>
To: David F. MacNeil
Cc: Edward Atkin <EdwardAtkin@caholdings.co.uk>; Al Thom
Sent: Thu Nov 23 15:11:37 2006
Subject: Re: Hyundai

David I take all your points on board I have no problem in coming to  Chicago next week or at any time. But that must be at the request of Edward.

I will await the outcome of the discussions between yourself and Edward.

Regards.

Bob
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: David F. MacNeil <dfmacneil@macneil.com>
To: Bob Peacock <Bob.Peacock@cannonauto.co.uk>
CC: Edward Atkin <EdwardAtkin@caholdings.co.uk>; Al Thom <arthom@macneil.com>
Sent: Thu Nov 23 20:33:32 2006

Subject: Hyundai

Bob, I read your email to Edward and I would like to invite you to Chicago to immediately observe the destruction of the Hyundai mats and to discuss your points. We have found that we can put about 25 crates in a dumpster. All next week we will be filling dumpster after dumpster. Come on over, meet us on Monday, spend the week and help dump crate after crate over the edge of the dumpster. I personally dumped a few crates over the edge myself.

Were not asking for lost profits, so I'm not sure what the relavence of what we sold them to Hyundai for is? Furthermore, Hyundai's price included many other expenses besides just floormats. Such as Reps, transportation, marketing support, SGA, etc.

The 11500 number, as I understand it was just the part number that represented the new carpet mats. George Kurth, from Hyundai forgot that there was another part number for the "old" style carpet mats that he also had in stock. There is the difference between 18K and 11K
Our inspection process was, at your request, a gentle process and as we all know, if one bends the corner back sharply enough, the carpet will start to release and peel back, so we didn't do that. Furthermore, what might have been stuck or partially stuck at one time, over a number of weeks became unstuck for whatever reason; the wrong glue (off brand or not the right spec), not a thick enough mat to provde enough latent heat for the bonding process or the application of the glue wasn't correct or the rubber compound had a new cost saving plasticizer or the inconsistent procedure for putting the carpet on the rubber mat at the press, or, or, or. It doesn't really matter. The fact is, the carpet was off or coming off on thousands of mats and that's a fact.   The fact is that they came out of your factory under your watch and your responsible for them.

Let's not even go down the road of lost profits, and damage to our reputation and lost future business that totals in the millions!

I personally had my as chewed out by top Hyundai management in person on more than one occasion over the carpet adhesion issue. I have walked into their offices in California and opened sealed bags and the carpet just fell out. I have had their management pound their fists on the table about this. I have had my time and my teams time consumed by this issue.

To avoid a lawsuit from Hyundai, one that they most certainly would win (against both MacNeil and Cannon) I did the right thing and recalled all the mats, both old and new for reinspection. When we received them back, it became apparent that the ONLY solution was to scrap them.

We are asking for a credit from Cannon for the mats, their freight and duties and other associated expenses with this debacle.  I am not asking for lost profits, damage to my reputation or the profits from lost business.

Let us be grateful that they haven't recalled the 80,000 sets that they installed in vehicles.

Finally, we had carpet adhesion issues from the beginning of this program. We notified you of our concerns in this area and we expected that steps would be taken to continually improve this process. The fact is that the initial quality of these mats was poor and it went downhill from there.

I want a fair and equitable solution for both Cannon and MacNeil.

I hope to see you on Monday in Chicago.

David MacNeil
--------------------------
Sent from my BlackBerry Wireless Handheld

# EXHIBIT D

# CANNONAVENT GROUP PLC

FINANCIAL RESULTS 2001

# CANNONAVENT GROUP PLC

Ashley Road, London  N17 9LH England
Tel: 020 8365 5700   Fax: 020 8365 5701

www.avent.co.uk

CANNON AVENT GROUP PLC

# statement from Edward Atkin



*Edward Atkin, Managing Director*

2001 proved to be another excellent year for CANNON AVENT despite the dislocation to world trade resulting from September 11th. Group turnover increased by 26% to £93m, and operating profits increased by 37% to £15.6m. Operating margins increased to 16.8% and gearing remained low at 21%.

