**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MACNEIL AUTOMOTIVE PRODUCTS, LTD., )  | |
| ) | |
| Plaintiff, ) | |
| ) | Judge Joan B. Gottschall |
| v. ) | |
| ) | Case No. 08 C 0139 |
| CANNON AUTOMOTIVE LTD., f/k/a ) | |
| CANNON RUBBER LTD., ) | |
| AUTOMOTIVE DIVISION; C.A. ) | |
| HOLDINGS, plc; and CAH ESTATES (1) ) | |
| LIMITED; United Kingdom Companies, ) | |
| ) | |
| Defendants. ) | |

**<u>MEMORANDUM OPINION & ORDER</u>**

Plaintiff MacNeil Automotive Products Limited ("MacNeil") sued Defendant Cannon Automotive Limited ("Cannon") over defective automobile floor mats produced by Cannon and supplied by MacNeil to auto manufacturers. Before the court is Cannon's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Cannon asks the court to enter judgment in its favor on counts I, IV, V, VI, and VII of MacNeil's complaint and to dismiss counts II and III of the complaint with prejudice.[1] Because Cannon has not shown that MacNeil is unable to establish necessary elements of its claims on which it will bear the burden of proof at trial, the court denies Cannon's motion as to counts I, II, IV, V, VI, and VII. Count III, a promissory estoppel claim, is dismissed without prejudice, as the parties agree that their relationship was contractual.

---

[1] The operative complaint in this case is MacNeil's Third Amended Complaint, filed on June 29, 2012, which added counts VIII-XI against Defendants C.A. Holdings, plc, and CAH Estates (1) Limited. Although Cannon's Motion for Summary Judgment is directed at the First Amended Complaint, Counts I-VII of the First and Third Amended Complaints are identical, and the court will treat the motion as directed at the operative complaint.

## I. BACKGROUND

The following facts are not in dispute, except as otherwise indicated. MacNeil, a manufacturer and supplier of automotive products including floor liners and mats, is an Illinois corporation with its principal place of business in Downers Grove, Illinois. Cannon is a United Kingdom corporation that manufactures and supplies automobile floor mats. Sometime in 1989, MacNeil and Cannon entered into an oral distribution agreement under which Cannon supplied automobile floor mats to MacNeil for resale to end users in the United States.

In May 2004,[2] Hyundai Motors America, Inc., an American affiliate of Korean auto manufacturer Hyundai Motors Corporation ("Hyundai"), awarded MacNeil a contract to supply Hyundai with composite floor mats, consisting of carpet adhered to a rubber base. The mats were to be installed in Hyundai Tucson vehicles delivered to U.S. ports to be sold in the United States. MacNeil engaged Cannon to manufacture and supply the composite floor mats. Cannon was aware that MacNeil intended to re-sell the composite mats to Hyundai. As a first step in the manufacturing process, Cannon created pre-production models of the Hyundai floor mats.[3] Hyundai approved the models, and full-scale production began in 2004.

MacNeil was concerned from the beginning of the Hyundai floor mat program about the fact that Hyundai wanted a combination rubber-carpet mat. Before the Hyundai program, Cannon shipped MacNeil defective product on some occasions, and MacNeil's requests for credit for the defective product were accepted by Cannon. In 2001, MacNeil supplied Land Rover with a rubber-carpet mat manufactured by Cannon and experienced adhesion defects with the mat. Although MacNeil claims that Cannon assured MacNeil that it had fixed the adhesion

---

[2] According to MacNeil, the Hyundai contract was actually executed in June 2004.

[3] Cannon claims that MacNeil provided the specifications for the mats, whereas MacNeil argues that Cannon created the mold and was largely responsible for the design and tooling of the mats.

problems, Cannon denies that MacNeil either sought or received such assurances. In its manufacturing process, Cannon used glue, among other methods, to attach the carpet insert to the rubber base of the composite mats. Cannon supplied MacNeil with technical data on the glue.

Cannon sent its first shipment of Hyundai mats to MacNeil on July 23, 2004. The last shipment was sent on May 17, 2006. Altogether, Cannon delivered 98,895 mats to MacNeil for resale to Hyundai. Starting with the first shipment, the mats exhibited significant adhesion defects. They arrived at MacNeil's facility in Illinois with the carpet not fully glued to the rubber base. Cannon claims that these defects happened "from time to time;" MacNeil states that they happened "nearly always."

MacNeil instituted an inspection program under which its personnel inspected every mat MacNeil received from Cannon upon the arrival of a shipment of floor mats in Illinois. When MacNeil's personnel found a mat with peeling carpet, they attempted to glue the carpet back down using heat guns. MacNeil made a steel plate with handles so that its employees could push down on the mats to try to obtain good adhesion. If MacNeil's repair appeared successful, MacNeil shipped the mat on to Hyundai. According to former Hyundai employee Daniel Boudalis, the mats were not immediately inspected upon arrival at Hyundai, but were stored until they were installed in vehicles. Where MacNeil's attempted repair of the mats failed, MacNeil rejected the mat and sought a credit from Cannon. Cannon fulfilled the credits. Cannon representatives witnessed MacNeil's inspection and repair procedures.