For the third year, we appeared in the FT PricewaterhouseCoopers Fast Track 100 as one of the UK's fastest growing private companies in terms of profits. We are one of only 10 companies to qualify for 3 successive years.

Our new multi-award winning baby products factory is now fully equipped with state of the art automation, which has allowed us to increase output substantially without increasing staffing levels.

Whilst the aftermath of September 11th is still slowing growth in some territories, profits for the first quarter 2002 remain on budget and we look forward to continuing our positive trend in both sales and profitability.

Once again, I would like to thank all our employees in the UK, Singapore and the USA who have helped to produce these excellent results.

**Edward Atkin**
Managing Director

# business review

*CANNON AVENT Group plc. manufactures at two sites in the UK and has marketing and distribution subsidiaries in Chicago and Singapore. The Group produces and markets high quality, innovative consumer products under the CANNON and AVENT brands. It also undertakes private label manufacturing for the leading car manufacturers.*



Whilst the Automotive Division did not return to profitability in 2001, mainly due to significant raw material cost increases which we were unable to pass on to our customers, the Automotive plant benefited from major new investment which will help both to improve quality and productivity.

New products and new marketing initiatives are now beginning to show positive results, and for the first time this year we are supplying our high quality car mats to the US OE market.

In Europe, we are continuing to upgrade and improve our product offerings to both major retail chains and the Motor Manufacturers and we expect the trend of increasing profitability experienced in the first quarter, to continue throughout the year.





**Everything you and your car deserve**

# EXHIBIT E

# Response Pack

**You should read the 'notes for defendant' attached to the claim form which will tell you when and where to send the forms**

## Included in this pack are:

- either **Admission Form N9A** (if the claim is for a specified amount) or **Admission Form N9C** (if the claim is for an unspecified amount or is not a claim for money)

- either **Defence and Counterclaim Form N9B** (if the claim is for a specified amount) or **Defence and Counterclaim Form N9D** (if the claim is for an unspecified amount or is not a claim for money)

- **Acknowledgment of service** (see below)

**Complete**

| | |
|---|---|
| If you admit the claim or the amount claimed and/or you want time to pay ▶ | the admission form |
| If you admit part of the claim ▶ | the admission form and the defence form |
| If you dispute the whole claim or wish to make a claim (a counterclaim) against the claimant ▶ | the defence form |
| If you need 28 days (rather than 14) from the date of service to prepare your defence, or wish to contest the court's jurisdiction ▶ | the acknowledgment of service |
| If you do nothing, judgment may be entered against you | |

---

# Acknowledgment of Service

Defendant's full name if different from the name given on the claim form

| In the | HIGH COURT OF JUSTICE QUEEN'S BENCH DIVISION |
|---|---|
| **Claim No.** | HQ07X04142 |
| **Claimant** (including ref.) | CANNON AUTOMOTIVE LIMITED |
| **Defendant** | MACNEIL AUTOMOTIVE PRODUCTS LIMITED |

Address to which documents about this claim should be sent (including reference if appropriate)

WINSTON & STRAWN
99 GRESHAM STREET
LONDON

Tel. no.  020 7105 0000   Postcode EC2V 7NG

| if applicable | |
|---|---|
| fax no. | 020 7105 0100 |
| DX no. | |
| Ref. no. | JEH/KP |
| e-mail | kphillips@winston.com |

### Tick the appropriate box

1. I intend to defend all of this claim ☐

2. I intend to defend part of this claim ☐

3. I intend to contest jurisdiction ☑

(My) (Defendant's) date of birth is [ ][ ][ ][ ][ ][ ][ ][ ]

If you file an acknowledgment of service but do not file a defence within 28 days of the date of service of the claim form, or particulars of claim if served separately, judgment may be entered against you.

If you do not file an application to dispute the jurisdiction of the court within 14 days of the date of filing this acknowledgment of service, it will be assumed that you accept the court's jurisdiction and judgment may be entered against you.

Signed *Kent Phillips*

~~(Defendant)~~(Defendant's solicitor)~~(Litigation friend)~~

| Position or office held (if signing on behalf of firm or company) | PARTNER | 11.01.2008 |
|---|---|---|
| | | **Date** |

The court office at

is open between 10 am and 4 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.