In an email to Cannon dated August 26, 2004, MacNeil's Vice President, Allan Thom, discussed problems MacNeil had discovered in the first shipment of floor mats, including cracks and problems with carpet affixation. The latter problems included corners that were not fully affixed and bubbles or air pockets where the carpet was not adhered to the rubber. The email

3

stated that, of the first crate of eighty sets of mats,[4] only nine sets of mats were perfect, while thirty-nine sets required regluing of the carpet and thirty-two sets had cracks and gluing issues. Thom further stated,

> "Hyundai are a potentially HUGE account for both of us, and they intend to hold all of their suppliers to a higher standard as they continue to raise [their] quality standards. Therefore, we need to look carefully at our processes to eliminate these issues before [the mats] get placed in the crate! . . . I will send over some photographs of more examples of the troubles, but in the meantime, can you sit down with your team and discuss these issues and give us some ideas on solutions?"

Cannon responded that any defects on the mats it had observed in England were within its normal quality levels.

On September 8, 2004, MacNeil's President, David MacNeil, sent Cannon an email, attaching pictures of defective mats. He stated, "Here are some 'winning' photographs of Hyundai mats inspected today. . . . If I didn't so desperately need these mats, I would reject the whole lot. How can the production people and the QC people allow this kind of garbage to leave the factory?" The email continued, "You should be thanking us, really thanking us for performing this inspection process. If we shipped this shit to Hyundai, we would lose a multi million dollar contract immediately and without a second chance!" Mr. MacNeil asked Cannon to send representatives to Chicago to inspect the mats and to ensure that no more defective mats were shipped to Illinois. Cannon responded to Mr. MacNeil's email, apologizing for the adhesion issues and proposing to address the adhesion problem by "add[ing] an extra piece of rubber to enlarge the pressure bead and hopefully retain more heat along the carpet edge."

On October 13, 2004, after receiving a complaint about carpet adhesion from Hyundai, Mr. MacNeil sent Cannon an email stating:

---

[4]     The email refers to the "first crate of 80 mats," but drawing inferences in favor of MacNeil, given the other numbers Thom cites, the court takes this to mean that the crate contained eighty *sets* of mats.

> Cannon is the manufacturer and must have processes in place to absolutely insure the proper bonding of the carpet to the rubber . . . . I have no clue whether 1%, 21% or 51% of the mats already shipped are any good! Time will tell and our reputation will either be left intact or in tatters! I sure hope that what is currently being built is good, really good!

On November 26, 2004, MacNeil sent Cannon a credit note requesting credit for rejected mats and for labor expenses, explaining the adhesion defects and what MacNeil had been doing to try to repair the mats. On February 11, 2005, Thom sent Cannon an email discussing certain defect issues and explaining that "the tooling was modified to increase the 'pad' thickness to get higher latent heat for better carpet adhesion."

On June 18, 2005, Mr. MacNeil sent Cannon an email reporting issues arising during two meetings between MacNeil and Hyundai:

> Bad news. Carpet Adhesion. We (I'm not exaggerating) got completely ripped on about the carpet adhesion. They, yes Hyundai, they bend the corner over and guess what happens? The carpet starts to peel back. We have to supply FEMA results with corrective measures by Monday, end of business. Please help! If you cannot obtain consistently excellent adhesion of the carpet, WE WILL LOSE THE ACCOUNT! We have been put on notice!

The email discussed various ways to improve the glue and ensure proper adhesion and concluded: "Hyundai, the customer considers the carpet adhesion issue a fundamental quality issue! They have requested that we immediately address this issue and improve the product." On October 3, 2005, MacNeil asked Cannon for information with which to defend its production process, as Hyundai had found that the adhesion issue had not been resolved and had requested information on the process.

In or around May 2006, Hyundai complained to MacNeil that the carpet was peeling off the rubber on some of the composite mats in its warehouses. The mats were those that MacNeil had tried to repair at its Illinois facility. On July 4, 2006, Hyundai informed MacNeil that the

carpet adhesion issues were so bad that they were shutting off the entire program. Mr. MacNeil

forwarded these communications to Cannon and stated:

> We think Hyundai fully intends to return $500,000 worth of mats. If they return
> $500,000 in mats, we intend to return to Cannon $500,000 in mats. This issue is
> fully the responsibility of Cannon. The quality of the Hyundai floor mats coming
> out of your factory was inferior, unacceptable, and as Winston Churchill said "We
> are entering the consequences phase." We have notified Cannon multiple times
> over the past few years of the inconsistency of the carpet adhesion . . . We are not
> the manufacturer of the floormats, Cannon is, but we are stuck trying to formulate
> a plan that Hyundai will accept to QC the mats AGAIN and to repair (re-glue) any
> defective product. Thanks to this Cannon caused situation, we will NEVER do
> business again with Hyundai . . . [W]hat is YOUR solution to this crisis?"

After Cannon responded and offered no suggestions, Mr. MacNeil wrote again stating:

> [T]he quality responsibility rests 100% with Cannon and I expect that Cannon
> will financially stand behind the product and all of the expenses associated with
> dealing with this issue. My guess is that Hyundai may sue MacNeil and also
> Cannon. THIS is what we are trying to prevent. Since you don't have a plan,
> here's mine: If Hyundai allows us, Cannon will sen[d] over 3 of 4 top people to
> personally inspect and repair, by a mutually agreeable method at Hyundai's
> locations, all 11,500 sets that Hyundai has in stock. My guess is that this will take
> a month. Who is coming and when?

On July 6, 2006, Hyundai sent MacNeil an email reaffirming the shut-off of the program

and stating: "We have conducted an inspection of 50 mats at each port. We have results back

from four of our ports today and 80-100% of the mats inspected exhibit carpet separation." In a

July 2006 email to Hyundai, Mr. MacNeil expressed skepticism that Hyundai had a legal right to

reject the floor mats, but agreed that MacNeil would send representatives to Hyundai's

warehouses to address Hyundai's problem with carpet delamination on the Cannon-

manufactured mats. Cannon did not send anyone to inspect the defects or otherwise assist

MacNeil during its visit to Hyundai.

When MacNeil's employees inspected the mats at Hyundai facilities, they found adhesion defects. MacNeil had brought its heat guns and metal tool and conducted the repair process, with a group of Hyundai employees witnessing the repairs. The day the repairs were made, the carpet appeared to be adhered. But the next day, the carpet was again detaching from the rubber, and the adhesion had not taken. MacNeil became concerned that the mats were not amenable to repair. During one meeting with Hyundai, a senior Hyundai executive pounded his fist on the table and shouted at MacNeil's executives in Korean. MacNeil's Korean engineer translated that MacNeil was "finished as a supplier."

From July to September 2006, MacNeil contacted various glue manufacturers and other independent contractors to try to find a process to ensure that the carpet would adhere properly to the rubber floor mat. MacNeil's attempts to fix the problem did not work. On August 3, 2006, Thom told Cannon by email that MacNeil had suggested to Hyundai that it could modify the tooling and provide "a one-for-one replacement for defective carpet mats with rubber."

In August 2006, nearly two years after receiving the first shipment of composite mats from MacNeil, Hyundai purported to reject all 16,722 mats that had accumulated in its inventory. MacNeil and Hyundai agreed that Hyundai would return all the composite mats in its possession to MacNeil, and that MacNeil would reinspect each mat and return to Hyundai only mats found to be free of carpet adhesion defects.

On September 6, 2006, Thom sent Cannon an email, forwarding a discussion from a glue expert, and expressed concern that the mats were not repairable: "As much as the adhesion appeared pretty good overnight, if you checked the mat a week later, the carpet was separating again! So the question remains, are the mats repairable???" Thom added that due to these defect issues, MacNeil had lost several other projects that it was scheduled to do for Hyundai.

In October and November 2006, Hyundai returned all the composite mats still in its possession to MacNeil. This return included approximately 7,000 older model mats, the most recent shipment of which had been in August 2005. MacNeil received so many pallets of mats from Hyundai that it had difficulty conducting its normal business.

Cannon was not a party to any finalized agreement between MacNeil and Hyundai with regard to how to resolve the adhesion defect issue. Mr. MacNeil emailed Cannon three times, explaining how many mats were being returned and that MacNeil was going to credit Hyundai for the mats. He received no response from the owner of Cannon to the emails he sent.

On November 23, 2006, Mr. MacNeil invited Cannon to send a representative to Chicago to observe the destruction of the returned mats and assist in their disposal. He wrote in an email:

> We had carpet adhesion issues from the beginning of this program. We notified you of our concerns in this area and we expected that steps would be taken to continually improve this process. The fact is that the initial quality of these mats was poor and it went downhill from there. I want a fair and equitable solution for both Cannon and MacNeil. I hope to see you on Monday in Chicago.

Cannon's Operations Manager, Bob Peacock, testified at deposition that he was ready to come to Chicago at this time, but that Edward Atkin, Cannon's owner, told him, "You will not be going to Chicago."

After the mats were returned by Hyundai, MacNeil employee Daniel Barton testified at deposition that MacNeil "went through hundreds of them" and then, after a decision was made to destroy the mats, "cut every individual mat." (Def.'s Rule 56.1(a)(3) Statement of Facts Ex. I (Barton Dep.) 112:7-113:15, ECF No. 347-4.) Barton testified that "random samples" of the mats were kept. (*Id.* at 115:9.) MacNeil did not keep a record of each individual mat and whether it was defective. After disposing of the mats, MacNeil offered to supply Hyundai with replacement product.

Stephen Lee, a former Hyundai executive who was the senior parts coordinator for Hyundai during the floor mat program, is currently President of Mobis Parts America, LLC ("Mobis"), the company that makes all product sourcing decisions for Hyundai. Allan Thom testified at deposition that MacNeil has not been awarded any new business from Hyundai. (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 2 (Thom Dep.) 135:7-20, ECF No. 404-1.) Retired Hyundai employee Ted Boudalis, who was involved in the floor mat program, agreed during his deposition that the floor mat program was "a significant black mark on MacNeil's record with Hyundai" and that it was "unlikely" that MacNeil would do business with Hyundai in the future. He stated that Mr. Lee was "very vocal about the failure of these parts and MacNeil's failure to produce such a product" and "was very, very unhappy." He further testified that Lee said that MacNeil had "very bad quality" and that Hyundai would "never buy anything from them again."

Mobis employee Inger Nelson testified at deposition that Mobis does business with MacNeil and that she was not aware of any instruction not to do business with MacNeil. (Defs.' Rule 56.1(a)(3) Statement of Facts Ex. Q (Nelson Dep.) 20:16-17, ECF No. 347-6.) Nelson also testified, however, that she had not spoken with Mr. Lee with regard to her testimony and that her group at Mobis did not make decisions about sourcing accessories from third-party vendors. (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 7 (Nelson Dep.) 28:10-23, ECF No. 404-3.)

In addition to its work for Hyundai, MacNeil has since 2001 supplied BMW with rubber floor mats manufactured by Cannon. In Fall 2005, and again in Fall 2006, MacNeil received shipments of rubber mats from Cannon containing some discolored mats. In March 2006, MacNeil contacted Cannon to report that it received a shipment of mats in which the back set of mats and the front set of mats did not match in color. At some time prior to October 2007, Cannon provided replacements or credits to BMW for all defective BMW mats. On October 9,

2007, MacNeil presented Cannon with a breakdown of a claim including approximately $11,000 for damages stemming from defective BMW mats.

MacNeil's expert, John P. Garvey of Navigant, tendered a report stating that MacNeil lost significant profits from potential future sales to both Hyundai and BMW as a result of defect issues, in an amount totaling $9,400,000. Cannon admits that the report has been tendered, but it disputes the assumptions underlying Garvey's calculations and argues that the defects at issue did not cause the losses.

In October 2007, Cannon was in possession of some of MacNeil's tool sets, used for compression molding of rubber mats. On October 9, 2007, Cannon and MacNeil met in Illinois to discuss, among other matters, the parties' dispute about unpaid invoices owed to Cannon by MacNeil.[5] After that meeting, Cannon sued MacNeil in the United Kingdom under a breach of contract theory to collect the balance of the unpaid invoices. While that suit was pending, MacNeil filed suit in this court on January 7, 2008. On March 20, 2008, Cannon obtained a judgment in the United Kingdom against MacNeil in the amount of £425,106.12. On March 25, 2008, Cannon's English solicitors sent MacNeil a letter offering to return MacNeil's tools if MacNeil paid the U.K. judgment.

Cannon successfully registered the U.K. judgment before the Circuit Court of DuPage County. MacNeil attempted to stay enforcement of the judgment in the state court pending resolution of its federal claims, but the state court denied its motion, stating that MacNeil's arguments would be more appropriately presented to the federal court. The Illinois Court of Appeals upheld that decision. On June 3, 2011, MacNeil filed an emergency motion asking this court to stay enforcement of the U.K. judgment, expressing concern that Cannon might have no assets to pay MacNeil should MacNeil prevail on its federal claims. (ECF No. 285.) In lieu of

---

[5]     MacNeil contends that the unpaid invoices reflected credit due to MacNeil for defective mats.

the court granting that motion, by agreement of the parties, MacNeil posted a bond with the court's registry on July 8, 2011, in the amount of $1,650,000.00, pursuant to Federal Rule of Civil Procedure 64 and Illinois' prejudgment attachment statute, pending the resolution of MacNeil's federal lawsuit and claim for a declaratory judgment of a setoff.  (ECF No. 307.)

The parties dispute how many of MacNeil's tools Cannon has held or currently holds. Cannon argues that MacNeil was aware prior to 2010 that Cannon was holding its tools pending payment of monies MacNeil owed to Cannon.  MacNeil contends that it was not aware that Cannon was claiming a lien on MacNeil's tools.  MacNeil's Director of Tool Design and Engineering inspected the tools still held by Cannon in England and issued a report dated July 31, 2012, concluding that the tools were severely neglected and are now ruined for purposes of injection molding.[6]

## II. JURISDICTION

This court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the action involves a citizen of the United States and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The court has personal jurisdiction over Cannon because Cannon has engaged in systematic and continuous business transactions in Illinois.  Venue is proper in the Northern District of Illinois pursuant to 29 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to MacNeil's complaint occurred in this judicial district.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;

---

[6]     Cannon admits that the report was submitted but calls it "irrelevant" to this motion.

*Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is called for when the nonmoving party is unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. ANALYSIS

### A. Counts I, IV, V, and VI (Breach of Contract, Express Warranty, Implied Warranty of Merchantability, and Implied Warranty of Fitness for a Particular Purpose)

In counts I, IV, V, and VI of its Third Amended Complaint, MacNeil alleges breach of contract and other violations of the Illinois Uniform Commercial Code ("Illinois UCC"), which governs contracts for the sale of goods in Illinois. In count I, MacNeil claims that MacNeil and Cannon entered into an oral agreement in Spring 2004, whereby Cannon agreed to supply composite floor mats to MacNeil to be re-sold to Hyundai, and that MacNeil and Cannon also entered into an oral agreement whereby Cannon agreed to supply MacNeil with all-rubber floor mats for BMW. MacNeil alleges that the contracts are evidenced by Cannon's acceptance of MacNeil's purchase orders and shipment of product to MacNeil. MacNeil further alleges that Cannon breached the contracts, as well as an implied covenant of good faith and fair dealing under the contracts, by delivering defective floor mats to MacNeil for both BMW and Hyundai vehicles and by failing to deliver the floor mats in a timely fashion.

In count IV, MacNeil alleges that by delivering defective floor mats for the Hyundai vehicles, Cannon breached its express warranty to MacNeil that the carpet would properly adhere to the rubber floor mat, in violation of section 2-313 of the Illinois UCC, 810 Ill. Comp. Stat. 5/2-313. According to MacNeil, that warranty formed the basis of the bargain between MacNeil

and Cannon.  In count V, MacNeil alleges that, through its sale of defective floor mats for the Hyundai and BMW projects, Cannon breached its implied warranty of merchantability to MacNeil, in violation of section 2-314 of the Illinois UCC, 810 Ill. Comp. Stat. 5/2-314. MacNeil alleges that Cannon warranted that the floor mats would be fit for the ordinary purposes for which such goods are used.  Finally, in count VI, MacNeil alleges that Cannon breached its implied warranty of fitness for particular purpose, in violation of section 2-315 of the Illinois UCC, 810 Ill. Comp. Stat. 5/2-315, by selling MacNeil floor mats that Cannon knew at the time of shipment did not meet MacNeil's, Hyundai's, or BMW's particular purpose for which the goods were required, when MacNeil was relying on Cannon's skill to furnish such suitable goods.  MacNeil alleges that it reasonably and  justifiably relied on Cannon's warranties and representations that Cannon's products would be free of defects, that the carpet would adhere to the rubber floor mat for the Hyundai vehicles, and that the colors of the mats would match for the BMW vehicles and would be consistent with a defined standard.

1.  Notice

Cannon argues that it is entitled to summary judgment on counts I, IV, V, and VI, because under the Illinois UCC, a plaintiff must notify the seller within a reasonable time after discovery of a breach.  Cannon claims that MacNeil sent defective floor mats received from Cannon on to Hyundai rather than allowing Cannon to repair or replace the mats.  Cannon claims that the defects in the Hyundai mats did not come to Cannon's attention until May 2006 at the earliest, when Cannon was "suddenly faced with claims of defect months and years after the original manufacture."  (Defs.' Mot. for Summ. J. at 12, ECF No. 346.)

The Illinois UCC provides that, where a tender of goods has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the

seller of breach or be barred from any remedy[.]"  810 Ill. Comp. Stat. 5/2–607(3)(a).  Direct notice is not required, however, when the seller has actual knowledge of the problem.  *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 589 (Ill. 1996).  In *Connick*, the Illinois Supreme Court clarified what constitutes actual knowledge of a breach of contract, holding that "the notice requirement of [5/2-607] is satisfied only where the manufacturer is somehow apprised of the trouble with the particular product purchased by a particular buyer."  *Id*. at 590.  Although it is not necessary to list specific claims of breach when giving notice, "it is essential that the seller be notified that this particular transaction is 'troublesome and must be watched.'"  *Id*. (quoting 810 Ill. Comp. Stat. 5/2-607 cmt. 4).  The notice requirement provides the seller with an opportunity to cure a defect and favors settlement of disputes over litigation.  *Id.* at 589-90.

Contrary to Cannon's assertions, MacNeil has presented evidence that it notified Cannon of the defects in the Hyundai mats.  MacNeil sent Cannon an email regarding the carpet adhesion defects after receiving the very first shipment of mats in August 2004.  Another email with photos of the defects was sent by Mr. MacNeil on September 8, 2004.  Cannon responded to Mr. MacNeil's email, apologizing for the adhesion issues and proposing to address the adhesion problem by "add[ing] an extra piece of rubber to enlarge the pressure bead and hopefully retain more heat along the carpet edge."  Cannon admits that these emails contained the statements attributed to them.  Drawing inferences in MacNeil's favor for purposes of the motion for summary judgment, Cannon was notified by MacNeil that the adhesion defect needed to be cured, and was given the opportunity to investigate the alleged breach, attempt to cure the defect, and minimize damages.

Cannon further argues that the notice MacNeil provided was not adequate because MacNeil "blithely" scrapped the mats produced by Cannon in their entirety rather than

ascertaining the extent to which the mats had failed. Cannon is correct that MacNeil did not document the defects in each and every individual floor mat. The undisputed facts show that in October and November 2006, Hyundai returned thousands of composite mats to MacNeil. MacNeil received so many pallets of mats from Hyundai that it had difficulty conducting its normal business. Mr. MacNeil emailed Cannon three times—in a tone that was anything but blithesome—explaining how many mats were being returned and that MacNeil was going to credit Hyundai for the mats. According to MacNeil, Cannon did not respond. On November 23, 2006, Mr. MacNeil invited Cannon to send a representative to Chicago to observe the destruction of the returned mats and assist in their disposal. But Cannon did not send a representative to Chicago. After the mats were returned by Hyundai, MacNeil went through hundreds of them before deciding to destroy most of them, keeping random samples.

Drawing inferences in favor of MacNeil, as the non-moving party, a finder of fact could conclude that MacNeil reported to Cannon that the problems with carpet adhesion were widespread and invited Cannon to come to Chicago to inspect the mats as early as 2004. Cannon, however, refused to participate in repairs and inspections of the mats. The record supports the inference that Cannon was given notice of the extent of the defects numerous times between 2004 and 2006 and deliberately turned a blind eye to those defects, until MacNeil ultimately determined that the defects were so widespread that it had no option but to destroy the mats. Cannon's argument that the notice was insufficient because the mats were destroyed fails because Cannon was given the opportunity to inspect the mats for itself before their destruction and declined to do so.

2.   Lost Profits and Future Business Opportunities

MacNeil seeks actual and consequential damages that include lost profits, lost business opportunities, and damage to its reputation.  Cannon argues that MacNeil has failed to point to evidence that establishes that it suffered reputational damages or loss of future business opportunities as a result of the defective floor mats.  Cannon asks the court to bar MacNeil from seeking such damages.

In order to recover damages for breach of contract under Illinois law, MacNeil must establish that it sustained damages, as well as "'a reasonable basis for computation of those damages.'"  *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007) (quoting *Ellens v. Chi. Area Office Fed. Credit Union*, 576 N.E.2d 263, 267 (Ill. 1991)).  Lost profits must be proven with a "reasonable degree of certainty," and the court must be "'satisfied that the wrongful act of the defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into.'"  *Id.* (quoting *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1235 (Ill. 1992)).

Cannon argues that MacNeil has presented no evidence that Hyundai or BMW diverted future business away from MacNeil as a result of the defects in Cannon-supplied products.  MacNeil, however, points to the deposition testimony of Hyundai employee Ted Boudalis, who stated that that the floor mat program was "a significant black mark on MacNeil's record with Hyundai" and that it was "unlikely" that MacNeil would do business with Hyundai in the future.  Boudalis further stated that the senior parts coordinator for Hyundai during the floor mat program was "very vocal about the failure of these parts and MacNeil's failure to produce such a product" and "was very, very unhappy."  MacNeil also presented evidence that it was not awarded certain new contracts for other Hyundai vehicles.  Allan Thom testified at deposition

that MacNeil has not been awarded any new business from Hyundai. MacNeil also submitted a report on damages from its expert, John Garvey. The report opined that, after 2006, although MacNeil continued to do business with Hyundai and BMW, MacNeil experienced a loss in its percentage of the volume of rubber floor mats that were supplied to the two auto manufacturers.

Although Cannon calls MacNeil's allegations of lost business volume entirely speculative, the court finds that MacNeil has presented evidence supporting the inference that its relationship with Hyundai and BMW was harmed by the defects in Cannon-supplied floor mats, as well as evidence that "afford[s] a reasonable basis for the computation of damages." *Id.* at 632-33. MacNeil's expert compared the percentage volume of business MacNeil received from the auto manufacturers before and after the defect issues to estimate MacNeil's lost sales. This is more than sheer "conjecture or speculation," which the Illinois Supreme Court has rejected as a basis for recovery of lost profits. *Tri–G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) ("[L]ost profits cannot represent hopes rather than the results of scientific analysis."). Although Cannon may disagree with the assumptions on which MacNeil's expert based his calculations of lost profits, Cannon may attack the assumptions underpinning the expert's report at trial. The court finds that MacNeil has presented sufficient evidence that it suffered lost profits to survive a motion for summary judgment.

3. Accord and Satisfaction

Cannon argues that the doctrine of "accord and satisfaction" bars all claims related to floor mats supplied to BMW, because every breach of warranty issue was resolved prior to a meeting between the parties in October 2007. In support of this argument, Cannon cites the fact that prior to October 2007, Cannon provided replacements or credits to BMW for all defective

BMW mats, a fact that MacNeil admits. MacNeil contends, however, that it also suffered lost profits and damage to its reputation as a result of the defect issues.

Under Illinois law, an accord and satisfaction is a contractual method of discharging a debt or claim that requires: "(1) a bona fide dispute, (2) an unliquidated sum, (3) consideration, (4) a shared and mutual intent to compromise the claim, and (5) execution of the agreement." *Saichek v. Lupa*, 787 N.E.2d 827, 832 (Ill. 2003). These elements are not met here. Cannon has presented no evidence that MacNeil and Cannon agreed that the credits provided to BMW by Cannon would constitute a full satisfaction of MacNeil's claims regarding the defective BMW mats. Therefore, Cannon has not demonstrated that the doctrine of accord and satisfaction applies to bar MacNeil's claims regarding the BMW mats.

## B. Count VII (Conversion)

MacNeil alleges that Cannon wrongfully assumed control of approximately fifty-two of its compression mold tools valued at approximately $2,800,000.00, and that Cannon has refused to return the tools and has ruined them by exposing them to the elements. In order to prevail on a conversion claim under Illinois law, MacNeil must show that it has a right to the property and to its immediate possession, that it has made a demand for possession, and that Cannon "wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 707 N.E.2d 67, 70 (Ill. 1998). As explained by the Illinois Supreme Court in *Loman v. Freeman*, a conversion claim exists not only where a defendant exercises dominion over property, but also where the defendant "'intentionally destroys a chattel or so materially alters its physical condition as to change its identity or character.'" 890 N.E.2d 446, 461 (Ill. 2008) (quoting Restatement (Second) of Torts § 226).

Cannon argues that it is entitled to summary judgment on count VII because MacNeil did not have a right to immediate possession of its tools. Cannon claims that it acted within its rights in retaining possession of the tools under the Illinois Tool and Die Lien Act, 770 Ill. Comp. Stat. 105/1, which grants a manufacturer a statutory possessory lien over any debtor's tooling in order to secure payment for work performed to produce goods on the debtor's behalf. Thus, Cannon argues, it was entitled to retain possession of the tools for as long as MacNeil's debt remained outstanding. Cannon argues that it released its lien on the tools in July 2010 and that MacNeil failed to collect the tools.

A prerequisite to enforcing a lien pursuant to 105/1 is that the customer be provided with notice in writing stating that a lien is being claimed and including a demand for payment. 770 Ill. Comp. Stat. 105/3. Cannon argues that MacNeil was aware that Cannon would retain its tools pending resolution of any dispute about payment, and it points to a letter sent to MacNeil by Cannon's solicitors stating that Cannon was prepared to deliver the tooling to MacNeil upon receipt of £425,106.12 that Cannon claimed MacNeil owed in unpaid invoices. Cannon further argues that notice is not required for a lien to attach under the Illinois Tool and Die Act.

MacNeil denies that Cannon gave it any notice that a lien on its tools was being claimed. The letter sent by Cannon's solicitors to MacNeil makes no mention of a lien or the Illinois Tool and Die Lien Act. MacNeil also points out that Cannon has presented no evidence that all of the tools were subject to a lien, and it disputes whether all the tools would have been covered by any lien that Cannon could assert. MacNeil further argues that Cannon has apparently lost or spoiled some of the tools. MacNeil's tooling expert's report stated that the tools were severely neglected or intentionally disregarded, rendering them useless. According to MacNeil, even if Cannon had

a valid lien on the tools, it was not entitled to destroy the tools so that MacNeil could not collect them even after satisfying Cannon's demand for payment.

The court concludes that, construing the facts in MacNeil's favor, a trier of fact could conclude that Cannon gave MacNeil no notice that it was exerting a lien on MacNeil's tools. Even if notice was not required for the lien to attach, the Illinois statute requires that notice be provided before a lien is enforced. Given this requirement, the court concludes that Cannon was not entitled to destroy or dispose of MacNeil's tools without notice. Questions of fact also exist as to whether all of the tools were covered by a lien, and whether Cannon deliberately neglected the tools so that they were rendered useless to MacNeil. Moreover, Cannon states that it released its lien on the tools in July 2010. Cannon may have destroyed or lost the tools after that date, at which time MacNeil was entitled to their possession. On these facts, Cannon cannot claim that any lien it might have had on the tools operates as a defense to Cannon's conversion claim. The court therefore denies Cannon summary judgment on count VII of the Third Amended Complaint.

## C. Count II (Declaratory Judgment)

In count II of the Third Amended Complaint, MacNeil seeks a declaration that MacNeil does not owe Cannon any monies for outstanding invoices for floor mats. These unpaid invoices were the subject of the action brought by Cannon against MacNeil in the United Kingdom, which resulted in a judgment in Cannon's favor in the amount of £425,106.12. MacNeil claims that, given the damages Cannon has caused MacNeil that form the subject of this action, it is entitled to a full set-off of the amount of the U.K. judgment.

Cannon claims that MacNeil has no legal right to a set-off, and that count II is moot because there is no actual controversy between the parties as to whether MacNeil can offset its

claims in this case against the debt it owes Cannon for unpaid invoices. In support of its argument, Cannon states that the Illinois Court of Appeals "decisively ruled that no setoff existed under Illinois law." (Def.'s Mot. for Summ. J. at 17.)

This court finds no such language in the Illinois court's decision, which simply upheld the state trial court's denial of MacNeil's motion to stay enforcement of the U.K. judgment. The Illinois court never stated that no setoff was possible. Rather, it stated that it fell to *this* court to decide whether to stay the enforcement of the foreign judgment pending the resolution of MacNeil's claims in federal court. In its order of May 25, 2010, this court denied Cannon's motion to dismiss Count II, stating:

> [T]here is a very real controversy between MacNeil and Cannon regarding whether MacNeil is obligated to pay Cannon based on the foreign judgment, given that MacNeil contends it is entitled to set off amounts Cannon owes to it against any payments it owes to Cannon. Moreover, it does not appear that the setoff issue has been litigated either in the British court or in the Circuit Court of DuPage County, where Cannon registered the foreign judgment.

(Mem. Op. & Order May 25, 2010 at 6, ECF No. 151.)

After MacNeil moved in June 2011 to enjoin Cannon from enforcing the U.K. judgment until this court had ruled on MacNeil's set-off claim, the parties agreed on July 1, 2011, that MacNeil would post a bond with the court's registry pursuant to Federal Rule of Civil Procedure 64 and 735 Ill. Comp. Stat. 5/4-101(1). Rule 64 provides that every prejudgment remedy available under state law is also available to litigants in federal court. The Illinois attachment statute, 735 Ill. Comp. Stat. 5/4-101, provides that a creditor with a claim exceeding $20 may attach property of the debtor where the debtor is not a resident of Illinois. In this case, the attachment procedure was employed in lieu of the court enjoining enforcement of the U.K. judgment.

Cannon now argues that because this court did not enjoin Cannon from enforcing the U.K. judgment against McNeil, and because MacNeil posted a bond consisting of the proceeds of the judgment and additional security, MacNeil's declaratory judgment claim is moot. Cannon is misrepresenting the record in both the state court and this court. The court adheres to its earlier conclusion that a "real controversy" exists as to whether MacNeil is entitled to a set-off. Cannon's motion to dismiss count II is denied.

### D. Count III (Promissory Estoppel)

In count III, MacNeil claims that because MacNeil justifiably relied on Cannon's representations and promises regarding floor mats for the Hyundai and BMW vehicles, Cannon's promises must be enforced to avoid injustice. Count III is pleaded in the alternative to MacNeil's breach of contract claim. Cannon claims that MacNeil's promissory estoppel claim fails because the parties agree that the relationship between them is contractual. Where a contract exists, promissory estoppel may not be invoked. *See Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 526 (Ill. 2009) (explaining that promissory estoppel provides a remedy where there is no mutual agreement on the essential terms of a contract). MacNeil agrees that if Cannon concedes that the parties had a contract with regard to the BMW and Hyundai floor mat programs, the promissory estoppel claim should be dismissed. The court concludes that the undisputed facts establish that a contract existed between the parties, and it dismisses count III accordingly. The dismissal, however, is without prejudice. Should Cannon attempt to disclaim the existence of a contract, MacNeil will be entitled to reassert its promissory estoppel claim.

## IV. CONCLUSION

The court denies Cannon's motion for summary judgment as to Counts I, II, IV, V, VI, and VII of MacNeil's Third Amended Complaint.  Count III is dismissed without prejudice.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   October 26, 2012